| | |
|---|---|
| 1 | ROBBINS GELLER RUDMAN<br>  & DOWD LLP |
| 2 | DENNIS J. HERMAN (220163)<br>WILLOW E. RADCLIFFE (200087) |
| 3 | JOHN H. GEORGE (292332)<br>Post Montgomery Center |
| 4 | One Montgomery Street, Suite 1800<br>San Francisco, CA  94104 |
| 5 | Telephone:  415/288-4545<br>415/288-4534 (fax) |
| 6 | dennish@rgrdlaw.com<br>willowr@rgrdlaw.com |
| 7 | |
| 8 | Lead Counsel for Plaintiffs |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 11 | MARK STOYAS and NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND, | ) ) ) ) |
| 13 | Plaintiffs, | ) ) |
| 14 | and | ) ) |
| 15 | AUTOMOTIVE INDUSTRIES PENSION TRUST FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| 17 | Lead Plaintiff, | ) ) |
| 18 | vs. | ) ) |
| 19 | TOSHIBA CORPORATION, | ) ) |
| 20 | Defendant. | ) ) |
| 21 | | ) |

Case No. 2:15-cv-04194-DDP(JCx)

<u>CLASS ACTION</u>

<u>AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS OF THE UNITED STATES AND JAPAN</u>

<u>DEMAND FOR JURY TRIAL</u>

1090890_1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................. 1

II.    JURISDICTION & VENUE .............................................. 4

III.   PARTIES ........................................................................... 6

    A.   Plaintiffs ................................................................. 6

    B.   Defendant Toshiba and Its Business ...................... 7

IV.    OVERVIEW OF SCHEME TO DEFRAUD ................... 11

    A.   Government Inquiry Sparks Widening Probes into Toshiba's Fraudulent Accounting ......................... 11

    B.   Investigators Find that Toshiba Deliberately Inflated Profits by Forcing Subsidiaries to Misrepresent Their Financial Results .......... 16

    C.   Toshiba Admits Wrongdoing; Fires, Disciplines, and Sues Its Top Executives ................................ 21

    D.   Toshiba Restates Five Years of Results ............... 24

    E.   Toshiba Belatedly Reveals Westinghouse Goodwill Impairment ...... 27

V.     FRAUDULENT STATEMENTS, OMISSIONS & COURSE OF BUSINESS DURING THE CLASS PERIOD ............................ 35

    A.   False Financial Statements ................................... 36

        1.   False Annual Financial Reports ................. 39

        2.   False Quarterly Financial Reports ............. 41

    B.   False Statements About Westinghouse Goodwill Impairment .......... 43

        1.   Failure to Disclose or Record Goodwill Impairment Charges in FY12 and FY13 ...... 43

        2.   Continuing Concealment of Goodwill Impairment Charges During 2015 Investigations of Accounting Fraud ...... 47

    C.   False Statements About Internal Controls ........... 52

VI.    SUMMARY OF ACCOUNTING FRAUD ................... 58

    A.   False Accounting of Percentage of Completion Contracts ................ 60

        1.   Westinghouse ("Project G") ....................... 62

        2.   Landis + Gyr ("Project H") ........................ 63

1

2                                                                    **Page**

3              3.     TIC America ("Project I") ........................................ 64

4              4.     Other Instances of False POC Accounting .............................. 65

5      B.     Cookie Jar Accounting in Visual Products Business ......................... 67

6      C.     Channel Stuffing in PC Business ........................................ 70

7      D.     Failure to Report Westinghouse Goodwill Impairment Charges,
8             or to Record Charges on Consolidated Financial Statements ............. 75

9      E.     Other False Accounting Practices ........................................ 79

10             1.     Failure to Record Asset Impairment Charges ........................ 79

11             2.     Failure to Devalue Obsolete Semiconductor Inventory .......... 80

12             3.     Recognition of Phantom Profits in the Visual Products
              Business ........................................................... 82

13             4.     Improper Deferral of Operating Expenses in the PC
14            Business ........................................................... 83

15             5.     Manipulation of Foreign Currency Exchange Rates ............... 83

16             6.     Delayed Charge and Expense Recognition .............................. 84

17  VII.   PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET) ............. 85

18  VIII.  LOSS CAUSATION & DAMAGES ............................................ 88

19  IX.    CLASS ACTION ALLEGATIONS ............................................. 98

20  X.     CLAIMS FOR RELIEF ...................................................... 101

21  XI.    PRAYER FOR RELIEF ...................................................... 106

22  XII.   JURY DEMAND ............................................................ 107

23

24

25

26

27

28

1090890_1

# I.    INTRODUCTION

1.      This is a class action complaint seeking damages from Toshiba Corporation ("Toshiba" or the "Company") for violation of the U.S. Securities Exchange Act of 1934 ("Exchange Act") and the Financial Instruments & Exchange Act of Japan ("JFIEA").

2.      The claims alleged herein are brought on behalf of the class of persons defined in ¶270 below (the "Class"), which consists of: (i) all persons who acquired Toshiba American Depository Shares or Receipts (collectively, "ADSs") between May 8, 2012 and November 12, 2015, inclusive (the "Class Period"); and (ii) all citizens and residents of the United States who otherwise acquired shares of Toshiba common stock during the Class Period.

3.      This case arises from Toshiba's deliberate use of improper accounting over a period of at least six years to inflate its pre-tax profits by more than $2.6 billion (¥225 billion) and conceal at least $1.3 billion (¥128.2 billion) in impairment losses at its U.S. nuclear business, Westinghouse Electric Co. ("Westinghouse").

4.      The Company's accounting fraud was orchestrated by three successive CEOs of Toshiba and dozens of top executives who directed the manipulation of financial results reported by scores of Company subsidiaries and business units.  An internal investigation concluded that the fraudulent accounting had been "carried out . . . in an institutional manner" under an oppressive command and control environment in which subsidiaries and subordinates were required to falsify financial results in order to demonstrate purported compliance with profit projections that Toshiba's senior management had established knowing the targets were unattainable under current business conditions.  Investigators found that Toshiba's control over the accounting fraud was so strict that "correcting such situation became practically impossible."

5.      Toshiba's accounting fraud was uncovered by a series of investigations that took place beginning in February 2015.  The ever-widening probe quickly

1    revealed numerous instances of deliberate violations of generally accepted accounting

2    principles ("GAAP") carried out at the direction or with the knowledge and approval

3    of Toshiba's most senior executives, including CEOs Atsutoshi Nishida, Norio Sasaki,

4    and Hisao Tanaka; Audit Committee Chairman Fumio Muraoka; and CFO Makoto

5    Kubo, who was also the Company's chief conference call spokesman during the Class

6    Period.

7         6.    The investigations resulted in the September 7, 2015 restatement of more

8    than six years of reported financial results that eliminated approximately one-third

9    ($2.6 billion) of the profits Toshiba had reported from 2008 to 2014.  In issuing the

10   restatement, Toshiba assured investors that there was no need to write down the

11   $2.8 billion (¥344 billion) in goodwill still carried on Toshiba's books as a result of its

12   2006 acquisition of Westinghouse, falsely claiming that its nuclear business had

13   strengthened since the acquisition, even after the March 2011 meltdown of the

14   Fukushima Daiichi nuclear reactor.  It was not until Toshiba issued its 2Q15 results on

15   November 6, 2015 that it admitted that, in fact, Westinghouse had written down

16   goodwill in both FY12 and FY13.  (Those charges were neither disclosed nor reflected

17   in Toshiba's financial statements at the time they were taken.)  Six days later, on

18   November 12, a shocking report in the Nikkei Business journal revealed that the secret

19   write-downs had totaled $1.3 billion: $926 million in FY12 and $400 million in FY13.

20   Toshiba has since admitted that it should have disclosed the FY12 impairment charges

21   at the time Westinghouse recorded the write-down.

22        7.    The fraudulent accounting practices described herein were ingrained in

23   Toshiba's business and carried out for the purpose of meeting earnings forecasts that

24   were unattainable by any other means.  As detailed in the report of an independent

25   committee formed to investigate the fraud, Toshiba deliberately violated GAAP by

26   failing to timely record losses on unprofitable construction contracts; channel stuffing

27   manufacturing parts sold at inflated prices; deferring operating expenses until they

28   could be reported without causing an earnings loss; failing to record charges for

- 2 -

obsolete inventory or impaired assets; manipulating foreign currency conversion rates; and engaging in the other fraudulent practices alleged herein. *See* Ex. 1 to the Appendix of Exhibits ("Appendix" or "Apx.") to this Complaint; *infra* §VI.

8.     By deliberately overriding its own internal control procedures and taking advantage of known internal control weaknesses that it deliberately failed to correct, Toshiba was able to inappropriately consolidate its subsidiaries' results into its own financial statements while avoiding detection by investors or, in many instances, outside auditors.

9.     When auditors recognized an overstatement of earnings on a Westinghouse project in FY13, Toshiba refused to apply the correct accounting in order to avoid a negative earnings impact, and then pressured the auditor to ignore the deliberate overstatement by improperly classifying it as an immaterial error. When U.S. auditors ordered Westinghouse to write down its goodwill based on worsening business conditions, Toshiba similarly threatened to replace its outside auditor in an effort to force the auditor to back off on the requirement. After that effort failed, Toshiba pressured the auditor to replace the U.S. audit manager with a manager from Japan, while making extensive efforts to ensure that the fact that Westinghouse had taken a writedown would not be publicly disclosed or recorded on Toshiba's consolidated financial statements.

10.    By falsifying its earnings and failing to take required write-downs and charges, Toshiba avoided stock price declines that would have accompanied revelation of the Company's actual financial condition and results. Between April 3, 2015, when the internal investigation into Toshiba's accounting practices was first announced, and November 13, 2015, following the issuance of Toshiba's restatement and the revelation of the impaired goodwill at Westinghouse, the price of Toshiba securities declined by more than 40%, resulting in a loss of $7.6 billion (¥908 billion)

1090890_1

1  in market capitalization that caused hundreds of millions of dollars in damages to U.S.

2  investors in Toshiba securities:[1]



## II.    JURISDICTION & VENUE

11.    The Exchange Act claims are asserted on behalf of purchasers of ADSs or other Toshiba securities acquired in the United States and arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction over the Exchange Act claims is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

---

[1]   The chart below reflects the movement of Toshiba's common stock sold on the Tokyo Stock Exchange.  The price of common stock sold as ADSs in the United States moved in tandem with the price of common stock on the Tokyo exchange, such that the movements of the latter as reflected in the chart below are also illustrative of the movements of the former.  *See infra* ¶251.

12.     Lead Plaintiff Automotive Industries Pension Trust Fund and named plaintiff New England Teamsters & Trucking Industry Pension Fund are both citizens of the United States.  Defendant Toshiba is a citizen of Japan.  The amount in controversy under the JFIEA claims exceeds $5 million.  Jurisdiction over the JFIEA claims is therefore conferred by 28 U.S.C. §1332(a)(2), and by 28 U.S.C. §1332(d)(2).

13.     The JFIEA claims are so related to the Exchange Act claims that they form part of the same case or controversy.  Jurisdiction over the JFIEA claims is therefore also conferred by 28 U.S.C. §1367.

14.     Toshiba is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below: (i) it engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States and this District; (ii) in committing the fraudulent acts complained of herein, Toshiba operated as a unitary business and an integrated enterprise with its wholly-owned subsidiaries, including those based in this District and elsewhere in the United States, and controlled the internal affairs and operations of the subsidiaries to the extent that they became mere instrumentalities of their parent; and (iii) Toshiba has had and continues to have continuous and systematic contacts with this forum that render it at home in the United States and in this District.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c)(3) because Toshiba's principal places of business in the United States are located in and around Irvine, California within this District, and because some of the fraudulent acts alleged herein occurred or were related to transactions and occurrences that occurred in the United States and caused economic harm in the United States, including in this District.

16.     In prior judicial proceedings, Toshiba has asserted that this District is a convenient forum for litigation and discovery of disputes in which it is involved.

1090890_1

17.     Toshiba provides products for sale in this District and in the United States to its Irvine-based subsidiary, Toshiba America Information Systems ("TAIS"). Toshiba is the parent corporation of Toshiba America, Inc., which in turn is the parent corporation of TAIS.  Toshiba is aware and intends that its products are or have been marketed and sold to customers in this District and the United States.  The business documents and records relating to the marketing, sales, and financials of products sold in the United States are located at TAIS in this District.

18.     In connection with the acts alleged in this Complaint, Toshiba, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications, and the facilities of the national securities markets.

### III.     PARTIES

#### A.     Plaintiffs

19.     Lead Plaintiff Automotive Industries Pension Trust Fund ("AIPTF") is a pension fund formed for the benefit of auto industry workers.  AIPTF is based in Alameda, California.  As set forth in the certification attached hereto as Exhibit A, AIPTF acquired Toshiba common stock during the Class Period through the purchase on March 23, 2015 of 36,000 shares of TOSYY ADSs in the United States.

20.     Named plaintiff New England Teamsters & Trucking Industry Pension Fund ("NETPF") is a pension fund formed for the benefit of New England trucking industry workers.  NETPF is based in Burlington, Massachusetts.  As set forth in the certification attached hereto as Exhibit B, NETPF made the following purchases of Toshiba common stock on the Tokyo Stock Exchange during the Class Period:

| Date Acquired | No. of Shares | Price |
|---|---|---|
| 4/1/15 | 110,400 | ¥ 503.42 |
| 4/2/15 | 66,600 | ¥ 512.26 |
| 9/4/15 | 58,000 | ¥ 356.51 |
| 10/22/15 | 57,600 | ¥ 340.53 |
| 10/23/15 | 9,000 | ¥ 343.35 |
| 10/26/15 | 23,400 | ¥ 356.66 |

1090890_1

| Date Acquired | No. of Shares | Price |
|---|---|---|
| 10/27/15 | 18,000 | ¥ 349.00 |

21.     Named plaintiff Mark Stoyas filed the initial complaint in this action. *See* Dkt. No. 1.

**B.     Defendant Toshiba and Its Business**

22.     Toshiba is a worldwide enterprise that engages in the research, development, manufacture, construction, and sale of a wide variety of electronic and energy products and services, including semiconductors, disc drives, storage devices, computers, televisions, appliances, nuclear power plants, elevators, lighting systems, and medical equipment.  The Company was founded in 1875 and is headquartered in Tokyo, Japan.

23.     Toshiba operates its business through a worldwide network of subsidiaries and affiliated companies whose activities and financial reports were closely directed and tightly controlled by the Company's top executives during the Class Period, as described below.  During the Class Period, Toshiba treated its subsidiaries and business units as mere instrumentalities of itself, ordering them to inflate revenues and delay recognition of expenses in order to meet profit expectations that Toshiba had established even knowing the targets could not be attained without falsifying financial results.  Toshiba used the phrase "Toshiba Group" throughout its public filings to refer to Toshiba and its consolidated subsidiaries.

24.     Toshiba's Board of Directors was composed of 14-16 members during the Class Period, the majority of whom were then members of the Company's executive management team or had been in the recent past.  As reflected in the letters to shareholders and corporate governance disclosures on Toshiba's website and in its annual reports, Toshiba's Board of Directors took an active role in supervising the Company's executive management, received detailed reports and had thorough discussions of the Company's results of operations and forecasts, and made important

- 7 -

1  decisions on the Company's basic policies to exert direct supervision over executive
2  officers' business operations.

3     25. By the outset of the Class Period, Toshiba had issued more than 4.2
4  billion shares of common stock.  Toshiba's common stock is publicly traded on the
5  Tokyo Stock Exchange under the ticker symbol "6502" and on the Over the Counter
6  ("OTC") market operated by OTCMarkets Group in the United States under the ticker
7  symbols "TOSBF" and "TOSYY."  One share of TOSBF represents ownership of one
8  share of Toshiba common stock sold under the ticker symbol 6502 on the Tokyo
9  exchange.  One share of TOSYY represents ownership of six shares of Toshiba
10  common stock.  OTCMarkets Group identifies TOSYY as an ADS and TOSBF as
11  "Ordinary Shares" on its website.

12     26. The Bank of New York Mellon ("BNY"), one of the depositary
13  institutions for Toshiba common stock sold as ADSs in the United States is one of
14  Toshiba's largest ten shareholders.  At the end of FY14, Toshiba reported that BNY
15  held 1.3% (~55 million shares) of the Company's outstanding common stock.

16     27. During the Class Period, institutional investors in the United States
17  owned at least 485 million shares of Toshiba common stock, representing more than
18  11% of the Company's outstanding shares.

19     28. The Company regularly communicates with investors through periodic
20  filings with the Financial Services Agency ("FSA") and Securities Exchange and
21  Surveillance Commission ("SESC") of Japan and in press releases, conference calls,
22  and investor and analyst presentations.  During the Class Period Toshiba maintained
23  both English- and Japanese-language corporate websites at http://www.toshiba.co.jp,
24  on which it established an Investor Relations section where regulatory filings, press
25  releases, conference call transcripts, corporate profiles, descriptions of its business,
26  and other information about the Company is made available to investors.  Toshiba's
27  annual reports included detailed financial information presenting results in both
28  Japanese and U.S. currency.

1090890_1

29.     On an ongoing basis and for each fiscal year, Toshiba published on its Internet website English-language versions of its annual and quarterly reports, earnings and other press releases, investor presentations, governance and business policies, and other information reflecting the Company's results of operations or financial condition, changes in business, acquisitions or dispositions of assets, changes in management or control, and other information required to maintain compliance with SEC Rule 12g3-2, 17 C.F.R. §240.12g3-2.

30.     Toshiba operates on an April 1 – March 31 fiscal year, with the fiscal year identified by the year in which it starts.[2]

31.     From FY09 through FY13, Toshiba reported net sales in North America ranging from $11.3 billion to $13.9 billion, representing approximately 18% of its worldwide sales in each fiscal year.  According to its most recent corporate profile, Toshiba employs 22,585 people – 11.8% of its workforce – in North America.

32.     Toshiba organized its business into worldwide segments differentiated by the products or services offered.  In FY11 and FY12, Toshiba organized its business into four segments: Digital Products (personal computers, televisions, and related products), Electronic Devices (memory, hard drives, other storage devices, semiconductors, and similar products), Social Infrastructure (utility and power plant construction, medical devices, elevators and building systems, and similar activities), and Home Appliances (refrigerators, washing machines, lighting systems, air conditioning, etc.).

33.     Starting in FY13, Toshiba reorganized its business activities into five segments, primarily by splitting the Social Infrastructure segment into three new segments: Energy & Infrastructure (power plant and utility construction), Community Solutions (building facilities such as elevators, lighting, and air conditioning systems), and  Healthcare  Systems  &  Services  (medical  devices  and  related  services  and

---

[2]    Toshiba's FY13, for example, started on April 1, 2013 and ended March 31, 2014.

1   equipment).  The Digital Products and Home Appliances segments were combined in

2   the reorganization to form the Lifestyle Products & Services segment, while the

3   Electronic Devices segment stayed the same, and was renamed Electronic Devices &

4   Components.

5           34.   Toshiba maintains a substantial presence in the United States through its

6   business activities, operations, and corporate representatives in the United States.

7   Many of Toshiba's largest and most significant subsidiaries and affiliates, including

8   those directly involved in the fraud alleged herein, were based in or had significant

9   business operations in the United States, including Westinghouse, based in Township,

10  PA; TAIS, Toshiba America Medical Systems, Inc., Toshiba America Electronic

11  Components, Inc., and Toshiba America Business Solutions, Inc., all based in or

12  around Irvine, CA; Toshiba International Corp., based in Houston, TX; Toshiba

13  America Nuclear Energy Corp., based in Charlotte, NC; and Toshiba America, Inc.

14  San Francisco, which "functions as a U.S.-based purchasing and export agent for

15  Toshiba companies around the world."

16          35.   Toshiba's Power Systems Company (part of its Energy & Infrastructure

17  segment) includes the nuclear power plant operations of Westinghouse.

18  Westinghouse is a Limited Liability Company under U.S. law with its headquarters in

19  Pennsylvania, and with a principal business of designing, manufacturing, and

20  maintaining nuclear fuel and nuclear power generating facilities.  Westinghouse is a

21  consolidated subsidiary of Toshiba, with all of its equity effectively held by Toshiba

22  Nuclear Energy Holdings (US) Inc. ("TNEH").  Toshiba holds 87% of the voting

23  rights of TNEH.

24          36.   In addition to Westinghouse, Toshiba's Power Systems Company

25  ("TPSC") includes business operations in or around: San Francisco, CA (Toshiba

26  International Corp. Power Systems Division headquarters); Charlotte, NC (Toshiba

27  America Energy Systems ("TAES") Nuclear Business Unit, TAES headquarters, and

28  TPSC US Corp.); West Allis, WI (Toshiba America Energy Systems Thermal

- 10 -

Business Unit); Littleton, CO (Toshiba America Energy Systems Hydro Business Unit); Rogers, MN (TurbinePROSs, L.L.C.); Lafayette, IN and Pequot Lakes, MN (Landis+Gyr regional offices); and Alpharetta, GA (Landis+Gyr North America regional headquarters).

## IV.   OVERVIEW OF SCHEME TO DEFRAUD

### A.   Government Inquiry Sparks Widening Probes into Toshiba's Fraudulent Accounting

37.   On February 12, 2015, Toshiba received an order from the SESC pursuant to JFIEA Article 26 requiring an inspection of projects using the percentage of completion ("POC") method of accounting, and submission of a report to the agency detailing the findings.  No public announcement or disclosure of the order was made.  The Company carried out an investigation pursuant to the order and by late March 2015 had discovered extensive evidence of GAAP violations in projects using POC accounting.

38.   On April 3, 2015, Toshiba issued a press release announcing the establishment of a "Special Investigation Committee" ("SIC") to look into the Company's use of POC accounting on "certain infrastructure projects undertaken by the Company."  The SIC was composed of six members: Toshiba's chairman of the Board, a member of its Audit Committee, a representative from its legal and its audit departments, an outside lawyer, and an outside auditor.

39.   Over the course of the next five weeks, the SIC identified instances in which POC accounting had been improperly applied to underestimate contract costs with the result that contract losses (including provisions for contract loss) were not recorded in a timely manner.  During that time period, the committee also identified other instances in which POC accounting was used in a suspect manner that required further investigation.

40.   On May 8, 2015, Toshiba issued a press release announcing that, as a result of the findings described in the preceding paragraph, the SIC would be

- 11 -

1    reconstituted as an "Independent Investigation Committee" ("IIC") consisting solely
2    of impartial outside experts with no interests in Toshiba.  The May 8 press release
3    alerted investors that the scope of the investigation had broadened to include
4    investigations of accounting in areas other than POC contracts and that, as a result,
5    "there has emerged a possibility that past financial results for 2013 or earlier may be
6    corrected, and the Company is currently ascertaining the amount of the impact on the
7    financial results for fiscal 2015."  The Company issued two additional press releases
8    the same day announcing that, as a result of the investigations into its financial
9    reporting and accounting, it was withdrawing its FY14 earnings forecast and
10   cancelling the expected payment of its FY14 dividend.  The May 8 disclosures caused
11   an immediate 16.6% decline in the price of Toshiba common stock.

12          41.    Five days later, on May 13, 2015, Toshiba announced that it expected to
13   restate its financial results from FY11 to FY13 to reduce operating income by ¥50
14   billion (~$420 million[3]) due to improper use of POC accounting for projects
15   undertaken through its Power Systems Company, Social Infrastructure Systems
16   Company, and Community Solutions Company.  The Company cautioned that the ¥50
17   billion reduction was "only the current expected amount" and the final adjustment
18   could differ after the IIC completed its investigation.  The release then went on to
19   describe additional categories of accounting that would be investigated by the SIC,
20   including the appropriateness of the timing and amount of recorded loss provisions,
21   the appropriateness of the timing of recorded operating expenses, and the
22   appropriateness of valuations of inventory.  The release stated that these matters
23   would be subject to "a Company-wide, comprehensive investigation, which includes
24   its in-house companies other than the above three, as well as its consolidated

25
26   ───────────────────
     [3]    All conversions from ¥ to $ contained herein use the same year-end exchange rates
27   that were used by Toshiba to convert yen to dollars in its annual financial reports:
     FY14 (¥120 = $1); FY13 (¥103); FY12 (¥94); FY11 (¥82); FY10 (¥83); FY09 (¥93);
28   and FY08 (¥98).

                                        - 12 -

1    subsidiaries." The release stated that it was "undetermined" whether the investigation
2    into these matters would result in the restatement of periods prior to FY11.

3         42.   On May 15, 2015, Toshiba issued a press release announcing that it had
4    appointed two attorneys and two CPAs to form the IIC. The press release revealed
5    additional details regarding the SIC's findings, including that, in addition to
6    discovering improper POC accounting, the SIC investigation had raised questions
7    regarding "the appropriateness of the timing and recorded amounts of provisions for
8    losses, the timing of recording operating expenses, and valuations of inventory." The
9    release also said Toshiba had "identified some of the cause of inappropriate
10   accounting practice[s]," including "the high priority of budget achievement in the
11   Company, and the imperfect function of internal controls for accounting."

