1    ROBBINS GELLER RUDMAN
       & DOWD LLP
2    DENNIS J. HERMAN (220163)
     WILLOW E. RADCLIFFE (200087)
3    JOHN H. GEORGE (292332)
     Post Montgomery Center
4    One Montgomery Street, Suite 1800
     San Francisco, CA  94104
5    Telephone:  415/288-4545
     415/288-4534 (fax)
6    dennish@rgrdlaw.com
     willowr@rgrdlaw.com
7    jgeorge@rgrdlaw.com

8    Lead Counsel for Plaintiff

9                      UNITED STATES DISTRICT COURT

10                    CENTRAL DISTRICT OF CALIFORNIA

11   MARK STOYAS and NEW              )   Case No. 2:15-cv-04194-DDP(JCx)
     ENGLAND TEAMSTERS &              )
12   TRUCKING INDUSTRY PENSION        )   CLASS ACTION
     FUND,                            )
13                                    )   PLAINTIFFS' MEMORANDUM IN
                      Plaintiffs,     )   OPPOSITION TO DEFENDANT
14                                    )   TOSHIBA CORPORATION'S
              and                     )   NOTICE OF MOTION AND MOTION
15                                    )   TO DISMISS
     AUTOMOTIVE INDUSTRIES            )
16   PENSION TRUST FUND, Individually )   DATE:        May 2, 2016
     and on Behalf of All Others Similarly )   TIME:        10:00 a.m.
17   Situated,                        )   JUDGE:       Hon. Dean D. Pregerson
                                      )   COURTROOM:    3
18                   Lead Plaintiff,  )
                                      )
19            vs.                     )
                                      )
20   TOSHIBA CORPORATION,             )
                                      )
21                   Defendant.       )
                                      )
22

23

24

25

26

27

28

1128565_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  ARGUMENT ...................................................................... 2

    A.   *Morrison* Does Not Preclude Enforcement of the U.S. Exchange Act Against Domestic ADS Transactions........................... 4

        1.   The Exchange Act Applies to All Domestic Transactions, Including Purchases on the U.S. OTC Market ........................ 5

        2.   Application of the Exchange Act Does Not Turn on Whether an ADS Is "Sponsored" or Not .................................... 9

            a.   Arguments Generally Applicable to Transactions in ADSs Do Not Support Dismissal ............................... 10

            b.   The "Unsponsored" Character of the ADSs Does Not Insulate Toshiba from Liability ............................... 12

    B.   Toshiba Fails to Show Any Basis for Dismissal of Japanese Law Claims over Which This Court Has Original Jurisdiction on Grounds of Comity or Inconvenience............................................ 21

        1.   No Legitimate Issue of Comity Is Raised Here....................... 22

            a.   The Cases on Which Toshiba Rests Bear Little Resemblance to This One............................................... 22

            b.   Toshiba Fails to Properly Invoke Adjudicatory Comity ....................................................................... 25

            c.   *Morrison* Does Not Support Toshiba's Comity Argument .................................................................. 26

            d.   The Balance of Interests Does Not Support Comity Dismissal .................................................................. 27

        2.   Toshiba Fails to Show that This Forum Is Inconvenient ......... 31

            a.   Toshiba Ignores that Substantial Discovery Will Be Required in the United States ................................... 33

            b.   The Application of Japanese Law Will Not Be Difficult .................................................................... 37

III. CONCLUSION ................................................................. 40

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ............................................................. 9, 19

*Akazawa v. Link New Tech. Int'l, Inc.*,
   520 F.3d 1354 (Fed. Cir. 2008) ............................................................. 38

*Am. Ass'n of Naturopathic Physicians v. Hayhurst*,
   227 F.3d 1104 (9th Cir. 2000) ............................................................. 17

*Atlantica Holdings, Inc. v. BTA Bank, JSC*,
   2015 U.S. Dist. LEXIS 3209
   (S.D.N.Y. Jan. 12, 2015) ............................................................. 21

*Bigio v. Coca-Cola Co.*,
   448 F.3d 176 (2d Cir. 2006) ............................................................. 27

*Bost. Telecomms. Grp., Inc. v. Wood*,
   588 F.3d 1201 (9th Cir. 2009) ............................................... 31, 33, 35, 37

*Bruno v. Quten Research Inst., LLC*,
   280 F.R.D. 524 (C.D. Cal. 2011) ............................................................. 2

*Carijano v. Occidental Petroleum Corp.*,
   643 F.3d 1216 (9th Cir. 2011) ............................................... 32, 33, 34, 35

*Cheng v. Boeing Co.*,
   708 F.2d 1406 (9th Cir. 1983) ............................................................. 31

*Colo. River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976) ............................................................. 22, 30

*Cooper v. Tokyo Elec. Power Co., Inc.*,
   slip op. (S.D. Cal. June 11, 2016) ............................................................. 29, 30

*Copeland v. Fortis*,
   685 F. Supp. 2d 498 (S.D.N.Y. 2010) ............................................................. 19

*Cornwell v. Credit Suisse Grp.*,
   729 F. Supp. 2d 620 (S.D.N.Y. 2010) ............................................................. 10

- ii -

1

2                                                                                      **Page**

3
*CYBERsitter, LLC v. People's Republic of China*,
4       2010 U.S. Dist. LEXIS 128345
5       (C.D. Cal. Nov. 18, 2010) ................................................................. 35

6   *Dole Food Co. v. Watts*,
7       303 F.3d 1104 (9th Cir. 2002) ......................................................... 31

8   *Ernst & Ernst v. Hochfelder*,
9       425 U.S. 185 (1976) ............................................................... 28, 30

10  *Garcia v. Guo*,
11      2016 U.S. Dist. LEXIS 1819
        (C.D. Cal. Jan. 7, 2016) ................................................................. 10

12  *GDG Acquisitions, LLC v. Gov't of Belize*,
13      749 F.3d 1024 (11th Cir. 2014) ..................................................... 27

14  *Global Touch Sols., LLC v. Toshiba Corp.*,
15      2015 U.S. Dist. LEXIS 77227
        (E.D. Va. June 15, 2015) ................................................................. 36
16
    *IES Indus. v. United States*,
17      253 F.3d 350 (8th Cir. 2001) ......................................................... 11

18  *In re Air Cargo Shipping Servs. Antitrust Litig.*,
19      2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) ................................. 31

20  *In re Alstom SA Sec. Litig.*,
21      406 F. Supp. 2d 346 (S.D.N.Y. 2005) ............................................ 11

22  *In re Alstom SA Sec. Litig.*,
23      741 F. Supp. 2d 469 (S.D.N.Y. 2010) ............................................ 10

24  *In re BP P.L.C. Sec Litig.*,
25      843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................... 10

26  *In re China Mobile Games & Entm't Grp., LTD Sec. Litig.*,
        2016 U.S. Dist. LEXIS 29258
27      (S.D.N.Y. Mar. 7, 2016) ................................................................. 10

28

                                          - iii -

1

2                                                                                              **Page**

3

*In re Elan Corp. Sec. Litig.*,
4       2011 WL 1442328
5       (S.D.N.Y. Mar. 18, 2011) .................................................................. 10

6   *In re O2CNI Co.*,
        2013 U.S. Dist. LEXIS 116019
7       (N.D. Cal. Aug. 15, 2013) ................................................................. 36

8
    *In re Royal Bank of Scotland Grp. PLC Sec. Litig.*,
9       765 F. Supp. 2d 327 (S.D.N.Y. 2011) .............................................. 10

10
    *In re Sanofi-Aventis Sec. Litig.*,
11      293 F.R.D. 449 (S.D.N.Y. 2013) .................................................... 8, 10

12
    *In re Societe Generale Sec. Litig.*,
13      2010 U.S. Dist. LEXIS 107719
        (S.D.N.Y. Sept. 29, 2010) ...................................................... 10, 18, 19
14
    *In re Toyota Motor Corp. Sec. Litig.*,
15      2011 U.S. Dist. LEXIS 75732
16      (C.D. Cal. July 7, 2011)................................................................. 22, 23

17  *In re Urethane Antitrust Litig.*,
        683 F. Supp. 2d 1214 (D. Kan. 2010) .............................................. 31
18
    *In re Vivendi Universal, S.A. Sec. Litig.*,
19      765 F. Supp. 2d 512 (D. Me. 1991)................................................. 10
20
    *Ishizaki Kisen Co. v. United States*,
21      510 F.2d 875 (9th Cir. 1975).......................................................... 38
22
    *J.C. Renfroe & Sons, Inc. v. Renfroe Japan Co., Ltd.*,
23      515 F. Supp. 2d 1258 (M.D. Fla. 2007) .......................................... 35
24
    *Laub v. United States DOI*,
25      342 F.3d 1080 (9th Cir. 2003).......................................................... 17

26  *Lee v. City of L.A.*,
        250 F.3d 668 (9th Cir. 2001) ........................................................... 16
27

28

1128565_1

**Page**

*Lou v. Belzberg*,
    834 F.2d 730 (9th Cir. 1987) ..................................................................... 32

*Lueck v. Sundstrand, Corp.*,
    236 F.3d 1137 (9th Cir. 2001) ............................................................. 32, 36

*Manela v. Garantia Banking*,
    940 F. Supp. 584 (S.D.N.Y. 1996) ............................................................ 36

*Morrison v. Nat'l Austl. Bank, Ltd.*,
    561 U.S. 247 (2010) ........................................................................*passim*

*Mujica v. AirScan, Inc.*,
    771 F.3d 580 (9th Cir. 2014) ...........................................................*passim*

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ....................................................................... 2

*O'Connor v. Nevada*,
    27 F.3d 357 (9th Cir. 1994) ...................................................................... 23

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) ......................................................... 19, 20, 21

*Petrie v. Elec. Game Card, Inc.*,
    308 F.R.D. 336 (C.D. Cal. 2015) ............................................................... 8

*Pinker v. Roche Holdings, Ltd.*,
    292 F.3d 361 (3d Cir. 2002) ......................................................... 11, 17, 20

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ........................................................................... 32, 37

*Quail Cruises Ship Mgmt. v. Agencia de Viagens CVC Tur Limitada*,
    645 F.3d 1307 (11th Cir. 2011) .................................................................. 9

*Richmark Corp. v. Timber Falling Consultants*,
    959 F.2d 1468 (9th Cir. 1992) ................................................................. 34

**Page**

*SEC v. Compania Internacional Financiera S.A.*,
    2011 U.S. Dist. LEXIS 83424
    (S.D.N.Y. July 29, 2011) ................................................................. 10

*SEC v. Ficeto*,
    839 F. Supp. 2d 1101 (C.D. Cal. 2011) ....................................... 6, 7, 8

*SEC v. Fujinaga*,
    2014 U.S. Dist. LEXIS 141801
    (D. Nev. Oct. 3, 2014) ........................................................................ 9

*SEC v. Levine*,
    462 F. App'x 717 (9th Cir. 2011) ....................................................... 9

*SEC v. Sayegh*,
    906 F. Supp. 939 (S.D.N.Y. 1995) .................................................... 8

*SEC v. Zandford*,
    535 U.S. 813 (2002) ......................................................................... 15

*Stackhouse v. Toyota Motor Co.*,
    2010 WL 3377409
    (C.D. Cal. July 16, 2010) ............................................................ 17, 18

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ............................................. 10

*Takiguchi v. MRI Int'l, Inc.*,
    47 F. Supp. 3d 1100 (D. Nev. 2014) .................................................. 9

*Thales Avionics Inc. v. Matsushita Avionics Sys. Corp.*,
    2006 U.S. Dist. LEXIS 97119
    (C.D. Cal. Mar. 8, 2006) ................................................................. 34

*TSC Indus. v. Northway, In*c.,
    426 U.S. 438 (1976) ......................................................................... 38

*Tuazon v. R.J. Reynolds Tobacco Co.*,
    433 F.3d 1163 (9th Cir. 2006) .............................................. 32, 36, 37

1128565_1

**Page**

*United States v. Georgiou*,
   777 F.3d 125 (3d Cir. 2015),
   *cert. denied*, __ U.S. __, 136 S. Ct. 401 (2015) ........................................... 7, 8, 9

*United States v. Isaacson*,
   752 F.3d 1291 (11th Cir. 2014),
   *cert. denied*, __ U.S.__, 135 S. Ct. 990 (2015) ..................................................... 7

*United States v. Martoma*,
   2013 U.S. Dist. LEXIS 176998
   (S.D.N.Y. Dec. 17, 2013) ..................................................................... 10, 18, 19

*Universe Sales Co. v. Silver Castle, Ltd.*,
   182 F.3d 1036 (9th Cir. 1999) ........................................................................ 38

*Varnelo v. Eastwind Transp.*,
   2003 U.S. Dist. LEXIS 1424
   (S.D.N.Y. Feb. 3, 2003) ................................................................................... 36

*Wu v. Stomber*,
   883 F. Supp. 2d 233 (D.D.C. 2012) ..................................................... 10, 18, 19