12        43.   On May 22, 2015, Toshiba issued a press release announcing that, in
13   addition to POC accounting, the IIC would also be looking at the accounting for
14   operating expenses in Toshiba's Visual Products Business, the valuation of inventory
15   in the Semiconductor Business, and the accounting for component (parts) transactions
16   in the PC Business. The release also stated that Toshiba was conducting a "self
17   check" of accounting practices throughout its entire business in parallel with the IIC's
18   investigation. To carry out the self check, Toshiba sent a list of specific types of
19   inappropriate accounting to each of its 585 business units and asked them to self
20   report any violations of accounting principles or Company rules that occurred from
21   FY09 thru FY14. The Company said it would also conduct a second round of self
22   checks aimed primarily at misreporting of income, expenses, profits, and losses at the
23   83 consolidated subsidiaries that it "considered particularly important to closing the
24   Company's financial accounts."

25
26
27
28

1090890_1

44.     The purported results of Toshiba's self check were contained in a press release issued on June 12, 2015.[4]  Apx. Ex. 2-A.  In the June 12 press release, as corrected, Toshiba identified additional types and instances of inappropriate accounting that it said were being examined by the IIC, including additional violations of POC accounting rules and untimely or inaccurate reporting of promotional and other general expenses, inventory costs, and profits and losses, including nine specific cases of improper accounting that had been referred to the IIC for further investigation and 12 additional cases that would not be referred to the IIC for further investigation. The report described specific failures to accurately or timely post contract expenses and anticipated losses and described other instances of improper accounting used to understate costs or overstate income, including: failures to timely or accurately record provisions for warranty claims; postponements of selling, general and administrative ("SG&A") expenses including advertising, promotion, and marketing expenses; understating parts and inventory costs; failing to timely post losses for obsolete inventory; and failing to post write-downs for changes in foreign currency exchange rates.  Toshiba said that it estimated that the 21 specific projects identified in the self check report had caused a cumulative overstatement of Toshiba's operating income of ¥54.8 billion from FY09 to FY13.

45.     On June 25, 2015, Toshiba held an Ordinary General Meeting of Shareholders, at which time it provided additional details on the nature of the accounting fraud, including by revealing that: (i) the Company had "identified unrealistic cost reduction measures [that] were included in percentage-of-completion method accounting producing inappropriate estimates of total contract costs"; (ii) the Visual Products business had "coordinat[ed] with vendors to adjust the purchase price of materials and carry over part of the payment to the following period" to lower

---

[4]   On June 17, 2015, Toshiba filed a further press release to correct factual errors in the June 12 release, mostly related to the fiscal years in which specific cases of accounting fraud had occurred.  Apx. Ex. 2-B.

- 14 -

1090890_1

1   reported materials costs in the periods in which they were incurred; (iii) in addition to

2   artificially lowering production costs in the semiconductor business, the Company had

3   manipulated the recorded value of inventories of discontinued products stocked for

4   customers; and (iv) PC profits had been inflated by failing to accurately record costs

5   of parts and components supplied to original design manufacturers ("ODMs").  Apx.

6   Ex. 3.

7        46.   On July 17, 2015, the Company announced that the IIC report would be

8   made public on July 20 and a press conference to discuss its findings would be

9   conducted on July 21.  On July 20, 2015,  the Company issued a press release

10  announcing that it had received the IIC report, and released a summary version of the

11  report in Japanese.  The July 20 press release stated that, based on the IIC report,

12  Toshiba expected to restate its financial results from FY08 through FY13 to reduce

13  income before income taxes and noncontrolling interests by ¥185.8 billion.  The

14  release also stated that Toshiba expected the restatement to include fixed asset

15  impairment charges of up to ¥246 billion and annual valuation allowances of up to

16  ¥270 billion regarding long-term deferred tax assets.

17       47.   The full version of the IIC report, in Japanese with portions redacted, was

18  released on July 21, 2015.  The report was based on internal information of Toshiba

19  that the IIC had reviewed.  Toshiba claimed prior to and after the issuance of the

20  report that it had cooperated fully with the IIC in its investigation, and claimed to have

21  provided it with access to any relevant information that it asked to review.

22       48.   Also on July 21, the Company announced that Tanaka, Sasaki, and seven

23  other senior executives had resigned as a result of the "substantial amount of

24  inappropriate accounting over a long period of time" and the IIC's findings that

25  "pointed to the involvement of top management in respect to the causes of the

26  inappropriate accounting."

27       49.   On July 25, 2015, Toshiba published an English translation of the

28  summary version of the IIC report.  Apx. Ex. 1.

1090890_1

**B.    Investigators Find that Toshiba Deliberately Inflated Profits by Forcing Subsidiaries to Misrepresent Their Financial Results**

50.    The IIC report, together with Toshiba's public statements and restated annual reports, provides a detailed account of the deliberate misuse of accounting standards on a worldwide basis that was perpetrated pursuant to the directions and demands of Toshiba's most senior executives.  The manipulations were designed and used to achieve market expectations and conceal poor business performance from investors over a period of at least 27 consecutive quarters.

51.    The IIC found direct and circumstantial evidence of deliberate and repeated instances of accounting fraud in Toshiba's accounting for POC contracts and its recording of revenues and expenses in its Visual Products, Semiconductor, and PC businesses. *Infra* §VI; Apx. Ex. 1.  The POC accounting violations occurred primarily in the Power Systems Business, which formed a major part of the Social Infrastructure and, later, the Energy Infrastructure segment.  Other fraudulent accounting practices, including channel stuffing and cookie jar accounting, were carried out in Toshiba's Semiconductor business, which formed the primary part of the Electronic Devices segment; and in the Visual Products and PC businesses, which formed the substantial parts of the Digital and, later, Lifestyle Product segments.  Additional instances of fraud were uncovered by Toshiba's self check report, and by its outside auditor, as also described below.

52.    The IIC limited its review to specific issues and transactions that had been identified by Toshiba and specifically delegated to the IIC for review.  The IIC was not permitted to, and did not, undertake investigations with respect to issues of potential accounting fraud other than those that were delegated to it or uncovered in the course of its investigation of the delegated matters.  The IIC report specifically recognized that the restatement required by its findings could lead to secondary effects, including requirements to restate inventory valuations, take fixed asset impairment charges, or write-down the value of deferred tax assets.  However, the IIC

- 16 -

said that it had "not considered" such secondary effects, which were beyond the scope of the authority delegated to it.  Apx. Ex. 1 at 17.

53.     Following the July 21, 2015 press conference where the IIC discussed its findings, one analyst wrote:

**Limitations of scope of independent investigation**

> The independent investigative committee held a press conference at 7pm JST on 21 July, largely reiterating points from the committee's report. The point that came up a number of times in the Q&A session was that the scope of the committee's investigation was determined by Toshiba's requirements.   Some key areas of interest to investors, including the financial situation at subsidiaries Westinghouse and Landis Gyr, were not part of the investigation, and we will have to rely on the opinions of auditors for the time being.  The fact that the committee did not look into every item on Toshiba's balance sheet certainly needs to be noted.

Mitsubishi UFJ Morgan Stanley, *Resignation of top management merely the start of a long restructuring road* (July 21, 2015) at 1.

54.     The IIC found that Toshiba's top management directed and demanded the accounting fraud to be carried out in order to meet their objective of overstating current period profits.  Apx. Ex. 1 at 67-69.  Toshiba's management did this by exerting strong pressure on subordinates to achieve budgeted targets by any means necessary, including by the deliberate misapplication of accounting standards. Toshiba's executives did so knowing that the Company's employees were unable to act contrary to the intent of their superiors, even when superiors were instructing them to falsify the reported results of their business.  *Id.*  By carrying out their fraud through subtle changes in accounting that were difficult for outsiders to detect, and then deliberately concealing the true facts from external auditors (including by deliberately falsifying corporate records), Toshiba's executive management was able to falsify Toshiba's financial results over a period of more than six years.  *Id.* at 17-18, 69, 73-74.  Management's ability to carry out their scheme was enhanced by their efforts to foster confusion among subordinates about proper accounting requirements, and their

1  deliberate failure to adopt internal controls that would be effective in detecting or

2  preventing their fraud. *Id.* at 69-73.

3       55.    Toshiba and its senior executives operated the Company as a unitary

4  enterprise, enforcing their will on each of Toshiba's consolidated business units and

5  subsidiaries by requiring them to falsify earnings reports where necessary to meet the

6  targets that Toshiba's executives had established.  Toshiba did so by establishing and

7  enforcing a strict command and control culture throughout the Company's operations.

8       56.    As the IIC concluded:

9         The inappropriate accounting treatment that was carried out or
continued in a number of Companies simultaneously and in an

10  institutional manner with the involvement of Corporate-level top
management . . . should be considered a management decision, and

11  correcting such situation was practically impossible.

12  *Id.* at 67.

13       57.    To carry out their will, Toshiba's executive management held monthly

14  meetings with the CEOs of all of Toshiba's companies where they demanded that

15  each company meet performance targets that the executives had established.  The

16  targets were established based only on Toshiba's desire to meet quarterly profit

17  objectives.  The targets were communicated to each of Toshiba's subsidiaries at CEO

18  Monthly Meetings.  Although referred to internally as "Challenges," they were in fact

19  mandatory requirements.  Subsidiaries were ***required*** to report results in line with the

20  "Challenge" targets, even if fraudulent accounting was the only way to do so.

21       58.    As described by the IIC:

22         At the CEO Monthly Meetings, etc., P [Toshiba's President,
Tanaka] indicated targets for improved income set as "Challenges" to

23  each CP [Company President], with the strong suggestion that those
targets needed to be achieved, and sometimes implied that under-

24  performing Companies would have to withdraw from their business if
they did not improve their profit.  In particular, from FY 2011 to FY

25  2012 when inappropriate accounting treatments were carried out broadly,
those Companies were required by P to set out strict Challenges

26  (excessive targets) in order to achieve budget.  Therefore, the CP of each
Company was faced with strong pressure to achieve these targets.

27         Most of the Challenges indicated by P were based not on long-

28  term profit targets, but on target values to achieve, set with a view to

- 18 -

maximizing current year or current quarter profits (over-riding current profit policy). Also, toward the end of each quarter, when it was difficult to achieve a large amount of profit improvement even with a concerted sales effort, a "Challenge" was given to achieve an overstated budget that exceeded the capabilities of the Company. Given this management policy, in order to achieve the Challenge, each Company was driven into a situation where it was forced to engage in inappropriate accounting treatments, instead of carrying out accounting treatment reflective of performance at the end of the applicable period, by way of bringing apparent current-period profits closer to the budget and Challenge values substantially with pre-emption of profits for subsequent accounting periods or with postponement of recording of current losses and expenses to subsequent accounting periods. Even though pre-empting profits or postponing the recording of expenses and losses in order to overstate apparent profits in one period would make the recording of profits in subsequent periods difficult, an excessive Challenge was set for that subsequent period as well, and this resulted in Companies being forced to carry out inappropriate accounting treatment in an even larger amount in order to achieve it, the repetition of which caused the inappropriate accounting treatments to continue and expand in scale.

59. The IIC found that Toshiba attained its unreasonable targets by imposing its will on subsidiaries to force them to falsely report results that met the challenge:

A corporate culture existed at Toshiba whereby employees could not act contrary to the intent of their superiors. For this reason, when certain top management established a "Challenge", the CPs, who were subject to the will of such top management, the business division heads under the CPs, and in turn the employees under the heads continuously engaged in inappropriate accounting treatments to achieve the targets in line with the will of their superiors.

*Id.* at 68-69.

60. Toshiba's control over its subsidiaries was so complete that executive consent was even needed to **comply** with stated accounting policies, where doing so would negatively impact the Company's performance:

Moreover, under this corporate culture, a de facto rule existed for Toshiba accounting practices, whereby approval from a progressively senior personnel was required before making an accounting treatment in accordance with an express rule provided for in the Company's accounting rules, etc., with respect to any matter that entailed a significant amount of impact, such that if at any point a superior's approval was not obtained, then the appropriate accounting treatment itself, based on an express rule, would not be carried out.

*Id.* at 69.

61. The IIC found that misstatements of accounting had been deliberately concealed from Toshiba's outside auditors:

- 19 -

1
2
3
4
5

> [M]ost of the instances of accounting treatment in question were the intentional operation of internal accounting treatment, and were instances of inappropriate accounting treatment carried out in an institutional manner, and skillfully utilizing circumstances where confirming the facts based on external evidence was difficult, such as by using methods that were difficult for the accounting auditor to detect and, in response to questions and requests for materials from the accounting auditor, hiding facts and providing explanations by presenting materials creating stories different from the facts.

6  *Id.* at 73.

7        62.   The accounting fraud was directed, approved, or ratified by Nishida,
8  Tanaka, Sasaki, and other members of Toshiba's top-level management.  The IIC
9  specifically found repeated instances where Toshiba's most senior executives directed
10 or deliberately turned a blind eye to accounting fraud:

11               (i)   "members of top management were aware of the intentional
12 overstating of apparent current-period profits and the postponement of recording
13 expenses and losses, or the continuation thereof, but did not give instructions to stop
14 or correct them" (*id.* at 67);

15               (ii)   "although the Company requested approval to record provisions
16 for contract losses [on contracts subject to POC accounting], certain top management
17 either rejected it or instructed the recording to be postponed" (*id.*);

18               (iii)   "while certain top management was aware that [achieving
19 performance targets] would inevitably lead to a situation where Channel Stuffing of
20 ODM Parts was necessary, still they imposed strict "Challenges" onto the Company
21 and drove it into such situation, or showed reluctance when the Company expressed
22 its intent to eliminate the overstating of apparent profits by way of the Channel
23 Stuffing of ODM Parts" (*id.*);

24               (iv)   "Company-level top management like the CP and business unit
25 heads were involved in carrying out or the continuation of inappropriate accounting
26 treatments" and "Company-level top management [] actively instructed that
27 inappropriate accounting treatments be carried out" (*id.*);

28

- 20 -

1090890_1

1    (v)    "certain Corporate or Company-level top management had the

2 objective to carry out the 'overstating of apparent current-period profits'" and

3 "executive officials [] carried out or continued inappropriate accounting treatments

4 under such objective of certain top management" (*id.* at 68);

5    (vi)    "the involvement of certain top management and key executives

6 led to the deviation from and ineffectiveness of the internal control function for

7 financial reporting, with inappropriate accounting treatments then being carried out by

8 instructions, etc. from outside of the internal control framework" (*id.* at 70);

9    (vii)    "accounting personnel knew of a fact that made an accounting

10 treatment necessary, such as recording a provision, but did not take any action …

11 there were many projects where no action was taken in accordance with the

12 instruction of a superior such as a business unit head or CPs" (*id.*); and

13    (viii)    "several members of the Audit Committee were aware that

14 inappropriate accounting treatments were being carried out with respect to several

15 projects . . . [but] no action was taken" (*id.* at 73).

16 **C.    Toshiba Admits Wrongdoing; Fires, Disciplines, and Sues**
   **Its Top Executives**

17

18    63.    Toshiba has repeatedly acknowledged its responsibility for the fraud

19 alleged herein, and admitted that the fraud was carried out at the direction and under

20 the control of its most senior executives.  At least nine senior executives of the

21 Company resigned or were fired as a result of their participation in the misconduct

22 alleged herein.  Dozens more were reprimanded or had their salaries reduced, and

23 Toshiba has sued five of its most senior executives – Tanaka, Sasaki, Nishida, Kubo,

24 and Muraoka – for damages arising from their roles in the fraud.

25    64.    In a July 21, 2015 press release, Toshiba acknowledged responsibility for

26 the misconduct:

   **Clarification of managerial responsibility**

27

28    Although the Company is currently committed to reviewing and
   closely checking the investigation report, it wishes at this juncture to

- 21 -

express its sincere apologies to shareholders, investors and all other stakeholders for what has been identified as a substantial amount of inappropriate accounting over a long period of time, from fiscal 2008 to fiscal 2014. The outcome is that the cumulative amount of income before income tax to be corrected, discovered within the scope of the investigation carried out by the Independent Investigation Committee, is minus 151.8 billion yen. The Company also wishes to apologize for any concerns or inconvenience arising from not yet being able to announce the Company's financial results for fiscal year 2014 as at July 21.

In light of the foregoing, and effective as of July 21, Hisao Tanaka, Representative Executive Officer, President and Chief Executive Officer and Director; Norio Sasaki, Vice Chairman of the Board and Director; Hidejiro Shimomitsu, Representative Executive Officer, Corporate Senior Executive Vice President and Director; Masahiko Fukakushi, Representative Executive Officer, Corporate Senior Executive Vice President and Director; Kiyoshi Kobayashi, Representative Executive Officer, Corporate Senior Executive Vice President and Director; Toshio Masaki, Representative Executive Officer, Corporate Senior Executive Vice President and Director; and Makoto Kubo, Chairman of the Audit Committee and Director, will all resign from their positions in the Company; and Keizo Maeda, Representative Executive Officer, Corporate Executive Vice President and Director, will resign from his positions as Representative Executive Officer and Director. In addition, Atsutoshi Nishida, Adviser to the Board, will also resign from his position, effective as of today.

65. Toshiba made similar admissions of responsibility in nearly every other press release it issued to provide updates on the status of the investigations or disclose additional findings about the nature, cause, extent, or impact of the accounting fraud. *E.g.*, Apx. Ex. 2-A ("The Company expresses sincere apologies to its shareholders, investors, and all other stakeholders for any concerns or inconvenience caused by the current investigation into accounting practices."); Apx. Ex. 4 ("The Company will make every effort to regain the trust of shareholders, investors, all other stakeholders and the public, and asks for your understanding and ongoing support."); Apx. Ex. 7 ("The Company deeply apologizes to our shareholders, investors and stakeholders for causing the state of matters this time. The Company, under its new management team, will endeavor with all of its effort to regain trust in the Company from all shareholders, investors and other stakeholders, and humbly requests your ongoing support.").

1090890_1

66.     On July 29, 2015 Toshiba announced "further personnel measures to be taken in respect of inappropriate accounting," including the resignation of another executive officer – Corporate Senior Vice President, Masaaki Osumi – and salary reductions for other executive officers and Board members. Apx. Ex. 4. The release stated that the Company "will seek to establish a new corporate culture under new management and governance structures" and would immediately begin to implement measures recommended by the IIC. Toshiba stated that it would effect a "[c]hange in [the] mindset of top management" by removing incentives to achieve short-term budget targets, reform its accounting policies, enhance its internal controls, and increase the number of outside directors. Among the measures that Toshiba said needed to be undertaken was the elimination of budgets that were not "commensurate with company capability." The release stated:

The Company has confirmed, company-wide, that it will not focus only on short-term profit in the current period, but, taking a long-term perspective, first disclose actual results and then stress consideration of how to improve those results. In order to guarantee this, the Company has decided to abolish the CEO Monthly Meeting held at the end of every month, which mainly dealt with figures for short-term outlooks.

67.     On August 18, 2015, Toshiba described how it would reform its governance structure, improve its internal controls, and take other measures needed to correct the problems identified in the IIC report. Apx. Ex. 5. In announcing the formation of a Management Revitalization Committee to propose measures for the reform of Toshiba's corporate governance, Toshiba stated:

The investigation report by the Independent Investigation Committee found the direct causes of inappropriate accounting to include: the involvement of top management; a policy that placed an over-riding concern on current profit; and strong pressure to achieve budget targets. The report noted, as the indirect causes why the Company was unable to prevent these actions, that the involvement of top-level management resulted in deviation from or the non-functioning of internal controls, and also found that an internal control structure that anticipated top management's involvement in inappropriate accounting had not been established. The report also determined that internal control structures did not function efficiently, at both the corporate and in-house company level. As measures toward preventing recurrence of such actions, the report recommends the enhancement of corporate governance by strengthening the internal control function of the Board of

- 23 -

1090890_1

1  Directors and the Audit Committee; establishing a new and stronger
2  internal control department; and such as increasing the number of
   Outside Directors and revising the membership of the Board.

3  *Id.*

4      68.    On September 17, 2015, Toshiba formed an Executive Liability

5  Investigation Committee to investigate wrongdoing by its senior executives.  The

6  release stated, in part:

7          Toshiba Corporation . . . received an Investigation Report from the
           Independent Investigation Committee on July 20 containing findings on
8          the facts and causes of the series of inappropriate accounting practices at
           the Company, and recommendations on prevention of any recurrence.
9          The Company carefully reviewed the report and took steps necessary to
           restate past financial statements and compile its fiscal year 2014
10         financial results.

11                            *         *         *

12         Separately from the restatement of past financial results and
           compilation of financial results, and discussions on the management
13         structure, reform of corporate governance and measures to prevent
           recurrence, the Company has also validated the facts contained in the
14         report, and discussed the methods to determine whether there is a need to
           enforce liability of current and former directors and executive officers
15         for inappropriate accounting.

16     69.    On November 7, 2015, the Company announced that the committee had

17  investigated 98 individuals who had been directors or executive officers of the

18  Company between FY08 and 3Q14 regarding their involvement in the accounting

19  fraud.  Apx. Ex. 8.  On November 10, 2015, the Company filed suit against five of its

20  former executives – Nishida, Sasaki, Tanaka, Kubo, and Muraoka – seeking damages

21  arising from their participation in the accounting fraud.  The Company also said that,

22  in addition to previously-announced personnel measures taken against other directors

23  and executive officers, the Company would implement disciplinary measures against

24  26 additional employees suspected of involvement, "mainly the top managerial

25  employees mentioned in the [IIC report]."

26     **D.    Toshiba Restates Five Years of Results**

27     70.    As a result of the false accounting described above, Toshiba falsified its

28  reported financial results for at least 27 consecutive quarters from 1Q08 through

- 24 -

1090890_1

3Q14, as summarized in the charts at ¶¶76, 111-112 & 115-116.  Toshiba did not officially restate its FY08 financial statements to correct the errors found by the IIC and the other investigations described herein, presumably because, by the time of the restatement, the FY08 financial reports were no longer formally available for public inspection pursuant to Article 25 of the JFIEA.[5]  Restated FY08 results are, however, included in Toshiba's restated FY09 financial statements.

71.    On August 18, 2015, Toshiba provided an initial outline of the anticipated restatement of its financial results from FY08 through 3Q14.  The release stated that Toshiba planned to issue its restatement when its FY14 results were released at the end of the month.  Apx. Ex. 5.

72.    On August 31, 2015, Toshiba announced that it would be unable to meet the August 31 deadline for submitting its FY14 annual report and restatement, and had obtained an extension until September 7 to do so.  On the same day, UBS reported that:

> Reasons for delay include 1) discovery of multiple new instances of inappropriate accounting and the need for investigation, 2) miscalculation of impairment amounts for fixed assets that required restatement, 3) inappropriate timing for booking provisions for a project in which the percentage-of-completion method was used at a US subsidiary, and 4) an audit of a US subsidiary taking longer than scheduled.

The delay announcement caused Toshiba's stock to drop by 5.3%, its largest decline since the May announcement of the broader inquiry into accounting fraud.

73.    When Toshiba's restatement was issued, the restatement of income (loss) before taxes had grown by ¥11.8 billion from what had been reported on August 18. The largest contributors to the increase were adjustments to POC accounting used by a US subsidiary on a hydroelectric project, increases in the amount of unrecognized FY14 costs at U.S. subsidiaries, and a reserve for an administrative monetary penalty.

---

[5]   The IIC also found errors in Toshiba's FY07 financial reports.

- 25 -

74.   On September 7, 2015, Toshiba issued its FY14 annual report and earnings release, including details of its restatement.  Because the IIC and other investigations were limited in scope, as described above, Toshiba's restatement is likely to have significantly understated the true extent of the fraud or its impact on Toshiba's previously reported financial results.

75.   The restatement eliminated more than ¥l90.5 billion (~$2.1 billion) in previously reported net income from FY08 through FY13, and resulted in Toshiba recording an additional ¥90.6 billion (~$1.0 billion) in delayed asset impairment charges that should have been taken in FY08 (¥41.7 billion) and FY11 (¥48.9 billion). Although net income for the first three quarters of FY14 increased as a result of the restatement, this was simply due to moving expenses that the Company had deliberately delayed reporting until FY14 back to the earlier periods in which they should have been recognized, thereby reducing FY14 expenses by the same amount.