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78c(a)(1) ...................................................................................................... 6
   §78(dd)................................................................................................. 9, 12, 14
   §78f ........................................................................................................*passim*
   §78(j)(b)...................................................................................................*passim*
   §78(t)(a) .......................................................................................................... 2

28 U.S.C.
   §1332(a)(2) ..................................................................................................... 21
   §1332(d)(2) ................................................................................................. 7, 21
   §1367 .............................................................................................................. 21
   §1404(a).............................................................................................. 32, 33, 36

1128565_1

**Page**

17 C.F.R.
  §239.36 ................................................................................ 16
  §239.36(a) ........................................................................... 11
  §240.12g3-2 ................................................................... 12, 13
  §240.12g3-2(b)(1)(iii) ......................................................... 13
  §240.12g3-2(b)(2) ............................................................... 14

Federal Rules of Civil Procedure
  Rule 12(b)(2) ...................................................................... 17
  Rule 12(b)(6) ...................................................................... 17
  Rule 12(h)(1) ...................................................................... 17
  Rule 44.1 ............................................................................ 37

Federal Rules of Evidence
  Rule 706 .............................................................................. 37

Japan's Financial Instruments Exchange Act
  Article 21-2 ................................................................*passim*

1128565_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CITATIONS**

Citations herein use the following form:

| Citation Form | Document |
|---|---|
| ¶__ or ¶¶__ | Amended and Consolidated Class Action Complaint for Violation of the Securities Laws of the United States of Japan (Dkt. No. 34) (the "Complaint") |
| Cpt. Ex. ___ | Exhibits attached to the Complaint |
| Inoue §__ at ___ | Declaration of Osamu Inoue (March 19, 2016), filed contemporaneously herewith |
| Ishiguro, ¶__ | Declaration of Toru Ishiguro in Support of Defendant Toshiba Corporation's Motion to Dismiss (February 2, 2016) (Dkt. No. 46) |
| Mem. at ____ | Memorandum of Points and Authorities in Support of Defendant Toshiba Corporation's Motion to Dismiss (Dkt. No. 44-1) |
| Motion to Strike at __ | Memorandum of Points and Authorities in Support of Plaintiffs' Objections and Motion to Strike the Declaration of Ayumi Wada in Support of Defendant Toshiba Corporation's Motion to Dismiss, filed contemporaneously herewith |
| Pardieck, ¶__ | Declaration of Andrew M. Pardieck (March 20, 2016), filed contemporaneously herewith |
| TOS RJN, Ex. ___ | Defendant Toshiba Corporation's Request for Judicial Notice in Support of Its Motion to Dismiss (Dkt. No. 45) |
| Wada, ¶__ | Declaration of Ayumi Wada in Support of Defendant Toshiba Corporation's Motion to Dismiss (February 2, 2016) (Dkt. No. 47) |

1128565_1

1    Plaintiffs hereby respond as follows to the motion to dismiss (Dkt. No. 44) filed
2  by defendant Toshiba Corporation ("Toshiba" or the "Company"):[1]

3  **I. INTRODUCTION**

4         This cases arises from a massive, worldwide accounting fraud perpetrated by
5  Toshiba over a period of at least six years, by which it inflated its pre-tax profits by
6  more than $2.6 billion and concealed at least $1.3 billion in impairment losses at U.S.-
7  based Westinghouse Electric Co.  *See, e.g.*, ¶¶1-10, 79-98, 155-241.  Toshiba's
8  accounting fraud was subject to an investigation by an "Independent Investigative
9  Committee" ("IIC") selected by the Company, which memorialized its findings in a
10  detailed report that Toshiba issued in both English and Japanese.  ¶¶40-62 & Cpt. Ex.
11  1.  Toshiba has admitted that it has "validated the facts contained in the [IIC] report"
12  (¶68), and also has repeatedly acknowledged responsibility for the misconduct
13  detailed therein.  *E.g.*, ¶¶63-69 & Cpt. Exs. 2-8.

14         The IIC found that three successive CEOs and other senior Toshiba executives
15  had continuously pressured lower level executives to falsify reported results in order
16  to conceal operating losses and avoid writedowns and impairment charges, or had
17  looked the other way when they were told that the executives had done so anticipating
18  that the actual results of operations were worse than what Toshiba wanted to report to
19  investors.  *See, e.g.*, ¶¶37-98, 177.  The false accounting violated U.S. generally
20  accepted accounting principles ("U.S. GAAP") followed by Toshiba (¶155), and
21  occurred throughout Toshiba's worldwide operations, including significant
22  overstatements of revenue and understatements of expenses involving its operations in
23  the United States.[2]     Toshiba's falsified financial statements and other

24  _____
25  [1]   Plaintiffs' opposition is based on this memorandum, the points and authorities
     contained herein, and the declarations of Osamu Inoue, Andrew M. Pardieck and
26  Dennis J. Herman submitted herewith.  Citations are in the form shown in the Table of
     Citations (*supra* at ix).  In quoting cited sources, all emphasis is added and citations
27  are omitted unless otherwise noted.

28  [2]   *See, e.g.*, ¶¶79-98, 121-144, 168-175, 203-220, 234-37; *see also* ¶¶183, 190, 200
     (accounting fraud precipitated by economic conditions in the U.S.).

1   misrepresentations (¶¶99-154) were distributed worldwide, including English-

2   language versions that it prepared and posted on its website, permitting its common

3   stock to be sold as American Depositary Shares ("ADSs") in the U.S.[3]  ¶¶25-29.

4        Plaintiffs are injured American investors who purchased Toshiba common stock

5   either as ADSs in the United States or as common stock (under the ticker "6502") in

6   Japan, and seek to represent a class of all American investors who made similar

7   purchases between May 8, 2012 and November 12, 2015.[4]  ¶¶2, 19-20, 25, 270.

8   Consistent with the requirements of *Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247

9   (2010), the claims of investors who purchased their shares on the over-the-counter

10  ("OTC") market in the United States are brought pursuant to §10(b) and §20(a) of the

11  U.S. Securities Exchange Act of 1934 ("Exchange Act") (¶¶270-294), and the claims

12  of investors who acquired their securities in Japan are brought under Article 21-2 of

13  Japan's Financial Instruments Exchange Act ("JFIEA") (¶¶295-304).

14  **II. ARGUMENT**

15       Toshiba's motion is as notable for what it ***doesn't*** challenge as for what it does.

16  Toshiba does not deny that it committed fraud, or that any named plaintiff or absent

17  class member was damaged as a result.  Toshiba does not seek dismissal for lack of

18  falsity, scienter, materiality, reliance, loss causation or damages, nor does it contend

19  that the Complaint fails to meet the heightened pleadings standards of the Private

20

21  [3]   An ADS is a share of foreign common stock that is sold in the United States.
22  Ownership of an ADS is reflected by an American Depositary Receipt ("ADR").
    Both acronyms may be used interchangeably.  Ex. 1 at 6 n.4 (2003 ADS Rule Fed.
    Reg. Notice).  For consistency, we use "ADS" here, as in the Complaint.

23  [4]   Toshiba shares were sold under two tickers, "TOSBF" and "TOSYY," on the OTC
24  market in the United States.  ¶25.  Toshiba asserts in its brief that TOSBF shares are
    not at issue in this case. Mem. at 7:26-8:14. This is incorrect. ¶¶2, 25, 270. Toshiba
25  does not request dismissal of claims asserted on behalf of TOSBF purchasers, nor are
    there grounds to do so because TOSYY purchasers can assert class claims on behalf of
26  similarly situated TOSBF purchasers. *See, e.g.*, *NECA-IBEW Health & Welfare Fund
    v. Goldman Sachs & Co.*, 693 F.3d 145, 149, 162 (2d Cir. 2012).  Whether TOSBF
27  purchasers require a separate class representative is an issue to be raised at class
    certification, and also does not provide grounds for dismissal.  *Bruno v. Quten
28  Research Inst., LLC*, 280 F.R.D. 524, 530 (C.D. Cal. 2011).

1  Securities Litigation Reform Act.  Toshiba does not contest this Court's personal

2  jurisdiction over it, nor does it challenge the Court's subject matter jurisdiction to

3  consider claims under either the Exchange Act or the JFIEA.  In short, Toshiba does

4  not dispute that cognizable claims for securities fraud have been alleged by investors

5  with standing to assert them.

6          Toshiba makes only two arguments for dismissal, neither of which is correct.

7  First, Toshiba contends that ADS purchasers only have claims under Japanese law,

8  asserting that their claims under the Exchange Act are barred by *Morrison* even

9  though their purchases undeniably took place in the United States.   Toshiba's

10 argument is directly contradicted by *Morrison*, which held that the place of the

11 transaction – not the residence of the parties, the location of the fraud, the nature of

12 the securities, or anything else – determines whether U.S. or foreign law applies.

13         Second, Toshiba asks this Court to take the extraordinary step of dismissing this

14 case on grounds of either international comity or *forum non conveniens*.  But these

15 doctrines are designed for exceptional and unusual circumstances that are not present

16 here.  This case raises no difficult issues of Japanese law nor does it present the

17 potential for any interference whatsoever with the foreign policy of the United States,

18 the sovereignty of the Japanese government, or any completed, pending or anticipated

19 civil, criminal or regulatory proceeding or investigation in Japan.  Neither does this

20 case arise solely from misconduct that took place only in, and affects only the interests

21 of, Japan.  In arguing that it does, Toshiba deliberately ignores numerous allegations

22 regarding the perpetration and impact of the fraud in the United States, including

23 detailed allegations describing the Company's fraud in concealing impairment charges

24 at Westinghouse, a business that has as venerable a history in the United States as

25 Toshiba does in Japan.

26         For all of these reasons, and the additional reasons set forth below, Toshiba's

27 motion to dismiss is lacking in any merit, and must be denied.

28

1128565_1

### A. *Morrison* Does Not Preclude Enforcement of the U.S. Exchange Act Against Domestic ADS Transactions

Toshiba's motion is largely based on a misreading of the Supreme Court's opinion in *Morrison*, which defendant incorrectly contends prevents enforcement of the U.S. securities laws against foreign issuers of securities traded in the United States. In fact, *Morrison* held just the opposite: the application of the U.S. securities laws is determined by the place of the transaction, ***not*** the location of the fraud or the residence of the defendant who committed it. *Morrison* holds that the Exchange Act applies to transactions that took place in the U.S., and does not apply to transactions that took place outside the U.S. 561 U.S. at 273. Here there is no dispute that the ADSs that are the subject of the Exchange Act claims were all bought and sold in the United States. ¶25; Mem. at 14:9-10. Thus, the Complaint fully meets the requirements set forth in *Morrison*. While this lawsuit also includes claims brought by U.S. purchasers of Toshiba common stock in Japan, those claims are brought only under Japanese law. Thus, those claims, too, are fully consistent with *Morrison*.

Toshiba's argument ignores that the Exchange Act has regularly been applied after *Morrison* against issuers of foreign stock underlying ADSs. In this regard, there is no distinction between "sponsored" and "unsponsored" ADSs, because – unlike the types of synthetic and derivative securities Toshiba attempts to analogize to in its brief – both represent a direct investment in the issuer's foreign stock. Nothing in *Morrison* or the Exchange Act protects foreign issuers from liability under §10(b) based on their claimed lack of consent, acquiescence, participation or approval in the sale of their stock as an ADS. Such circumstances only go to the exercise of personal jurisdiction over a foreign defendant, an issue that Toshiba does not (and cannot) challenge here. But even if Toshiba's acquiescence in the sale of its stock as ADSs in the United States was required (it isn't), its argument that the "unsponsored" nature of the ADSs establishes, as a matter of law, its lack of consent or involvement in the sale of those

- 4 -

securities is incorrect.  At best, its argument raises factual issues for discovery.  It provides no grounds for dismissal.

### 1. The Exchange Act Applies to All Domestic Transactions, Including Purchases on the U.S. OTC Market

Toshiba misunderstands *Morrison*.  *Morrison* dealt exclusively with the extraterritorial application of the securities laws.  Rejecting arguments that required or permitted courts to look to the locus of the fraudulent activity or the residency of its perpetrators, the Supreme Court instructed lower courts to focus on the location of the underlying transaction.  If the purchase or sale of securities took place in the United States, the Exchange Act regulates it.  If it took place outside of the United States, it doesn't.  561 U.S. at 273.  Thus, the Court held, §10(b) only applies to "the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  *Id.*; *see also id.* at 267 ("it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which §10(b) applies").