76.   The restatement reduced Toshiba's cumulative pre-tax profit for FY08 through 3Q14 by ¥225 billion ($2.6 billion), which was 39% lower than the previously reported amounts:

| Cumulative restatements | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ¥ billions | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 | Total |
| Pre-tax Profit | Before | -259.7 | 27.2 | 194.7 | 145.4 | 159.6 | 180.9 | 134.9 | 583.0 |
| | After | -336.1 | -14.3 | 201.8 | 61.4 | 74.9 | 182.3 | 188.2 | 358.2 |
| | Change | -76.4 | -41.5 | 7.1 | -84 | -84.7 | 1.4 | 53.3 | -224.8 |
| Net Profit | Before | -343.6 | -19.7 | 137.8 | 70.1 | 77.4 | 50.8 | 71.9 | 44.7 |
| | After | -398.9 | -53.9 | 158.3 | 3.2 | 13.4 | 60.2 | 107.2 | -110.5 |
| | Change | -55.3 | -34.2 | 20.5 | -66.9 | -64 | 9.4 | 35.3 | 155.2 |
| | $ millions | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 | Total |
| Pre-tax Profit | Change | -779.6 | -446.2 | 85.5 | -1024.4 | -901.1 | 13.6 | 444.2 | -2608.0 |
| Net Profit | Change | -564.3 | -367.7 | 247.0 | -815.9 | -680.9 | 91.3 | 294.2 | -1796.3 |

*Source: Macquarie Research, Sept. 9, 2015*

- 26 -

77.    The restatement also eliminated ¥953.2 billion (~$9.9 billion) in previously reported shareholder equity from Toshiba's books, reducing equity by as much as 20% below the amounts the Company had previously reported:

| Restatement of Shareholder Equity | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Reported Equity | | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 | Total |
| Before Restatement | | 447.3 | 797.4 | 868.1 | 863.5 | 1,034.3 | 1,229.1 | 1,426.5 | 6,666.2 |
| After Restatement | | 385.2 | 705.9 | 793.9 | 718.7 | 824.6 | 1,027.2 | 1,257.5 | 5,713.0 |
| Change in S/H Equity | ¥ billions | (62.1) | (91.5) | (74.2) | (144.8) | (209.7) | (201.9) | (169.0) | (953.2) |
| | $ millions | (633.7) | (983.9) | (894.0) | (1,765.9) | (2,230.9) | (1,960.2) | (1,408.3) | (9,876.8) |
| | % change | -13.9% | -11.5% | -8.5% | -16.8% | -20.3% | -16.4% | -11.8% | -14.3% |

78.    The restatement confirmed the breadth of the fraud and the extensive efforts that were used to conceal the manipulations from the Company's investors. As one analyst noted following Toshiba's investor conference call to discuss the restatement:

> We were not impressed by the old president's *mea culpa*: it takes a certain discipline to fiddle accounts over half a dozen years. Generally, any fool can tweak the P&L, it is more difficult to twiddle effectively the balance sheet and quite hard to fiddle the cashflow. To get whole teams to do such in a way consistent with each other and tenable against general reporting requires care and systematic deceit. Foreign subsidiaries, if they are to be involved, need be involved similarly. Alternatively, their numbers, though reported locally, are not reported in Japan in such a way that comparisons can be made.

Mirabaud 1819, *What they did* (Sept. 10, 2015) at 3.

**E.    Toshiba Belatedly Reveals Westinghouse Goodwill Impairment**

79.    Toshiba acquired Westinghouse in 2006, paying $5.4 billion. At the time of the acquisition many analysts pointed to the huge amount of goodwill as evidence that Toshiba had paid too much for Westinghouse.[6] Analysts again raised questions about the need to write-down goodwill following the Fukushima nuclear accident in

---

[6]    *See, e.g.*, UBS, *Toshiba earnings potential highest ever* (Aug. 8, 2011) at 7 ("[T]he purchase consideration was an unprecedented ¥621bn, and at the time the acquisition was announced, there was a number of reports indicating that it would be difficult to generate a sufficient return on investment at such a high purchase price.").

1090890_1

1   March 2011.[7]  Questions were raised again in FY11, when Toshiba became obligated

2   to pay approximately ¥125 billion after the Shaw Group exercised its option to sell its

3   20% interest in Westinghouse.[8]  At each of these times, Toshiba told investors that

4   Westinghouse's goodwill was not impaired, including by assuring investors in the

5   wake of the Fukushima disaster that the large percentage of sales that Toshiba derived

6   from fuel and maintenance contracts insulated it from the larger impacts in the

7   industry arising from weakened demand for construction of new nuclear power plants.

8       80.    In FY12 and FY13 Westinghouse took goodwill impairment charges

9   totaling $1.3 billion.  Toshiba did not publicly disclose the impairment charges taken

10   by Westinghouse.  Toshiba did not write-down any of the Westinghouse goodwill in

11   its consolidated financial statements in FY12, FY13, or any subsequent period.

12       81.    When the Shaw Group exercised the option requiring Toshiba to

13   purchase its interest in FY12, Toshiba initially claimed it had an offer from a third

14   party to acquire the interest.  Toshiba ultimately chose to acquire rather than resell the

15   Shaw Group interest, even though doing so required the majority of the cash on its

16   balance sheet.  Had Toshiba accepted an offer to sell the Shaw Group interest to a

17   third party at a price lower than the value of Westinghouse that was reflected on

18   _____

19   [7]    *See, e.g.*, Deutsche Bank, *Pessimism excessive; still a Buy* (Apr. 10, 2011) at 4
20   ("[F]uture profit expectations in the nuclear power business will have a large impact
    on the application of impairment of goodwill."); UBS, *Toshiba earnings potential*
    *highest ever* (Aug. 8, 2011) at 44 (noting risk of goodwill impairment if "opinion
21   moved against nuclear power in the US"); Macquarie Research, *Whether thou goest,*
    *Westinghouse?* (Dec. 28, 2012) at 1 ("[P]rospect of goodwill impairment taken upon
22   the disposal of stakes in Westinghouse has been a perennial concern of investors.").

23   [8]    *See, e.g.*, UBS, *Re-iterating our Buy rating*  (Sept. 14, 2012) at 7 ("the possibility
    arises of impairment losses on the Westinghouse goodwill" as result of Shaw Group
24   exercise of option); Macquarie Research, *Production cut brings NAND to the nadir*
    (July 25, 2012) at 6 (noting "creditor wariness over worsened balance sheet" and
25   potential for impairment if investor replacing Shaw Group were to value
    Westinghouse on a lower assessed fair value accepted by Toshiba); *see also* UBS, *OP*
26   *growth likely in FY11, but shares volatile on nuclear power* (Apr. 11, 2011) at 1
    ("Financial risks from nuclear power market changes include 1) partial write-down of
27   ¥350.8bn in Westinghouse goodwill and 2) the need for roughly ¥100bn if the Shaw
    Group exercises put options.  This impact cannot be overlooked since the balance
28   sheet at end-Dec was not solid . . . .").

Toshiba's books, accounting practices generally accepted in the United States ("US-GAAP") would likely have required Toshiba to write-down goodwill. *See infra* §VI(D).

82.     One of the ways that Toshiba avoided taking an impairment charge was to restructure its business at the outset of FY13. *See* ¶¶32-33, *supra*. In Toshiba's FY12 annual report, Sasaki explained the restructuring of the Company's segments as follows:

> One key part of our basic management strategy is to press ahead with the "restructuring of businesses." Using FY2008 as a reference point, over a period of three years starting from FY2009, we have achieved a reduction in fixed costs of about ¥1,500 billion, and with regard to variable costs, we have also significantly reduced procurement and logistics costs. As a result, operating income, income before taxes and net income were all brought back to the levels attained prior to the financial crisis. . . .
>
> Based on the results of our efforts to build a strong profit-making business structure, which we have been implementing over the past three years, we are now moving ahead along the path of growth.

83.     Contrary to Sasaki's statements, the reduction in costs was achieved not by successful management but through improper accounting, as described above. Moreover, the reorganization of Toshiba's segments therefore was not designed to capitalize on successful cost-reduction strategies. Rather, it appears to have been undertaken, in whole or in part, to avoid taking a write-down of the Westinghouse goodwill on a consolidated basis. *Infra* §VI(D).

84.     The goodwill associated with the Westinghouse transaction represented more than 60% of all the goodwill on Toshiba's books. Goodwill impairment charges would have reduced Toshiba's earnings at a time when Toshiba and its top executives were falsifying financial results on a massive scale to avoid much smaller negative earnings impacts. Goodwill charges would have also had significant derivative impacts on the Company, potentially requiring it to cancel its dividend payments and giving rise to violations of the covenants attached to its ¥600 billion in long-term debt.

- 29 -

85.     On November 17, 2015, Toshiba issued a press release describing the circumstances leading to the recording of the write-downs at Westinghouse.  At the end of the release, Toshiba admitted that, at least for FY12, the write-downs were required to be disclosed at the time they were taken:

> Although impairment recorded by Westinghouse Group did not influence Toshiba's financial consolidated statement, impairment recorded by Westinghouse Group in fiscal 2012 fell under the guidelines for timely disclosure, and the Company should have disclosed it appropriately at the appropriate timing.

86.     According to a November 17, 2015 Nikkei Business report describing the Company's failure to write down its Westinghouse goodwill:

> Internal documents reveal the gap between Toshiba's claims and the actual state of affairs at Westinghouse.  As the nuclear unit fell into a prolonged slump, Toshiba's management tried a number of methods to prevent it from affecting the parent's bottom line.  An internal document clearly states that if Toshiba had had to write down its goodwill related to Westinghouse, there might have been "insufficient funds for cash dividends."  Executives appear to have been concerned about this and other possibilities.

Apx. Ex. 9.

87.     The Nikkei Business article quotes at least six internal Toshiba e-mails from 2013 and 2014 reflecting the Company's efforts to avoid Westinghouse's write-down of goodwill and, after that could not be avoided, to conceal the write-downs from investors.  On July 23, 2013, Westinghouse's U.S.-based auditor, Ernst & Young ("E&Y"), signed its FY12 audit report requiring the write-down of $926 million in goodwill.  According to the Nikkei Business report:

> Ernst & Young had clear reasons for recommending a write-down in view of the difficulties Westinghouse was experiencing. An internal e-mail from Westinghouse from the time stated that it "had a particularly serious shortage of funds in the second quarter.  This fiscal year, the failure to meet sales targets for uranium and the drop in revenue due to deferred plant construction [could] have a large impact on the bottom line."

*Id.*

- 30 -

88.     On July 28, 2013, five days after the Company received E&Y's audit report, Kubo sent the following e-mail to Westinghouse executives describing his efforts to get the auditor to change its mind:

> EY . . . has tried to cut off debate.  It's completely inappropriate for an auditor to say they can't change their conclusion.  I brought this up with H, partner at [EY] ShinNihon.  I told him we'll be soliciting bids, and we hope EY will put its best foot forward with a new team.

*Id.*  Toshiba subsequently pressured EY to replace Westinghouse's U.S.-based audit manager with a Japanese manager for subsequent audits.

89.     Despite the level of internal concern at Toshiba regarding the goodwill write-downs taken at Westinghouse, the write-downs were not publicly disclosed.  As reported by Nikkei Business:

> If Westinghouse's troubles became publicly known, Toshiba would have been pressured to write down the unit's value on its consolidated statement.  Given the size of the write-down – over 100 billion yen – Toshiba no doubt wanted to contain the damage to its subsidiary.

*Id.*; *see also id.* (Quoting April 2014 e-mail from executive at Toshiba's nuclear power division: "The Westinghouse impairment test is extremely important for Toshiba. Even when on the premises, be careful not to needlessly share information with people who are not directly involved, and do not discuss company matters outside the office (during lunch, in taxis, etc.).").

90.     Throughout the investigations into Toshiba's accounting, analysts and investors again questioned whether the concealed losses and other circumstances revealed by the inquiries would require a write-down of the $2.9 billion (¥344.1 billion) in goodwill remaining on Toshiba's books from the 2006 acquisition of Westinghouse.  Following the April release announcing the SIC investigation, analysts expressed relief that Westinghouse did not appear to be involved.[9]  But on

---

[9]     *See, e.g.*, MorganStanley MUFG, *Our Take on Infrastructure Business Accounting Probe and Lifestyle Business* (Apr. 13, 2015) at 1 ("we do not think [the April 3 announcement of the SIC investigation] has anything to do with . . . Westinghouse"); SMBC Nikko, *Cut to hold on white goods deterioration, accounting investigation*

May 8, 2015 when Toshiba announced the formation of the IIC to conduct a wider probe, analysts grew more concerned over the potential impact on Westinghouse goodwill.[10]

91.    Following the July 21 release of the IIC report, analysts again questioned whether Toshiba was addressing the impact of the business conditions concealed by accounting fraud on the Westinghouse goodwill.[11]  For example:

**Explanation of past profits/losses at Westinghouse on shaky ground**

>       We note that certain aspects of the report's content differ from Toshiba's own past explanations of profit fluctuations.  We take for example Westinghouse (WEC), mentioned as Project G on page 27. Based on Toshiba's previous explanation, we understand that a total of JPY30bn in additional costs related to WEC were posted: JPY10bn in 2Q and JPY20bn in 3Q FY3/14.  Moreover, Toshiba wrote down the South Texas Project, an overseas nuclear power project operated independently of WEC, by JPY30bn in 4Q FY3/14.  This caused a total impact on the overseas nuclear power business from one-time factors of JPY60bn.  However, according to the investigation report, WEC reported to Toshiba that the risk of additional cost was $385mn in 2Q and $401mn in 3Q for a total of $786mn.  ***The amount of costs recognized in each quarter and their accompanying explanation differ considerably, raising the possibility that Toshiba misled investors on the actual situation in the nuclear power business***.

---

(Apr. 21, 2015) at 5 ("Westinghouse Electric (nuclear power-related) is probably not involved.").

[10]   *See, e.g.*, J.P. Morgan, *Westinghouse Already Included as Potential Investigation Target* (May 16, 2015) at 1 ("[W]e question whether overseas actions to achieve quotas differ from those in Japan.  Westinghouse was included as a potential investigation target, but we still see risk of uncertainty because it was not actually subject to investigation."); Mitsubishi UFJ Morgan Stanley, *Independent Committee plans to report in mid-July; Securities filing deadline extended by two months* (May 29, 2015) at 1 ("We will probably have to wait to hear the conclusions of the independent investigation committee to find out if there are problems at Westinghouse."); UBS, *The heart of the matter* (June 10, 2015) at 1 ("When we discuss Toshiba's accounting irregularities with investors, interest centers on whether Westinghouse assets will be impaired.").

[11]   *See, e.g.*, Macquarie Research, *Set to clean the slate* (July 21, 2015) at 2 ("We continue to see risk of further provisioning in FY3/16-19 related to cost overruns, notably in the AP1000 projects in the US."); UBS, *Still stuck* (July 21, 2015) at 3 ("We believe the probability has increased of the Westinghouse impairment risk that we have been concerned with not being taken care of now. . . . [W]e believe there is a high probability that there has been no improvement since the time of the acquisition and that operations are below levels planned at that time.").

Mitsubishi UFJ Morgan Stanley, *Hit to net assets may be up to JPY448.2bn; risk of capital increase a concern* (July 21, 2015) at 1.

92.    In another July 21, 2015 research report, UBS similarly noted that:

> [I]n business plans unveiled in FY06, immediately after the acquisition, the company targeted FY15 sales for the overall nuclear business (Toshiba + Westinghouse) of ¥700bn.  However, we estimate that actual sales have remained at about ¥600bn.  Furthermore, the OPM target for Westinghouse was 12%, much higher than at the time of acquisition (7%), and here too the business has likely fallen short. We believe the only way that Toshiba can convince equity markets that there is no need to write down the value of the business despite it being below medium-term business plan targets and despite the unforeseen nuclear accident in FY11 is to disclose absolute earnings levels.

UBS, *Still stuck* (July 21, 2015) at 3.

93.    When Toshiba provided its initial outline of the restatement on August 18, 2015, it sought to address concerns like those raised by Macquarie Research and UBS by telling investors that no impairment charges had been taken because Westinghouse had performed as expected since the acquisition, achieving cumulative earning before interest, taxes, depreciation, and amortization ("EBITDA") of ¥370 billion since 2006.  Toshiba assured investors that goodwill had been repeatedly tested for impairment and nothing had been detected to indicate even a "potential" for impairment.  On an August 18, conference call, Kubo told investors that annual impairment testing of Westinghouse's goodwill had been conducted every year since the acquisition, and there had been "no change" and "no event [that] happened" to show any impact on goodwill.

94.    When Toshiba issued its FY14 and restated FY09-3Q14 financial results on September 7, 2015, it confirmed that no goodwill impairment charge would be included in either the restated or current results.  Investors were buoyed by the assurances that Westinghouse's business had remained strong through the meltdowns in the financial markets and at Fukushima.  Although the market continued to question whether future write-downs would be required in light of the continuing high valuation placed on Westinghouse in Toshiba's books, the assurances that no past

- 33 -

1   write-downs had been required led investors to believe that any write-down, should

2   one be required, would be relatively slight.[12]

3        95.     However, when Toshiba issued its 2Q15 financial results on November 6,

4   2015, it admitted, for the first time, that Westinghouse itself had taken goodwill

5   impairment charges in FY12 and FY13.  On a conference call the same day, Toshiba

6   spokesman, CFO Masayoshi Hirata acknowledged that the impairment charges were

7   "not fully disclose[d] in the past on the side of the Westinghouse."

8        96.     According to a November 17, 2015 Nikkei Business report:

9        The write-downs were first discovered by Nikkei Business in Toshiba
         internal e-mails and documents, and Toshiba did not disclose them until
10       questioned by Nikkei Business reporters.  In response to the newly
         revealed accounting issues, the Tokyo Stock Exchange is launching a
11       probe.

12  Apx. Ex. 9.

13       97.     When Toshiba first disclosed the existence of the impairment charges, it

14  refused to quantify the amounts.  On November 12, 2015, however, Nikkei Business

15  reported that Westinghouse had written down its assets by $926 million in FY12 and

16  $400 million in FY13.   On November 13, 2015, Toshiba issued a press release

17  confirming the amounts of the impairment charges.  These developments stunned

18  investors:

19       The report comes after Toshiba said in July that Westinghouse
         was more profitable today than when Toshiba bought it in 2006. It could
20       be a sign that Toshiba is yet to draw a line under its $1.3 billion
         accounting scandal.

21                              *        *        *

22  _____

23  [12]  *See, e.g.*, SMBC Nikko, *NAND slowdown in 1H and full-FY3/16 could dent core
    profits* (Sept. 16, 2015) at 6 (even though "[r]umors abound concerning the risk of
24  impairment losses at nuclear power-related US subsidiary Westinghouse (WEC)"
    based on Toshiba's description of its nuclear power business "the risk from WEC
25  write-downs is relatively minor.") ; UBS, *Disappointing Results* (Sept. 14, 2015) at 2
    ("A key point for the company's irregular accounting issue was whether
26  Westinghouse's assets would be impaired or not.  No impairment loss was taken and
    the company has only recorded ¥528.2bn (UBS estimate) in related intangible assets
27  on its balance sheet.  However, the impression given is that impairment was not
    recorded this time but has not been ruled out going forward, and the market has not
28  likely entirely disregarded the risk of impairment losses.").

> The writedowns mainly reflected sluggish demand for new nuclear power plants, the report said, citing Toshiba's internal documents. The Japanese laptops-to-nuclear conglomerate does not disclose results for the nuclear power business alone.

Reuters, *Toshiba's Westinghouse unit booked losses in 2012, 2013 – report* (Nov. 12, 2013).

98.     By the close of trading on November 12, Toshiba shares had fallen more than 11% below their closing price on November 5, before the impairments were revealed.  As the *Wall Street Journal* reported on November 13, 2015:

> Toshiba Corp. shares fell sharply Friday after the Japanese electronics and industrial giant said its U.S. nuclear business, Westinghouse Electric Co., booked $1.3 billion in impairment charges, raising investor concerns about a new phase in a drawn-out accounting scandal.
>
> It was the latest in a series of unusual financial disclosures that have shaken investor trust, even after Toshiba overhauled its board and senior management this summer to try to move on from the scandal.
>
> Toshiba said at an earnings briefing last weekend that Westinghouse's plant construction business stalled after the Fukushima nuclear disaster in Japan four years ago, but didn't reveal the amount written down until late Thursday.  The company confirmed the $1.3 billion impairment charges, which took place during the 2012 and 2013 fiscal years, after a report in Japanese magazine Nikkei Business.
>
> "It's a big amount," said Naoki Fujiwara, fund manager at Shinkin Asset Management.  "It would have been fairer had they disclosed that from the beginning."

Wall Street Journal, *Toshiba Shares Dive as Westinghouse Disclosure Spooks Investors* (Nov. 13, 2015).

## V.     FRAUDULENT STATEMENTS, OMISSIONS & COURSE OF BUSINESS DURING THE CLASS PERIOD

99.     During the Class Period, Toshiba made at least three types of materially false and misleading statements and omissions: (i) false financial statements that misrepresented the Company's financial results and financial condition (*infra* §V.A.); (ii) misrepresentations about the financial condition and performance of Westinghouse and the impairment of the goodwill associated with Toshiba's acquisition of Westinghouse (*infra* §V.B.); and (iii) misrepresentations about the existence and

- 35 -

effectiveness of internal controls to detect or prevent the misrepresentation of financial results or other information about the Company's operating results and condition (*infra* §V.C.).

### A.    False Financial Statements

100.    As a result of the improper and inaccurate accounting described herein, Toshiba's quarterly and annual earnings reports included numerous materially false and misleading statements about its financial condition and results.  These statements were made in the press releases, conference calls, and presentation materials Toshiba issued to report its earnings, and in the quarterly and annual reports it filed with the FSA and SESC.

101.    The Company's financial results were initially reported in quarterly earnings releases issued about a month after the end of the quarter for the first three quarters of the year, and about two months after the end of the fiscal year.  These releases consisted of two parts: (i) a press release describing Toshiba's financial results for the period, and (ii) a set of presentation slides used at the quarterly conference calls Toshiba hosted to discuss its results with analysts and investors. References herein to earnings releases refer collectively to both parts.  Toshiba issued both English and Japanese versions of each earnings release.

102.    The Company's financial results were also reported in the quarterly and annual reports that Toshiba was required to file with the FSA and SESC.  The reports were signed by Nishida and Sasaki in FY11-FY13, and by Masashi Muromachi and Tanaka in FY14.   Toshiba's annual reports were also issued in two parts: an Operational Review containing the CEO's report and a narrative description of the Company and its business; and a Financial Review containing the Company's financial statements.  References herein to annual reports refer collectively to both parts.  Toshiba issued its quarterly and annual reports in both Japanese and English.

103.    According to Toshiba's Disclosure Policy, before the Company's earnings releases, annual and quarterly reports, and other disclosure materials were

- 36 -

released they were reviewed and approved by the Company's Finance & Accounting Division, Legal Affairs Division, Corporate Communications Division, and then by the Company's executive officers.  The materials were also discussed with the Board of Directors before being publicly released.  Pre-announcements of earnings, dividend payments, and earnings forecasts were specifically approved by the Board of Directors before being released.

104.   The quarterly and annual reports were filed on the Tokyo stock exchange's Electronic Disclosure for Investors Network ("TDnet").  Pursuant to JFIEA Art. 25, copies of the annual reports were made available for public inspection for a period of five years from the date of filing on TDnet, and copies of the quarterly reports were made available for public inspection for a period of three years from the date of filing.  The Company's Disclosure Policy states that "Toshiba makes full use of the electronic facilities provided by the Tokyo stock exchange's TDnet. Information disclosed on TDnet is also promptly disclosed via other media, including the Toshiba Web site and direct e-mail."  The policy states that Toshiba "makes every effort to assure full disclosure to investors by appropriate methods."  Pursuant to this policy, Toshiba's annual and quarterly reports, earnings releases, investor presentations, financial statements, and other information were published and continuously made available for viewing and download on the investor relations portion of the Company's website.

105.   On the day that each earnings release was issued, Toshiba also hosted a conference call to discuss the Company's financial results with investors and analysts. During the Class Period, Kubo or another senior executive of Toshiba began each call with a power point presentation and discussion of the Company's financial results for the quarter.  Toshiba provided an interpreter for the call, who was present on the live call and provided spoken translations of the statements into English.  The calls were publicized in advance by the Company, and written transcripts of the call were published and disseminated by Thomson Reuters and other sources.

1090890_1

106.   The contents of the Company's earnings releases, annual and quarterly reports, and other information published on its website and disclosed on its conference calls was disseminated further by news organizations, financial analysts, investor websites, and other sources of information for investors and, as a result, the information communicated in the Company's statements became widely available to investors and reflected in the market price for Toshiba securities.

107.   Toshiba's annual and quarterly financial reports misrepresented the Company's net sales and operating income and other financial results and metrics derived therefrom, as described below.  Net sales and operating income were the basic key performance indicators that the Company and its management used to assess its performance, as the Company told investors in its FY12 and FY13 annual reports.

108.   The misstatement of net sales and operating income in turn caused numerous other statements included with Toshiba's financial results to be materially false and misleading, including Toshiba's segment results as well as the three other key performance indicators identified by Toshiba's annual reports: operating income ratio (ratio of operating income to net sales), shareholders' equity ratio (ratio of equity attributable to shareholders of the Company to total assets), and debt-to-equity ratio.