In urging that *Morrison* "establishes" that the Exchange Act does not apply to the sale of ADSs in the United States Toshiba misrepresents both the Supreme Court's holding and the facts under which the case arose.  Initially, Toshiba words its brief in a manner that suggests, incorrectly, that the Supreme Court considered and rejected ADSs as a basis for applying the Exchange Act.  Mem. at 9:8-23, 10:15-20.  In fact, the ADSs were irrelevant to the outcome because the claims of the only plaintiff (Morrison) who had bought ADSs were dismissed for failure to allege damages and not appealed.  *Id.* at 253 n.1.  As a result, the case only involved the purchase of ordinary shares by foreign plaintiffs in Australia; the ADS program was not at issue and played no role in the result.  In fact, the Court was careful to point out that its holding was ***not*** based on the ADS transactions which were not before it: "This case involves no securities listed on a domestic exchange, and all aspects of the purchases

1   complained of *by those petitioners who still have live claims* occurred outside the

2   United States." *Id.* at 273.[5]

3         The reason that the Supreme Court was careful to point out that the ADSs were

4   not at issue is plain: unlike the purchases in Australia that remained in the case, the

5   purchase of ADSs *had* taken place in the United States and therefore fell well within

6   the test *Morrison* announced.  *See* 561 U.S. at 252 n.1.  Similarly, here, all aspects of

7   the purchase and sale of Toshiba ADSs took place in the U.S.  ¶25; Mem. at 14:9-10.

8   While the ADSs in *Morrison* were listed on the New York Stock Exchange, nothing in

9   the Supreme Court's opinion requires, or even suggests, that domestic transactions on

10  the OTC market, where Toshiba's ADSs were traded, should be treated any

11  differently.  *E.g.*, *SEC v. Ficeto*, 839 F. Supp. 2d 1101, 1107-09 (C.D. Cal. 2011)

12  (King, J.).

13        Toshiba's entire argument to the contrary is premised on the mistaken

14  proposition that *Morrison* held that only securities traded on a "national securities

15  exchange," as defined by §6 of the Exchange Act, 15 U.S.C. §78f, qualify under the

16  first prong of *Morrison*.  But Toshiba ignores the broader definition of "exchange" in

17  §3(a)(1) of the Exchange Act, which plainly encompasses the OTC market.[6]  *See*

18  Mem. at 12:9-13:10; 15 U.S.C. §78c(a)(1).  Toshiba ignores as well that *Morrison* did

19  not limit its test only to securities listed on "national securities exchanges," but cast its

20  test more broadly, to include *all* domestic exchanges.  *E.g.*, *Morrison*, 561 U.S. at 267

21

22  ───────────────

    [5]  Notably, in quoting the passage above, Toshiba's brief carefully excises the

23  highlighted language through the artful use of an ellipses, demonstrating its

recognition that the outcome likely would have been different (as to the ADS

24  transactions) if those claims had remained before the Court.  *See* Mem. at 9:22-23.

25      [6]  Section 3(a)(1) defines an "exchange" as: "any organization, association, or group

of persons, whether incorporated or unincorporated, which constitutes, maintains, or

26  provides *a market place or facilities for bringing together purchasers and sellers of

securities* or for otherwise performing with respect to securities the functions

27  commonly performed by a stock exchange as that term is generally understood, and

includes the market place and the market facilities maintained by such exchange." 15

28  U.S.C. §78c(a)(1).

("[I]t is in our view only transactions in securities *listed on domestic exchanges*, and domestic transactions in other securities, to which §10(b) applies."); *id.* at 273 ("This case involves no securities *listed on a domestic exchange* . . . ."); *cf.* 15 U.S.C. §§78c(a)(1), 78f.  Thus, while the OTC market may not be a "national securities exchange," it is a "domestic exchange" within the meaning of both *Morrison* and the Exchange Act.[7]

Given the Court's unwavering focus on the geographic location of the transaction, it is simply incorrect to suggest that it intended to hold that §10(b) only regulates transactions on *some* domestic exchanges.  *See Morrison*, 561 U.S. at 266 ("[W]e think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States."); *see also Ficeto*, 839 F. Supp. 2d at 1108 ("[T]ransactions on the domestic over-the counter market are as inherently imbued with our national interest as trades on national exchanges. . . .  Taken as a whole, the *Morrison* opinion clearly demonstrates that the Court was focused on securities *exchanges* due to the facts presented in the case, and only intended to draw a bright line between foreign and domestic exchanges.") (emphasis in original); *United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014) (*Morrison* test satisfied by transactions on OTC markets, based on expert testimony that "these exchanges are 'similar to' the NYSE and the NASDAQ"), *cert. denied*, __ U.S.__, 135 S. Ct. 990 (2015).

Toshiba's reliance on *United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015), *cert. denied*, __ U.S. __, 136 S. Ct. 401 (2015), is misplaced for several reasons.  *First*, *Georgiou's* analysis of *Morrison's* first prong is incorrect because it ignores that

---

[7]    Toshiba is incorrect in contending that, by asserting jurisdiction over the JFIEA claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d), plaintiffs have admitted that the Toshiba securities traded on the OTC market are not "covered securities" within *Morrison's* first prong. Mem. at 12:12-19. Toshiba misconstrues the Complaint, which asserts jurisdiction over the JFIEA claims under *both* diversity, 28 U.S.C. §1332(d)(2), and CAFA.  ¶12.  Jurisdiction over the ADS purchasers JFIEA claims rests on diversity, not CAFA.  *See infra*, n.21.

the Court used the broader "exchange" in formulating its test for extraterritoriality, and used "national securities exchanges" only in quoting §10(b).[8]  *See id.* at 134-35; *cf. Morrison*, 561 U.S. at 266, 269-70, 273.  **Second**, *Georgiou* explicitly recognized that there was contrary authority from this District and the 11th Circuit.  777 F.3d at 135 n.12.  Toshiba's failure to address that authority demonstrates that they have no argument to explain why the Third Circuit's analysis withstands scrutiny.  **Third**, regardless of whether or not *Georgiou* is correct, it held that the transactions at issue in that case **did** satisfy *Morrison's* second prong because the securities were bought on the OTC market in the United States.  *Id.* at 135-37.  Again, Toshiba's failure to confront this aspect of the holding, even when it later argues that *Morrison's* second prong is **not** satisfied, demonstrates the inapplicability of *Georgiou* to the case at bar.

Toshiba's reliance on *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449 (S.D.N.Y. 2013), is even more misplaced.  *Sanofi*, in considering a motion to certify a class, refused to appoint a representative for foreign purchasers of common stock not traded in the U.S., finding that the intervening decision in *Morrison* precluded claims on behalf of the class it sought to represent.  *Id.* at 457-58.  The court refused to certify the class because the transactions took place in Europe; not because some of the overseas transactions occurred on an over-the-counter market, as Toshiba suggests.  *Id.*; *cf.* Mem. at 13:18-22.

Finally, even if Toshiba were correct in its interpretation of *Morrison's* first prong (it isn't), it would be wrong in its contention that domestic OTC transactions in

---

[8]  *Georgiou* also fails to give effect to the statutory language.  In concluding that §10(b) applies to transactions registered on national securities exchanges "to the exclusion of the OTC markets," *Georgiou* fails to take into account that §10(b) by its terms also applies to "any security not so registered."  *See* 777 F.3d at 135; *see also Morrison*, 561 U.S. at 266.  Just as *Morrison* recognized that reading "any security not so registered" to encompass all foreign securities "makes nonsense of the phrase," 561 U.S. at 268 n.10, interpreting §10(b) in the manner advanced by *Georgiou* similarly leads to absurd results that are contrary to settled authority.  *See, e.g., Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015) (§10(b) applies to OTC transactions); *SEC v. Sayegh*, 906 F. Supp. 939, 946 (S.D.N.Y. 1995) (same); *Ficeto*, 839 F. Supp. 2d at 1117 (same).

its ADSs also fall outside of *Morrison*'s **second** prong, applying to "domestic transactions in other securities." *Morrison*, 561 U.S. 274 at 249. In discussing the intent of this prong, *Morrison* relied on §30(a) of the Exchange Act as evidencing Congressional intent to regulate acts in the United States that effect a transaction "'on an exchange **not** within or subject to the jurisdiction of the United States.'" *Id.* at 268. Because the OTC market is within and subject to the jurisdiction of the United States, transactions on that exchange are more properly considered under the first prong. But even if the second prong is implicated, there is no dispute that the transactions at issue here took place in the United States. Mem. at 14:9-10. Thus, the transactions satisfy *Morrison's* second prong as well. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (under *Morrison's* second prong, Exchange Act applies when irrevocable liability or transfer of title occurs in the U.S.); *Georgiou*, 777 F.3d at 136 ("territoriality under *Morrison* turns on 'where, physically, the purchaser or seller committed him or herself' to pay for or deliver a security").[9]

## 2. Application of the Exchange Act Does Not Turn on Whether an ADS Is "Sponsored" or Not

Toshiba contends that it cannot be held liable for the sale of its stock in the U.S. because: (i) the stock was sold as ADSs which are issued by depositary banks; and (ii) the ADSs at issue here are unsponsored. Toshiba's first argument ignores that foreign issuers of stock sold as ADSs are regularly held subject to liability for transactions in those securities, irrespective of the nature or characterization of an ADS. Toshiba's second argument raises factual issues regarding the extent of its participation or approval in the sale of ADSs that, even if resolved in Toshiba's favor

---

[9]   *See also Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp. 3d 1100, 1109-10 (D. Nev. 2014) (applying *Absolute Activist*); *SEC v. Fujinaga*, 2014 U.S. Dist. LEXIS 141801, at *17 (D. Nev. Oct. 3, 2014) (same); *SEC v. Levine*, 462 F. App'x 717, 719 (9th Cir. 2011) (applying similar test); *Quail Cruises Ship Mgmt. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307 (11th Cir. 2011) (same).

at an appropriate stage of these proceedings, would not support dismissal of the claims against it.

### a. Arguments Generally Applicable to Transactions in ADSs Do Not Support Dismissal

Toshiba contends that, as a foreign issuer of securities sold as ADSs, *Morrison* precludes it from being held liable under §10(b) because the ADSs were issued and listed by a depositary bank, not by Toshiba.  Mem. at 11:25-12:2, 14:9-11.  In this respect, there is no difference between a "sponsored" and an "unsponsored" ADS.  Both are registered and issued by depositary banks, not by the issuer of the foreign securities whose shares the ADSs represent.  Toshiba's arguments based on these characteristics, which are common to ***all*** ADSs, provide no ground for dismissal.

Numerous courts have found that issuers of foreign shares may be held liable for violations of §10(b), notwithstanding the fact that their stock was sold in the U.S. only as an ADS issued by a depositary bank.[10]  *E.g.*, *Wu v. Stomber*, 883 F. Supp. 2d 233, 253 (D.D.C. 2012); *United States v. Martoma*, 2013 U.S. Dist. LEXIS 176998, at *14-*17 (S.D.N.Y. Dec. 17, 2013); *see also SEC v. Compania Internacional Financiera S.A.*, 2011 U.S. Dist. LEXIS 83424, at *19-*20 (S.D.N.Y. July 29, 2011) ("*Morrison* . . . never states that a defendant must itself trade in securities listed on domestic exchanges or engage in other domestic transactions.").

---

[10]  None of these cases turned on the sponsored nature of the security.  *See also Sanofi*, 293 F.R.D. at 452-53; *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 521 (D. Me. 1991); *In re Royal Bank of Scotland Grp. PLC Sec. Litig.*, 765 F. Supp. 2d 327, 337 (S.D.N.Y. 2011); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 622 (S.D.N.Y. 2010); *In re Elan Corp. Sec. Litig.*, 2011 WL 1442328 (S.D.N.Y. Mar. 18, 2011); *In re BP P.L.C. Sec Litig.*, 843 F. Supp. 2d 712, 796 (S.D. Tex. 2012); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 471 (S.D.N.Y. 2010); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330 (S.D.N.Y. 2015); *In re China Mobile Games & Entm't Grp., LTD Sec. Litig.*, 2016 U.S. Dist. LEXIS 29258 (S.D.N.Y. Mar. 7, 2016); *Garcia v. Guo*, 2016 U.S. Dist. LEXIS 1819 (C.D. Cal. Jan. 7, 2016).  The only post-*Morrison* case that Toshiba points to as refusing to apply the Exchange Act to transactions in ADSs, *In re Societe Generale Sec. Litig.*, 2010 U.S. Dist. LEXIS 107719 (S.D.N.Y. Sept. 29, 2010), has been widely recognized to be incorrect.  *Infra* at 18.