109.   The accounting practices that caused Toshiba's net sales, operating income, and other financial results and metrics to be falsely reported are described in the IIC report (Apx. Ex. 1) and summarized in §VI below.

110.   The facts giving rise to a strong inference of scienter are detailed in the IIC report and the Company's admissions of wrongdoing, as described in §IV, *supra* and §VI, *infra*.  In particular, the improper accounting resulted from acts that were intended to conceal Toshiba's true financial condition and results by delaying recognition of losses, expenses, and required charges.  Toshiba deliberately used accounting methods that its senior executives knew to be improper, leading to the publication of financial results that were known to be inaccurate at the time they were issued.  The false accounting was systemic to the business and was directed or

- 38 -

1  knowingly permitted by Tanaka, Sasaki and Nishida during the time periods when
2  they served as Toshiba's CEO and numerous other senior Company executives.  The
3  false financial information resulted from earnings requirements imposed on Toshiba's
4  business units that Toshiba executives knew were unattainable without falsifying the
5  entities financial results.

**1.     False Annual Financial Reports**

7      111.   Toshiba's annual earnings reports for FY11, FY12, and FY13 were
8  published in the following earnings releases and annual reports that were issued
9  during the Class Period and that falsely reported the following amounts of net sales
10 and operating income:

| Class Period Annual Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| Period | Type | Date | Net Sales | Op. Income (loss) |
| FY11 | Release | May 8, 2012 | 6,100.3 | 206.6 |
| FY11 | Report | June 22, 2012 | 6,100.3 | 206.6 |
| FY12 | Release | May 8, 2013 | 5,800.3 | 194.3 |
| FY12 | Report | June 25, 2013 | 5,800.3 | 194.3 |
| FY13 | Release | May 8, 2014 | 6,502.5 | 290.8 |
| FY13 | Report | June 25, 2014 | 6,502.5 | 290.8 |

      112.   The Company's Class Period annual reports and earnings releases
incorporated or referenced the Company's FY08, FY09, and FY10 financial results,
which were originally reported in the following earnings releases and annual reports
that falsely reported the following amounts of net sales and operating income:

- 39 -

1090890_1

| Pre-Class Period Annual Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| Period | Type | Date | Net Sales | Op. Income (loss) |
| FY08 | Release | May 8, 2009 | 6,654.5 | (343.6) |
| | Report | June 24, 2009 | 6,654.5 | (343.6) |
| FY09 | Release | May 7, 2010 | 6,381.6 | 117.2 |
| | Report | June 23, 2010 | 6,381.6 | 117.2 |
| FY10 | Release | May 9, 2011 | 6,398.5 | 240.3 |
| | Report | June 22, 2011 | 6,398.5 | 240.3 |

113.   The Company's FY08, FY09, and FY10 net sales and operating income, along with other pre-Class Period financial data, was presented in the Company's Class Period financial statements as bases for investors to compare the Company's results or understand business trends across multiple earnings periods.  Toshiba's FY08, FY09, and FY10 earnings releases and annual reports remained available for public inspection and continued to be made available for viewing or downloading on Toshiba's website during the Class Period.

114.   The false financial information in Toshiba's FY09 and FY10 reports was not corrected prior to the commencement of the Class Period.  At the outset of the Class Period, Class members therefore did not know, and could not in the exercise of reasonable diligence have discovered, that the information in those releases and reports was materially false, or had been based on deliberate manipulations of accounting practices for the purpose of concealing losses and improving reported results.  As a result, the uncorrected false information that predated the Class Period remained alive in the market and continued to mislead investors during the Class Period.

115.   Toshiba's financial reports from FY09 through 3Q14 misrepresented its net sales, operating income, and other financial results and metrics by at least the amounts of the Company's restatement, as summarized in the following chart issued by the Company on September 7, 2015:[13]

---

[13]   The "before" figures in the chart below do not precisely match the previously reported results because, in preparing the chart, the Company did not revise or

## Restatement of Past Financial Results
### FY2009-FY2013

(Yen in billions)

|  | FY2009 | | | FY2010 | | | FY2011 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Before | Correction | After | Before | Correction | After | Before | Correction | After |
| Net Sales | 6,129.9 | 7.8 | 6,137.7 | 6,270.7 | -6.7 | 6,264.0 | 5,994.3 | 2.1 | 5,996.4 |
| Operating Income (Loss) | 117.6 | -45.8 | 71.8 | 238.7 | 5.8 | 244.5 | 202.6 | -87.7 | 114.9 |
| Income (Loss) before income taxes and noncontrolling interests | 27.2 | -41.5 | -14.3 | 194.7 | 7.1 | 201.8 | 145.4 | -84.0 | 61.4 |
| Net Income (Loss) | -19.7 | -34.2 | -53.9 | 137.8 | 20.5 | 158.3 | 70.1 | -66.9 | 3.2 |
| Free cash flow | 198.5 | 2.3 | 200.8 | 159.4 | -2.5 | 156.9 | -42.2 | 2.5 | -39.7 |
| Equity attributable to shareholders of the Company | 797.4 | -91.5 | 705.9 | 868.1 | -74.2 | 793.9 | 863.5 | -144.8 | 718.7 |
| Net interest-bearing debt | 950.9 | 0.0 | 950.9 | 822.5 | 2.5 | 825.0 | 1,021.5 | 0.0 | 1,021.5 |
| Net debt-to-equity ratio | 119% | 16% | 135% | 95% | 9% | 104% | 118% | 25% | 143% |

|  | FY2012 | | | FY2013 | | |
|---|---|---|---|---|---|---|
|  | Before | Correction | After | Before | Correction | After |
| Net Sales | 5,727.0 | -4.8 | 5,722.2 | 6,502.5 | -12.8 | 6,489.7 |
| Operating Income (Loss) | 197.7 | -105.6 | 92.1 | 290.8 | -33.7 | 257.1 |
| Income (Loss) before income taxes and noncontrolling interests | 159.6 | -84.7 | 74.9 | 180.9 | 1.4 | 182.3 |
| Net Income (Loss) | 77.4 | -64.0 | 13.4 | 50.8 | 9.4 | 60.2 |
| Free cash flow | -64.0 | 0.0 | -64.0 | 40.0 | 0.0 | 40.0 |
| Equity attributable to shareholders of the Company | 1,034.3 | -209.7 | 824.6 | 1,229.1 | -201.9 | 1,027.2 |
| Net interest-bearing debt | 1,262.4 | 0.0 | 1,262.4 | 1,217.0 | 0.0 | 1,217.0 |
| Net debt-to-equity ratio | 122% | 31% | 153% | 99% | 19% | 118% |

**TOSHIBA** Leading Innovation >>>                                    © 2015 Toshiba Corporation   13

### 2.    False Quarterly Financial Reports

116.    The quarterly earnings reports Toshiba issued during the Class Period falsely reported the following amounts of net sales and operating income:[14]

| Class Period Quarterly Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| **Period** | **Type** | **Date** | **Net Sales** | **Op. Income (loss)** |
| 1Q12 | Release | July 31, 2012 | 1,268.9 | 11.5 |
| | Report | Aug. __, 2012 | 1,268.9 | 11.5 |
| 2Q12 | Release | Oct. 31, 2012 | 1,417.0 | 57.5 |
| | Report | Nov. 13, 2012 | 1,417.0 | 57.2 |
| 3Q12 | Release | Jan. 31, 2013 | 1,357.1 | 29.3 |
| | Report | Feb. 8, 2013 | 1,357.1 | 29.6 |

reclassify prior results to reflect subsequent discontinuation of businesses, changes in the organization of its segments, or a change in the allocation method for administrative and overhead expenses.

[14]   The 1Q reports were typically filed in the first week of August.  However, the dates of the 1Q12 and 1Q13 reports are presently unknown because those reports are no longer publicly available.

| Class Period Quarterly Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| Period | Type | Date | Net Sales | Op. Income (loss) |
| 1Q13 | Release | July 31, 2013 | 1,390.6 | 24.3 |
| | Report | Aug. __, 2013 | 1,371.1 | 25.1 |
| 2Q13 | Release | Oct. 30, 2013 | 1,648.6 | 81.3 |
| | Report | Nov. 12, 2013 | 1,629.6 | 81.8 |
| 3Q13 | Release | Jan. 30, 2014 | 1,549.6 | 47.7 |
| | Report | Feb. 10, 2014 | 1,531.3 | 48.3 |
| 1Q14 | Release | July 31, 2014 | 1,408.0 | 39.5 |
| | Report | Aug. 8, 2014 | 1,414.0 | 47.7 |
| 2Q14 | Release | Oct. 30, 2014 | 1,700.4 | 75.6 |
| | Report | Nov. 11, 2014 | 1,700.0 | 75.6 |
| 3Q14 | Release | Jan. 29, 2015 | 1,607.8 | 49.7 |
| | Report | Feb. 9, 2015 | 1,608.0 | 49.7 |

117.   As with the Company's annual reports, Toshiba's Class Period quarterly earnings releases and reports also included net sales, operating income, and other financial metrics and information that had been falsely reported in prior quarters as bases for investors to compare the Company's results or understand business trends across multiple earnings periods.  For the first three quarters of FY12, this included false pre-Class Period information that had been reported in the first three quarters of FY11.  In addition, all of the quarterly earnings releases and quarterly reports that Toshiba had issued in FY08, FY09, FY10, and FY11 remained available for public inspection at the outset of the Class Period and continued to be made available for viewing or downloading on Toshiba's website during the Class Period.

118.   The false financial information in Toshiba's FY08, FY09, FY10, and FY11 quarterly earnings releases and reports was not corrected prior to the commencement of the Class Period.  At the outset of the Class Period, Class members therefore did not know, and could not in the exercise of reasonable diligence have discovered, that the information in those releases and reports was materially false, or had been based on deliberate manipulations of accounting practices for the purpose of concealing losses and improving reported results.  As a result, the uncorrected false

- 42 -

1090890_1

1 information that predated the Class Period remained alive in the market and continued

2 to mislead investors during the Class Period.

3   119.   The IIC found that the matters delegated to it for investigation had caused

4 the net sales and net income originally reported in the false earnings releases and false

5 SESC reports to have been misstated for every quarter between 1Q08 and 3Q14, in at

6 least the following amounts (Apx. Ex. 1 at Ex. 1 (Quarterly Correction List):

| ¥100 million | FY08 | | | | | FY09 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period | Q1 | Q2 | Q3 | Q4 | YEAR | Q1 | Q2 | Q3 | Q4 | YEAR |
| Sales | -- | 5 | 20 | 15 | 40 | 4 | (8) | (3) | 7 | -- |
| Net Profit | 31 | 142 | 90 | 20 | 282 | 131 | 167 | (13) | 115 | 400 |
| | FY10 | | | | | FY11 | | | | |
| Period | Q1 | Q2 | Q3 | Q4 | YEAR | Q1 | Q2 | Q3 | Q4 | YEAR |
| Sales | 1 | (54) | -- | -- | (53) | 43 | (10) | -- | (28) | 5 |
| Net Profit | 201 | (94) | (187) | 4 | (84) | 224 | 157 | (112) | 42 | 312 |
| | FY12 | | | | | FY13 | | | | |
| Period | Q1 | Q2 | Q3 | Q4 | YEAR | Q1 | Q2 | Q3 | Q4 | YEAR |
| Sales | 32 | 5 | 8 | (16) | 28 | (11) | 252 | (139) | (24) | 78 |
| Net Profit | 240 | 116 | 131 | 371 | 858 | (134) | 471 | (196) | (87) | 54 |
| | FY14 | | | | | | | | | |
| Period | Q1 | Q2 | Q3 | Q1-Q3 | | | | | | |
| Sales | 59 | -- | (7) | 52 | | | | | | |
| Net Profit | (69) | (83) | (152) | (304) | | | | | | |

19   120.   The actual quarterly misrepresentations were greater than the amounts

20 identified in the chart above, which does not include adjustments required for

21 improper accounting on issues outside of the matters delegated to or specifically

22 investigated by the IIC, alleged above.

23 **B.    False Statements About Westinghouse Goodwill
Impairment**

24      **1.    Failure to Disclose or Record Goodwill Impairment
Charges in FY12 and FY13**

26   121.   **Failure to comply with GAAP**.  Toshiba's FY12 financial statements

27 falsely reported goodwill and other intangible assets of $9.8 billion (¥919.3 billion)

28 without further disclosure.  Toshiba's annual report stated that "[t]he Group tested

1  goodwill for impairment in accordance with ASC No. 350[15] applying a fair value

2  based test and has concluded that there was no impairment for the years ended

3  March 31, 2013 and 2012."

4      122.   Toshiba's FY13 financial statements falsely reported goodwill and other

5  intangible assets of $9.8 billion (¥1,006.6 billion) without further disclosure.

6  Toshiba's annual report stated that "[t]he Group tested goodwill for impairment in

7  accordance with ASC No.350, applying a fair value based test and has concluded that

8  there was no impairment for the years ended March 31, 2014 and 2013."

9      123.   Westinghouse took goodwill impairment charges of approximately

10  $930 million in FY12 and $390 million in FY13.  Toshiba did not include any

11  impairment charge for Westinghouse goodwill in either its FY12 or FY13 annual

12  reports.  Neither did Toshiba disclose the goodwill impairment charges that had been

13  taken by Westinghouse until November 2015.  After the goodwill impairment charges

14  taken by Westinghouse were revealed, Toshiba asserted that the impairment charges

15  were not required to be taken on a consolidated basis because there were sufficient

16  overall cash flows to support the goodwill on its balance sheet.  However, on

17  November 17, 2015 Toshiba admitted that the impairment charges that had been taken

18  by Westinghouse were material and were required to have been disclosed at the time

19  they were taken.

20      124.   Toshiba's recent assertions that GAAP did not require the Westinghouse

21  impairment charges to be taken at the corporate level and reflected in Toshiba's

22  consolidated financial statements are conclusory and insufficiently particularized to

23  establish that this is, in fact, correct.  Toshiba had both the motive and opportunity to

24  manipulate its financial reporting in a manner that was designed to avoid recording the

25  impairment charge at the corporate level, including by manipulating the segments and

26

27  _____

[15]  Accounting Standard Codification ("ASC") Topic 350, *Intangibles-Goodwill and*

28  *Other*.

1   reporting units used to evaluate the impairment, and falsifying actual or projected

2   earnings at Westinghouse or other business units in a manner designed to avoid

3   recording an impairment.

4       125.   Toshiba's efforts to avoid taking a charge at the subsidiary level and then

5   to prevent public disclosure of the charges after they were taken, together with the

6   other deliberate and extensive manipulations of reported revenues and earnings

7   designed to avoid negative charges on the Company's financial statements, render

8   Toshiba's recent assertions of GAAP compliance uncredible.  Toshiba's FY12 and

9   FY13 annual reports were materially false and misleading to investors to the extent

10  that the reported goodwill amounts (¥1,006.6 billion for FY13) were not stated in

11  compliance with GAAP.

12      126.   **Omission of impairment charges taken by Westinghouse**.  Toshiba's

13  omission to disclose the impairment charges taken by Westinghouse in FY12 and

14  FY13 was also materially misleading to investors.  At the time of the Westinghouse

15  acquisition, Toshiba projected that the transaction would enable it to secure contracts

16  to build over 30 new reactors and increase revenue to ¥1 trillion by FY15.  By 2015,

17  however, Toshiba had won only ten contracts for new nuclear plants.  A decline in

18  cash flows resulting from the failure to secure new contracts and project delays on

19  other contracts was the primary reason that E&Y's U.S.-based auditors required an

20  asset write-down in FY13, according to a November 17, 2015 Nikkei Business article

21  based on internal Toshiba documents.  Apx. Ex. 9.

22      127.   To avoid recording the FY13 impairment charge on its consolidated

23  financial statements, Toshiba changed the way it valued goodwill by combining

24  Westinghouse with its nuclear business in Japan for valuation purposes, and then

25  valuing the business based only on its own internal projections of earnings, which

26  were (as the other accounting fraud described herein illustrates) easily manipulated.

27  *See* Apx. Ex. 9.  Avoiding the charge at the corporate level was necessary to protect

28  Toshiba from having to cancel payment of its annual cash dividend or breach the debt

1090890_1

1  covenants in the agreements covering its ¥600 billion in long-term debt.  Taking the

2  charges – or even disclosing that the charges had been taken at Westinghouse – also

3  would have alerted investors to the magnitude of the business decline in the wake of

4  the March 11, 2011 accident at the Fukushima Daiichi nuclear reactor, causing a

5  substantial decline in Toshiba's stock price.

6      128.  **Materially incomplete disclosures about Shaw Group put option**.

7  Toshiba's FY11 annual report stated the following with respect to the Shaw Group's

8  exercise of its put option:

9      In December 2011, The Shaw Group Inc. announced that its put
   options to sell to the Group all or a part of its stake in the holding
10  companies of Westinghouse Electric (20% of the holding companies of
   Westinghouse Electric) which are currently held by Nuclear Energy
11  Holdings LLC, a wholly owned subsidiary of the Shaw Group Inc., the
   announcement of which was made in September 2011, will be exercised
12  automatically in October 2012 in accordance with the contractual terms
   between Shaw Group and the Group because it did not receive the
13  consent from the third party in order to exercise its put options.  In the
   case such put options are exercised, the Group will seek for the
14  participation of new strategic partner in investment in Westinghouse,
   however the Group may bear substantial amount of investment funds
15  during the period from January 2012 when the Group acquires the stakes
   to the time of such investment by new strategic partner.  Several
16  companies have already expressed an interest in investing in
   Westinghouse and it remains open to the idea of inviting the
17  participation of new investors in Westinghouse, if the Company and such
   potential investors could share a long-term vision and business strategy
18  with respect to Westinghouse business.

19     129.  Following Toshiba's acquisition of the Shaw Group's stake in

20 Westinghouse, Toshiba's ownership interest in Westinghouse stood at 87%.

21 Toshiba's FY12 cash flow statement reflected the $1.3 billion (¥124.7 billion)

22 purchase of the Shaw Group interest.  The FY12 annual report continued to state that:

23     Several companies have already expressed an interest in investing in
   Westinghouse and the Company is considering inviting the participation
24  of new investors in Westinghouse, on the condition that the Company
   retains a majority-in-interest.

25     130.  Toshiba did not sell the Westinghouse stake acquired from the Shaw

26 Group, or any other portion of its Westinghouse ownership interests, to a new

27 investor.  The note about the expressions of outside interest in acquiring a stake in

28

1090890_1

1   Westinghouse was not included in the notes to Toshiba's FY14 financial statements.

2   The most likely reason that Toshiba failed to sell any part of its Westinghouse stake to

3   outside investors is that the offers to acquire the Westinghouse interests were at a

4   value below that reflected on Toshiba's financial statements, such that accepting the

5   offer would have required Toshiba to test and likely write-down the value of the

6   Westinghouse goodwill on its financial statements.  *See* ASC Topic 350-20-35-22

7   (quoted market prices are best evidence of fair value and should be used as basis for

8   measurement where available).

9       131.   The statements about the acquisition and potential resale of the Shaw

10   Group interests were materially misleading to investors in the absence of disclosure of

11   the significant goodwill impairment charges that had been taken at Westinghouse.

12   The concealment of the impairment charges, together with Toshiba's failure to reflect

13   those charges on its consolidated financial statements and its assertions about the

14   interest expressed by outside investors were designed to, and did, falsely assure

15   investors about the strength of Westinghouse's business and the adequacy of support

16   for the values ascribed to Westinghouse in Toshiba's consolidated financial

17   statements.

18           **2.   Continuing Concealment of Goodwill Impairment**
     **Charges During 2015 Investigations of Accounting**
19   **Fraud**

20       132.   When Toshiba released its preliminary restatement on August 18, 2015, it

21   told investors that no impairment charges had been required for the goodwill booked

22   on the Westinghouse acquisition.  A power point presentation that Toshiba provided

23   to investors along with its August 18 press release included the following two slides:

24

25

26

27

28

- 47 -

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26



27       133.   On the August 18, 2015 conference call, Toshiba CEO Muromachi

28   explained the slides as follows:

- 48 -

> Compared to the time of the acquisition of Westinghouse in 2006, EBITDA has reached – accumulated JPY370 billion, since its acquisition.
>
> In terms of the impairment evaluation of Westinghouse goodwill, we are conducting impairment tests every year for there was no change or no event happened to confirm that the – there was not the impact on the book value of the asset. We will continue to have the strict test carried out with the audit house.

134.   When Toshiba issued its restated financial results on September 7, 2015 it did not include any charges in any period reflecting the impairment of Westinghouse goodwill.  Neither did Toshiba disclose the goodwill write-downs that had been taken by Westinghouse in FY12 and FY13.

135.   Toshiba's deliberate omission to disclose the $1.3 billion in write-downs that had been taken of Westinghouse goodwill in FY12 and FY13 was materially misleading to investors, particularly given the contemporaneous circumstances surrounding the investigation into Toshiba's accounting fraud, the restatement of its results for those fiscal years, and the heightened investor concern over the potential impairment of Westinghouse goodwill.

136.   Toshiba's statements in the August 18, 2015 presentation materials showing the growth in EBITDA resulting from the Westinghouse acquisition and its assurances that it had "[f]ound nothing indicating the possibility" of an impairment charge were highly misleading to investors in the absence of a disclosure of the $1.3 billion in Westinghouse goodwill write-downs, as they presented a misleading picture of financial strength and growth that was at odds with the true condition of Westinghouse's business since the acquisition.

137.   The statements that "there was no change or no event [that] happened to confirm" that Westinghouse goodwill was impaired, and that "the fair value of goodwill has always exceeded the book value since the acquisition" were misleading both affirmatively and by omission of the FY12 and FY13 goodwill charges, which demonstrate that there had, in fact, been changes and events that had demonstrated

- 49 -

1   that Westinghouse goodwill was overstated and had been written down by
2   Westinghouse.

3       138.   Toshiba knew or recklessly disregarded that its statements about
4   Westinghouse goodwill were materially misleading to investors, or would be without
5   disclosure of the $1.3 billion in goodwill write-downs that they knew had been taken
6   in FY12 and FY13.   Throughout the disclosures of the findings from the fraud
7   investigations, Toshiba studiously avoided disclosing the historical charges against
8   Westinghouse goodwill, even as the Company was assuring investors that it was
9   providing complete disclosure in an effort to restore shareholder confidence and trust
10  in the Company.   When the goodwill charges were revealed in its 2Q15 earnings
11  report, Toshiba then took the unusual step of holding its earnings conference call on a
12  Saturday, hoping that the weekend disclosure would blunt market reaction to the
13  announcement.

14      139.   In its November 7, 2015, conference call with investors at which the
15  goodwill write-downs had been taken, Toshiba spokesman Hirata, using the slide
16  reproduced below, acknowledged that the Company had "not fully disclose[d] in the
17  past" the circumstances surrounding the evaluation or need to write-down
18  Westinghouse goodwill.

1090890_1

140.    After directing investors to the chart above, Hirata stated:

This slide, I believe will help you better understand the overall stations in terms of impairment, which I'm afraid we did not fully disclose in the past on the side of the Westinghouse. So I would like to now go through this conceptual graph to help your better understanding.  The left is the Westinghouse stand-alone and the right is Toshiba on a consolidated basis.  Westinghouse in the left shows it has four product lines on its own.   As on FY 2012, Fuel, Automation Services, and New Construction, as of FY 2013, Fuel, Automation Field Services and Engineering Equipment and the Large Construction and the New Construction.  So these are the four operating lines in operation even before the acquisition which took place back in 2006.

        Westinghouse had believed that impairment should be recorded by each line after the M&A done.  So in FY 2012 impairment, we had impairments recorded in Automation and in New Construction and in FY 2014, in New Construction.

141.    Toshiba did not disclose the amount of the impairment charges until November 13, 2015, when it issued a press release generally confirming the amounts reported the prior day by the Nikkei Business journal.

142.    Toshiba contended on the November 7 conference call and in its November 13 press release that the goodwill impairment reflected on Westinghouse's

- 51 -

1090890_1

1   books was not required to be taken at the corporate level.  Westinghouse's contentions

2   are not credible in light of the Company's repeated misrepresentations about the

3   accuracy of its accounting.  *Infra* §VI.  Even if Toshiba was correct that goodwill was

4   not impaired at the corporate level, the failure to disclose the historical impairment

5   charges that had been taken by Westinghouse was misleading, particularly in light of

6   the statements the Company had made when the restatement was announced about the

7   historical performance and financial condition of Westinghouse since the acquisition.

8       143.  Toshiba's efforts to conceal the write-downs at Westinghouse were

9   deliberate, and designed to prevent investors from discovering the significant

10  difficulties being experienced in its nuclear business.  As the November 17, 2015

11  Nikkei Business article reported:

12          Toshiba has been consistently upbeat regarding its nuclear power
            business until now.  But it has become clear that there is a gap between
13          the company's public statements and its actual state of affairs.