1    As these and other courts have recognized, ADSs are intended to, and do,

2    provide a direct mechanism for U.S. investors to purchase shares of foreign stock that

3    are not otherwise available for purchase on a domestic exchange.  *E.g.*, *Pinker v.*

4    *Roche Holdings, Ltd.*, 292 F.3d 361, 365 (3d Cir. 2002) (ADSs "are financial

5    instruments that allow investors in the United States to purchase and sell stock in

6    foreign corporations").  Whether sponsored or unsponsored, all ADSs are issued and

7    sold by depositary banks, and convey to the purchaser a direct beneficial ownership

8    interest in specific shares of common stock that have been issued by the foreign

9    company and are held in trust by the depositary bank (which charges holders a

10   custodial fee for doing so).[11]  *Id.* at 367; *IES Indus. v. United States*, 253 F.3d 350,

11   351 (8th Cir. 2001).  The sale of an ADS is the sale of a corresponding interest in the

12   foreign stock held by the depositary, and provides the holder with the right to obtain

13   the foreign shares on demand as well as other rights providing indicia of ownership,

14   such as the right to receive the dividends payable to and obtain tax credits associated

15   with the underlying shares.  *See, e.g.*, 17 C.F.R. §239.36(a) (ADS holder "is entitled to

16   withdraw the deposited securities at any time"); *IES*, 253 F.3d at 351-352 (discussing

17   dividend rights and foreign tax obligations of ADS holders); TOS RJN, Ex. 5 (Form

18   F-6 for Toshiba ADSs) at 22, 24 (§9), 25 (§12).  Thus, contrary to Toshiba's repeated

19   argument that the ADSs are not "Toshiba securities," in fact they are, because (unlike

20   swaps, straddles, options and the other types of derivative and synthetic securities it

21   attempts to analogize to in its brief) the purchase of an ADS ***is*** the direct purchase of

22   ownership in the underlying foreign stock issued by Toshiba.[12]  *In re Alstom SA Sec.*

23

---

24   [11]  Toshiba ignores the beneficial interest of ADS holders in asserting, incorrectly,

25   that they have "no ownership interest" because the depositary bank is the "title owner."  Mem. at 14:21-27.

26   [12]  As the Securities and Exchange Commission ("SEC") bulletin Toshiba relies on

27   (TOS RJN, Ex. 2) states: "ADRs allow U.S. investors to invest in non-U.S. companies . . . ."  Even Toshiba grudgingly concedes that an ADS "represents" the underlying

28   shares of foreign stock.  Mem. at 4:6-13.

- 11 -

1   *Litig.*, 406 F. Supp. 2d 346, 353 n.6 (S.D.N.Y. 2005) ("An ADS 'represents an

2   ownership interest in a specified number of securities that have been deposited with a

3   depositary by the holder of such securities.'").

4        Toshiba misplaces reliance on *Morrison's* reference to §30(b) of the Exchange

5   Act as indicating its intent to refuse to permit regulation of the Act against foreign

6   citizens. Mem. at 14:2-7. The Supreme Court did not cite §30(b) to "emphasize" that

7   the Act does not apply to foreign citizens; it did so to emphasize, in explaining the

8   second prong of its test, that "it is the foreign location of the *transaction* that

9   establishes (or reflects the presumption of) the Act's inapplicability." *Morrison*, 561

10  U.S. at 268. Contrary to the argument Toshiba advances here, *Morrison* specifically

11  recognized that §30(b) evidences Congress' intent *to* permit application of the Act

12  against foreigners for acts taking place overseas where necessary "'to prevent evasion

13  [of the Act].'" *Id.*

14       Thus, whether considered under the first (as the purchase on an American

15  exchange) or second (as the purchase of foreign stock in America) prong, the purchase

16  of a Toshiba ADS in the United States satisfies *Morrison*, and is therefore a

17  transaction that can support §10(b) liability. Toshiba's arguments to the contrary,

18  which would preclude ***any*** claim against ***any*** ADS regardless of whether it was

19  sponsored or not, are mistaken and provide no ground for dismissal.

20            **b. The "Unsponsored" Character of the ADSs Does**
              **Not Insulate Toshiba from Liability**

21

22       Toshiba's principal argument against application of the Exchange Act is that the

23  stock that it issued was sold in the United States as ADSs that were "unsponsored."

24  But this alone cannot insulate Toshiba from liability under the Exchange Act.

25       Both sponsored and unsponsored ADSs are regulated by SEC Rule 12g3-2, 17

26  C.F.R. §240.12g3-2. In 2008, Rule 12g3-2 was amended to permit foreign securities

27  to be sold as ADSs in the United States so long as, *inter alia*, the securities are listed

28  on a regulated foreign exchange and the issuer publishes English-language versions of

- 12 -

1128565_1

1   its annual and quarterly reports and other material information on a website accessible

2   to American investors.[13]  The 2008 amendments to Rule 12g3-2 permitted depositary

3   banks to issue "unsponsored" ADSs without the express consent of the foreign issuer,

4   but only so long as the issuer maintains its listing on a foreign exchange and complies

5   with the requirements to provide American investors with electronic access to

6   English-language translations of the information provided to their foreign investors.

7   *Id.*; *see also* Ex. 2 at 20 (2008 ADS Rule Fed. Reg. Notice).  As one of the depositary

8   banks for Toshiba's shares sold as ADSs noted in its comments to the rule, the English

9   language disclosure requirements "ensur[e] that U.S. investors receive the protection

10  of adequate disclosure that has always been the premise of securities regulation in the

11  United States."  Ex. 3 at 33; *see also* Ex. 2 at 21.

12         Because the 2008 amendments no longer required a formal written application

13  by the foreign issuer to establish an ADS program, the SEC solicited comment on

14  whether it should require consent from or notification to the foreign issuer before

15  unsponsored ADSs could be sold.  Ex. 2 at 24.  While Toshiba points this out (Mem.

16  at 5:5-9), it ignores that two of the depositary banks that registered to sell its stock as

17  ADSs, Bank of New York ("BNY") and Deutsche Bank, objected to the requirement

18  as unnecessary because practical consent was already being obtained.  Exs. 3-4.  As

19  Deutsche Bank explained, "***in practice depositary banks obtain the issuer's consent***

20  ***before establishing an unsponsored ADR program***."  Ex. 4 at 51.

21         In our experience, foreign issuers are often willing to allow a depositary

22         bank to establish an unsponsored ADR program but are reluctant to

23

24  _____

    [13]  As amended, Rule 12g3-2 permits the sale of foreign securities as ADSs so long as

25  all "information that is material to an investment decision regarding the subject
    securities" is "published in English, on its Internet Web site or through an electronic

26  information delivery system generally available to the public in its primary trading
    market."   17 C.F.R. §240.12g3-2(b)(1)(iii).   At a minimum, the issuer must

27  electronically publish English translations of its annual report and financial
    statements, interim (*i.e.*, quarterly) reports and financial statements, press releases, and

28  "[a]ll other communications and documents distributed directly to" holders of its
    foreign securities.  *Id.* at §240.12g3-2(b)(2,3).

memorialize this in writing.  We believe that, given the adequacy of the current environment of self-regulation, the protection provided issuers by the ability to affirmatively object to the establishment of an unsponsored ADR program and the benefit provided to U.S. investors by unsponsored ADR programs, ***consent should be implied by a lack of affirmative objection by the issuer***.

*Id.*; *accord* Ex. 5 at 54 ("the depositary typically requests a letter of non-objection from the issuer before establishing an unsponsored program").

Despite its claims to have not acquiesced in the sale of its stock as ADSs, Toshiba has never made any public objection to the sale of those securities.  In fact, Toshiba has facilitated the sale of those securities by voluntarily complying with the requirement to maintain an English-language investor relations website where direct English translations of the materials provided to Japanese investors are posted, and has also paid for a translator to provide English translations of its investor conference calls.[14]  ¶¶28-29.  Had Toshiba not done so, its stock could not have been sold as ADSs, whether sponsored or unsponsored.  17 C.F.R. §240.12g3-2(b)(2).  Thus, Toshiba's consent to the sale of its shares in the United States should be implied from its lack of any objection or action to prevent the sale of its shares as unsponsored ADSs in the United States.[15]  Ex. 4.

This conclusion is compelled with even greater force by Toshiba's suggestion that it does not believe that purchasers of ADSs in the United States have any direct right to sue Toshiba under Japanese law.  Toshiba's carefully-worded brief asserts only that the ***depositary banks*** that sold the ADSs to investors "***may***" have a claim in

---

[14]   Toshiba did not publish its annual and quarterly reports or provide any of its other investor materials in any language other than English and Japanese.

[15]   Toshiba's reliance on the section of *Morrison* citing §30(b) of the Exchange Act is relevant here, too, because it demonstrates the appropriateness of regulating Toshiba's conduct to the extent it has sought to evade liability by refusing to memorialize its consent to the sale of ADSs.  *See Morrison*, 561 U.S. at 248, 268.

- 14 -

1   Japan against Toshiba for the benefit of investors who purchased Toshiba's ADSs,
2   apparently meaning to suggest that the ADS purchasers themselves have no such
3   claim.   Mem. at 14:11-13; *see also* Ishiguro, ¶20 (asserting, without citation to
4   authorities, that rights of ADS holders under Japanese law are unsettled).   Toshiba
5   ignores, in this regard, that the depositary agreements governing the sale of its stock as
6   ADSs specifically provide that the depositary banks will ***not*** institute or participate in
7   any such action.[16]   Thus, in Toshiba's view, American investors who purchased its
8   shares as ADSs should not have a remedy for fraud anywhere in the world simply
9   because those securities were "unsponsored."

10          There is no reason to accept the distinction that Toshiba implicitly attempts to
11  draw here, that foreign issuers are subject to the Exchange Act if their stock is sold via
12  a "sponsored" ADS, but are absolutely immune to liability if the ADS is
13  "unsponsored."   *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (Section 10(b)
14  "should be 'construed "not technically and restrictively, but flexibly to effectuate its
15  remedial purposes."'").   The primary difference between "sponsored" and
16  "unsponsored" ADSs is the level of ***administrative*** support that the issuer of the stock
17  provides to American investors, not the type of ownership interest that an investor is
18  purchasing in the foreign company.   Mem. at 4:15-18 ("Sponsored ADRs are those in
19  which the non-U.S. company enters into an agreement directly with a U.S. depositary
20  bank to arrange for recordkeeping, forwarding of shareholder communications,
21  payment of dividends, and other services."); *see also* Ex. 3 at 34-35 (chart showing
22  differences in programs).   Nor is there any practical difference in the issuer's level of
23  participation in the purchase or sale of the ADS because, whether sponsored or
24
25

---
26  [16]   *See* TOS RJN, Ex. 5 (BNY Form F-6) at 25 ("The Depositary shall be under no
27  obligation to appear in, prosecute or defend, any action, suit or other proceeding in
    respect of any of the Deposited Securities or in respect of the Receipts on behalf of
28  Owners or holders or any other persons."); *see also id.*, Exs. 6 at 47, 7 at 69, 8 at 94.

1   unsponsored, it is the depositary bank that issues and sells the ADS and holds the

2   underlying foreign shares in trust for the purchasers.  *See* 17 C.F.R. §239.36.

3       In attempting to draw a distinction between "sponsored" and "unsponsored"

4   ADSs to explain why the two should be treated differently, Toshiba asserts that

5   because it did not "sponsor" the ADSs, it did not "cooperate," "assist," "acquiesce,"

6   "consent," "participate," or otherwise have any "involvement" in the marketing or sale

7   of the ADSs.  But even if that were relevant here (it is not), Toshiba's lack of consent

8   or participation cannot be implied merely from the fact that the ADSs are

9   unsponsored.  At most, that characteristic of the security raises factual issues for

10  discovery.  *E.g.*, *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).  Determining

11  the extent of Toshiba's involvement in or consent to the sale of ADSs will require,

12  among other things, discovery of the communications it had with BNY (one of its ten

13  largest shareholders) or other depositary banks about the issuance or sale of ADSs,

14  discovery of any communications Toshiba had with American or foreign investors or

15  regulators about the sale of its stock as ADSs, and discovery of any transactions or

16  agreements by which the depositary banks obtained the shares of Toshiba stock that

17  were repackaged and sold as ADSs in America.[17]   Toshiba's purported lack of

18  acquiescence cannot be determined simply from the fact that the ADS is

19  "unsponsored."[18]  *See* Ex. 4 at 51.

20

---

21  [17]  It is unlikely that BNY, which had custody of 50 million Toshiba shares for sale as
22  ADSs, obtained that amount of shares in open market transactions.  Toshiba's
    carefully worded brief allows only that the "depositary banks *may* have acquired
23  actual Toshiba common stock in Japan" (Mem. at 14:11-12), thereby leaving open the
    question of how and where those shares were acquired and from whom, and how
24  involved Toshiba was in consummating, reviewing, consenting to, approving or
    participating in the transaction.  That the OTC market identifies TOSBF as "common
25  shares" rather than an ADS (¶25) also raises issues about the sale of Toshiba stock in
    America for discovery.