14  Apx. Ex. 9.

15      144.  Toshiba had significant motives to avoid taking required write-downs of

16  the Westinghouse goodwill or disclosing the goodwill write-downs that Westinghouse

17  itself had taken.  As alleged above, writing down goodwill would have: (i) reduced

18  earnings at a time when Toshiba was engaging in widespread accounting fraud to

19  avoid reporting any negative earnings; (ii) given rise to potential liquidity problems

20  arising from breaches of debt covenants attached to the debt it had incurred in

21  acquiring Westinghouse; (iii) forced cancellation of the Company's payment of an

22  annual dividend to investors; and (iv) required Toshiba to acknowledge that it had

23  paid too much for the acquisition, and that Westinghouse's business had suffered to a

24  far greater extent than was revealed following the Fukushima disaster in FY11.

25      **C.    False Statements About Internal Controls**

26      145.  Each of the operational review portions of the annual reports issued by

27  Toshiba during the Class Period contained the following statement:

28

1

**Toshiba's Internal Control Systems**

2

> Toshiba Group constantly refines its system of internal controls, towards ensuring management effectiveness and efficiency and reliable reporting on operations and finances, and to secure high level legal compliance and risk management.

3

4

> We also ensure that domestic Group companies, regardless of the scale of their operations, establish internal control systems based on those of the parent company.

5

6

> The following website provides detailed information on the structure of our internal control systems. http://www.toshiba.co.jp/ about/ir/en/governance/governance_ system.htm

7

8

2012 Annual Report Operational Review at 46; 2013 Annual Report Operational

9

Review at 44; 2014 Annual Report Operational Review at 60.

10

> 146.   The financial review portion of Toshiba's annual reports issued during

11

the Class Period each contained the following statement regarding the risks related to

12

internal control:

13

**Compliance and internal control**

14

> The Group is active in various businesses in regions worldwide, and its business activities are subject to the laws and regulations of each region.   The Group has implemented and operates necessary and appropriate internal control systems for a number of purposes, including compliance with laws and regulations and strict reporting of business and financial matters.

15

16

17

> However, there can be no assurance that the Group will always be able to structure and operate effective internal control systems. Furthermore, such internal control systems may themselves, by their nature, have limitations, and it is not possible to guarantee that they will fully achieve their objectives.   Therefore, there is no assurance that the Group will not unknowingly and unintentionally violate laws and regulations in future. Changes in laws and regulations or changes in Management's Discussion and Analysis interpretations of laws and regulations by the relevant authorities may also cause difficulty in achieving compliance with laws and regulations or may result in increased compliance costs.   On these grounds, the Group makes every effort to minimize these risks by making periodic revisions to the internal control systems, continuously monitoring operations, and so forth.

18

19

20

21

22

23

24

25

2012 Annual Report Financial Review at 16; 2013 Annual Report Financial Review

26

at 16; 2014 Annual Report Financial Review at 15.

27

28

- 53 -

147.   The operational review portion of Toshiba's 2012, 2013, and 2014 annual reports also contained the following statement, or a substantially identical statement:

**Risk Management**

At Toshiba, throughout our worldwide operations, we strive to ensure compliance with laws and regulations, social and ethical norms and internal rules. According top priority to human life and safety and to compliance in everything we do underpins our commitment to promoting business activities through fair competition and serving the interests of customers to the best of our ability.

We consider thorough adherence to the Toshiba Group Standards of Conduct (SOC), which embodies the Basic Commitment of the Toshiba Group, to be the foundation of our compliance. Thus we are working toward the SOC becoming an integral part of the entire Toshiba Group. Every year, priority themes regarding compliance are established and promoted in light of business circumstances. By implementing a Plan-Do-Check-Action (PDCA) cycle of self-assessment, not only at each in-house company but also at group companies worldwide, we are stepping up our efforts to ensure compliance.

The Risk Compliance Committee, headed by the CRO [Chief Risk Compliance Management Officer], manages serious risk and compliance issues and works with the relevant divisions to strengthen the risk management system by developing countermeasures to specific risks, plus measures to prevent their spread and recurrence.

2012 Annual Report Operational Review at 46; 2013 Annual Report Operational Review at 44; 2014 Annual Report Operational Review at 60.

148.   Toshiba's Standards of Conduct were made available to investors on Toshiba's corporate website throughout the Class Period. The Standards of Conduct included the following provisions:

**13.   Accounting**

**1.   Toshiba Group Corporate Policy**

Toshiba Group Companies shall comply with all applicable laws and regulations regarding accounting and conduct proper accounts management and financial reporting in accordance with generally accepted principles.

**2.   SOC for Toshiba Group Directors and Employees**

Directors and Employees shall:

1.     maintain proper and timely accounts in accordance with generally accepted accounting principles;

- 54 -

2.      promote the prompt release of accurate accounts; and

3.      endeavor to maintain and improve the accounting management system, and establish and implement internal control procedures for financial reporting.

**14.    Corporate Communications**

**1.    Toshiba Group Corporate Policy**

Toshiba Group Companies shall:

1.      endeavor to obtain the understanding of stakeholders, including customers, shareholders and the local community, with respect to corporate activities, products and services, and further improve public recognition of Toshiba Group and its corporate image by means of positive and timely corporate communications activities on business information (Note), such as corporate strategy and financial data; and

2.      ensure that management policies are well communicated within the company, and promote information sharing as a means of raising morale and creating a sense of unity.

**2.    SOC for Toshiba Group Directors and Employees**

Directors and Employees shall:

1.      conduct corporate communications with integrity on the basis of objective facts;

2.      conduct corporate communications by appropriate means, to enable customers, shareholders, potential investors and the members of the community of each country or region to obtain a reasonable understanding of Toshiba Group's activities; and

3.      obtain prior consent from the persons responsible for corporate communications before disclosing business information to analysts and to the media, including newspapers, magazines and television stations.

Note:  Herein, "business information" includes but is not limited to information regarding actions or activities which may raise the suspicion of such actions prohibited by these SOC (hereinafter called "Risk Compliance Information").

149.   The operational review section of Toshiba's 2012, 2013, and 2014 annual reports stated:

- 55 -

1090890_1

**Status of Internal Audits and Audits by the Audit Committee**

The Corporate Audit Division . . . reports directly to the president. It is responsible for internal audits from the perspectives of appropriate operational procedures, accountability of results and legal compliance.

The Division holds advance discussions with the Audit Committee on each year's audit policy and plans. It also holds semimonthly liaison meetings with the Audit Committee for pre-audit discussions and to share information on the divisions subject to audit.

The Corporate Audit Division carries out on-site inspections and reports its results to the Audit Committee. However, if it deems it necessary, the Audit Committee has the right to carry out its own on-site inspections.

Furthermore, in addition to receiving explanations from independent auditors (CPA) on their audit plans at the beginning of each fiscal year, the Audit Committee can also request reports on the status of audits during the course of each term, and explanations and reports on end-of-year audits, as necessary.

2012 Annual Report Operational Review at 47; 2013 Annual Report Operational Review at 45; 2014 Annual Report Operational Review at 60-61.

150.    Each of the foregoing representations was materially false and misleading to investors. Each of the representations falsely assured investors that Toshiba had an adequate and functioning system of internal controls that was reasonably designed to prevent the type of misconduct and accounting fraud herein alleged.

151.    The IIC specifically found that a lack of adequate internal controls had caused or permitted the accounting violations to occur. Apx. Ex. 1 at 70-74; *see also id.* at 46-49, 56-58, 78-79. The IIC found that "each internal control system at Toshiba did not function sufficiently," including because "[t]here was no Internal Audit Department at any Company, other than the Accounting Division, such as could check for inappropriate accounting treatment" and the Accounting Division was not doing its job:

In the case subject to this investigation, accounting personnel knew of a fact that made an accounting treatment necessary, such as recording a provision, but did not take any action, or although they easily could have known of a fact that made a certain accounting treatment necessary, they did not take any action, and further, there were many projects where no action was taken in accordance with the instruction of

- 56 -

a superior such as a business unit head or CPs, etc., and the internal control by the Accounting Division was not functioning.

*Id.* at 70.

152.   The IIC found that: (i) Toshiba's Finance Division performed no internal control measures such as checking whether or not accounting treatment was appropriate; (ii) no internal control measures were performed by other corporate divisions tasked with control responsibilities, including the Risk Management Division and the Securities Report, Etc., Disclosure Committee; (iii) the Corporate Audit Division was mainly concerned with providing management consulting services to Toshiba's business units, and "rarely conducted any services from the perspective of an accounting audit into whether or not an accounting treatment was appropriate"; (iv) internal control measures at the Board of Director level were routinely ignored; and (v) outside auditors were deliberately misled to prevent detection of the Company's fraudulent accounting activities. *Id.* at 70-74.

153.   Thus, it was materially false and misleading to investors for Toshiba to assert that:

(a)   Toshiba was "constantly refin[ing] its system of internal controls" to assure "reliable reporting on operations and finances, and to secure high level legal compliance and risk management";

(b)   Toshiba had "implemented and operates necessary and appropriate internal control systems" to achieve "compliance with laws and regulations and strict reporting of business and financial matters";

(c)   The internal controls were functioning in a manner such that only "unknowing[]" and "unintentional[]" violations were at risk of escaping detection, and Toshiba was "mak[ing] every effort to minimize these risks by making periodic revisions to the internal control systems, continuously monitoring operations, and so forth"; or

- 57 -

1090890_1

(d)     Toshiba's risk management department was "striv[ing] to ensure compliance with laws and regulations, social and ethical norms and internal rules" by "developing countermeasures to specific risks" and taking actions designed to require adherence to Toshiba's Standards of Conduct, including standards requiring Toshiba's companies, directors, and employees to "conduct proper accounts management and financial reporting in accordance with [GAAP]," to "establish and implement internal control procedures for financial reporting," and to provide timely and accurate disclosure of Toshiba's business information, including information regarding actions or activities raising suspicions of violations of GAAP or internal control requirements.

154.   The accounting fraud perpetrated prior to and during the Class Period was not the type of concealed or difficult-to-detect activity that could escape detection by an adequate and functioning system of internal controls.  To the contrary, as found by the IIC, the accounting manipulations were open and obvious, well known to and directed by management, and of a type that could not have been perpetrated if Toshiba had a functioning system of controls.  The IIC findings establish a strong inference of scienter on the part of Toshiba and its management:

> At Toshiba, the involvement of certain top management and key executives led to the deviation from and ineffectiveness of the internal control function for financial reporting, with inappropriate accounting treatments then being carried out by instructions, etc. from outside of the internal control framework. It also must be noted that an internal control (risk management) structure that anticipates inappropriate accounting treatment being carried out by such persons' involvement had not been established.

*Id.* at 70.

## VI.    SUMMARY OF ACCOUNTING FRAUD

155.   Toshiba's consolidated financial statements were based on accounting principles generally accepted in the United States (US-GAAP).  US-GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  The audit reports from Toshiba's independent auditor, Ernst & Young ShinNihon LLC

- 58 -

1   ("E&Y ShinNihon"), which were included within Toshiba's annual reports opined on

2   whether Toshiba's consolidated financial statements were presented fairly, in all

3   material respects, in conformity with US-GAAP.

4       156.   The SIC and IIC investigations focused primarily on, and found repeated

5   instances of fraud in, Toshiba's accounting for POC contracts and the improper

6   recording of revenues and expenses in Toshiba's Visual Products, Semiconductor, and

7   PC businesses, as described below.  Apx. Ex. 1 at 13.

8       157.   Toshiba's self check report identified other similar instances of improper

9   accounting, including cases where the Company had improved its operating results by

10   overstating the value of inventory; using outdated (more favorable) currency

11   conversion rates; postponing the recording of advertising, marketing, and other SG&A

12   expenses; understating anticipated warranty expenses and materials costs; failing to

13   recognize incurred labor costs; and not reporting actual or anticipated contract losses.

14   Apx. Ex. 2-A (Attachment 1 at 2-3).

15      158.   Additional accounting violations were detected by E&Y ShinNihon

16   during the review of Toshiba's FY14 results in connection with the restatement.  Apx.

17   Ex. 6.  Toshiba has admitted the accounting for the additional violations described in

18   its self check report and detected by E&Y ShinNihon was improper.  Toshiba claims

19   to have included a correction of such violations in its restatement.

20      159.   Due to the nature of the fraud and its perpetration on a worldwide basis

21   over a number of years, the internal investigations conducted to date have not yet

22   uncovered all of the instances of improper accounting or the full extent of Toshiba's

23   accounting fraud.

24      160.   In reporting the results of its self check at its June 25, 2015 general

25   meeting, Toshiba cautioned that, due to the geographic and temporal scope of the

26   misconduct and the manner in which it was carried out, the amounts that needed to be

27   corrected due to improper accounting could be incorrect because the financial impact

28   was very difficult to determine, particularly in the Visual Products and PC businesses.

1   Apx. Ex. 3 at 6-7 (amounts difficult to determine because "the volume of transactions

2   requiring examination is massive," "the scale of transactions subject to investigation is

3   expansive," and "the transactions include those involving countries other than Japan").

4        161.   The IIC based its analyses on a limited sampling of Toshiba's accounting

5   during the Class Period.  For example, the IIC's analysis of Toshiba's violations of

6   POC accounting rules was based on reviewing a limited number of POC projects that

7   had been selected from a group of such projects that had (i) been undertaken by

8   Toshiba or eight of its largest subsidiaries and (ii) identified as candidates for review

9   based on the size of the contract, amount of loss, or other criteria.  Apx. Ex. 1 at 22-

10   23.  The IIC similarly limited its review of improper recording of operating expenses

11   and parts transactions in the Visual Products and PC businesses to a subset of

12   transactions selected for review, and did not conduct a complete review of all

13   transactions over the entire time period under study.

14        162.   Thus, the specific cases of improper accounting found by the IIC and SIC

15   or described in Toshiba's self-check report or by its outside auditor only represent

16   examples of the type of misconduct that occurred, and are not a definitive

17   determination of the full nature or extent of Toshiba's fraudulent accounting.  Subject

18   to this understanding, examples of the misconduct detected to date are summarized

19   below.

20        **A.**    **False Accounting of Percentage of Completion Contracts**

21        163.   POC accounting rules represent an exception to the rule that revenues are

22   to be recognized only after services are performed or products are delivered and the

23   money is earned.  POC rules apply to construction and other contracts involving

24   performance over a long period of time, and permit revenues to be recognized

25   throughout the life of the contract in proportion to the amount of services that have

26   been performed (*i.e.*, in proportion to the percentage of completion of the contract),

27   subject to certain requirements.  One of those requirements is that as soon as it

28   becomes apparent that the company will suffer a loss on the contract, the entire

1   expected loss must be recognized, including losses that are expected to be incurred in

2   future quarters as additional (unprofitable) work required by the contract is performed.

3       164.   To inflate reported income, Toshiba understated the estimated costs

4   associated with construction projects accounted for under the POC method.  This had

5   the direct effect of overstating revenue and profits associated with the projects,

6   delaying recognition of losses on unprofitable contracts, and overstating the

7   Company's net income during the Class Period.

8       165.   Toshiba's improper accounting violated US-GAAP, including ASC

9   Topic 605-35, *Revenue Recognition [for] Construction-Type and Production-Type*

10  *Contracts*.  Profits reported based on POC accounting must be based on the difference

11  between estimated contract revenues and costs over the life of the contract, not just the

12  revenues and costs incurred as of the date of the reported financial results.  ASC

13  Topic 605-35-25-37f, 82.  Estimates of the total cost to complete a contract must also

14  be periodically reviewed and revised to reflect new information.  ASC Topic 605-35-

15  25-44e.  A provision for loss on the entire contract (not just the portion completed)

16  must be recognized when the estimated cost for the contract exceeds its estimated

17  revenue.  ASC Topic 605-35-45-1.

18      166.   The Summary of Significant Accounting Policies in Toshiba's annual

19  reports assured investors that the Company's use of POC accounting was consistent

20  with US-GAAP, including the provisions of ASC Topic 605-35 described above:

21          Revenue on long-term contracts is recorded under the percentage
    of completion method.   To measure the extent of progress toward

22  completion, [Toshiba] generally compares the costs incurred to date to
    the estimated total costs to complete based upon the most recent

23  available information.  When estimates of the extent of progress toward
    completion and contract costs are reasonably dependable, revenue from

24  the contract is recognized based on the percentage of completion.  A
    provision for contract losses is recorded in its entirety when the loss first

25  becomes evident.

26  *See, e.g.*, 2011 Annual Report Operational Review at 25.

27      167.   The IIC found that Toshiba had manipulated POC accounting rules to

28  overstate profits from FY09 through FY14, primarily by recognizing POC revenues

1090890_1

1   under contracts known to be unprofitable while refusing to recognize anticipated

2   project expenses in order to delay taking required provisions for the expected losses.

3   Apx. Ex. 1 at 19-42.  The IIC reported that violations of POC accounting requirements

4   had resulted in an overstatement of pre-tax income of ¥36 billion ($367 million) in

5   FY08, ¥79 billion ($963 million) in FY11, ¥180 billion ($1.915 billion) in FY12, ¥245

6   billion ($2.379 billion) in FY13, and ¥9 billion ($75 million) in the first three quarters

7   of FY14.

8               **1.      Westinghouse ("Project G")**

9               168.    The manner in which Toshiba accounted for significant cost overruns on

10  a $7.6 billion power plant construction contract obtained by Westinghouse provides an

11  illustrative example of the type of accounting fraud that was perpetrated during the

12  Class Period.  As a result of design changes and construction delays on the project

13  (referred to as "Project G" in the IIC report), Westinghouse reported that it expected

14  to incur additional costs of $385 million in 2Q13 and $401 million in 3Q13.

15  However, Toshiba recorded the risks at just $69 million for 2Q13 and $293 million for

16  3Q13.

17              169.    According to the IIC report, during the 3Q13 quarterly review, Toshiba's

18  outside auditor "insisted" that Toshiba use the $401 million amount reported by

19  Westinghouse because "there were no specific grounds for the [$293 million] figure

20  adopted by Toshiba."  Apx. Ex. 1 at 31.  Toshiba refused to do so, and then got the

21  auditor to agree to overlook the misrepresentation by improperly treating it as an

22  immaterial error.  Based on the unsubstantiated cost reduction, Toshiba understated its

23  3Q13 losses from the project by $107 million.   The IIC concluded that the

24  unsubstantiated cost reduction was made at the direction of Power Systems Company

25  President Igarashi, and known to Tanaka (Toshiba's President) and Kubo (its CFO)

26  before the financials were released:

27              There is a high possibility that the cause of this treatment was that Hisao
            Tanaka P and Makoto Kubo CFO, with an intention to avoid a
28          substantial negative impact that would result from recording losses in the

1   consolidated financial statements for that quarter based on a large
    increase in the total estimated cost of contract work of Project G in
2   accordance with the estimated increase amount reported by WEC
    [Westinghouse Electric Co.] and to postpone that until a subsequent
3   period, used an unsubstantiated figure of negative USD 225 million[16]
    without a detailed statement as grounds for that as an increase in the total
4   estimated cost of contract work.

5   *Id.* at 32.

6   ## 2.    Landis + Gyr ("Project H")

7        170.   Another example of the type of fraud committed by defendant is provided

8   by Toshiba's refusal to record losses on a ¥31.9 billion contract (Project H in the IIC

9   report) calling for its Social Infrastructure Systems Company ("SIS Co.") to develop a

10  communication system for utility smart meters, which is referred to as Project H in the

11  IIC report.  The contract was being performed by Landis + Gyr, a Swiss subsidiary

12  that Toshiba had acquired in 2012, announcing plans to use the acquisition to enter the

13  U.S. smart home energy market.

14       171.   In September 2013, Toshiba received an order under the contract, on

15  which it immediately forecast incurring an ¥8 billion loss.  The SIS Co. sought

16  approval for recording contract losses of at least ¥4.2 billion even before the contract

17  was awarded, but Tanaka and Hideo Kitamura refused to permit it to do so.  No

18  provision for contract losses was ever recorded.

19       172.   The IIC found that Tanaka, CFO Kubo and other Toshiba executives

20  "were fully aware of the need to record provisions for contract losses in each quarter

21  from [2Q13]."  Apx. Ex. 1 at 34.  The IIC report stated:

22        It can be surmised that both Hisao Tanaka P and Hideo Kitamura GCEO
          intended to postpone recording a loss.  It can also be surmised that no
23        provision for contract losses was recorded in the second quarter of FY
          2014 because SIS Company understood from prior statements by P and
24        others that, from the perspective of budgetary control, it would be
          necessary to generate profits equivalent to such provision to be recorded.
25

26  ---
    [16]   The $225 million was the loss on the project reported in Toshiba's consolidated
27  financial statements based on the understated expenses.  Based on the amounts
    reported by Westinghouse, the actual loss was $332 million, a material discrepancy of
28  $107 million.  *See* Apx. Ex. 1 at 31-32.

1   *Id.* at 33.

2           **3.      TIC America ("Project I")**

3           173.    The IIC found that Toshiba had similarly failed to record losses incurred

4   due to cost increases under "Project I," a $129 million order received in December

5   2010 by its U.S.-based subsidiary, TIC America, to provide electrical equipment for

6   364 subway cars in the U.S., with an option to add an additional 384 cars to the order

7   for another $122 million.  Although the project was accounted for using inspection-

8   based rather than POC accounting (*i.e.*, recording sales as equipment passed

9   inspection), the relevant accounting rules still required provisions to be made for

10  anticipated contract losses.  By the time TIC America was ready to conduct its Final

11  Design Review in March 2012, it had projected that it would cost $207 million to fill

12  the requirements of the $129 million initial order, resulting in an anticipated loss of

13  $78 million on the project.  The IIC found that a provision for the loss should have

14  been recorded at the end of FY11, with additional losses reported in subsequent

15  periods during FY12.  "However, despite the absence of any reasonable grounds, no

16  provision for losses was recorded on receipt of the order."  Apx. Ex. 1 at 35.

17          174.    The IIC found that the decision to postpone recording the loss was made

18  by Kitamura and Kubo on March 16, 2012. *Id.* at 35.  Although the need to record the

19  losses was discussed and the accounting treatment was deliberated at that time,

20  "Makoto Kubo CFO made the decision to not record provisions and no appropriate

21  instructions were given since the end of FY 2011 despite an awareness of the need to

22  record provisions for losses every quarter." *Id.* at 36.  Sasaki knew about and ratified

23  that decision:

24          Norio Sasaki P was also aware of both the multi-billion yen of
        anticipated losses and the lack of provisions for losses regarding Project
25          I, and should have either instructed or demanded the recording of
        provisions for losses, but there is no evidence that he did so.  Rather, it is
26          presumed that he did not instruct or demand the recording of provisions
        in order to avoid recording losses regarding Project I for that period.

27  *Id.* at 35.

28

175.   By the end of 2Q13, Toshiba had still recorded only a portion of the required provision for losses on Project I, because sufficient profits to offset the remaining losses on the project still had not been generated.  Tanaka and Kitamura only approved the recording of a ¥2 billion loss for the project, even though "[i]t was highly probable that both of them were able to recognize that the figure of such provision was not adequate to cover the reasonably expected loss." *Id.* at 35-36.  The loss remained understated at the end of FY13 because sufficient profits had still not been generated to cover the loss.  Tanaka and Kitamura were advised during CEO Monthly Meetings and quarterly review sessions that a ¥6 billion loss needed to be recorded, but Toshiba only recorded a loss of ¥2.5 billion.  "There is no evidence of instruction or demand to record provisions. It can be surmised that there is a high possibility that Hisao Tanaka P and Hideo Kitamura GCEO intended to postpone recording losses for that period." *Id.* at 36.

### 4.    Other Instances of False POC Accounting

176.   Despite limiting its review to just a sampling of projects where POC accounting was used, the IIC found repeated instances of deliberate violations of those rules.  The IIC report identified 19 examples of projects where POC rules had been intentionally misused to improve financial results: (i) Toshiba won contracts by agreeing to do work for less than the expected cost but refused to report the expected losses at the outset of the contract, as POC rules required (Projects A, H, I, M); (ii) Toshiba chose not to apply POC accounting rules where required to do so in order to avoid reporting losses on unprofitable contracts (Projects B, L); (iii) Toshiba did not report costs incurred for additional contract work required to be performed, in order to delay reporting a contract loss (Projects C, N); and (iv) in projecting expected profits and losses on POC contracts, Toshiba chose to ignore expected cost increases caused by higher materials acquisition costs, changed foreign currency conversion rates, or other known circumstances (Projects D, E, F, K, O), or simply reduced

- 65 -

expense projections without any reasonable basis to do so (Projects G, J).  Apx. Ex. 1 at 19-42.