26  [18]  Nor can it be determined based on a self-serving declaration from a recent Toshiba
27  employee who lacks any apparent foundation for his account.  *See* Motion to Strike
    at 5-10.  Indeed, by repeatedly arguing that it did not "consent" to, offer any
28  "assistance" or have any "involvement" or "any role whatsoever" in the sale of ADSs
    to the market – and by attempting to establish this through a factual declaration of one

- 16 -

1    In attempting to engraft a sponsorship requirement onto §10(b), Toshiba relies

2   on *Pinker*, where the Third Circuit held that, by sponsoring ADSs that are actively

3   traded by American investors, a Swiss corporation had "purposely availed itself of the

4   American securities market and thereby evidenced the requisite minimum contacts

5   with the United States to support the exercise of personal jurisdiction."  292 F.3d at

6   365, 368-73.  But Toshiba overlooks the critical distinction that *Pinker* was addressing

7   a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2),

8   ***not*** a motion for failure to state a claim under Rule 12(b)(6) based on arguments over

9   the scope of the Exchange Act, as Toshiba advances here.  *Id.*  Toshiba, recognizing

10  its substantial contacts in the United States, has ***not*** sought dismissal under Rule

11  12(b)(2).  Whether or not sponsorship or participation in the sale is required to support

12  the exercise of personal jurisdiction, the issue is not relevant here because that defense

13  was not, and therefore cannot, be asserted by Toshiba.  Fed. R. Civ. P. 12(h)(1); *Am.*

14  *Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1106, 1108 (9th Cir.

15  2000).    Moreover, even under a jurisdictional analysis, *Pinker's* holding that

16  sponsorship ***establishes*** personal jurisdiction does not mean that ***absence*** of

17  sponsorship automatically ***defeats*** it.  Again, the lack of sponsorship would only

18  present grounds for discovery, not dismissal.  *E.g.*, *Laub v. United States DOI*, 342

19  F.3d 1080, 1093 (9th Cir. 2003).  Here, however, the presence or lack of sponsorship

20  is irrelevant.

21    Toshiba's reliance on *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409

22  (C.D. Cal. July 16, 2010), for the assertion that *Morrison* requires solicitation in the

23  United States is specious.  The portion of the short opinion Toshiba relies on was

24  addressing, shortly after *Morrison* was decided and in the context of lead plaintiff

25  motions, a question not presented here: whether Americans who had purchased

26

27  —————————————
    of its employees – Toshiba tacitly acknowledges that the mere lack of "sponsorship"
28  is not enough to secure dismissal.

- 17 -

1   foreign stock on a foreign exchange could state an Exchange Act claim after

2   *Morrison*.   The Court expressed the preliminary view ("this is not a final

3   determination of the issue") that a foreign transaction that was solicited in the United

4   States could comply with *Morrison*.   *Id.* at *1.   The Court did ***not***, as Toshiba

5   characterizes the opinion, "hold[]" that an issuer ***must*** "explicitly solicit[]" a purchase

6   in the United States for the Exchange Act to apply, much less reach the conclusion

7   that an ADS represented a "foreign transaction" that could only be prosecuted under

8   the laws of the foreign country.  *Id.*; *cf.* Mem. at 14:9-18.   To the contrary, the Court

9   ***appointed*** an ADS purchaser as the lead plaintiff, finding that its transactions were

10  plainly within *Morrison* rendering it, and not the plaintiffs who had acquired their

11  securities in Japan, the most adequate plaintiff to lead the prosecution of the case.

12  2010 WL 3377409, at *2.  *Stackhouse* provides no support for dismissal of this action.

13          Nor have courts "uniformly" rejected attempts to impose §10(b) liability based

14  on transactions in unsponsored ADSs post-*Morrison*, as Toshiba boldly asserts at the

15  outset of its brief.   Mem. at 1:27-2:2.   In fact there is ***no*** binding or persuasive

16  authority on this issue.   The one post-*Morrison* case Toshiba cites for this point,

17  *Societe-Generale*, 2010 U.S. Dist. LEXIS 107719, doesn't state that the ADSs at issue

18  there were "unsponsored" (in fact they were not), nor is there any indication that the

19  purported "unsponsored" nature of the ADSs played any role in the outcome.[19]

20  Rather, the reasoning of that decision (that an ADS transaction is "inherently foreign"

21  because it is tied to the purchase of foreign shares) applies equally to sponsored

22  ADSs, and has been criticized as incorrect and contrary to *Morrison*.  *United States v.*

23  *Martoma*, 2013 U.S. Dist. LEXIS 176998, at *12 n.3 (S.D.N.Y. Dec. 17, 2013); *Wu*,

24  883 F. Supp. 2d at 252-53.   Although defendants in *Societe-Generale* did ***not*** assert

25  that claims based on ADS transactions were barred by *Morrison*, the court raised the

26

27  [19]  Not all ADSs that trade on the OTC market are unsponsored.  *See, e.g.*, Ex. 6
28  (reflecting that *Societe-Generale* ADSs are sponsored).

issue *sua sponte* and resolved it based on the same **pre-*Morrison*** case that Toshiba cites here, *Copeland v. Fortis*, 685 F. Supp. 2d 498 (S.D.N.Y. 2010), which in turn had based its decision on the Second Circuit "conduct" and "effects" tests that were specifically ***rejected*** by *Morrison.  Societe-Generale*, 2010 U.S. Dist. LEXIS 107719, at *7 n.2, *18-*21; *see Copeland*, 685 F. Supp. 2d at 506; *cf. Morrison*, 561 U.S. at 255-61.   *Copeland* and similar decisions have no force post-*Morrison*, which instructed courts to look only to the place of the transaction to establish whether or not the Exchange Act applies. *Martoma*, 2013 U.S. Dist. LEXIS 176998, at *12; *Wu*, 883 F. Supp. 2d at 253; *see also Absolute Activist*, 677 F.3d at 69 ("we cannot conclude that the identity of the security necessarily has any bearing on whether a purchase or sale is domestic within the meaning of *Morrison*").

In contending that unsponsored ADSs are not subject to regulation by the Exchange Act, Toshiba relies heavily upon *Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014).  But that decision is both wrongly decided and inapposite to the facts of this case.  ***First***, the case did not arise from the sale of ADSs, but from transactions in securities-based swap agreements tied to the price of Volkswagen ("VW") stock in Germany.   Unlike an ADS, the swap agreements: (i) were not tied to and did not involve any actual purchase or sale of VW stock; (ii) did not provide purchasers with any ownership interest in or rights to acquire any shares of VW stock; (iii) had no basis in or relationship to the number of shares actually trading in VW stock (thereby permitting the parties to "wager on the value of a stock in quantities that are unrelated to the amount of stock available"); and (iv) "were economically equivalent to short sales referencing VW shares." *Id.* at 205-06 & n.8.  The Second Circuit was careful to note that the outcome in that case was predicated in part on the "unusual security at issue" in the case, and driven by concerns over the expansion of liability by "novel financial instruments" that "market participants can freely invent to serve the market's needs of the moment." *Id.* at 202, 217.  An unsponsored ADS has none of the characteristics of the unique swap

- 19 -

agreements at issue in *Parkcentral*, nor is it the type of "agreement independent from the reference securities" (*id.* at 216) that concerned the Second Circuit. Rather, it is a simple vehicle that has been used for nearly 90 years to provide American investors a means to make direct investments in foreign companies that are secured by specific shares of foreign stock held in trust at a depositary bank in the U.S. *E.g.*, *Pinker*, 292 F.3d at 367; *supra* at 11.

**Second**, unlike the Toshiba ADSs, the swap agreements were not traded on the OTC market or any other domestic exchange. Rather, they were the product of purely private agreements between institutional investors and investment banks that referenced VW securities traded only in Germany.[20]  *Parkcentral*, 763 F.3d at 207. **Third**, the claims in the case were not, as here, brought against the issuer of the referenced security (VW), but against another investor in the company, Porsche, which was not a party to the swap agreements. Porsche was alleged to have manipulated the public trading price of VW shares as part of a corporate takeover scheme in a manner that caused a short squeeze resulting in losses to plaintiffs on their swap investments. *Id.* at 201-03. Questions of issuer liability were not before the court. *Id.* at 206 n.8. **Fourth**, the Second Circuit's decision is not binding on this Court and, even under the unusual facts of that case, is inconsistent with *Morrison* because, despite acknowledging that the transactions at issue were "unmistakably . . . domestic," the Second Circuit went to great lengths attempting to read into *Morrison* latitude to develop multi-factor tests of the type the Supreme Court had specifically rejected. *Id.* at 214-16; *see id.* at 212, 218-21 (Leval, J., concurring); *see also Morrison*, 561 U.S. at 255-61.

---

[20]  Significantly, the Second Circuit noted that the parties **could** have referenced ADSs traded in the United States but chose **not** to, indicating that had the parties done so the transaction could have been sufficiently domestic to meet the *Morrison* test. *See* 763 F.3d at 207 n.9.

1    *Finally*, even if the decision was correctly decided it could not apply under the

2    facts of this case.  The Second Circuit went out of its way to caution that its decision

3    was not intended to "proffer a test that will reliably determine" whether §10(b) may be

4    applied in a specific case, nor could its holdings "be perfunctorily applied to other

5    cases based on the perceived similarity of a few facts."  *Parkcentral*, 763 F.3d at 217.

6    None of the novel and unique factors present in *Parkcentral* are present here, and the

7    case provides no persuasive authority for finding that the unsponsored ADSs at issue

8    in this case are not subject to §10(b) of the Exchange Act.  *See Atlantica Holdings,*

9    *Inc. v. BTA Bank, JSC*, 2015 U.S. Dist. LEXIS 3209, at *23-*24 (S.D.N.Y. Jan. 12,

10   2015) (distinguishing *Parkcentral* based on character of securities at issue).

11   **B. Toshiba Fails to Show Any Basis for Dismissal of Japanese**
     **Law Claims over Which This Court Has Original Jurisdiction**

12   **on Grounds of Comity or Inconvenience**

13       Toshiba next asks the Court to require plaintiffs to litigate their Japanese law

14   claims in Japan.  Notably, Toshiba does ***not*** contest this Court's jurisdiction to

15   consider the JFIEA claims by Americans who acquired Toshiba stock overseas.[21]

16   Toshiba admits the original jurisdiction of this Court, and seeks dismissal only on

17   grounds of comity or inconvenience.[22]

18       Toshiba's motion fails to meet its heavy burden of justifying dismissal on either

19   ground.  Toshiba's arguments misconstrue the relevant legal authorities, rest on

20   declarations that are conclusory and incorrect, and ignore most of the relevant factual

21   allegations in the Complaint.  At bottom, Toshiba's arguments for dismissal come

22   
_____

23   [21]  This Court has three bases on which to exercise jurisdiction over the claims
     asserted under Japanese law: (i) the alienage provisions under diversity jurisdiction,
24   28 U.S.C. §1332(a)(2), because the claims are in excess of $75,000 and brought by
     citizens of the United States against a citizen of Japan (¶12); (ii) CAFA, 28 U.S.C.
25   §1332(d), because Toshiba common stock traded in Japan is not a "covered security"
     and this action involves claims in excess of $5 million (*id.*); and (iii) supplemental
26   jurisdiction, 28 U.S.C. §1367, because the Japanese law claims arise from the same
     operative facts as the Exchange Act claims (¶13).

27   [22]  Toshiba does not seek dismissal, on grounds of either comity or convenience, of
28   the U.S. Exchange Act claims.  *See* Mem. at 16:23-24.

- 21 -

down to the false assertion that its fraud had no relationship to, and will not require any discovery in, the United States, and its simplistic conclusion that, merely because the claims arise under Japanese law, they ***must*** be tried in Japan.

### 1.  No Legitimate Issue of Comity Is Raised Here

Toshiba's argument for dismissal based on international comity misunderstands and misapplies that doctrine.  Unlike cases in which comity has been found to support dismissal, this case involves no issue of the extraterritorial application of U.S. law to events taking place in Japan, nor any risk that this case will interfere with the adjudication of any past, present or anticipated civil, criminal, regulatory or investigative proceeding in Japan.  Neither does this action raise any issues of American foreign policy or face any objection from the Japanese government or any court, regulator, law enforcement agency or private litigant in Japan.  In short, this action bears none of the hallmarks of a case that is subject to dismissal under comity, and Toshiba's motion to dismiss on that ground should be denied.  *See Mujica v. AirScan, Inc.*, 771 F.3d 580 (9th Cir. 2014).

### a.  The Cases on Which Toshiba Rests Bear Little Resemblance to This One

"International comity is a doctrine of abstention," *Mujica*, 771 F.3d at 598, and as such "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" that applies only in "exceptional circumstances." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  Toshiba bases its comity arguments primarily upon *Mujica* and *In re Toyota Motor Corp. Sec. Litig.*, 2011 U.S. Dist. LEXIS 75732 (C.D. Cal. July 7, 2011).  Both cases are distinguishable and neither compels, or even supports, dismissal on grounds of comity here.  *See Mujica*, 771 F.3d at 608 ("comity is circumstance-dependent and not susceptible to mechanical application" because it "'varies according to the factual circumstances surrounding each claim'").