177.   The IIC report identified repeated instances where the false accounting was directed by or known to and not corrected by senior executives of Toshiba, or carried out based on expectations they had set that losses should be deferred or concealed rather than reported.  *E.g.*, *id.* at 25 ("recording a provision for contract losses would not be accepted by Yasuhuru Igarashi CP"); *id.* at 26 (same); *id.* at 28 (subordinates "intended to delay recording a provision for contract losses under heavy pressure to achieve their sales target"); *id.* at 29 ("CP did not give approval for recording a provision for contract losses because he intended to postpone recording losses"); *id.* at 30 ("the sales managers were convinced that it would not be possible to receive approval to record a provision for contract losses"); *id.* at 32 (Tanaka and Kubo ordered that projected losses be reduced or deferred to later quarters, as described further below); *id.* at 33 ("Hisao Tanaka P and Toshio Kitamura GCEO intended to postpone recording a loss"); *id.* at 34 (Kubo was "fully aware of the need to record provisions for contract losses" but "no appropriate instructions were given to record provisions"); *id.* at 35 ("Hideo Kitamura GCEO and Makoto Kubo CFO intended to postpone recording a loss in this period.  Norio Sasaki P was also aware of both the multi-billion yen of anticipated losses and the lack of provisions for losses regarding Project I, and should have either instructed or demanded the recording of provisions for losses, but there is no evidence that he did so."); *id.*at 38 ("Hisao Tanaka P and Hideo Kitamura GCEO were informed of the situation at the time, but there is no evidence of instruction or demand for SIS Company to record provisions for contract losses in that period."); *id.* at 39 ("Tanaka P was informed that the target for Project K would result in prospective losses of JPY 8.7 billion . . . but indicated a course of action to the effect that the contract losses of JPY 3.5 billion be recorded").

1090890_1

1

**B.**    **Cookie Jar Accounting in Visual Products Business**

2    178.  From 2008 or earlier through 2014, Toshiba used a form of cookie jar

3  accounting to reduce or avoid reporting losses in its Visual Products Business.

4  Toshiba did so through a variety of schemes designed to defer operating expenses and

5  charges incurred in one period so that they would not be reported until a later date

6  when Toshiba was able to generate sufficient earnings to incur the expense without

7  reporting a loss.  As the IIC later recognized, "it can generally be understood by

8  anyone without any accounting expertise that this sort of treatment is a diversion from

9  appropriate accounting practice."  Apx. Ex. 1 at 46.

10    179.  The 2007 financial crisis in the United States and ensuing recession

11  caused a significant and sustained slump in Toshiba's sales of televisions and related

12  products, causing a sustained loss of profitability in its Visual Products Business.  In

13  response, corporate executives issued "Challenges" to the presidents, business

14  division heads, accounting executives and subsidiaries in the Visual Products Business

15  requiring them "to achieve the profits and losses required by each budget and to meet

16  improvements in the profits and losses mandated during each relevant period."  *Id.*

17  at 45.  "What was fundamentally merely an estimate to be seen as a budget or goal

18  amount from Corporate to the Visual Products Company was transformed into a

19  mandatory profit and loss figure that needed to be achieved within Toshiba at some

20  stage, driving the Visual Product Company to be in the situation where it had no

21  choice but to push forward and achieve those figures."  *Id.*  To achieve these targets,

22  "profits were intentionally overstated at the Visual Products Company through

23  Inappropriate [carryover of expenses]."  *Id.*

24    180.  Toshiba referred to the deferred operating expenses as "carryover," or

25  "C/O" for short.  By the end of FY10, the C/O balance had risen to ¥19.6 billion

26  (~$236 million).  However, the business "continued to generate losses, and the

27  Challenges set by Corporate became more severe.  From FY 2011 at the latest, the

28  CEO Monthly Meetings and individual exchanges often featured stern rebukes and

- 67 -

Challenges from the CEO of Corporate, directed at the Visual Product Company executives." *Id.*  In response, the Visual Products Business established express C/O requirements in amounts needed to meet Challenge goals.  The C/O requirements were then communicated to area managers by division business heads with authorization from the Company President.  In this manner, the instructions from Toshiba's President were conveyed throughout the business, and "a culture came to be established in the Visual Products Company of using every available means to meet Challenges or avoid losses." *Id.*  "[T]he root cause of the Inappropriate C/O stems from excessive demands to meet Challenges from certain top management at Corporate level." *Id.*

181.   Toshiba used a variety of schemes to generate fraudulent C/O in response to the Challenge directives from FY11 through FY14, including: (i) using cash-based accounting where accrual accounting was required; (ii) requesting vendors to delay submission of invoices for services that had already been provided; (iii) increasing the price of products shipped to affiliated companies outside of Japan while concurrently decreasing cost of manufactured goods for that quarter to generate false profits; and (iv) recognizing cost reductions that had been requested from manufacturers but not yet approved, even when they were unlikely to be achieved.

182.   Toshiba's use of C/O violated accounting rules.  US-GAAP requires expenses to be recorded in the period they are incurred.  *See, e.g.*, FASB Statement of Financial Accounting Concerts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶¶85-87, and ASC Topic 450-20, *Loss Contingencies*.  The concept that expenses be recorded in the same period in which the corresponding benefit is realized is one of the most basic tenets underlying accrual accounting.  Toshiba deliberately ignored this basic rule and instead systematically engaged in a scheme of improper timing of expense recognition, understating its expenses in a current period and/or improperly delaying expense recognition to inflate profits.

183.   Toshiba's use of C/O in its Visual Products concealed the impact of the economic downturn precipitated by the U.S. financial crisis on Toshiba's business and misrepresented actual demand for the Company's televisions and other Visual Products.

184.   The IIC found that, through its improper use of C/O, Toshiba had misstated its profits and losses in the following amounts over a six-year period:

(¥100 million)

| FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 3Q14 |
|------|------|------|------|------|------|------|
| 53 | 78 | 65 | (115) | 37 | (13) | (47) |

185.   The IIC concluded that the misstatements were deliberate:

[A]ccording to C/O reports provided to Corporate, it is evident that Norio Sasaki P was aware that C/Os were conducted to overstate the profit in the Visual Products Company by November 2011 at the latest, while Hisao Tanaka P was aware by either August 2013 or March 2014 at the latest. . . .

It is considered that both Norio Sasaki P and Hisao Tanaka P were aware that the C/O adjustments including Inappropriate C/Os were conducted to overstate profits, but took no action to address this issue.

Apx. Ex. 1 at 46.

186.   Accounting and finance personnel at both the Visual Products Company and Toshiba headquarters also knew about the inappropriate use of C/Os to inflate profits but did nothing to stop the practice.  As found by the IIC:

[T]he C/O balances including the Inappropriate C/Os . . . were shared with the accounting department, which recognized that Inappropriate C/Os were conducted, but no evidence indicates that the accounting department tried to stop or prevent the implementation of Inappropriate C/Os. From 2012 at the latest, the accounting department itself played a proactive role by examining and proposing Inappropriate C/O items, assessing the possibility of Inappropriate C/Os and communicating that to the accounting managers at overseas affiliated companies, or preparing explanations for audit corporations.

Id. at 46-47.

187.   Toshiba's internal audit personnel were also made aware of the use of C/Os but did nothing to investigate further, due to the fact that the Corporate Audit

- 69 -

1090890_1

1  Division put emphasis on advising how to improve business performance and ignored

2  their internal control function.

3      188.  To avoid detection, the use of C/Os was concealed from Toshiba's

4  outside auditors. "[T]he Visual Products Company did not disclose to the accounting

5  auditors materials or information indicating the existence of C/Os, and devised

6  explanations so that the existence of C/Os would not be revealed to the accounting

7  auditors." *Id.* at 49.

8      189.  The improper C/O balances were eliminated in FY14 in connection with

9  Toshiba's plans to spin off the Visual Products Business. "It can be surmised that one

10  of the reasons for this lies in the fact that Inappropriate C/O would be difficult to

11  continue because of the spin-off . . . causing an issue with respect to auditing and also

12  because of the substantial withdrawal from overseas business . . . scheduled for FY

13  2015." *Id.* at 46.

14  **C.    Channel Stuffing in PC Business**

15      190.  In reaction to a business decline triggered by the 2007 financial crisis in

16  the U.S., Toshiba began a long running scheme to inflate the profitability of its PC

17  business through channel stuffing.[17] The practice continued uninterrupted through

18  2014, resulting in "enormous amounts of Channel Stuffing" (Apx. Ex. 1 at 55) that

19  masked true demand for and misrepresented worldwide sales of Toshiba's PCs. The

20  IIC found that the practice had caused ***operating profit to exceed PC sales*** in the last

21  month of some quarters, when channel stuffing typically occurred.

22          The Challenge was often set in the CEO Monthly Meetings, etc.
        held when there was only a short time left until the end of that quarter.

23      Since it was difficult for the Company issued with the Challenge to

24  ――――――――――――――――――
    [17]  Channel stuffing has been defined by the American Institute of Certified Public

25  Accountants ("AICPA") as: "[A] marketing practice that suppliers sometimes use to
    boost sales by inducing distributors to buy substantially more inventory than they can

26  promptly resell. Inducements to overbuy may range from deep discounts on the
    inventory to threats of losing the distributorship if the inventory is not purchased.

27  Channel stuffing without appropriate provision for sales returns is an example of
    booking tomorrow's revenue today in order to window-dress financial statements."

28  AICPA *Indicators of Improper Revenue Recognition*.

1
2
3

achieve such large amounts of profit improvement during the short time remaining until the end of the quarter, even if they made every effort in sales, it seems that they were often forced to use the inappropriate method of Channel Stuffing of ODM Parts in order to overstate profits as the only way available to them to achieve the Challenge.

4   *Id.* at 56.

5      191.   Toshiba's channel stuffing was "conducted in an institutional manner by

6   Toshiba, involving certain top management" and was "intentionally conducted with

7   the firm aim of overstating current-period profit."  *Id.*  These illegal practices were

8   known to and continued through the tenures of three successive Toshiba Presidents,

9   Nishida, Sasaki, and Tanaka:

10
11
12
13
14

It can be found that, against the above backdrop, the Company was forced to embark on Channel Stuffing of ODM Parts because Atsutoshi Nishida P and Norio Sasaki P demanded the Company to be sure to reach the Challenge with high profit improvement.  Moreover, although Atsutoshi Nishida P and Hisao Tanaka P were aware that the profit was overstated by Channel Stuffing of ODM Parts, they did not take action such as giving instructions to immediately correct this, and instead allowed the situation to continue.

15   *Id.* at 55-56.

16      192.   During his tenure as Toshiba's President, Sasaki recognized the

17   overstatement of profits due to channel stuffing but would not permit the practices to

18   be stopped or the past overstatements to be corrected unless the PC business could do

19   so without reporting a loss, which was not possible.  *Id.* at 55.  Although Tanaka

20   sought to bring an end to the practice in FY14 after he became President, he similarly

21   did not permit Toshiba to correct the misstatements all at once, but instead sought to

22   do so gradually in a manner that was calculated to avoid revealing the fraud or

23   alarming investors.  *See id.*

24      193.   Toshiba's channel stuffing scheme was based on its ability to sell large

25   volumes of parts at inflated prices to the third party ODMs responsible for building

26   Toshiba's computers to its specifications.  Because Toshiba determined both the price

27   and volume of the parts supplied to the ODMs, it had the ability to, and did, sell more

28   parts to ODMs than were required to meet actual demand for its PCs.

- 71 -

194.   Under its manufacturing agreements with the ODMs, Toshiba supplied parts like hard drives and RAM sticks in amounts needed to support production volumes that had been determined by Toshiba.  Toshiba supplied the parts to ODMs through an overseas subsidiary, Taiwan Toshiba International Procurement Corp. ("TTIP").  TTIP charged the ODMs prices that were four-to-eight times higher than Toshiba's actual cost, *i.e.*, well above the wholesale value of the parts.[18]  Toshiba did so to prevent its true acquisition cost from being leaked to competitors by the ODMs. ODMs agreed to pay inflated parts prices because Toshiba was obligated to purchase the ODMs' inventories of assembled computers, work-in-progress ("WIP") and unused parts within a specified amount of time after TTIP had supplied the parts, and to do so at prices that would include the full price of the delivered parts.  Pursuant to the terms of its production agreements, Toshiba "in fact purchased incontrovertible extra inventories every term" – *i.e.*, inventory exceeding actual demand for its products.

195.   The difference between Toshiba's actual procurement price and the price charged to the ODMs was called the "masking difference."  At the time the parts were supplied to the ODMs, Toshiba recorded a receivable from TTIP in the amount of the masking difference.  When the assembled computers were delivered back to Toshiba through TTIP, the receivable would be marked paid and the masking difference eliminated, such that the final cost of goods sold ("COGS") ("would reflect only the actual procurement price of the parts.  However, during the time that the parts (or finished goods and WIP using the parts) remained in ODM inventories, the TTIP receivable (*i.e.*, the masking difference) was reflected as a negative cost of manufactured goods on Toshiba's books, thereby inflating its profits.  By shipping

---

[18]   In most cases, Toshiba or TTIP obtained the parts from an outside vendor, then TTIP supplied the parts to the ODM at an inflated price.  From 2Q12 to 4Q12 Toshiba used a more complicated series of internal transactions involving two other Toshiba subsidiaries – Toshiba Trading, Inc. ("TTI") and Toshiba Information Equipment (Hanghzhou) Co. Ltd. ("TIH") – that had the same effect.  *See* Apx. Ex. 1 at 52-53.

1   more products than needed to support actual demand, Toshiba was able to cause the

2   ODMs to hold excess inventory and inflate its profits by the amount of the masking

3   difference of unused Toshiba-supplied parts still sitting in ODM inventories.

4   196.   Through the foregoing transactions, the masking difference became a

5   phantom profit on Toshiba's books during the period that parts remained with the

6   ODMs.   Recording profits at the time the parts were supplied to the ODMs was

7   improper, as it did not accurately represent the actual series of transactions or their

8   economic reality.   Because the purchase of parts by an ODM was premised on

9   Toshiba's obligation to purchase the ODM's inventories of finished goods, WIP and

10   parts within a set amount of time, the original parts sale was required to be treated as a

11   transaction subject to repurchase conditions.   As a result, Toshiba was not permitted to

12   recognize any profit on the parts transactions at the time they were made, and was

13   required to deduct the masking price of all parts still in ODM inventories from its

14   profits on a quarterly basis, which it did not do.

15   197.   A major objective of GAAP in accounting for inventories is the proper

16   determination of income through the process of matching appropriate costs with

17   revenues.   ASC Topic 330-10-05, *Inventory*.   This requires determining what portion

18   of the cost of goods available for sale should be deducted from current period revenue,

19   and what portion should be carried forward as inventory to be matched against the

20   revenue of a subsequent period in which it is sold.   The proper determination of profits

21   and income takes precedence over other goals.   In measuring the gross profit on sales

22   earned during an accounting period, the COGS is subtracted from sales.   If COGS is

23   understated (*i.e.*, because some of the costs are held up in inventory at the ODMs),

24   then current period profits will be overstated.   Thus, by causing the ODMs to hold

25   excess inventory, Toshiba caused the masking difference for those parts to be

26   recognized as negative costs of manufactured goods on the parts transactions, thereby

27   reducing COGS and inflating current period profits.

28

1090890_1

198.   In addition, at least during FY12, Toshiba also sold parts held as inventory by Toshiba at an inflated price to fully owned subsidiaries, TTI and TIH, and improperly recorded profits without eliminating the intercompany profit in violation of ASC Topic 810, *Consolidation*.

199.   Toshiba's FY13 Corporate Audit Report asserted that E&Y had detected the improper accounting for ODM parts transactions but agreed to accept it based on Toshiba's representations that the parts were only in ODM inventories for a short period of time such that the improper accounting had only an immaterial impact on Toshiba's reported results:

> "Under the accounting policies, the resale profit from Buy-Sell cannot be realized until it becomes sales revenue after shifting to products. However, Buy-Sell parts held by ODMs as inventory are ordinarily equivalent to three days' worth of production.   Therefore, it was explained to the auditor that the impact on unrealized profit and loss from this situation would be very limited and approval of the current accounting treatment was obtained."

Apx. Ex. 1 at 58.

200.   By using channel stuffing to keep PC parts sold at inflated prices in ODM inventories for an extended period of time, Toshiba was able to conceal the impact of the economic downturn precipitated by the U.S. financial crisis on Toshiba's business and misrepresented actual demand for the Company's PCs.   The IIC found that, through the improper recording of profits on buy-sell ODM parts transactions, Toshiba had misstated its profits and losses in the following amounts:

(¥100 million)

| FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 |
|------|------|------|------|------|------|---------|
| 198 | 286 | (105) | 166 | 296 | 1 | (247) |

201.   "Successive CFOs and Finance and Accounting Division heads and managers were aware that the Company had recorded a large profit at the end of every quarter since 2009 and that a large portion of such profit was overstated by using Channel Stuffing of ODM Parts."   *Id.* at 57.   To conceal the improper recording of profits from detection, Toshiba's Finance and Accounting Division "intentionally

- 74 -

1090890_1

1   provided insufficient explanations to the accounting auditors so that they would not be

2   criticized by them, and acted in ways that could be seen to conceal the issues in an

3   institutional manner." *Id.*  Even when the audit department, despite these efforts at

4   concealment, "noted that there was a possibility that Buy-Sell Transactions were being

5   used to cause ODMs to retain excess volumes of parts, [] they did not go so far as to

6   make any clear comment regarding the intentional Channel Stuffing of ODM Parts,"

7   thereby permitting the illegal practices to continue.  *Id.*

8       202.   Toshiba's Audit Committee similarly failed to take any action prior to

9   January 2015 to stop or correct the overstatement of profits due to channel stuffing,

10  despite the fact that former CFOs who were aware of the practices were members of

11  the committee from June 2011 forward.  *Id.*  In November 2015, Toshiba filed suit

12  against Muraoka for damages arising from his participation or acquiescence in the

13  fraudulent channel stuffing activities, including for breaching his duty of care of

14  monitoring and supervision as a director and chairman of the Company's Audit

15  Committee from 1Q11 to 1Q14, and as a director and executive officer in charge of

16  the Finance & Accounting Division from 3Q08 to 1Q11.

17      **D.   Failure to Report Westinghouse Goodwill Impairment
           Charges, or to Record Charges on Consolidated Financial**
18         **Statements**

19      203.   Goodwill represents the excess of the purchase price over the fair value

20  of the net assets acquired in a business combination.  Goodwill is an asset representing

21  the future economic benefits arising from the other assets acquired in the acquisition

22  that are not individually identified and separately recognized.  ASC Topic 350-10-20.

23  In other words, goodwill is considered to be an asset because future economic benefits

24  are expected from it in combination with the future economic benefits of the other

25  assets acquired.

26      204.   Westinghouse took goodwill impairment charges totaling $1.3 billion in

27  FY12 and FY13.  Toshiba was required to, but did not, publicly disclose those

28  charges.   Toshiba also did not record the charges on its consolidated financial

- 75 -

1090890_1

1  statements.  Toshiba's recent assertions that GAAP did not require it to do so are not

2  credible, and appear to be incorrect.

3       205.   GAAP, specifically ASC Topic 350, requires that goodwill be tested for

4  impairment at the "reporting unit" level.  ASC Topic 350-20-20.  A reporting unit is

5  an operating segment or one level below an operating segment.  *Id*.  A component of

6  an operating segment is a reporting unit if the component constitutes a business or a

7  nonprofit activity for which discrete financial information is available and segment

8  management regularly reviews the operating results of that component.   ASC

9  Topic 350-20-35.   Two or more components of an operating segment can be

10 aggregated and deemed a single reporting unit, but only if the components have

11 similar economic characteristics.  *Id*.  The Company therefore had the opportunity to

12 manipulate its reporting units in a manner that was designed to avoid recording an

13 impairment charge.  The fact that Toshiba was changing its operating segments during

14 this time raises the possibility that it did so.

15      206.   If the goodwill evaluation shows that the carrying value of the reporting

16 unit exceeds its book value, then the goodwill is considered impaired and an

17 impairment charge must be recorded in that period.  ASC Topic 350-20-35-11.  The

18 consideration of carrying value includes consideration of the reporting unit's actual

19 and anticipated earnings.  Falsification of earnings or projections can affect the need

20 to take an impairment charge.   Toshiba was falsifying its financial results at

21 Westinghouse, the Power Company, and throughout the Social Infrastructure (in

22 FY12) and Energy (in FY13) segments during the time that the impairment charges

23 were recorded at the subsidiary level.   The nature, extent, and intent of the

24 manipulations, as described above, raises the possibility that Toshiba's false

25 accounting was perpetrated, at least in part, to avoid recording an impairment charge

26 on the consolidated financial statements.

27      207.  Toshiba has not disclosed sufficient information to demonstrate the

28 accuracy of its assertion that GAAP did not require the impairment charges to be

1090890_1

1   reported at the corporate level.  However, the information that **has** since been publicly

2   revealed since the Westinghouse impairment charges were publicly revealed strongly

3   indicates that Toshiba violated GAAP by not taking an impairment charge in its

4   consolidated financial statements for FY12 and FY13.

5       208.   Additional evidence strongly suggesting that Toshiba manipulated its

6   consolidated accounting at the corporate level to avoid recording the Westinghouse

7   write-down is found in a November 17, 2015 Nikkei Business article based on internal

8   e-mails and corporate records.  Apx. Ex. 9.  The article recounts how Toshiba initially

9   fought with Westinghouse's U.S. auditor over the FY13 write-down, then got the

10  auditor to replace the U.S.-led team with one led by its Japanese office for subsequent

11  audits, under threat of losing the ¥1 billion audit contract.  After Toshiba recognized,

12  in March 2014, that "'it would be very hard for even [the new audit team leader] to

13  alter Ernst & Young's position'" that another write-down be recorded in FY14, it

14  began intensive efforts to "'minimize[] the impact of a write-down on consolidated

15  performance.'"  *Id.*  As an executive at Toshiba's energy division wrote in an April

16  2014 e-mail:

17          We need to make an argument that will convince [EY] ShinNihon
    to evaluate our consolidated results using slightly different methods than
18          Ernst & Young proper, that is, using methods that the Japan side takes
    the initiative in applying.

19  *Id.*

20

21      209.   According to the Nikkei Business article, at the end of FY13, Toshiba

22  executives recognized the Company would have to take an impairment charge of up to

23  ¥150 billion on its consolidated financial statements if the Westinghouse impairment

24  charge exceeded $500 million, "meaning," according to an e-mail quoted in the report,

25  that "'there would be no funds for cash dividends.'"  Apx. Ex. 9.  To avoid this,

26  Toshiba changed the way it was evaluating and accounting for goodwill.  First,

27  Toshiba integrated Westinghouse with its Japanese nuclear power division, which had

28  the effect of increasing projected cash flows for the reporting unit used to evaluate

1    goodwill, thus lessening the impact of the goodwill charges taken at Westinghouse.

2    Second, Toshiba stopped using competitor stock prices as a measure of the value of

3    the business, and instead began valuing it exclusively on the basis of projected future

4    cash flows, which made it easier to inflate the value of the business.

5        210.   Toshiba's decision to stop using market prices in its goodwill valuation

6    methodology is particularly suspicious in light of its failure to resell the Shaw Group's

7    equity stake in Westinghouse after assuring investors in FY12 that it had received

8    significant interest from qualified purchasers of that interest.  Sale of the Shaw Group

9    stake at a price that was lower than that reflected on Westinghouse's books would

10   have required Toshiba to test for goodwill impairment.   US-GAAP would have

11   required the Company to use prices in active markets, rather than internal discounted

12   cash flow projections, as the best evidence of value.  ASC Topic 350-20-35-3; ASC

13   Topic 350-20-35-22.  Eliminating market prices as a basis for comparison appears to

14   have been designed to avoid the impairment findings that could have resulted from

15   such a review.  That the FY13 impairment charge at Westinghouse was limited to

16   $400 million – below the threshold that Toshiba executives had recognized would

17   require a consolidated write-down – provides additional strong circumstantial

18   evidence that the change in accounting procedures was designed solely to avoid taking

19   the charge.

20       211.   Even if Toshiba was not required to write down goodwill on a

21   consolidated level, Toshiba's statements in the FY12 and FY13 annual reports that

22   there was no goodwill impairment were materially misleading.

23       212.   Toshiba violated the Tokyo Stock Exchange's ("TSE") timely disclosure

24   rules which stipulate that a company must disclose information about losses if a

25   subsidiary included in the company's securities report incurs losses that account for

26   3% or more of the parent company's net assets.  The $930 million write-down

27   represented approximately 6% of Toshiba's net assets of $15.1 billion at March 31,

28

2013.  Toshiba's reported goodwill overstated the future benefit Westinghouse would provide by at least that amount.

213.    The TSE's parent, Japan Exchange Group, confirmed on November 17, 2015 that Westinghouse's FY12 write-downs met the timely disclosure guidelines and should have been communicated to investors.  Toshiba's publicly-issued Disclosure Policy states that its information disclosure policies meet the TSE standards, as well as the disclosure standards of the Securities Exchange Law, other legislation, and rules on timely disclosure defined by any other stock exchanges on which Toshiba is listed.