- 22 -

1    In *Toyota*, Judge Fischer, shortly after *Morrison* was decided, declined to

2  exercise her discretion to accept supplemental jurisdiction over JFIEA claims, citing

3  comity as one of her reasons.  2011 U.S. Dist. LEXIS 75732, at *19-*21.  Judge

4  Fischer did ***not*** undertake the type of detailed analysis of international comity factors

5  that is required by the Ninth Circuit, nor did she have the benefit of *Mujica*, decided

6  three years later, to guide her in the limited analysis she conducted.  Neither was such

7  an analysis required in that case, because the Court was merely exercising its broad

8  discretion to refuse to exercise supplemental jurisdiction.  *Id.*; *see, e.g.*, *O'Connor v.*

9  *Nevada*, 27 F.3d 357, 362 (9th Cir. 1994).  *Toyota* has no relevance here, where

10  original jurisdiction is admitted and the need to exercise supplemental jurisdiction is

11  not at issue.[23]

12    Even if supplemental jurisdiction was contested, significant factual differences

13  between this action and *Toyota* would render that case inapplicable to this proceeding.

14  *Toyota* asserted claims on behalf of a ***worldwide*** class of investors, raising questions

15  over the impact of the U.S. court's resolution of claims of Japanese citizens under

16  Japanese law on Japanese sovereignty.[24]  Here, the class for the JFIEA claims is

17  limited to U.S. investors and no such questions are present.  ¶270.  In addition, the

18  fraud alleged in *Toyota* related to the failure to disclose safety risks in the vehicles it

19  manufactured, which raised difficult issues over the actionability of certain alleged

20  misrepresentations, even under U.S. law.  *See Toyota*, 2011 U.S. Dist. LEXIS 75732,

21  at *4-*11.  Here, the alleged misrepresentations arise from improper accounting that

22  was used to deliberately falsify Toshiba's financial statements (¶¶99-241), and

23  Toshiba does not dispute that the alleged misrepresentations are actionable under both

24  U.S. and Japanese law.

25

26  [23]  *See supra* n.21 (jurisdictional bases for this suit); *cf. Toyota*, 2011 U.S. Dist.
LEXIS 75732, at *17-*19 (no original jurisdiction over Japanese law claims).

27  [24]  Toshiba omits the pages from the Toyota complaint that reflect this.  *See* Ex. 7

28  at 61 (1:12-13) & ¶191; *cf.* TOS RJN, Ex. 18.

- 23 -

1    In contrast to the substantive and procedural issues in this case, comity is
2    primarily concerned with "maintaining amicable working relationships between
3    nations." *Mujica*, 771 F.3d at 598. *Mujica* is illustrative of the type of case that is a
4    proper candidate for application of the comity doctrine, and the dissimilarity of such a
5    case to the one at bar. *Mujica* involved federal and California state law claims for
6    wrongful death, torture, war crimes and other acts arising from the bombing of a
7    Colombian village by members of the Colombian air force allegedly acting on behalf
8    of oil companies headquartered in the U.S. *Id.* at 584-85. Plaintiffs, all citizens or
9    former residents of Colombia, had previously filed suit and obtained a recovery
10   against the Colombian government and army in Colombia. *Id.* at 586. Before
11   judgment was entered by the Colombian court, plaintiffs had filed a related action in
12   the U.S. against the two oil companies alleged to be complicit in the crimes. *Id.*
13   Following their recovery in the Colombian suit, Colombian law prohibited plaintiffs
14   from obtaining a second recovery against the oil companies. *Id.* at 612-14. This
15   created a direct conflict between the pending U.S. action and the completed foreign
16   proceeding. *Id.* After the judgment was entered in Colombia, the U.S. Department of
17   State opposed the continuation of the litigation in the U.S. on grounds that it would
18   severely hinder U.S.-Colombian relations, and provided the Court with two démarches
19   (formal diplomatic statements) from the Colombian government objecting to the
20   prosecution of the case in this country. *Id.* at 584-86. After dismissing the federal
21   causes of action for failure to state a claim, the Ninth Circuit dismissed the state law
22   claims based on the doctrine of international comity. *Id.* at 596, 614-15.

23   Here, by contrast, the suit is brought under Japanese law by American plaintiffs
24   who have not filed any related actions or obtained any recovery in Japan; neither the
25   state department nor the Japanese government has objected that litigation of this case
26   will interfere with U.S.-Japanese relations or any pending civil, criminal or regulatory
27   proceedings in Japan; and there is no risk of double recovery present. Thus, even at
28   the outset, it is plain that the concerns of *Mujica* with applying U.S. law to a purely

- 24 -

Colombian dispute and thereby harming the foreign relations of the United States simply are not present in this case.  *See id.* at 614-15.

### b.  Toshiba Fails to Properly Invoke Adjudicatory Comity

Toshiba's motion is based on adjudicatory comity or "'comity among courts,'" which permits deference to foreign proceedings by allowing federal courts to exercise prudential abstention to "decline to exercise jurisdiction over a case before it when *that case* is pending in a foreign court with proper jurisdiction."[25]  *Mujica*, 771 F.3d at 599.  As a threshold matter, Toshiba fails to properly invoke this doctrine because it cannot establish that there are any proceedings in Japan that will address, or have addressed, plaintiffs' claims under Japanese law.  Rather, Toshiba's arguments are based on the fact that Toshiba is being sued by different investors (all residents of Japan) in three different lawsuits in Japan, and that Toshiba may be subject to certain regulatory proceedings and investigations in that country.  But Toshiba provides few details about those proceedings other than the fact they have been initiated, and can make no assertion that those proceedings will resolve the rights of the parties to this action, or that this action will impinge on the conduct or prosecution of the foreign proceedings.  In fact, it will not.  *See* Inoue §III at 2-7, §VI at 14-15; Pardieck, ¶¶9, 14-28.

Toshiba also fails to properly invoke comity because it has failed to show the adequacy of the Japanese forum as to the claims of ADS purchasers under Japanese law.  As set forth above, Toshiba stops well short of admitting that the ADS purchasers *could* bring suit in Japan.  To the contrary, it appears to contend that only

---

[25]  The Ninth Circuit has also recognized a second distinct comity doctrine – legislative (or "prescriptive") comity – which is concerned with the extraterritorial application of federal statutes in conflict with the law of a foreign jurisdiction. *Mujica*, 771 F.3d at 598, 600.  While Toshiba does not distinguish between these doctrines or articulate which branch it seeks dismissal under, legislative comity is plainly not implicated because Toshiba seeks dismissal only of claims brought under Japanese law.  Mem. at 16:23-24.  The extraterritorial application of U.S. law is not an issue with respect to those claims.  *See Morrison*, 561 U.S. at 269-70.

1  depository banks could initiate an action in Japan, effectively leaving ADS purchasers

2  without a remedy.  *Supra* at 14-15; Mem. at 14:9-14.  Because Toshiba has not shown,

3  as to the ADS purchasers, that Japan "would have jurisdiction and would provide a

4  remedy for a meritorious claim," it has failed to demonstrate grounds for dismissal

5  based on comity as to those purchasers.[26]  *See Mujica*, 771 F.3d at 612.

6  ### c.  *Morrison* Does Not Support Toshiba's Comity Argument

7
8  In contending that the Supreme Court's opinion in *Morrison* is sufficient to

   compel dismissal on grounds of comity (Mem. at 17:11-13), Toshiba once again
9
   misinterprets the decision.  *Morrison* was concerned with the potential for
10
   extraterritorial application of U.S. securities laws to interfere with the right of foreign
11
   governments to regulate their own securities markets.  But here, where ***Japanese*** law
12
   is being applied to foreign transactions, as *Morrison* requires, there is nothing that
13
   impinges, in any way, on the ability of Japan to decide how to regulate those
14
   transactions.[27]  Indeed, elsewhere in its brief Toshiba ***acknowledges*** that *Morrison's*
15
   requirement that transactions on foreign markets be decided in accordance with
16
   foreign law avoids interference with foreign securities regulation and, therefore,
17
   "***satisfies those comity concerns***."  Mem. at 11:22-25 (citing *Morrison*, 561 U.S. at
18
   269-70 (discussing *amicus* briefs submitted by foreign interests)).
19
20  Toshiba's interpretation of *Morrison* is based entirely on *Toyota* which, as

21  discussed above, concerned itself with the discretionary exercise of supplemental

22  jurisdiction, not a rigorous analysis of international comity.  *Supra* at 17-18; *see* Mem.

23  [26]  As to the American plaintiffs who purchased their shares in Japan, the adequacy of
    that forum is not, as Toshiba argues, a factor that "militates powerfully in favor of
24  dismissal."  Mem. at 21:5-6.  It is merely a necessary condition to applying the
    doctrine.  *Mujica*, 771 F.3d at 599, 612.  That a foreign forum is fair does not, on its
25  own, counsel for the exercise of the doctrine.  *See id.* at 598-99, 611-15.

26  [27]  Territoriality is most relevant where questions of extraterritorial application of U.S.
    statutes are raised, as in *Morrison*, and unlike here.  *See Mujica*, 771 F.3d at 605
27  ("where the conduct in question took place . . . is a critical question in determining the
    extraterritorial reach of U.S. statutes"); *see also* n.25, *supra*.
28

- 26 -

1128565_1

at 16:25-17:13.  To the extent that defendants read *Toyota* or *Morrison* to hold that foreign claims cannot be litigated in U.S. courts, they are simply incorrect.  *See* Mem. at 19:15-21 (asserting that *Morrison* holds that "U.S. ***courts*** must not insert themselves into foreign securities laws").  That was not an issue that was decided by the Supreme Court, nor would it be correct to conclude that the Supreme Court intended, *sub silencio*, to overturn a long line of cases recognizing that U.S. courts ***can*** apply foreign law to foreign disputes without intruding on a foreign sovereign's interests.  *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1034 (11th Cir. 2014) ("federal courts regularly interpret and apply foreign law without offending international interests"); *Bigio v. Coca-Cola Co*., 448 F.3d 176, 179 (2d Cir. 2006) ("While adjudication of plaintiffs' common law claims may also require some modest application of Egyptian law, . . . the courts of this Circuit are regularly called upon to interpret foreign law without thereby offending principles of international comity.").

### d.  The Balance of Interests Does Not Support Comity Dismissal

A proper analysis of international comity requires the Court to weigh the interests of the United States against the interests of a foreign nation, taking into account the nationality of the parties, the nature and location of the misconduct, the impact of the litigation on U.S. foreign policy and sovereignty of foreign governments, and the relative public policy interests here and abroad.  *Mujica*, 771 F.3d at 603-07.  Toshiba misapplies this test by overstating the interests of Japan and ignoring the interests of the United States in this suit.

Toshiba primarily asserts that comity dismissal is warranted because all of the misconduct purportedly took place in Japan and most of its investors live in Japan. Mem. at 17:21-18:2, 19:25-20:5.  But Toshiba's argument ignores that the fraud involved substantial businesses and transactions in the United States, and also ignores

- 27 -

1128565_1

that this case only addresses the rights of **U.S.** investors in Toshiba.[28] *Supra* at 1-2 & n.2; ¶270.  As *Mujica* recognizes, even where only **some** of the parties are U.S. nationals, their presence is an important factor that supports a strong nexus between the action and the interests of the United States.  771 F.3d at 605.  Here, **all** of the plaintiffs are from the United States; in *Mujica **none*** of the parties were residents of the U.S. at the time of the acts that gave rise to their claims.  *Id.* at 584.  That this action will address the rights, and **only** the rights, of U.S. investors who purchased Toshiba shares as ADSs in the U.S. or common stock in Japan, demonstrates the strong nexus between this case and the interests of the United States.[29]  The interest of the U.S. in protecting the rights of U.S.-based investors is at least as strong as, and indeed stronger than, any interest of Japan.  *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194-95 (1976) (discussing strong public policies in favor of full disclosure to prevent investor fraud).

That significant aspects of Toshiba's fraud occurred with respect to businesses and transactions in this country also demonstrates a substantial connection between this case and the interests of the United States.  *See Mujica*, 771 F.3d at 605.  Toshiba ignores entirely the allegations regarding its efforts to conceal a massive goodwill writedown at Westinghouse, as well the numerous misrepresentations it made to conceal losses arising from improper accounting for other transaction in the U.S.  *Supra* n.2; *see also infra* at §II.B.2.a.  Toshiba's attempt to mischaracterize this case as involving conduct and transactions that took place **only** in Japan belies its

---

[28]   During the class period, institutional investors in the U.S. owned at least 485 million shares of Toshiba common stock, representing more than 11% of its outstanding shares.  ¶27.

[29]   By the same token, the fact that most of Toshiba's investors are in Japan would appear to ***decrease*** the likelihood that this case will interfere with Japan's national interests, not increase it as Toshiba suggests.  Toshiba's conclusory assertion that it would be "reasonable" to require U.S. investors to file suit in Japan because they knew they were buying shares of a Japanese corporation is a standard it simply makes up out of whole cloth, untethered to any authority that mere "reasonableness" supports prudential abstention.  *See* Mem. at 19:25-20:5.