214.    Toshiba's Disclosure Policy also requires it to disclose information ***not*** required under rules of timely disclosure "in the event that such information is considered to have the potential to impact investment decisions by interested parties." The impairment charges taken by Westinghouse were information that had the potential to impact investment decisions by interested parties.  Toshiba stated that its policy was to disclose such matters "as promptly and comprehensively as possible."

215.    In its November 17, 2015 press release, Toshiba admitted that the approximately $930 million impairment of goodwill recorded by Westinghouse Group in FY12 "fell under the guidelines for timely disclosure, and [Toshiba] should have disclosed it appropriately at the appropriate timing."

### E.    Other False Accounting Practices

216.    The IIC and other internal investigations found proof of additional instances of fraudulent accounting by the Company, including the practices described below.  These practices, individually and collectively, had the purpose and effect of materially overstating Toshiba's reported profits or minimizing its reported losses.

### 1.    Failure to Record Asset Impairment Charges

217.    Toshiba's restatement also revealed that the Company had failed to write down the value of impaired fixed assets in violation of US-GAAP, including ASC Topic 360-10-35, *Property, Plant, and Equipment*, which requires that an impairment

1   loss be recognized if the carrying amount of a long-lived asset is not recoverable and

2   exceeds its fair value.

3       218.   Although the IIC recognized in its July 20, 2015 report that the required

4   restatements resulting from Toshiba's inappropriate accounting methods could require

5   fixed asset impairment and inventory charges to be booked, it did not investigate or

6   attempt to quantify the amount of those adjustments.

7       219.   On August 18, 2015, the Company acknowledged that fixed asset

8   impairment charges would be required in the PC Business, Visual Products business,

9   and Semiconductor business.  The Company said that the charges would reduce pre-

10  tax income by ¥41.8 billion ($427 million) in FY08 and ¥49.0 billion ($598 million)

11  in FY11.  Apx. Ex. 5 at 4-5.  The Company release stated that the FY08 impairment

12  was related to the PC and Visual Products businesses, and the FY11 impairment was

13  in the Semiconductor business.

14      220.   Toshiba's FY14 financial report, released at the same time as the

15  restatement, revealed an additional ¥127 billion (~$1.1 billion) in asset impairment

16  charges in FY14, including a ¥41 billion (~$342 million) full impairment charge for

17  the Company's investment in the South Texas Project, a Houston-area nuclear power

18  plant being built by Westinghouse.  Toshiba also took a ¥41.9 billion (~$349 million)

19  partial impairment charge in the Semiconductor business that Muromachi  attributed

20  to a "business downturn in white LEDs."  Although Toshiba claimed that these and

21  other assets did not become impaired until the end of FY14, based on the nature and

22  extent of the misconduct alleged herein, there is a significant probability that the

23  actual charges were required to be taken much earlier than they were.

24              **2.      Failure to Devalue Obsolete Semiconductor Inventory**

25      221.   In connection with plans to transfer manufacturing of semiconductor

26  parts from one plant to another in FY08, Toshiba manufactured a considerable number

27  of extra parts before the first plant was shutdown to assure sufficient parts would be

28  on hand during the period in which the new plant was being brought on line.

- 80 -

However, forecast demand for those parts never materialized and Toshiba was left holding a large amount of excess inventory, much of it designated for specific customers who no longer needed or wanted it. The excess and obsolete inventory was not disposed of until FY13, when Toshiba recorded a total loss of approximately ¥8.0 billion for disposed inventory. Although some of the inventory had been partially devalued before then, for most of the inventory no valuation loss was recorded before the FY13 loss was recorded.

222. Toshiba violated applicable accounting rules in delaying recognition of the loss until FY13, and in only partially devaluing the excess and obsolete inventory before then. Toshiba did so by: (i) not providing for any method for its semiconductor business to devalue obsolete or unsaleable parts based on their disposal value; (ii) failing to make any devaluation of its manufacturing inventory (*i.e.*, parts designated for use by third parties in manufacturing other products) prior to FY13; and (iii) using a combined allocation method for determining cost variances where a process specific method was required due to variations in the manner in which the increased unit cost of manufacturing due to lower plant utilization was allocated to inventory. *See* Apx. Ex. 1 at 61-66. This accounting was carried out "in such a way that made it difficult to detect from outside the Company." *Id.* at 66.

223. Toshiba's accounting for semiconductor inventory violated US-GAAP, including ASC Topic 330-10-35, *Inventory*, which requires that inventory be written down to market value "when the utility of the goods is no longer as great as their cost." "Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to damage, physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period." *Id.*

224. Both Sasaki and Tanaka "were aware of the fact that the apparent quarterly profits had been overstated as a result of [using the combined allocation method]." Apx. Ex. 1 at 66. The IIC found that the inappropriate accounting

- 81 -

treatment was continued until FY13 in order to meet the "strong demands" of Toshiba's management at CEO Monthly Meetings to meet Challenges for improved performance. *Id.*

225. The IIC found that the use of combined allocation method for semiconductor inventory caused Toshiba to overstate its profits and losses in the following amounts:

(¥100 million)

| FY09 | FY10 | FY11 | FY12 | FY13 | 3Q14 |
|------|------|------|------|------|------|
| 32 | 16 | 104 | 308 | (165) | 5 |

226. Toshiba's failure to properly account for inventory was not limited to the excess semiconductor parts described above.

227. Toshiba's self check report identified other similar instances of fraudulent and improper accounting, including: (i) failing to post a loss in FY13 when inventory was discarded due to discontinuation of sales activities; (ii) postponing the discard of obsolete inventory in an attempt to avoid posting a loss, and failing to post a provision for such loss at the time the inventory became obsolete; and (iii) under-recording the cost of inventory by failing to reflect increased unit costs of inventory. Apx. Ex. 2-A (Attachment 1 at Case Nos. 1, 3, 7).

### 3. Recognition of Phantom Profits in the Visual Products Business

228. Toshiba applied a masking difference to increase the price of parts supplied to ODMs for its Visual Products Business, and accounted for the difference between the actual acquisition cost and the inflated parts cost in the same manner as it engaged in the fraudulent practices in its PC business that are described above. This caused Toshiba to recognize the masking difference as a negative cost of manufactured goods at the time parts were supplied, artificially inflating its profits. Apx. Ex. 1 at 49-50.

229.  The accounting for ODM parts transactions in the Visual Products Business violated US-GAAP for the same reasons described above with respect to ODM parts transactions in the PC business.  *See supra* §VI.C.

230.  The IIC found that Toshiba's improper accounting for ODM parts transactions in the Visual Products Business caused Toshiba to misstate its profits and losses in the following amounts:

(¥100 million)

| FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 |
|------|------|------|------|------|------|---------|
| (5)  | 6    | (7)  | (5)  | 14   | 3    | (8)     |

### 4.  Improper Deferral of Operating Expenses in the PC Business

231.  Toshiba deferred operating expenses in its PC Business using improper C/O adjustments to overstate profits in the same manner and for the same reasons in which it did so in the Visual Products Business.  Apx. Ex. 1 at 58-60.

232.  The accounting for C/O expenses in the PC Business violated US-GAAP for the same reasons described above with respect to expense accounting in the Visual Products Business.  *See supra* §VI.B.

233.  The IIC found that Toshiba's improper accounting for C/O expenses in the PC Business caused Toshiba to misstate its profits and losses in the following amounts:

(¥100 million)

| FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 |
|------|------|------|------|---------|
| 17   | 83   | (36) | (17) | (17)    |

### 5.  Manipulation of Foreign Currency Exchange Rates

234.  Toshiba failed to apply accurate foreign currency exchange rates, where using the correct rate would have caused profits to decline or expenses to increase due to the performance of the Japanese yen against the U.S. dollar or other currencies.

235.  In FY11, for example, Toshiba obtained a contract to construct a power plant, and utilized estimates of the cost of work to be performed under the contract

that were denominated in U.S. dollars.  Throughout the project, Toshiba continued to use the exchange rate prevailing at the time the order was received ($1~85¥) from FY11 through 3Q14, by which time the value of the yen ($1~104¥) had fallen significantly.  Apx. Ex. 1 at 27-28 (Project D).  Using the incorrect conversion rate had inflated Toshiba's gross profit by ¥1,600 million (~$19.5 million).

236.  By the end of FY13 the contract was in a loss position, as the total estimated costs exceeded the total estimated income under the contract when using current exchange rates.  Toshiba's Power Systems Company nevertheless failed to record a loss and deferred taking the required loss for three more quarters.  The IIC found that there was a "reasonable degree of possibility" that the delay in recording the loss was due to "heavy pressure to achieve their sales target" and that "there was no evidence of any specific consideration" of whether the losses could be avoided.  *Id.* at 28.

237.  Toshiba's self-check report described a similar instance where the Company had taken advantage of foreign currency fluctuations to improve reported results.  Apx. Ex. 2-A (Attachment 1 at Case No. 2).  There, the Company had valued a claim for unpaid accounts receivable on a cancelled contract using foreign currency rates prevailing at the time the contract was in force.  Toshiba admitted that the Company should have taken a write down to reflect the lowered expectancy under the claim based on current foreign currency exchange rates.

### 6.    Delayed Charge and Expense Recognition

238.  Toshiba's self check report, E&Y ShinNihon's audit and the SIC and IIC investigations detected additional instances of fraudulent deferral of charges and expenses to improve reported results.  These instances further illustrate the extent and institutional nature of the accounting fraud that was perpetrated by Toshiba.

239.  <u>Deferred recognition of contract and production losses:</u> (i) In FY11, Toshiba failed to register an order resulting in a loss, and improperly delayed taking the required provision for the contract loss until FY12; (ii) Toshiba improperly

- 84 -

1    transferred losses under a consumables contract to a related contract, thereby delaying

2    recognition of a loss that should have been recorded when the consumables order was

3    received; (iii) Toshiba waited until FY14 to record an impairment or loss provision for

4    orders that fell short of expectations in FY12 under a development contract for which

5    Toshiba had recorded development expenses as an asset; and (iv) in FY11, Toshiba

6    failed to record the actual estimated costs of materials, using an under-estimated

7    amount and improperly waiting until FY12 to record the difference.

8         240.   Deferral of SG&A and other expenses: (i) In FY12, Toshiba improperly

9    postponed recording advertising, promotional and other SG&A expenses until FY13;

10   (ii) Toshiba improperly postponed recording advertising expenses incurred in FY10

11   until FY11; (iii) Toshiba understated its provision for product warranties by delaying

12   inclusion of anticipated warranty costs until a subsequent fiscal period; and

13   (iv) Toshiba failed to record FY13 labor costs, then improperly transferred those costs

14   to another department in FY14.

15        241.   Additional errors detected by E&Y ShinNihon.  During its review of the

16   restatement, Toshiba's outside auditor detected four additional items of inappropriate

17   accounting: (i) a delay in recording losses under an overseas contract to build a

18   hydroelectric power plant; (ii) a failure to record provisions for manufacturing costs

19   under a components transaction; and (iii & iv) misstatements of the amount of

20   depreciation and profit and loss on a sale accompanying the impairment of assets, and

21   following the evaluation of assets of an acquired overseas subsidiary.

## VII.   PRESUMPTION OF RELIANCE
### (FRAUD ON THE MARKET)

22

23        242.   Through the efficient operation of the markets in which Toshiba's

24   common stock was publicly traded, plaintiffs and the other members of the proposed

25   Class may be presumed to have relied upon each of the false and misleading

26   statements alleged herein.

27

28

- 85 -

1090890_1

243.   At all relevant times, the market for Toshiba's common stock was an efficient market.  The efficiency of the market for Toshiba's common stock may be established by the following facts, among others:

(a)   Toshiba's stock met the requirements for listing, and was listed and actively traded on the Tokyo Stock Exchange, a highly efficient and automated market;

(b)   Toshiba common stock was also actively traded as ADSs on the OTC market in the United States, which is also a highly efficient and automated market;

(c)   As a regulated issuer, Toshiba filed periodic public reports with the FSA and the SESC.   Toshiba was also required to comply with the formal requirements for listing on the Tokyo Stock Exchange, as set forth in Rule 601 of the Securities Listing Regulations, including minimum market capitalization requirements;

(d)   Toshiba published its quarterly and annual reports, press releases, presentation materials, and other material information of significance to investors on its website, including contemporaneous English-language versions of materials submitted to regulators in Japanese;

(e)   Toshiba regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the worldwide circuits of major news services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press, and other similar reporting services;

(f)   During the Class Period, Toshiba was followed by securities analysts employed by major brokerage firms with worldwide influence, including Citigroup, Credit Suisse Securities, UBS Securities, JP Morgan Securities, Macquarie Capital Securities, BNP Parnibas, Deutsche Bank, Morgan Stanley MUFG Securities,

- 86 -

1 | SBC Nikko, and others.  Analysts employed by each of these firms regularly wrote

2 | reports based upon the publicly available information disseminated about Toshiba.

3 | These reports were distributed to the sales force and certain customers of their

4 | respective brokerage firms;

5 |         (g)     During the Class Period, financial institutions in Japan collectively

6 | owned approximately 37% of Toshiba's outstanding shares, and other Japanese

7 | companies, including securities companies, owned approximately 6% of the

8 | outstanding shares.  Overseas investors, including financial institutions based in the

9 | United States, owned approximately 25% of Toshiba's outstanding shares during the

10 | Class Period.  Each of these institutional investors regularly analyzed and reported on

11 | the publicly available information about Toshiba and its operations; and

12 |         (h)     During the Class Period, the average daily trading volume of

13 | Toshiba's common stock was approximately 36 million shares.

14 |      244.   Information that affected the price of Toshiba's common stock also

15 | affected the price of Toshiba's ADSs in the same manner and to the same extent.  The

16 | price of Toshiba's common shares and ADSs traded on the OTC market in the United

17 | States during the Class Period was based upon and moved in tandem with the price of

18 | Toshiba's common stock traded on the TSE, as illustrated by the chart in ¶251 below.

19 | The price of TOSBF shares generally tracks the currency-adjusted price of Tokyo

20 | common stock on the Tokyo exchange.  The price of TOSYY shares, which reflect an

21 | ownership interest in six shares of Toshiba's common stock, is generally six-times the

22 | currency-adjusted price of Toshiba's common stock traded on the TSE.  As a result,

23 | the same facts that support the finding that the market for Toshiba common stock sold

24 | on the TSE in Japan was efficient also support a finding that the market for Toshiba's

25 | common stock sold on the OTC market in the United States was efficient.

26 |      245.  Through the foregoing mechanisms, the information publicly

27 | disseminated by defendant about the Company and its operations, and the import

28 | thereof, became widely available to and was acted upon by investors in the

1    marketplace such that, as a result of its transactions in Toshiba stock and ADSs, the

2    information disseminated by defendant, including the false and misleading statements

3    described above, became incorporated into and were reflected by the market price of

4    Toshiba securities.

5    246.    Under these circumstances, all purchasers of Toshiba's common stock

6    and ADSs during the Class Period are presumed to have relied upon the false and

7    misleading statements and material omissions alleged herein.

8    ## VIII.  LOSS CAUSATION & DAMAGES

9    247.    Each member of the proposed Class suffered economic losses as a direct

10   and proximate result of the misleading conduct alleged herein.  Each Class member

11   suffered similar injury as a result of: (i) their purchase of Toshiba securities at prices

12   that were higher than they would have been had defendant made truthful and complete

13   disclosures of information about the Company as necessary to prevent the statements,

14   omissions, and course of business alleged herein from being materially false or

15   misleading to investors; and (ii) their retention of those securities through the date of

16   one or more declines in the market price of those shares that was caused by the

17   revelation of facts, transactions, occurrences, or risks concealed from investors by

18   defendant's scheme to defraud, including the actual or anticipated financial

19   consequences of its concealed actions.

20   248.    The fraudulent accounting and the other misrepresentations and

21   omissions alleged herein caused Toshiba securities to trade at prices higher than they

22   would have during the Class Period had the Company disclosed accurate and truthful

23   information about the financial condition, results, and operations of its business.

24   249.    Because the misrepresentations and omissions that occurred before the

25   start of the Class Period remained uncorrected at the outset of the Class Period, they

26   continued to impact the price of Toshiba securities during the Class Period by causing

27   securities to trade at prices that were higher than they would have traded had accurate

28   and complete information been disclosed at the time of those misrepresentations or

- 88 -

1  omissions, or had Toshiba, prior to the start of the Class Period, corrected the

2  misrepresentations and disclosed the omitted facts that rendered them misleading to

3  investors.

4      250.   Even when Toshiba reported results or information that caused its stock

5  price to decline the disclosures were incomplete and misleading.  The false and

6  concealed information described herein therefore continued to maintain artificial

7  inflation in the price of Toshiba's shares by preventing the share price from suffering

8  even steeper declines that would have occurred had accurate and complete

9  information been disclosed, or had investors learned that Toshiba had long been

10  manipulating its reported results through deliberately false accounting, discovered the

11  specific manner in which Toshiba had done so at the time of each of the false earnings

12  reports described herein, or understood the impact that those manipulations had on

13  current, previously reported, or anticipated financial results.

14      251.   As illustrated by the chart below, the price of Toshiba's common stock

15  sold as ADSs (*e.g.*, TOSYY) tracked and followed the price movements of Toshiba's

16  common stock sold on the Tokyo exchange (6502) during the Class Period.  The

17  prevailing prices on both markets were therefore inflated to a similar extent by the

18  false and misleading information alleged herein, and both reacted similarly to the

19  disclosure of corrective information that revealed the facts, transactions, and

20  occurrences concealed by Toshiba's fraud, or the actual or potential impact of those

21  occurrences on the Company's financial condition, results, or prospects.

22

23

24

25

26

27

28

1090890_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    252.   The facts, transactions, and occurrences concealed from investors by

16  defendant's scheme to defraud reached the market through a series of partial

17  disclosures.  Though each of the disclosures was incomplete, each revealed some of

18  the business conditions and risks concealed by defendant's fraud scheme, leading to

19  price declines that partially corrected Toshiba's stock price by reducing the extent to

20  which it had been inflated by defendant's fraud.   These price declines caused

21  economic injury to plaintiffs and other members of the Class who had purchased

22  Toshiba securities during the Class Period at prices that had been artificially inflated

23  by the fraudulent course of business and misleading statements and omissions alleged

24  herein.

25    253.   The price of Toshiba shares declined precipitously from the time it

26  announced the formation of the SIC to investigate its use of POC accounting to the

27  time it issued its restated earnings and FY14 financial results detailing the full impact

28

- 90 -

of the accounting fraud on its financial condition and prospects and disclosed the existence and magnitude of the goodwill impairment at Westinghouse.  From April 3, 2015 thru November 13, 2015 (the "Corrective Period"), the price of Toshiba's common stock dropped by 41.8%, falling from ¥512 to ¥298 and resulting in a loss of more than ¥907 billion ($7.5 billion) in market capitalization, the majority of which was caused by the revelation of the risks, conditions, and circumstances that had been concealed by the fraud alleged herein.  During the same period, the price of TOSBF ADSs traded in the United States declined by 44.1% ($1.89/share) and the price of TOSYY ADSs traded in the United States declined by 44.6% ($11.49/share).[19]

| Loss in Value Over Corrective Period | | | |
|---|---|---|---|
| Closing Price | 6502 | TOSBF | TOSYY |
| 4/2/2015 | ¥   512.6 | $   4.29 | $ 25.79 |
| 11/13/2015 | ¥   298.3 | $   2.40 | $ 14.30 |
| *% decline* | **-41.8%** | **-44.1%** | **-44.6%** |

254.   By comparison, the Nikkei 225 Index (the "Nikkei") declined by 1.3% during the same period.[20]

255.   The decline in value during the Corrective Period exceeded the decline in value, if any, caused by general macroeconomic factors or industry-specific conditions, and was caused by the continued disclosure of information regarding the nature and extent of Toshiba's accounting fraud and delayed impairment charges and its impact on the Company's financial condition and prospects.

256.   The average trading volume of Toshiba common stock exceeded 46 million shares per day during the Corrective Period, nearly double the average

[19]   Because the U.S. markets were closed on April 3, 2015 (Good Friday), the TOSBF and TOSYY data is based on the closing price on April 2, the last trading day before the information in the April 6 disclosure reached the market.

[20]   The Nikkei, traded under the symbol NKY, is a price-weighted index of the 225 largest industrial stocks traded on the TSE.  Because the Nikkei includes Toshiba as part of its index, a portion of the decline of the index during the Corrective Period reflects the decline in the value of Toshiba shares.  Thus, the disparity between the movement of Toshiba's share price and the overall market during this period is even greater than is reflected by the data presented above.

1090890_1

1  volumes during the first three months of the year, and well above the 35 million

2  share/day average from 2010 thru 2014.  The increased level of activity in the market

3  during the Corrective Period reflects the volume of new information revealed during

4  this period about the extent to which Toshiba's past results had been improved

5  through false accounting, the measures that would be needed to correct and remediate

6  the harm from those violations, and the impact that those circumstances would have

7  on Toshiba's financial condition and earnings prospects.

8      257.   The disclosures that corrected the market price of Toshiba securities

9  during the Corrective Period to eliminate fraud-induced inflation include those

10  identified and described below.  The corrective events identified herein are based

11  upon plaintiffs' analysis and investigation to date.  Upon further investigation and

12  discovery and additional analyses, plaintiffs may change, alter, or amend their theory

13  of damages, including by identifying additional corrective events that caused or

14  contributed to the damages claimed in this action.

15      258.   On April 6, 2015, the next trading day following Toshiba's April 3

16  announcement of the investigation into POC accounting issues and the formation of

17  the SIC, the price of Toshiba common stock dropped by 4.9%, while the price of

18  TOSYY fell by 4.8% and the price of TOSBF declined by 3.8%.  By comparison, the

19  Nikkei fell 1.4% that day.  Market reaction was muted by the lack of information in

20  the press release about the extent of the accounting violations, leading analysts, and

21  market observers to anticipate a relatively modest impact on earnings.[21]

22

23  [21]  *See, e.g.*, J.P. Morgan, *We Expect Company to Target May 15 for End of
   Accounting Audit in Infrastructure Business* (April 6, 2015) at 1 ("The information
24  disclosed by the company is extremely limited . . . but we think that any impact on
   earnings due to the audit will be only temporary.  We think that any ongoing
25  overreaction by the share price to the results of the audit could offer a good
   opportunity to increase exposure to the stock."); Macquarie Research, *Looking for a
26  change in Lifestyle* (April 13, 2015) at 5 ("We do not have enough information to
   accurately estimate the amount at risk.  However, . . . a wide impact is likely ruled
27  out."); MorganStanley MUFG, *Our Take on Infrastructure Business Accounting
   Probe and Lifestyle Business* (April 13, 2015) at 1 ("we do not foresee a sizable
28  numerical impact"); SMBC Nikko, *Cut to hold on white goods deterioration,
   accounting investigation* (April 21, 2015) at 5 ("Toshiba's press release says that the

259.   On May 8, 2015, Toshiba announced that the initial findings of the SIC would require it to delegate the investigation to the IIC for a broader investigation into the "appropriateness" of Toshiba's accounting.   The price of TOSBF and TOSYY shares declined by 12.34% and 13.21% respectively.   Although the Tokyo stock market was closed at the time Toshiba issued its announcement on May 8, when the market reopened on May 11, 2015, Toshiba's common stock fell by 16.55%.

260.   The lack of detailed information in the May 8 announcement prevented analysts, investors, and other market participants from reaching firm conclusions about the scope of the problems or their impact on previously reported earnings, leading to uncertainty in the market and volatility in Toshiba's stock price.   As more information was released and further analyses were conducted, the price of Toshiba's common stock continued to fall, and by May 12 had declined by 16.8% from its closing price on May 7 prior to the announcement.   TOSBF and TOSYY shares declined by 16.4% and 17.5%, respectively, during the same period, while the Nikkei dropped by just 1%.   The declines over these three trading days[22] reflect the cumulative impact of the information that reached the market during this period about the scope and causes of the internal investigation and its potential impact on Toshiba's financial condition and results.[23]

---

investigation is into non-consolidated accounts, which we take to mean that major US subsidiary Westinghouse Electric (nuclear power-related) is probably not involved.").

[22]   May 8, 2015 was a Friday.  The markets in both Japan and the United States were closed on May 9 and 10, 2015.  It should be noted that the difference in time zones between the United States and Japan can affect when market reactions are reflected in the stock price, particularly with respect to information released at a time when markets in Japan are closed but those in the United States remain open (or vice versa).

[23]   *See, e.g.*, Macquarie Research, *Taking a harder, deeper look* (May 8, 2015) at 1 ("We are lowering our rating to Neutral until we have further clarity on the scope and scale of accounting irregularities, potential restatements of historical financials, and risk of organisational disruptions."); MorganStanley MUFG, *Suspending Rating Given Uncertain Outlook* (May 9, 2015) at 1 ("We suspend our rating, price target on Toshiba: However, we intend to continue researching the company and exchanging views with investors."); Mitsubishi UFJ Morgan Stanley, *Changing to Not Rated, from Neutral* (May 11, 2015) at 1 ("Depending on the findings of the committee, we see a possibility that the firm may have to restate earnings for earlier fiscal years.