1  recognition that the allegations of U.S.-based conduct are fatal to its arguments.  *Cf.*
2  *Mujica*, 771 F.3d at 605 (describing cases dismissed under comity because challenged
3  conduct "occurred entirely" in another country); *Cooper v. Tokyo Elec. Power Co.,*
4  *Inc.* ("*TEPCO*"), slip op. at 40-41 (Ex. 8A at 102-03) (S.D. Cal. June 11, 2016) (even
5  though alleged negligent actions took place entirely in Japan, U.S. had strong interest
6  in suit where plaintiffs were U.S. citizens, TEPCO was a large corporation with a
7  significant physical presence in the U.S., and the "global nature of the harm").[30]

8      While Toshiba asserts that Japan has a strong interest in regulating Toshiba's
9  misconduct, it fails to explain how this action will interfere with Japan's ability to do
10  so – because it won't.  Unlike *Mujica*, neither the Japanese government or any
11  Japanese court or regulatory authority (or any civil litigant) has objected to the
12  prosecution of this action in the United States, demonstrating the absence of the
13  significant foreign policy and sovereignty concerns that were present in that case.  *See*
14  *Mujica*, 771 F.3d at 606.  Nothing that happens here will interfere at all with any
15  action or investigation against Toshiba in Japan.  Inoue §VI at 15.

16     Neither has Toshiba shown that interest in Japan in this case far outweighs
17  interest in the United States, where Toshiba's fraud has also generated substantial
18  attention.  Exs. 9-16.  That civil liability for transactions on overseas markets is
19  determined by the law of the foreign jurisdiction does not mean that the U.S. has no
20  interest in such proceedings.  Indeed, just last week, Toshiba revealed that it had been
21  cooperating with a U.S. SEC and Department of Justice ("DOJ") probe into the

22

23  _____
    [30]  On a motion for reconsideration in light of *Mujica*, *TEPCO* reaffirmed an order
24  refusing to dismiss claims of U.S. citizens arising out of the meltdown of the
    Fukushima-Daiichi Nuclear Power Plant in Japan, finding that the global nature of the
25  harm, the residency of the plaintiffs, the substantial operations of the corporate
    defendant in the U.S., and the U.S. interests in safe operation of nuclear power plants
26  around the world prevented dismissal under comity, notwithstanding Japan's interest
    in regulating its nuclear power industry or the fact that the claims would (unlike here)
27  involve the application of U.S. laws to negligent conduct that took place in Japan.
    *TEPCO* has been certified for interlocutory appeal to the Ninth Circuit on entirely
28  different issues.  *See* Exs. 8B-8C.

1   involvement of its U.S. businesses, including Westinghouse, in the accounting fraud

2   that is at issue in this case.[31]  *See* Exs. 15-16.

3        Nor is Toshiba correct that U.S. courts have no interest in adjudicating claims

4   properly brought before them under the law of the foreign jurisdiction.  Not only do

5   U.S. courts have an "unflagging obligation" to hear cases where jurisdiction is

6   present, *Colo. River*, 424 U.S. at 817, the United States has a strong public policy

7   interest in assuring that the rights of U.S. investors are protected from fraud in

8   overseas transactions.  *Hochfelder*, 425 U.S. at 194-95; *see Mujica*, 771 F.3d at 607

9   (recognizing that public policy interests of U.S. are significant to comity analysis, and

10  citing cases finding that interests in preventing overseas trademark violations and

11  enforcing contractual rights overseas prevented comity dismissal); *TEPCO*, slip op. at

12  42 (Ex. 8A at 104) (even though Japan has interest in regulating its nuclear utilities,

13  U.S. also had interest in safe operation of nuclear power plants around the world, such

14  that factor was neutral and did not support dismissal).

15       Toshiba's argument that this case will interfere with the ability of Japanese

16  courts to "develop[] the jurisprudence" under the JFIEA because a decision of this

17  Court "would be unreviewable" in Japan ignores the differences between the U.S.

18  common law system and Japan's civil law system.  *See* Inoue §III at 2-6; Pardieck,

19  ¶¶14-28.  Nothing this Court does will impact, in any way, Japan's development of the

20  law, nor will it affect the outcome of any lawsuit, regulatory proceeding, investigation

21  or other action in Japan.  Inoue §III at 4, §VI at 14-15.  Even Toshiba's own expert

22  admits that "the ruling of the U.S. court would have no precedential weight in Japan."

23  Ishiguro, ¶21.

24

25  ───────────────

    [31]  Following a *Bloomberg* report that the SEC and DOJ were investigating Toshiba's

26  failure to timely record goodwill writedowns taken by Westinghouse, Toshiba
    admitted that U.S. regulators had been investigating the accounting fraud as it related

27  to its U.S. operations, but denied that Westinghouse was a target of the probe.  Exs.
    15-16.  It did not deny that Westinghouse was cooperating with investigators in

28  providing information relevant to their inquiry.

1128565_1

1     Toshiba's assertion that the law under the JFIEA is undeveloped is similarly
2 unsupported by citation to any authority or cogent analysis demonstrating that this is
3 so. *See infra* §II.B.2.b.  Unlike the cases Toshiba relies on – both of which arose from
4 the unresolved question of whether there was a private right of action for damages to
5 enforce antitrust laws in the European Union on behalf of foreign plaintiffs – Toshiba
6 points to no specific issue of Japanese law that is unsettled, provides no discussion or
7 analysis of the cases where such an issue has arisen, does not identify any specific
8 policy issues that are implicated, and makes no showing that a decision by this Court
9 would interfere with ongoing efforts in Japan to resolve those issues.  *See In re*
10 *Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1211-22 (D. Kan. 2010).  Indeed, the
11 principal case that Toshiba relies on explicitly recognizes that dismissal of a claim
12 because it would involve application of "unsettled foreign law" is a "rarer iteration of
13 the [comity] doctrine" because of courts obligation to hear claims properly brought
14 before them.  *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2008 WL 5958061, at
15 *31-*32 (E.D.N.Y. Sept. 26, 2008).

16     **2.  Toshiba Fails to Show that This Forum Is Inconvenient**

17     "*Forum non conveniens* is 'an exceptional tool to be employed sparingly, [not
18 a] . . . doctrine that compels plaintiffs to choose the optimal forum for their claim.'"
19 *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002); *Bost. Telecomms. Grp.,
20 Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009).  "'[A] plaintiff's choice of forum
21 will not be disturbed unless the "private interest" and the "public interest" factors
22 strongly favor trial in a foreign country.'"  *Bost. Telecomms.*, 588 F.3d at 1206.  A
23 court may not dismiss a claim pursuant to *forum non conveniens* unless "defendants
24 have made a 'clear showing of facts which either (1) establish such oppression and
25 vexation of a defendant as to be out of proportion to the plaintiff's convenience, which
26 may be shown to be slight or nonexistent, or (2) make trial in the chosen forum
27 inappropriate because of considerations affecting the court's own administrative and
28 legal problems.'"  *Cheng v. Boeing Co.*, 708 F.2d 1406, 1410 (9th Cir. 1983); *accord*

- 31 -

1128565_1

1   *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1236 (9th Cir. 2011).
2   Toshiba fails to make the requisite showing here.

3      Initially, Toshiba fails to demonstrate that Japan is an adequate forum for
4   litigation of the ADS purchasers claims under either the Exchange Act or JFIEA.
5   Toshiba provides no evidence that a Japanese court would entertain the ADS
6   purchasers U.S. claim or would permit them to advance their Japanese law claims
7   without participation by the depositary banks (or that such participation can be
8   compelled by a Japanese court).  Because Toshiba has failed to demonstrate that Japan
9   offers ADS purchasers a practical remedy in Japan, it has failed to meet the threshold
10  requirement for seeking dismissal of the ADS purchasers claims based on *forum non*
11  *conveniens*.  *See, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981)
12  ("dismissal would not be appropriate where the alternative forum does not permit
13  litigation of the subject matter of the dispute"); *Lueck v. Sundstrand, Corp.*, 236 F.3d
14  1137, 1144 (9th Cir. 2001) ("The effect of *Piper Aircraft* is that a foreign forum will
15  be deemed adequate unless it offers no practical remedy for the plaintiff's complained
16  of wrong."); *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1178 (9th Cir.
17  2006) (defendant must show that the foreign "forum provides 'some remedy' for the
18  wrong at issue").

19     Toshiba is also incorrect in asserting that plaintiffs' choice of forum is entitled
20  to "little if any weight."  Mem. at 21:27-22:6.  "When a domestic plaintiff initiates
21  litigation in its home forum, it is presumptively convenient."  *Carijano*, 643 F.3d at
22  1227; *cf. Piper*, 454 U.S. at 255 (less deference accorded where plaintiff is a foreign
23  subject).  Toshiba's assertion that it is "not unreasonable" to require plaintiffs to
24  litigate in Japan (Mem. at 22:3-4) articulates a standard that is nowhere found in the
25  law.  Its suggestion that less deference is due here because this is a class action case is
26  based on a single authority that is wholly inapposite because it arose on a motion to
27  transfer venue under 28 U.S.C. §1404(a) and did not address the application of *forum*
28  *non conveniens*.  *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987); *see Piper*, 454

- 32 -

U.S. at 253 (§1404(a) cases are not applicable in a *forum non conveniens* context); *Carijano*, 643 F.3d at 1228 (court must give great deference to U.S. resident plaintiff's choice of forum even where it was only one of 26 plaintiffs in case.

### a. Toshiba Ignores that Substantial Discovery Will Be Required in the United States

Toshiba's primary argument in support of dismissal on convenience grounds is its contention that all of the evidence needed at trial is located in Japan and unobtainable unless this case is transferred there.  Mem. at 22:17-24:13.  This contention is both unsupported and incorrect.  It is unsupported because Toshiba has failed to meet its burden of identifying specific evidence or witnesses that are located in Japan, explaining the nature and relevance of the documents or testimony they would provide, or establishing that such evidence is unobtainable for use in this action if it remains in the United States.  *Bost. Telecomms.*, 588 F.3d at 1210 (holding the district court erred in finding this factor was neutral because the defendant "provided very little information that would have enabled the district court to understand why various witnesses were material to his defense").  It is incorrect because it ignores the substantial amount of ***domestic*** discovery that will take place relating to events and transactions in the United States.

Discovery in the United States is of paramount importance to this action because, whereas Toshiba has admitted the facts needed to establish accounting fraud with respect to the transactions described in the IIC report, it has ***not*** admitted the fraud with respect to its efforts to conceal the financial condition of Westinghouse, other than with respect to a failure to disclose one of the two charges it took for impaired goodwill.  *See* ¶¶52, 68, 90-98, 124.  Thus, to the extent discovery of liability issues is needed in this case, that discovery will occur primarily in the United States, and will include discovery from both Westinghouse (*see* ¶¶79-98, 121-144) and its U.S. auditors at Ernst & Young who required the writedown and resisted Toshiba's efforts to force them to change their conclusion.  *See* ¶¶87-89.  Discovery

- 33 -

1   into the fraudulent accounting at other U.S.-based companies or transactions in the
2   U.S. will likely be required as well.  *See* ¶¶168-175, 203-220, 234-237.  Moreover,
3   based on the arguments Toshiba asserts elsewhere in its brief, it also appears that
4   discovery will be conducted from the depositary banks in the U.S. that sold Toshiba's
5   stock as ADSs.  *Supra* at 16.  Any discovery from the plaintiffs or related to class
6   certification issues will take place here as well.

7           By contrast, formal discovery in Japan will primarily involve producing (and, if
8   stipulations cannot be obtained, authenticating) the evidence that Toshiba has already
9   gathered and provided to the IIC and other investigators.  Inasmuch as Toshiba itself
10  has this evidence, this production can be accomplished under the U.S. discovery rules
11  without need for any proceedings in Japan.  *Richmark Corp. v. Timber Falling*
12  *Consultants*, 959 F.2d 1468, 1474 (9th Cir. 1992); *Thales Avionics Inc. v. Matsushita*
13  *Avionics Sys. Corp.*, 2006 U.S. Dist. LEXIS 97119, at *9 (C.D. Cal. Mar. 8, 2006).
14  To the extent depositions are required in Japan, they can – as Toshiba's motion admits
15  – be conducted under procedures specifically established to permit depositions
16  attendant to U.S. actions to occur there.  Pardieck, ¶¶63-66; Ishiguro, ¶¶23-24.