- 93 -

261.   On May 13, 2015, Toshiba provided additional details of the accounting violations discovered by the SIC and announced that correcting the errors would require a ¥50 billion restatement of previously reported operating income.  This led to a temporary increase in Toshiba's stock price, as investors wary of uncertainty over the impact of the accounting violations returned to the market.   But following Toshiba's May 15 press conference to discuss the SIC findings and IIC investigation, at which CEO Tanaka revealed more information about the SIC findings and scope of the IIC's mandate that revealed broader problems and continued uncertainty, the price of Toshiba's shares again began to decline.[24]  By May 22, 2015, when Toshiba issued a press release announcing the specific scope of the investigation delegated to the IIC, the gains in the price of Toshiba's common stock following the May 13 announcement had been completely erased.

262.   Thereafter, the price of Toshiba's shares in Japan and the United States continued to be volatile as the market reacted to new information and analyses about

---

This raises questions about the reliability of the financial figures on which our earnings estimates are based, in view of which we withdraw our estimates and target price . . . .").

[24] *See, e.g.*, Macquarie Research, *Pain, with no gain* (May 15, 2015) at 1 ("Our impression is that the level of market concern is likely to rise; we think the market will perceive a high likelihood that the amount of improperly-booked profit will be larger than the >¥50bn already found, given risk of systematic accounting abuses and poor oversight.  Our estimate remains ¥100bn."); UBS, *Far from out of the woods* (May 15, 2015) at 1 ("As of now, the required adjustments exceed ¥50bn, which would amount to minor impact based on the size of the company's assets.  This is likely to be welcomed by the stock market.  The share priced declined though, probably because management's explanation that this basically wraps things up seems insufficient. . . . The market generally dislikes uncertainties."); MorganStanley MUFG, *Selection of Members of Independent Investigation Committee* (May 18, 2015) at 1 (Investigative findings that false accounting had resulted from weak controls and unrealistic budget targets suggest that the scope of misconduct could be broader than revealed: "Over the last few years many analysts have presumably noticed that as earnings in Toshiba's struggling business fell far short of the company's targets, other segments were being tasked with high profit targets."); J.P. Morgan, *Westinghouse Already Included as Potential Investigation Target* (May 16, 2015) at 1 ("[W]e question whether overseas actions to achieve quotas differ from those in Japan.  Westinghouse was included as a potential investigation target, but we still see risk of uncertainty because it was not actually subject to investigation.").

the extent of the fraud and the size of the required restatement, just as J.P. Morgan had predicted in a May 11, 2015 research report. *See* J.P. Morgan, *Downgrade to Neutral on Withdrawal of Guidance* (May 11, 2015) at 1 ("[W]e expect the share price to be based more on the related news flow than on business fundamentals until the results [of IIC investigation] report."). Despite the volatility in Toshiba's daily share price in reaction to the frequent updates and analyses of the fraud investigation, the market for Toshiba securities remained efficient, keeping Toshiba's stock price on a consistent downward trend that reflected the repeated negative news during the Corrective Period.

263.   For example, Toshiba's common stock rose 3% following CEO Tanaka's comment on May 29, 2015 that Toshiba's self check report had not uncovered significant new concerns, leading investors to conclude that the restatement would be limited to the ¥50 billion previously reported. The stock price then fell by the same amount following a July 4, 2015 report in Japan's leading financial newspaper, the Nikkei Business Daily (Nikkei Sangyo Shimbun, the publisher of the Nikkei index), that Toshiba's restatement was expected to rise to ¥150 billion. Toshiba shares declined further following a July 12 Business Daily report that the restatement had climbed to ¥170-¥200 billion.[25] On July 13, 2015, Toshiba's share price closed at ¥372, which was 17% lower than the ¥450 it had reached following Tanaka's May 29

---

[25]   *See, e.g.*, UBS, *Expected to avoid delisting* (May 29, 2015) at 1 ("at this point it appears that no major problems have been found"); MorganStanley MUFG, *Approval of Postponed Deadlines for Submitting Securities Reports* (May 30, 2015) at 1 ("assuming that the only issue at this point is the anticipated ¥50bn downward revision" that was previously disclosed, "we expect the share price to rebound in the near term"); MorganStanley MUFG, *Nikkei Shimbun Reports Further Cases of Inappropriate Accounting* (July 6, 2015) at 1 ("If the cumulative negative effect relating to inappropriate accounting on OP through [FY14] exceeds ¥150bn . . . shareholders' equity (¥1.2991trn) would be reduced by ~7%. . . . [W]e do not think the stock will be regarded as investable for the medium and long term until there is clarity on fundamental improvement in management, taking into account the findings of the [IIC]."); Macquarie Research, *Waiting for resolution* (July 9, 2015) at 1 ("persistent uncertainty on strategic and financial development keeps us on the sidelines").

1    press conference.   The price of TOSBF and TOSYY shares declined by similar

2    amounts (losing 16% and 15%, respectively) over the same period, while the Nikkei

3    did not (dropping just 0.2%).

4         264.   When the IIC issued its report on July 21, 2015, Toshiba's share price

5    initially increased as the scope of the accounting adjustments was in line with the

6    Business Daily report.   However, the price soon began to decline again with the

7    disclosure of additional information and analyses revealing that the scope of the

8    problems and extent of the risks were larger even than what had been reported in the

9    IIC report.[26]  By July 29, 2015, following the release of the English translation of the

10   IIC summary report (Apx. Ex. 1), the gains had been completely erased, and Toshiba

11   shares were trading below the level they were at prior to the initial release of the IIC

12   report.  Toshiba's common stock, which had closed at ¥377 prior to the report's

13   release was down to ¥366, a 3% price decline.  TOSYY and TOSBF were down as

14   well (dropping 2% and 4%, respectively).

15        265.   Toshiba shares were trading at the same level on August 18, 2015, when

16   the Company issued a press release outlining the expected restatement, updating its

17   financial forecasts, and describing the governance reforms that would be implemented

18   to address the IIC findings.   The initial stock price reaction to Toshiba's

19   announcement was again positive, as the restatement and guidance  changes were

20   generally consistent with the market's already-lowered expectations, and the

21   announced reforms seemed to indicate that Toshiba was putting the problems behind

22   it.  The price gains were again only temporary, however, as subsequent analyses and

23   information revealed that significant risks arising from or revealed by the accounting

24   fraud remained unaddressed by the anticipated restatement, including the risk of

25

26   [26]  *See, e.g.*, UBS, *Still Stuck* (July 21, 2015) at 1 ("We do not expect the scepticism
     that has gradually become widespread in the markets to be completely dispelled by the
27   investigative report and President Hisao Tanaka's Q&A session. . . .  We do not
     expect a continued share price rise.").
28

impairment charges against the goodwill that had been booked in connection with Toshiba's acquisition of Westinghouse, and the potential for additional write-downs of deferred tax assets rendered unusable as a result of Toshiba's continued lack of profitability.[27]   By August 24, 2015, the temporary gains had been erased and Toshiba's common stock had fallen back to ¥360.

266.   On September 7, 2015, following Toshiba's release of its FY15 earnings and a partial restatement of its prior earnings, the price of Toshiba's common stock fell even further, closing at ¥336, a 4.4% drop from its prior-day close.  The price reaction in the United States was delayed by the Labor Day holiday, but on September 8, 2015, the price of TOSBF dropped by 5.12% and the price of TOSYY shares declined 5.26%.  Between September 8 and September 11, 2015 additional details and analyses of the restatement and its impact on Toshiba's financial condition and results reached the market, causing Toshiba's common stock to lose an additional 8.8% in value, closing at ¥316 at the end of the trading week on Friday, September 11. TOSBF and TOSYY shares similarly fell by 9.3% and 8.7%, respectively, during this period.

267.   The price decline continued the following week after Toshiba issued its 1Q15 earnings report on Monday, September 14, which revealed the extent to which Toshiba's profits had declined once the improper accounting ceased, and the expectations that profits would continue to lag as the Company struggled to change the business practices and correct the problems that had been concealed by its false

---

[27]  *See, e.g.*, Macquarie Research, *After the Deluge* (Aug. 19, 2015) at 1 ("We are satisfied that bulk of negative newsflow surrounding the accounting scandal is now out."); UBS, *Risks receding slightly* (Aug. 18, 2015) at 1 ("Our impression is that the main uncertainties remaining in connection with the inappropriate accounting are now limited to the financial statement details.  In the short term we expect a share price rise, but the long-term issues for the company remain unchanged."); Mitsubishi UFJ MorganStanley, *Toshiba (6502): Restatements leave three major balance sheet risks* (Aug. 19, 2015) at 1 ("What the market is mainly worried about, though, are the three major balance sheet risks, which Toshiba has effectively left unaddressed at this point.").

1    accounting.[28]   On this news, the price of Toshiba's common stock fell as low as ¥292,

2    before closing at ¥309 on September 15, a further decline of 6.9% in value since the

3    end of the prior week.  TOSYY and TOSBF fell by 5.6% and 7.2%, respectively, over

4    the same period.

5         268.   Toshiba's stock declined an additional 2.3% on September 18, 2015,

6    following the Company's announcement that it had formed an Executive Liability

7    Investigation Committee to investigate the potential for bringing suit against its

8    former executives and directors.  The Nikkei rose by 2.7% the same day, resulting in a

9    net decline in Toshiba shares of approximately 5% on the news of continuing

10   investigations into misconduct by Toshiba's officers and directors.

11        269.   On November 9, 2015, following Toshiba's weekend disclosure of the

12   FY12 and FY13 write-downs of Westinghouse goodwill, the price of Toshiba ADSs

13   declined  by  more  than  7%.    Toshiba's  common  stock  fell  more  than  5%  on

14   November 9 and 10, and then dropped a further 5% on November 13, following the

15   Nikkei report quantifying the amounts of the write-downs.

16                          **IX.   CLASS ACTION ALLEGATIONS**

17        270.   Plaintiffs bring this action as a class action pursuant to Rule  23 of the

18   Federal Rules of Civil Procedure on behalf of: (i) all persons who acquired Toshiba

19   ADSs during the Class Period ("ADS Purchasers"); and (ii) all citizens and residents

20   of the United States who acquired shares of Toshiba's common stock during the Class

21   Period ("6502 Purchasers") (collectively, the "Class").  Excluded from the Class are

22   defendant, all subsidiaries, business units, and consolidated entities of Toshiba, and

23   any person who was an officer or director of Toshiba or any of its subsidiaries,

24   business  units,  or  consolidated  entities  at  any  time  from  2008  to  the  present

25

---

26   [28]   *See, e.g.,* MorganStanley MUFG, *Jun Q Results: Profit Deterioration in All
     Segments, Inventories Also Rising* (Sept. 15, 2015) at 1 ("Toshiba's priority is
27   evidently to stem the losses in unprofitable business (especially PCs, LCD TVs, home
     appliances), and it will need to restructure and pull out of businesses speedily without
28   giving undue emphasis to near-term earnings.").

(collectively, "Excluded Person(s)").  Also excluded from the Class are all members of the immediate families of any Excluded Person, all legal representatives, heirs, successors, or assigns of any Excluded Person or any member of their immediate families, all entities in which any Excluded Person has or had a controlling interest, and any person or entity claiming under any Excluded Person.

271.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  There are over 4.2 billion shares of Toshiba common stock outstanding.  The shares of Toshiba common stock and ADSs are owned by hundreds of thousands of persons.

272.   Reliance on the alleged misrepresentations and material omissions is presumed.  The market for Toshiba securities is efficient, as alleged above.  Public information regarding the Company is rapidly incorporated into and reflected by the market price for Toshiba securities.  The omitted information described herein was not known to, and could not have been discovered through reasonable investigation by, members of the Class.  Investors who purchased Toshiba securities at the prices prevailing in the market during the Class Period therefore presumptively did so in reliance upon each of the false and misleading statements and material omissions alleged herein.

273.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   whether the Exchange Act or the JFIEA was violated by Toshiba;

(b)   whether Toshiba omitted and/or misrepresented material facts;

(c)   whether Toshiba's statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- 99 -

1090890_1

1    (d)    with respect to the Exchange Act claims, whether Toshiba knew or
2    deliberately disregarded that their statements were false and misleading;

3    (e)    whether and to what extent the price of Toshiba securities was
4    affected by the alleged misrepresentations; and

5    (f)    the extent of damage sustained by Class members and the
6    appropriate measure of damages.

7    274.   Plaintiffs' claims are typical of those of the Class because plaintiffs and
8    the members of the Class both purchased Toshiba securities at the prices prevailing in
9    the market during the Class Period and sustained damages from Toshiba and its
10   management's wrongful conduct.  Damages under the JFIEA and under the Exchange
11   Act will both be calculated using common and reliable methodologies that are based
12   on the movement of Toshiba's stock price during and after the Class Period, including
13   calculations based on the price at which the Class member obtained Toshiba
14   securities, the market price of Toshiba securities at the time corrective information
15   was disclosed, and analysis of the public information that impacted the market price of
16   Toshiba securities at those times.

17   275.   Plaintiffs will adequately protect the interests of the Class and have
18   retained counsel who are experienced in class action securities litigation.  Plaintiffs
19   have no interests which conflict with those of the Class.  There are no conflicts
20   between ADS Purchasers and 6502 Purchasers, as all purchasers seek to hold
21   defendant liable based on the same alleged misrepresentations and omissions and seek
22   damages based on the same corrective events.

23   276.   A class action is superior to other available methods for the fair and
24   efficient adjudication of this controversy.

25
26
27
28

1090890_1

# X. CLAIMS FOR RELIEF

## First Claim for Relief
### (Violation of §10(b) of the Exchange Act & Rule 10b-5)
### (On Behalf of ADS Purchasers Only)

277.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

278.  By engaging in the acts, practices, and omissions previously alleged, Toshiba violated §10(b) of the Exchange Act and Rule 10b-5 by:

(a)  employing devices, schemes, and artifices to defraud;

(b)  making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)  engaging in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Toshiba securities during the Class Period.

279.  During the Class Period, Toshiba made, disseminated, and/or approved each of the statements specified in §V, *supra*.

280.  Each of the statements specified in §V, *supra*, were materially false or misleading at the time they were made, in that they contained misrepresentations of fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

281.  The statutory safe harbor conditionally provided by 15 U.S.C. §78u-5 for certain forward-looking statements does not apply to any of the statements alleged herein to be materially false or misleading because:

(a)  the statements were not forward-looking, or identified as such when made;

1090890_1

1  (b)   the statements were not accompanied by meaningful cautionary
2  language that sufficiently identified the specific, important factors that could cause
3  actual results to differ materially from those in the statement;

4  (c)   the statements were included in a financial statement prepared in
5  accordance with GAAP; or

6  (d)   the statements were made by defendant with actual knowledge that
7  the statements were false or misleading.

8  282.  Toshiba made, disseminated, or approved the statements specified in §V,
9  *supra*, while knowing or recklessly disregarding that the statements were false or
10  misleading, or omitted to disclose facts necessary to prevent the statements from
11  misleading investors in light of the circumstances under which they were made.

12  283.  Plaintiffs purchased Toshiba securities in reliance upon the truth and
13  accuracy of the statements specified in §V, *supra*, and the other information that was
14  publicly reported by Toshiba about its operations, and without knowledge of the facts,
15  transactions, circumstances, and conditions fraudulently misrepresented to or
16  concealed from the market during the Class Period, as specified above.

17  284.  Plaintiffs and the Class have suffered damages in that they:

18  (a)   paid artificially inflated prices for publicly-issued shares of
19  Toshiba securities;

20  (b)   purchased their Toshiba securities on an open, developed, and
21  efficient public market; and

22  (c)   incurred economic losses when the price of those securities
23  declined as the direct and proximate result of the public dissemination of information
24  that was inconsistent with defendant's prior public statements or otherwise alerted the
25  market to the facts, transactions, circumstances, risks, and conditions concealed by
26  Toshiba's misrepresentations and omissions, or the economic consequences thereof.

27  285.  Plaintiffs and the Class would not have purchased Toshiba securities at
28  the prices they paid, or at all, if they had been aware that the market prices had been

- 102 -

1090890_1

artificially inflated by the false and misleading statements and omissions specified above.

## Second Claim for Relief
### (Violation of §20(a) of the Exchange Act)
### (On Behalf of ADS Purchasers Only)

286.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein

287.   Toshiba and/or persons under its control violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to plaintiffs and the other members of the Class.

288.   By virtue of its position as a controlling person, Toshiba is liable pursuant to §20(a) of the Exchange Act for the acts and omissions of its directors, executive officers, subsidiaries, and affiliates in violation of the Exchange Act.

289.   Toshiba, through its ability to hire, fire, appoint, compensate, supervise, direct, and discipline employees, had the ability to control the actions of the directors, executive officers, managers, and other employees of the Company and of its business subsidiaries and affiliates, including the capacity to control the actions of each of the individuals identified in the chart below.

| Hisao Tanaka | Norio Sasaki | Hideo Kitamura |
|---|---|---|
| Makoto Kubo | Fumio Muraoka | Atsutoshi Nishida |
| Hidejiro Shimomitsu | Masahiko Fukakushi | Kiyoshi Kobayashi |
| Toshio Masaki | Yasuharu Igarashi | Keizo Maeda |
| Naoto Nishida | Fumiaki Ushio | Seiya Shimaoka |
| Masaaki Osumi | Yasuo Naruke | Shigenori Tokumitsu |
| Shinichiro Akiba | Takeshi Yokota | Yoshihiro Aburatani |
| Masakazu Kakumu | Kiyoshi Okamura | Hidehito Murato |

290.   Toshiba had the power to prevent or correct the actions of its directors, executive officers, managers, and employees to prevent the actions in violation of the federal securities laws or the securities laws of Japan.

291.   Toshiba failed to act to prevent the actions of its directors, executive officers, managers, and employees in violation of the federal securities laws or the

securities laws of Japan, or actively controlled and directed those actions so as to cause the violations of the federal securities laws and the securities laws of Japan complained of herein.

292.   Toshiba, through its ownership of the subsidiaries and affiliates involved in the fraudulent conduct herein, and its ability to hire, fire, appoint, compensate, supervise, and discipline the officers, directors, and employees thereof, had but failed to exercise the capacity to control the actions of its business subsidiaries and affiliates, and the actions of the officers and employees of those subsidiaries and affiliates, in violation of the federal securities laws and the securities laws of Japan, including by failing to act to prevent the actions of the persons named in the chart above who exercised direct control over Toshiba's subsidiaries and affiliates in order to carry out the fraudulent actions complained of herein, or directing the actions they took in violation of those laws.

293.   Toshiba's executive officers and the other persons identified in the chart above had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above.  By virtue of their high-level positions, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SESC and disseminated to the investing public, Toshiba's executive officers had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

294.   Toshiba and its executive officers and directors, because of their positions with the Company, possessed the power and authority to control the contents of Toshiba's quarterly reports, press releases, quarterly conference calls, and other

- 104 -

presentations to securities analysts, money and portfolio managers, and institutional investors. Toshiba and its executive officers were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

### Third Claim for Relief
### (Violation of JFIEA Article 21-2)
### (On Behalf of ADS Purchasers & 6502 Purchasers)

295.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

296.    Toshiba was the Issuer of the securities acquired by plaintiffs and other members of the Class.

297.    Toshiba submitted the annual reports and quarterly reports identified in ¶¶111-112 & 116 above (collectively, the "Reports") to the FSA via the TDnet.

298.    Each of the Reports contained false statements about material particulars, omitted statements as to material particulars that were required to be stated, or omitted statements of material fact that were necessary to prevent the Reports from being misleading, as alleged in §V.A.-C. above.

299.    Toshiba breached its duty to make a reasonable and diligent investigation of the statements in the Reports and any incorporated or attached documents and to ensure that the statements contained therein were truthful and accurate, and that no material information necessary to prevent the statements from being misleading had been omitted.

300.    During the period that the Reports were required to be made available for public inspection, plaintiffs and the other members of the Class acquired securities issued by Toshiba.

301.    The false statements and omissions were concealed by defendant and unknown to the investing public, as alleged above.  At the time plaintiffs and the other

- 105 -

members of the Class acquired the securities issued by Toshiba they did not know, and in the exercise of reasonable diligence could not have known, that the statements in the Reports were false or that the Reports omitted statements of material particulars or material facts that were required to be stated therein or necessary to prevent the Reports from being misleading.

302.   The material false information and omissions in the Reports artificially inflated the prices of the securities acquired by plaintiffs and the other members of the Class.

303.   Plaintiffs and other members of the Class suffered damages arising from the statements alleged herein being false or having omitted material information due to the declines in the market value of Toshiba securities that occurred during the Corrective Period, as alleged above.  The damages sustained by plaintiffs and other members of the Class were not due to circumstances other than the decline in the value of Toshiba securities arising from the false and misleading statements alleged herein.

304.   Toshiba is therefore liable under Article 21-2 to compensate plaintiffs for damage arising from the false statements and omissions in the Reports.

## XI.   PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against defendant for all damages sustained as a result of defendant's wrongdoing in an amount to be proven at trial, including interest;

C.     Awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

- 106 -

1

## XII.   JURY DEMAND

2

305.   Plaintiffs demand a trial by jury on all issues so triable.

3

4

DATED:  December 17, 2015

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN &
   DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
JOHN H. GEORGE


                    s/ Dennis J. Herman
            DENNIS J. HERMAN

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

- 107 -

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on December 17, 2015, I authorized the electronic filing of

3   the foregoing with the Clerk of the Court using the CM/ECF system which will send

4   notification of such filing to the e-mail addresses denoted on the attached Electronic

5   Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6   document or paper via the United States Postal Service to the non-CM/ECF

7   participants indicated on the attached Manual Notice List.

8        I certify under penalty of perjury under the laws of the United States of America

9   that the foregoing is true and correct.  Executed on December 17, 2015.

10                                                       s/ Dennis J. Herman
                                                DENNIS J. HERMAN
11
                                                ROBBINS GELLER RUDMAN
12                                                & DOWD LLP
13                                              Post Montgomery Center
                                                One Montgomery Street, Suite 1800
14                                              San Francisco, CA  94104
                                                Telephone:  415/288-4545
15                                              415/288-4534 (fax)
                                                E-mail:  dennish@rgrdlaw.com
16

17

18

19

20

21

22

23

24

25

26

27

28

1090890_1

# Mailing Information for a Case 2:15-cv-04194-DDP-JC Mark Stoyas v. Toshiba Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Danielle S Myers**
  dmyers@rgrdlaw.com,Dennish@rgrdlaw.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Willow E Radcliffe**
  willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com,kirstenb@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Christopher M. Curran
Jamie M. Crowe
White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005-3807

Bryan A. Merryman
White & Case LLP
555 South Flower Street, Suite 2700
Los Angeles, CA  90071-2433

Owen C. Pell
White & Case LLP
1155 Avenue of the Americas
New York, NY  10036-2787
```

EXHIBIT A

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

AUTOMOTIVE INDUSTRIES PENSION TRUST FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Wang, et al. v. Ariad Pharmaceuticals, Inc., et al.*, No. 1:13-cv-12544 (D. Mass.)

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

TOSHIBA

110

1   except such reasonable costs and expenses (including lost wages) directly relating to

2   the representation of the class as ordered or approved by the court.

3         I declare under penalty of perjury that the foregoing is true and correct.

4   Executed this  16th  day of December, 2015.

5                         AUTOMOTIVE INDUSTRIES PENSION
                      TRUST FUND

6

7                       By: _____

8                         Michael Schumacher, Fund
                      Manager

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TOSHIBA

111

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 03/23/2015 | 36,000 | $25.57 |

EXHIBIT B

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND ("Plaintiff") declares:

    1.    Plaintiff has reviewed a complaint and authorized its filing.

    2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

    3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

    4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

    5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

    6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

TOSHIBA

113

1  except such reasonable costs and expenses (including lost wages) directly relating to

2  the representation of the class as ordered or approved by the court.

3      I declare under penalty of perjury that the foregoing is true and correct.

4  Executed this *14th* day of December, 2015.

5                   NEW ENGLAND TEAMSTERS &
                 TRUCKING INDUSTRY PENSION FUND

6

7         By:

8                   Edward F. Groden, Executive
                 Director

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

TOSHIBA

114

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 04/01/2015 | 110,400 | ¥ 503.42 |
| 04/02/2015 | 66,600 | ¥ 512.26 |
| 09/04/2015 | 58,000 | ¥ 356.51 |
| 10/22/2015 | 57,600 | ¥ 340.53 |
| 10/23/2015 | 9,000 | ¥ 343.35 |
| 10/26/2015 | 23,400 | ¥ 356.66 |
| 10/27/2015 | 18,000 | ¥ 349.00 |