17          Toshiba's motion fails to provide a sufficient basis for dismissal of this case on
18  grounds of inconvenience because it has not demonstrated that any material evidence
19  or witness is unavailable for discovery or trial here.  Toshiba asserts only that certain
20  individuals are probably living in Japan but does not establish that it will be unable to
21  compel the attendance of any of its current executives or employees at depositions or
22  trial, that any other witness is unwilling to voluntarily come to the United States to
23  testify (either by deposition or at trial), or that any witnesses' testimony cannot be
24  procured in Japan if they refuse to appear in the U.S.  *Carijano*, 643 F.3d at 1231
25  ("[T]he initial question is not whether the witnesses are beyond the reach of
26  compulsory process, but whether it has been alleged or shown that witnesses would be
27  unwilling to testify."); *cf.* Wada, ¶¶5-6, 8; *see also* Pardieck ¶¶58-66; Motion to Strike
28  at 7-9.  Toshiba simply assumes that any witness who may be located in Japan is

- 34 -

1  unavailable and unwilling to testify and cannot be compelled to do so either here or in

2  Japan.[32]

3          Toshiba also fails to carry its burden because it fails to describe the testimony

4  that any of the purportedly unavailable witnesses would provide or explain why that

5  testimony (or any other evidence it asserts is unavailable) is material, relevant and

6  necessary for trial.   As the Ninth Circuit has made clear, "in asking for the

7  extraordinary measure of dismissal on *forum non conveniens* grounds, [a defendant]

8  need[s] to provide not simply the numbers of witnesses in each locale, but information

9  sufficient to assist the court in assessing the 'materiality and importance' of each

10  witness." *Bost. Telecomms.*, 588 F.3d at 1210.[33]  Here, Toshiba asserts only that some

11  former executives responsible for accounting issues are no longer employed by the

12  Company.  Mem. at 22:27-23:2.  Toshiba makes no attempt to explain what these

13  witnesses would say, much less to explain why such testimony is necessary in light of

14  the substantial investigation that has already been completed, the IIC findings that the

15  fraud was carried out at the direction and under the control of senior executives, and

16  Toshiba's admissions that these findings were accurate.[34]  *E.g.*, ¶¶62, 68.

17

18  _____

19  [32]   In the case Toshiba relies on for its argument, *J.C. Renfroe & Sons, Inc. v. Renfroe
    Japan Co., Ltd.*, 515 F. Supp. 2d 1258, 1271 (M.D. Fla. 2007), the court similarly
20  "assume[d]" that non-employee witnesses were unwilling to come to the U.S.  That
    case is contrary to Ninth Circuit law, which requires defendants to ***show*** that a witness
21  is unwilling.  *Carijano*, 643 F.3d at 1231.

22  [33]   *See also CYBERsitter, LLC v. People's Republic of China*, 2010 U.S. Dist. LEXIS
    128345, at *21 (C.D. Cal. Nov. 18, 2010) ("[Defendant] does not identify any
23  witnesses who would be unwilling to testify at trial in the United States.  This favors
    retaining trial in the United States.").

24  [34]   For his part, Toshiba's declarant appears to have simply copied the names of the
25  executives named in the control person count under the Exchange Act – all of whom
    were identified in the IIC report – and asserted that each of those witnesses appear to
26  reside in Japan.  *See* Wada, ¶5; *cf.* ¶289.  Notably, Toshiba does not deny that it
    controlled any of these individuals.  Its only argument for dismissal of that claim is
27  derivative of its mistaken argument to dismiss the §10(b) claim.  *See* Mem. at 16:7-13.
    Thus, on its face, the motion shows no need for testimony from any of these
28  witnesses.

1    Toshiba's argument also ignores that issues of convenience require a balancing

2    test, as it pays no heed to the inconvenience that would be placed on American

3    plaintiffs or witnesses to travel to Japan to try this case.  *See Lueck*, 236 F.3d at 1145.

4    Toshiba also makes no argument that litigation in this District, where its American

5    headquarters is located, will be inconvenient to it.  Toshiba is subject to personal

6    jurisdiction here, has regularly defended claims brought against it in this Court, and

7    recently requested that an action be transferred from Virginia to the Northern District

8    of California or this District under §1404(a), contending that discovery here would be

9    more convenient.  *Global Touch Sols., LLC v. Toshiba Corp.*, 2015 U.S. Dist. LEXIS

10   77227, at *8-*11, *24-*26, *43 (E.D. Va. June 15, 2015).  Toshiba's recent assurance

11   that it is cooperating with the U.S. SEC and DOJ in their investigation into fraudulent

12   activities relating to the U.S., further establishes that it will not be inconvenient to

13   Toshiba to defend this case in this forum.  *See* Ex. 16.

14   Toshiba's contentions about the cost and difficulty of discovery for American

15   litigants in Japan also fail to provide proper grounds to support dismissal.[35]   *See*

16   *Tuarzon*, 433 F.3d at 45 ("Any court, whether in the United States or in the

17   Philippines, will necessarily face some difficulty in securing evidence from abroad.").

18   Discovery is regularly taken in Japan in connection with lawsuits pending in the

19   United States, and can be conducted in connection with this case too.  *See* Pardieck

20   ¶¶58-66.  Neither does Toshiba address the ability of Japanese litigants to obtain

21   discovery of witnesses and evidence regarding events that took place in the United

22   States, much less consider the cost or difficulty of obtaining such evidence for use in

23   an action pending in Japan.  *See id.*, ¶¶12, 67-68; *see also In re O2CNI Co.*, 2013 U.S.

24

25

---

26   [35]  Toshiba's motion appears to be concerned primarily with the cost to ***plaintiffs*** to
     conduct discovery overseas.  *See* Mem. 24:8-13.  This is not a proper basis for
27   ***Toshiba's*** motion.  *Manela v. Garantia Banking*, 940 F. Supp. 584, 592 n.12
     (S.D.N.Y. 1996); *Varnelo v. Eastwind Transp.*, 2003 U.S. Dist. LEXIS 1424, at *83
28   (S.D.N.Y. Feb. 3, 2003).

- 36 -

Dist. LEXIS 116019, at *24-*25 (N.D. Cal. Aug. 15, 2013) (accepting that Japanese courts cannot compel discovery from third parties in the U.S.).

Thus, Toshiba has failed to establish that on balance, the residence of the parties and convenience to the litigants strongly favors litigation in Japan rather than this District.

### b.  The Application of Japanese Law Will Not Be Difficult

The public factors that Toshiba asserts support dismissal on grounds of inconvenience are the same as those on which it seeks dismissal under the doctrine of international comity, all of which have been previously discussed and are insufficient here as well. *Supra* §II.B.1.d. Neither the interests of Japan or the fact that some residents of Japan are pursuing private actions against Toshiba means that it would be more convenient or efficient for American plaintiffs to litigate their claims in Japan. The actions by other litigants in Japan do not involve any of the plaintiffs here and will not determine the rights of any of the parties to this proceeding (including Toshiba). Inoue §§V-VI at 13-15; Pardieck, ¶¶26-28, 53-57.

Neither is the mere fact that an action involves the application of foreign law sufficient to support dismissal on grounds of inconvenience. *Piper Aircraft*, 454 U.S. at 260 n.29 (need to apply foreign law "alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate"); *accord Tuarzon*, 433 F.3d at 1182; *Bost. Telecomms.*, 588 F.3d at 1206. This is particularly true where, as here, Japanese law is readily determinable by this Court, the relevant statutes have been translated into English, and relevant case law and treatises are available to this Court. Pardieck, ¶¶8-11, 29-31, 39-52; Inoue §§III-IV at 7-12 & Exs. B-D; *see also* Ishiguro, ¶¶7-16. If need be, this Court can appoint a special master or expert to assist it in finding or determining Japanese law. Fed. R. Civ. P. 44.1; Fed. R. Evid. 706. That this case involves application of a statute that was expressly modeled on the U.S. securities laws (Pardieck, ¶¶14-15, 32-38) to

- 37 -

1  claims arising primarily from false accounting under U.S. GAAP[36] further

2  demonstrates that the issues raised in this case are readily capable of determination in

3  this Court.   Thus, this Court will be able to apply Japanese law, just as many U.S.

4  courts have done before.   *E.g.*, *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354

5  (Fed. Cir. 2008); *Universe Sales Co. v. Silver Castle, Ltd.*, 182 F.3d 1036 (9th Cir.

6  1999); *Ishizaki Kisen Co. v. United States*, 510 F.2d 875 (9th Cir. 1975).

7          Toshiba's argument that Japanese law is unsettled and, therefore, incapable of

8  determination, is similarly unsupported by identification of any specific issue that this

9  Court will be called upon to determine.[37]   Toshiba's declarant only makes a

10  generalized assertion that issues of materiality and damages under the JFIEA "may"

11  be unsettled but identifies no specific issue that has proven difficult for Japanese

12  courts to address, or offers any cogent explanation of why such issues (if they exist)

13  render it difficult for this Court to reach a decision under the facts of ***this*** case.   *See*

14  Ishiguro, ¶20.

15          Toshiba's declarant asserts that the criteria for defining materiality "remain[s]

16  undefined," but makes no effort to show that there is any close question of materiality

17  under Japanese law that is present in this case because, plainly, there is not.   The

18  standard for materiality under Japanese law is the same as under U.S. law.   *See* Inoue

19  §IV(B) at 10 ("the interpretation of what is a 'material particular' is determined by the

20  criteria of whether it has an effect on the investors' decision or the market price");

21  *TSC Indus. v. Northway, In*c., 426 U.S. 438, 445 (1976) ("The question of materiality

22  . . . is an objective one, involving the significance of an omitted or misrepresented fact

23  to a reasonable investor.").   The deliberate fraudulent accounting that led to a $2.6

24  ─────────────

25  [36]   *See* ¶¶158, 163-167, 182, 197-199, 203-207, 210, 217, 223, 229.

26  [37]   Toshiba's motion is largely based on the purported lack of binding precedent from

27  Japan's Supreme Court.   *See* Mem. at 18:25-19:4; Ishiguro, ¶¶20-21.   Again, Toshiba misapprehends the differences between Japan's civil law system and ours, and ignores that the purported lack of precedent does not hinder adjudication of claims under the

28  JFIEA in Japan and will not do so here.   *See* Inoue §§III-IV at 2-12.

billion restatement and the concealment of at least $1.3 billion in impaired asset charges is material under either definition, particularly for a company that undertook to prepare its financial statements in accordance with U.S. GAAP. ¶155; *see* Financial Accounting Standards Board, Accounting Standards Codification ¶¶250-10-45-23, 105-10-05-6 (only material errors are restated under U.S. GAAP).

Toshiba's declarant similarly asserts only that there is "some uncertainty" about damages, speculates that "there should be" cases pending in lower Japanese courts addressing specific instances of stock price declines supporting loss causation, and contends that it is "unclear" how damages may be calculated in some instances. Ishiguro, ¶20. But, again, the declarant fails to identify any specific case where this problem has been presented or point to any specific facts that would render such a calculation exceedingly difficult in this case.[38] As with damages under the U.S. securities laws, damages under Japanese law can be determined based on statutory formulas and statistical analysis of readily-available data regarding the movement of Toshiba's stock price and the contemporaneous public information available to the market, and testimony of experts interpreting that data. *See* ¶¶242-269; *cf.* Inoue §III(c) at 10-12 & Ex. D; Pardieck, ¶¶41-43. Toshiba's declarant fails to demonstrate that common methods of financial and statistical analyses are incompetent to prove damages under Japanese law, overlooks that any decision by any Japanese court (including the Supreme Court) on these issues would not be binding on any other court in Japan (or the U.S.), and fails to explain why a Japanese court is better suited than this Court to address such questions in the purported absence of guiding authority. In short, the declarant fails to establish any basis for finding that the law is unsettled in any respect material to the outcome of this case, much less to provide grounds for dismissal because of it.

---

[38]  Indeed, his speculation that many courts in Japan are currently addressing such issues appears to belie his assertion that the issues are unsettled or difficult to determine.

III.    **CONCLUSION**

For all of the foregoing reasons, Toshiba's motion to dismiss should be denied in its entirety.  To the extent the Court finds any defect in the Complaint that supports dismissal, plaintiffs respectfully request leave to amend to correct it.

DATED:  March 21, 2016                     ROBBINS GELLER RUDMAN &
                                            DOWD LLP
                                           DENNIS J. HERMAN
                                           WILLOW E. RADCLIFFE
                                           JOHN H. GEORGE


                                                  s/Dennis J. Herman
                                           DENNIS J. HERMAN

                                           Post Montgomery Center
                                           One Montgomery Street, Suite 1800
                                           San Francisco, CA  94104
                                           Telephone:  415/288-4545
                                           415/288-4534 (fax)

                                           Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 21, 2016.

s/ Dennis J. Herman
DENNIS J. HERMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: dennish@rgrdlaw.com

- 41 -

**Mailing Information for a Case 2:15-cv-04194-DDP-JC Mark Stoyas v. Toshiba Corporation et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jaime M Crowe**
  jcrowe@whitecase.com

- **Christopher M Curran**
  ccurran@whitecase.com

- **Dennis J Herman**
  dennish@rgrdlaw.com,jgeorge@rgrdlaw.com

- **Bryan A Merryman**
  bmerryman@whitecase.com,cgomez@whitecase.com,jdisanti@whitecase.com,mco@whitecase.com,taylor.wright@whitecase.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,Dennish@rgrdlaw.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Owen C Pell**
  opell@whitecase.com

- **Willow E Radcliffe**
  willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com,kirstenb@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

- 42 -