BRYAN A. MERRYMAN (SBN 134357)
bmerryman@whitecase.com
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone:  (213) 620-7700
Facsimile:   (213) 452-2329

CHRISTOPHER M. CURRAN
(*pro hac vice*)
ccurran@whitecase.com

OWEN C. PELL
(*pro hac vice*)
opell@whitecase.com

JAIME M. CROWE
(*pro hac vice*)
jcrowe@whitecase.com

Attorneys for Defendant
Toshiba Corporation

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MARK STOYAS, NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND, and AUTOMOTIVE INDUSTRIES PENSION TRUST FUND, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br>  v.<br><br>TOSHIBA CORPORATION, a Japanese Corporation,<br><br>   Defendant. | Case No.  2:15-cv-04194-DDP-JC<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT TOSHIBA CORPORATION'S MOTION TO DISMISS**<br><br>Date:  May 16, 2016<br>Time:  10:00 a.m.<br>Courtroom:  3<br>Judge:  Hon. Dean D. Pregerson |

1

## <u>TABLE OF CONTENTS</u>

2

**Page**

3    I.     INTRODUCTION .............................................................................1

4    II.    ARGUMENT ....................................................................................3

5         A. Plaintiffs Fail To Overcome *Morrison*'s Bar To Their U.S.
Exchange Act Claims .....................................................................3

6

7            1.     Plaintiffs Fail To Satisfy *Morrison*'s First Prong Because An
Over-The-Counter Market Is Not A National Securities
Exchange Under Section 10(b) .........................................3

8

9            2.     Plaintiffs Fail To Satisfy *Morrison*'s Second Prong Because
Toshiba Had No Involvement In Any Domestic Transactions ........8

10        B. Plaintiffs Fail To Overcome The Comity Concerns That Compel
Dismissal Of Plaintiffs' Japanese Exchange Act Claim ...........................14

11

12        C. Plaintiffs Fail To Overcome Toshiba's Showing That The
Inconvenience Of U.S. Litigation Compels Dismissal .............................19

13    III.   CONCLUSION ..............................................................................24

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY MEMORANDUM;
2:15-cv-04194-DDP-JC

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atl. Marine Cons. Co. v. U.S. Dist. Court for W. Dist. of Tex.*,
134 S. Ct. 568 (2013) ........................................................... 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................ 11

*Bigio v. Coca-Cola Co.*,
448 F.3d 176 (2d Cir. 2006) ............................................... 15

*Broam v. Bogan*,
320 F.3d 1023 (9th Cir. 2003) ............................................ 12

*Cheng v. Boeing Co.*,
708 F.2d 1406 (9th Cir. 1983) ............................................ 17

*Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.*,
918 F.2d 1446 (9th Cir. 1990) ............................................ 22

*Cooper v. Tokyo Elec. Power Co., Inc.*,
No. 12-CV-3032, 2015 WL 10687594 (S.D. Cal. June 11, 2015).... 16, 17, 18, 19

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ............................................................ 17

*Garcia v. City of King City*,
No. 14-cv-01126, 2015 U.S. Dist. LEXIS 46741
(N.D. Cal. Apr. 8, 2015) ..................................................... 14

*GDG Acquisitions, LLC v. Gov't of Belize*,
749 F.3d 1024 (11th Cir. 2014)........................................... 15

*Gemini Capital Grp., Inc. v. Yap Fishing Corp.*,
150 F.3d 1088 (9th Cir. 1998) ............................................ 20

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947) ............................................................ 23

*Howe v. Goldcorp Invs., Ltd.*,
946 F.2d 944 (1st Cir. 1991) .............................................. 17

*In re Banco Santander Sec.-Optimal Litig.*,
732 F. Supp. 2d 1305 (S.D. Fla. 2010)................................ 18

*In re China Mobile Games & Ent. Grp., LTD Sec. Litig.*,
No. 14-CV-4471, 2016 U.S. Dist. LEXIS 29258 (S.D.N.Y. Mar. 7, 2016) ....... 10

*In re Optimal U.S. Litig.*,
837 F. Supp. 2d 244 (S.D.N.Y. 2011)................................. 13

- ii -

*In re Société Générale Sec. Litig.*,
   No. 08-CV- 2495, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ...................... 8

*In re Toyota*,
   No. CV-10-922, 2011 WL2675395 (C.D. Cal. July 7, 2011) ..................... 14, 15

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011) .................................................................. 8

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013) ....................................................................................... 16

*Koster v. (Am.) Lumbermens Mutual Cas. Co.*,
   330 U.S. 518 (1947) ........................................................................................... 19

*Lockman Found. v. Evangelical All. Mission*,
   930 F.2d 764 (9th Cir. 1991) ...................................................................... 19, 22

*Lou v. Belzberg*,
   834 F.2d 730 (9th Cir. 1987) ............................................................................. 19

*Lueck v. Sundstrand, Corp.*,
   236 F.3d 1137 (9th Cir. 2001) .................................................................... 22, 23

*Morrison v. Nat'l Australia Bank, Ltd.*,
   561 U.S. 247 (2010) .................................................................................. *passim*

*Mujica v. AirScan, Inc.*,
   771 F.3d 580 (9th Cir. 2014) .................................................................... *passim*

*Parkcentral Global HUB Ltd. v. Porsche Auto Holdings SE*,
   763 F.3d 198 (2d Cir. 2014) ..................................................................... 1, 9, 11

*Pinker v. Roche Holdings Ltd.*,
   292 F.3d 361 (3d Cir. 2002) ....................................................................4, 13, 14

*SEC v. Compania Internacional Financiera S.A.*,
   No. 11-CV-4904, 2011 U.S. Dist. LEXIS 83424
   (S.D.N.Y. July 29, 2011) ................................................................................... 10

*SEC v. Ficeto*,
   839 F. Supp. 2d 1101 (C.D. Cal. 2011) ..................................................... 6, 7, 8

*Stackhouse v. Toyota Motor Co.*,
   No. CV-10-0922, 2010 WL 3377409 (C.D. Cal. July 16, 2010) ........................ 9

*Strom v. United States*,
   641 F.3d 1051 (9th Cir. 2011) ............................................................................. 6

*Ungaro-Benages v. Dresdner Bank AG*,
   379 F.3d 1227 (11th Cir. 2004) ........................................................................ 18

*United States v. Georgiou*,
   777 F.3d 125 (3d Cir. 2015) ..................................................................... *passim*

- iii -

*United States v. Isaacson,*
   752 F.3d 1291 (11th Cir. 2014) ........................................................ 6, 7

*United States v. Martoma,*
   No. 12-CR-973, 2013 U.S. Dist. LEXIS 176998
   (S.D.N.Y. Dec. 17, 2013) .................................................................... 10

*Wu v. Stomber,*
   883 F. Supp. 2d at 233 (D.D.C. 2012) ............................................... 10

**STATUTES, RULES & REGULATIONS**

17 C.F.R. § 12g3-2(b) .......................................................................... 12, 13

17 C.F.R. § 240.3a1-1 .................................................................................. 5

Securities Exchange Act of 1934,
   15 U.S.C. § 78a *et. seq.* ................................................................... *passim*

   15 U.S.C. § 78c ....................................................................................... 4

   15 U.S.C. § 78dd(b) ............................................................................ 1, 8

   15 U.S.C. § 78j(b) .......................................................................... *passim*

28 U.S.C. § 1404(a) ................................................................................... 19

28 U.S.C. § 1782 ........................................................................................ 21

Federal Rules of Civil Procedure
   Rule 12(b)(6) ................................................................................... 11, 12

**OTHER AUTHORITIES**

SEC Release No. 34-40760, 1998 WL 849548 (Dec. 22, 1998) ............... 5-6

## I.   **INTRODUCTION**

Plaintiffs' Opposition fails to justify the filing of this action in this Court (or anywhere else in the United States):

As to Plaintiffs' U.S. Exchange Act claims, Plaintiffs cannot satisfy *Morrison*'s bright-line, two-pronged test.  Plaintiffs themselves admit (Opp'n at 7) that the unsponsored ADRs — securities created and issued by third-party depositary banks — are not registered on any "national securities exchange" as that term is used in Section 10(b).  And, contrary to Plaintiffs' arguments (Opp'n at 5-9), over-the-counter trading in those ADRs does not satisfy *Morrison*'s first prong, which strictly requires registration on a "national securities exchange." *Morrison*, 561 U.S. at 266-67 (quoting "security registered on a national securities exchange" from Section 10(b) and adopting that term as touchstone for first prong); *Georgiou*, 777 F.3d at 134-35 (holding that OTC markets "are not national securities exchanges within the scope of *Morrison*").

Furthermore, while Lead Plaintiff alleges that it purchased ADRs in the United States (Am. Compl. ¶ 19), that allegation does not satisfy *Morrison*'s second prong, because Lead Plaintiff does not, and cannot, allege that it transacted with Toshiba in purchasing the ADRs.  *Morrison* makes clear that the U.S. Exchange Act does not apply to "any person insofar as he transacts a business in securities without the jurisdiction of the United States." *Morrison*, 561 U.S. at 268 (quoting 15 U.S.C. § 78dd(b)); *Parkcentral*, 763 F.3d at 207, 216 (holding *Morrison*'s second prong not satisfied by domestic transaction where defendant was not party to transaction and "complaints concern statements made primarily in Germany with respect to stock in German company traded only on exchanges in Europe"). Plaintiffs' U.S. Exchange Act claims, in short, do not fall within either of *Morrison*'s two prongs and are therefore foreclosed by *Morrison* and its progeny.

As to Plaintiffs' Japanese-law claim, Plaintiffs suggest that Toshiba merely objects to the application of Japanese law in a U.S. court.  Opp'n at 27, 30.  But

- 1 -

1    Toshiba raises a more fundamental comity concern, recognized in *Morrison*, 561

2    U.S. at 269-70, that this Court's adjudication of Plaintiffs' Japanese-law claim

3    would interfere with a "core prerogative" of Japan to regulate its own securities

4    exchanges and adjudicate claims under its own securities laws.  *See also Mujica*,

5    771 F.3d at 606-07 ("The closer the connection between the conduct and core

6    prerogatives of the sovereign, the stronger that sovereign's interest.").  So powerful

7    is this comity concern that Plaintiffs are unable to cite a single U.S. case

8    adjudicating a claim under the securities laws of any foreign country (Japan or

9    otherwise).

10         Plaintiffs also have failed to overcome Japan's superior interest in this

11   litigation, given that the alleged misstatements and omissions were made in Japan

12   by a Japanese corporation listed on Japanese stock exchanges and that Plaintiffs

13   purchased their Toshiba common stock on those exchanges in Japan.  And

14   Plaintiffs do not dispute that Japan is an adequate alternative forum.  While

15   Plaintiffs identify possible legal obstacles to their claim under Japanese law (Opp'n

16   at 25, 32), any such legal obstacles Plaintiffs might encounter in Japan would also

17   exist in a U.S. court applying the same Japanese law.

18         Finally, Plaintiffs fail to overcome Toshiba's showing that Japan is the more

19   convenient forum under a conventional *forum non conveniens* analysis.  *Id.* at 31-

20   39.  Plaintiffs' choice of this forum deserves less deference in the class-action

21   context, particularly because this is not the home forum of any of the Plaintiffs.

22   Furthermore, potential evidence and witnesses are overwhelmingly located in

23   Japan.  And while Plaintiffs question the relevance of the Japanese witnesses and

24   evidence identified by Toshiba (*id.* at 33-35), these are precisely the witnesses and

25   evidence referenced repeatedly by Plaintiffs in the Amended Complaint.

26         In sum, Plaintiffs cannot state a claim under the U.S. Exchange Act, and their

27   Japanese-law claim belongs in Japan.  This action should be dismissed, in its

28   entirety, with prejudice.

- 2 -

## II.   ARGUMENT

### A.   Plaintiffs Fail To Overcome *Morrison*'s Bar To Their U.S. Exchange Act Claims

Contrary to Plaintiffs' assertion (Opp'n at 4), Toshiba does not maintain categorically that *Morrison* "prevents enforcement of the U.S. securities laws against foreign issuers of securities traded in the United States." *Id.* at 4.  Toshiba has consistently maintained that *Morrison* allows enforcement of the U.S. securities laws against foreign issuers to the extent foreign issuers have entered the U.S. securities market by (1) registering their securities on a national securities exchange or (2) otherwise transacting in their securities in the United States.  *See Morrison*, 561 U.S. at 273.  The *Morrison* Court divined these two prongs from the statutory text of Section 10(b) — specifically "in connection with the purchase or sale of [1] any security registered on a national securities exchange or [2] any security not so registered" — read in light of the presumption against extraterritorial application of Congressional legislation.  *Morrison*, 561 U.S. at 266-68.  These prongs make sense because they ensure that the U.S. Exchange Act will apply only to foreign issuers that have taken affirmative steps to enter the U.S. securities market.  Here, Plaintiffs have not pled — and cannot plead — that Toshiba has registered its securities on a national securities exchange or otherwise transacted in its securities in the United States.

### 1.   Plaintiffs Fail To Satisfy *Morrison*'s First Prong Because An Over-The-Counter Market Is Not A National Securities Exchange Under Section 10(b)

Plaintiffs cannot satisfy *Morrison*'s first prong because Toshiba has not registered the ADRs (or any other security) on any "national securities exchange." *Morrison*, 561 U.S. at 266 (quoting Section 10(b)); *see* Mem. at 6-7, 12-13.  In establishing the first prong, the *Morrison* Court began by observing that Section 10(b) refers to "the purchase or sale of any security registered on a national

- 3 -

1   securities exchange."  561 U.S. at 266 (quoting Section 10(b)).  The Court

2   proceeded to acknowledge the "primacy of the domestic exchange" in the U.S.

3   Exchange Act's regulatory scheme.  And in concluding its discussion of the first

4   prong, the Court again expressly tethered that prong to "securities listed on national

5   securities exchanges":  "The Act's registration requirements apply only to securities

6   listed on national securities exchanges."  *Id.* at 267.  The Third Circuit decision in

7   *Georgiou*, the only federal court of appeals to address the issue directly, held that

8   securities traded over the counter do not satisfy *Morrison*'s first prong because

9   OTC markets are not "national securities exchanges."  777 F.3d at 134-35.  As

10  *Georgiou* observes, the SEC and OTC authorities themselves acknowledge that

11  OTC markets are not "national securities exchanges."  *Id.*

12       Here, Plaintiffs do not contend that the OTC market on which the ADRs

13  traded was a "national securities exchange"; indeed, Plaintiffs seem to concede

14  otherwise.  Opp'n at 7 ("the OTC market may not be a 'national securities

15  exchange'").  But Plaintiffs argue that *Morrison*'s first prong does not require a

16  "national securities exchange" after all, and that any type of "exchange" will satisfy

17  the first prong.  *Id.* at 6-7.  And Plaintiffs — citing to Section 3(a)(1) of the

18  Exchange Act (15 U.S.C. § 78c) ("a market place or facilities for bringing together

19  purchasers and sellers of securities") — add that the OTC market "plainly"

20  qualifies as an "exchange," even if not as a "national securities exchange."  Opp'n

21  at 6.  (To Plaintiffs, this proposition is so "plain[]" as to not even need supporting

22  authority.)  Nonetheless, Plaintiffs' argument is mistaken for two distinct reasons.

23       *First*, while Plaintiffs are correct that the Court in *Morrison* sometimes refers

24  to "domestic exchanges" (Opp'n at 6-7), the context of the Court's opinion

25  establishes that this term is simply synonymous shorthand for "national securities

26  exchanges."  (As discussed below, the terms are in fact essentially synonymous.)

27  *Morrison* explicitly created its first prong based on the statutory text of Section

28  10(b), which refers to "national securities exchange."  And *Morrison* repeatedly

- 4 -

1   refers to the first prong applying to securities "registered" (or "listed") on "national

2   securities exchanges" or "domestic exchanges," while adding that the Act's

3   registration requirements "apply only to securities listed on national securities

4   exchanges." *Morrison*, 561 U.S. at 267. *Morrison* thus makes clear that its first

5   prong applies only to securities "registered" on "national securities exchanges," and

6   that the occasional use of the term "domestic exchange" (or "American stock

7   exchange") did not broaden the scope of prong one. *See also id.*, at 273 (Breyer, J.,

8   concurring) (expressing understanding that first prong of Court's opinion applies to

9   "national securities exchange[s]").

10        *Second*, Plaintiffs' reliance on *Morrison*'s use of the term "domestic

11   exchange" is misplaced for the separate reason that the OTC market is not a

12   "domestic exchange"; the OTC market is not an "exchange" at all. Plaintiffs'

13   Amended Complaint (¶ 25) acknowledges that the ADRs at issue here are traded on

14   the OTC market operated by OTCMarkets Group (specifically OTC Link). The

15   SEC defines that market not as an exchange, but as "an electronic inter-dealer

16   quotation system," stating that "[m]arket makers and other broker-dealers who buy

17   and sell OTC securities can use OTC Link to publish their bid and ask quotation

18   prices." OTC Link LLC, SEC http://www.sec.gov/answers/pink.htm (May 2010)

19   (internal quotation marks omitted). The SEC adds: "OTC Link is registered with

20   the SEC as a broker-dealer and as an *alternative trading system*, and is a member of

21   FINRA. OTC Link does not require companies whose securities are quoted on its

22   systems to meet any listing requirements." *Id.* (emphasis added). Under SEC Rule

23   3a1-1(a) (entitled "Exemption from the definition of 'Exchange' under Section

24   3(a)(1) of the Act"), adopted in 1998, an alternative trading system (ATS) is

25   "exempt from the definition of the term 'exchange' under section 3(a)(1) of the

26   Act" (subject to an exception not relevant here). When issuing final Rule 3a1-1, the

27   SEC stated in its release: "[T]he Commission notes that its exemption for

28   alternative trading systems applies to the definition of exchange. By exempting

- 5 -

1   alternative trading systems from this definition, the Commission is making clear its

2   view that these systems should not be treated as exchanges under the Exchange Act

3   or in any other context."  Regulation of Exchanges and Alternative Trading

4   Systems, SEC Release No. 34-40760, 1998 WL 849548, at *23 (Dec. 22, 1998)

5   ("Regulation ATS"); *see also Strom v. United States*, 641 F.3d 1051, 1063 (9th Cir.

6   2011) ("We owe substantial deference to the SEC's published interpretation of its

7   own regulations and will treat it as controlling if it is not plainly erroneous or

8   inconsistent with the regulations.") (internal alterations, quotation marks, and

9   citation omitted).  As an alternative trading system that is registered as a broker-

10  dealer, OTC Link is not — and cannot be considered — an "exchange."

11      If OTC Link were an "exchange," it would have to register as a "national

12  securities exchange" or obtain from the SEC an exemption from that registration

13  requirement.  *See* 15 U.S.C. § 78(e).  (This requirement is why "domestic

14  exchange" is practically synonymous with "national securities exchange":  if the

15  former but not the latter, the exchange is operating in violation of law or has an

16  exemption.)  OTC Link has neither registered as a "national securities exchange"

17  nor obtained an exemption from such registration; it is not required to do either

18  because it is not an "exchange."

19      As a last gasp in their effort to invoke *Morrison*'s first prong, Plaintiffs

20  challenge *Georgiou* as wrongly decided.  Opp'n at 7-8.  But *Georgiou*, the most

21  authoritative and persuasive decision on the issue, is sound in its analysis:

22  *Morrison*'s first prong requires that the security at issue be registered on a "national

23  securities exchange" and a security traded over the counter does not qualify.

24  Plaintiffs also point out that *Georgiou* recognized contrary authority from the

25  Eleventh Circuit and this District, referring to *United States v. Isaacson*, 752 F.3d

26  1291 (11th Cir. 2014), and *SEC v. Ficeto*, 839 F. Supp. 2d 1101 (C.D. Cal. 2011).

27  *See* Opp'n at 8.  Neither case helps Plaintiffs.

28      *Isaacson* does not hold that an OTC market is a "national securities

- 6 -

exchange" for purposes of *Morrison*'s first prong.  Rather, in holding that "Mr. Isaacson's conduct meets *Morrison*'s requirements for a U.S. nexus" (752 F.3d at 1299), the court observed that an expert witness testified that the securities at issue there were traded on OTC markets, and that these "are 'similar to' the NYSE and the NASDAQ, which are both American markets." *Id.*  The court did not state that it considered this testimony relevant to *Morrison*'s first prong.  *See id.*  The court further observed that the fund at issue "was run out of New York City," and that the defendant's "office was located in Florida, which supports the inference that the Lancer Fund purchased the securities in the United States." *Id.* (internal quotation marks omitted).  The evidence the court discussed suggests that the court determined that *Morrison*'s second prong — not the first — had been satisfied.

*Ficeto* involved allegedly fraudulent purchases and sales of securities by defendants on a domestic OTC market.  839 F. Supp. 2d at 1103-04.  This Court (then-District Judge King) correctly held that the U.S. Exchange Act applied to the transactions, but — without the benefit of the later *Georgiou* decision — mistakenly relied upon *Morrison*'s first prong, instead of the second.  *Id.* at 1106-17.  This Court was justified in finding that the U.S. Exchange Act applies to OTC markets as well as to securities exchanges (*id.* at 1109-10), but erred in shoehorning OTC transactions into *Morrison*'s first prong, when such transactions fit comfortably in the second prong if — as in *Ficeto*, but not here — the defendants have engaged in the OTC transactions.  In any event, notwithstanding its misreading of *Morrison*'s first prong, *Ficeto* does not help Plaintiffs, because it also concluded that ADRs fall outside the U.S. Exchange Act:

> Cases have similarly held that § 10(b) does not reach transactions in a
> foreign company's shares that are traded only on a foreign exchange
> but where American Depositary Receipts (ADRs) representing those
> shares are listed and traded on an American exchange.  In these cases,
> courts have held that ADRs are merely placeholders for the ordinary

- 7 -

1    shares traded on foreign exchanges, and thus allowing § 10(b) claims

2    to survive would likewise be contrary to the spirit of *Morrison*.

3  *Id.* at 1115 (citing *In re Vivendi Universal*, 765 F. Supp.2d at 512; *Société*

4  *Générale*, 2010 WL 3910286).  *Ficeto* went on to state that "[t]hese cases seem

5  particularly correct," and that "[t]hese cases do not undermine our decision, as the

6  securities in this case were not traded on any foreign market."  *Id.* at 1115 & n.12.

7          Plaintiffs, in short, cannot rely upon *Morrison*'s first prong, because the

8  ADRs they purchased were not registered on any "national securities exchange."

9  Plaintiffs cannot rely upon OTC trading in those ADRs, instituted by third party

10  depositary banks, as a basis for invoking the first prong against Toshiba.  *See also*

11  *Pinker*, 292 F.3d at 371 (holding that to be liable under the U.S. Exchange Act,

12  foreign issuer must have taken "affirmative steps purposefully directed at the

13  American investing public").

14          **2.  Plaintiffs Fail To Satisfy *Morrison*'s Second Prong Because**

15              **Toshiba Had No Involvement In Any Domestic Transactions**

16          Plaintiffs' fall-back reliance on *Morrison*'s second prong (Opp'n at 9) also

17  fails, because, while the Amended Complaint certainly alleges that Lead Plaintiff

18  purchased ADRs in the United States (Am. Compl. ¶ 20), it does not — and cannot

19  — allege that Lead Plaintiff purchased ADRs in a transaction with Toshiba.  In fact,

20  the Amended Complaint is devoid of any allegation that Toshiba had any role in

21  Lead Plaintiff's ADR purchases or that Toshiba engaged in any securities

22  transactions in the United States whatsoever.  As *Morrison* states, the U.S.

23  Exchange Act expressly does not apply to "any person insofar as he transacts a

24  business in securities without the jurisdiction of the United States."  561 U.S. at 268

25  (quoting Section 30(b) of the Act (15 U.S.C. § 78dd(b))).

26          Not surprisingly, Plaintiffs do not cite any case in which a court has found a

27  foreign issuer (or other person) subject to the U.S. Exchange Act where the issuer

28  (or other person) is not alleged to have participated in securities transactions in the

- 8 -

United States.  In contrast, under circumstances analogous to those here, the Second Circuit in *Parkcentral* held that the U.S. Exchange Act cannot be applied against a foreign defendant who had no role in the plaintiffs' domestic transactions.  763 F.3d at 215-18 (holding that domestic nature of transaction is necessary but not sufficient condition for satisfying *Morrison*'s second prong).  While Plaintiffs contrive factual distinctions between *Parkcentral* and this case, those distinctions are not material and Plaintiffs are left arguing — as they did with *Georgiou* under the first prong — that the most authoritative and persuasive decision on the issue was "wrongly decided."  Opp'n at 19-20.

Similarly, this Court (District Judge Fischer) in *Stackhouse* found that the U.S. Exchange Act cannot apply unless the transaction at issue was "explicitly solicited by the issuer in the United States" (2010 WL 3377409, at *1), such that a purchaser of common stock in Japan would have no claim but a purchaser of sponsored ADRs on the NYSE would have a claim.  Plaintiffs can only attempt to distinguish *Stackhouse* on the basis of its procedural posture.  Opp'n at 17-18.

Plaintiffs cannot point to any role that Toshiba had in Plaintiffs' U.S. purchases of ADRs, or any "explicit[ ] solicit[ation]" by Toshiba in the United States.  The Amended Complaint does not allege that Toshiba was the counterparty on any of Plaintiffs' purchases or that Toshiba had any other role in those U.S. transactions.  The Amended Complaint is simply devoid of any factual allegations that Toshiba has taken any actions to enter the U.S. securities market.  In the absence of any such factual allegations, Plaintiffs can offer up only specious legal arguments and unsupported characterizations.

For example, Plaintiffs boldly declare that "[n]umerous courts" have found foreign issuers subject to the U.S. Exchange Act based on ADRs, and Plaintiffs purport to provide a list of such cases in their footnote 10.  Opp'n at 10 & n.10.  Plaintiffs neglect to note that every one of the cases they cite in footnote 10 involved sponsored ADRs (or similar instruments) registered on a national

- 9 -

1   securities exchange.  (Only sponsored ADRs can be registered on an exchange.

2   Mem. Ex. 2 (SEC Investor Bulletin), at 2).  These facts are apparent from the text

3   of each case, with the exception of *China Mobile Games*, in which its exchange

4   listing is apparent from the complaint in that case.  Consol. Sec. Class Action

5   Compl. at ¶ 8, *In re China Mobile Games*, 2016 U.S. Dist. LEXIS 29258 (No. 14-

6   CV-4471).

7       Plaintiffs cite three additional cases in the text of their Opposition (Opp'n at

8   10) — *Wu*, *Martoma*, and *Compania Internacional Financiera* — but those cases

9   are also inapposite.  *Wu*, 883 F. Supp. 2d at 250-53 (involving sponsored securities

10  sold directly to plaintiff by foreign issuer in the United States); *Martoma*, 2013 U.S.

11  Dist. LEXIS 176998, at *3 (denying motion to dismiss in criminal insider-trading

12  case involving sponsored ADRs listed on the New York Stock Exchange);

13  *Compania Internacional Financiera*, 2011 U.S. Dist. LEXIS 83424, at *6 (granting

14  preliminary injunction in connection with "insider trading in the domestic securities

15  of Arch stock listed on the NYSE").  In the latter two of these cases, no foreign

16  issuer was even a party.

17      Here, of course, there is no allegation that the ADRs are sponsored, and in

18  fact Plaintiffs *admit* that the ADRs are "unsponsored."  Plaintiffs' Judicial Notice

19  Objections at 7 ("[P]laintiffs do not dispute that TOSYY is unsponsored . . . .).  The

20  ADRs were created and issued by third-party depositary banks.  Plaintiffs do not

21  cite a single case in which a U.S. Exchange Act claim has been permitted to

22  proceed against a foreign issuer based on unsponsored ADRs.  The idea of such a

23  claim is so audacious that it appears that few, if any, plaintiffs are willing to bring

24  one.

25      Plaintiffs next attempt to conflate the distinction between the unsponsored

26  ADRs and Toshiba's common stock sold in Japan, as though such a contrivance

27  could somehow make Toshiba a participant in Plaintiffs' ADR purchases.  Opp'n

28  at 11 (asserting that ADRs are "Toshiba securities").  This effort is a reprisal of

- 10 -

similar characterizations in the Amended Complaint, addressed in Toshiba's opening memorandum.  Mem. at 2-3.  *See Twombly*, 550 U.S. at 545 (holding that complaint "requires more than labels and conclusions" to survive Rule 12(b)(6) motion).  In reality, ADRs and common stock are entirely distinct financial instruments.  *See* Mem. at 3-7; *Pinker*, 292 F.3d at 367 (stating that an ADR "*represents* a specified amount of foreign security") (emphasis added); *id.* ("The holder of an ADR is not the title owner of the underlying shares.") *Parkcentral*, 292 F.3d at 207 n.9 (same); Mem. Ex. 2 (SEC Investor Bulletin) ("An ADR may represent the underlying shares on a one-for-on basis, or may represent a fraction of a share or multiple shares.").  Here the depositary banks apparently purchased Toshiba common stock on the stock exchanges in Japan and chose to have the ADRs represent six shares of Toshiba common stock.

Plaintiffs' contention that the main difference between sponsored and unsponsored ADRs is "administrative" (Opp'n at 15) betrays a misunderstanding of ADR programs (*see* Mem. at 4-5 (discussing myriad of differences between sponsored and unsponsored ADR programs)).  To begin with, the foreign issuer does not raise any capital upon the issuance and sale of unsponsored ADRs.  Furthermore, the foreign issuer does not become obliged to make SEC filings and disclosures upon the issuance of unsponsored ADRs.  In fact, the foreign issuer is a stranger to any transaction involving unsponsored ADRs.  Plaintiffs' effort to recast their purchases as some kind of "direct investment" in Toshiba cannot obscure that Toshiba did not transact in the ADRs in the United States or elsewhere.  As a matter of law, Toshiba was not a participant in any transactions involving unsponsored ADRs.  *Cf. Georgiou*, 777 F.3d at 135-37 (finding second prong applicable because defendant participated in transaction in the United States).

Lacking a connection between Toshiba and the unsponsored ADRs, Plaintiffs argue that "Toshiba's consent to the sale of its shares in the United States should be implied from its lack of objection or any action to prevent the sale of its shares as

- 11 -

1   unsponsored ADSs in the United States." Opp'n at 14. But the Amended

2   Complaint does not allege any lack of objection or other action to prevent the sale

3   of ADRs. *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) ("In

4   determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond

5   the complaint to a plaintiff's moving papers, such as a memorandum in opposition

6   to a defendant's motion to dismiss.") (emphasis in original, internal quotation

7   marks and citation omitted). Even if it had, any objection by Toshiba would have

8   been irrelevant because the SEC specifically considered and rejected proposals that

9   would have required depositary banks to seek consent from foreign issuers or

10  allowed foreign issuers to object to the creation of an ADR program. *See* Mem. at

11  5 (describing proposals SEC rejected); Opp'n at 13 (acknowledging the SEC's

12  actions).

13       That two depositary banks that later issued the unsponsored ADRs here

14  opposed the proposed regulations (Opp'n at 13) is irrelevant, as neither referred to

15  Toshiba and both had every incentive to oppose regulations impeding their creation

16  of unsponsored ADRs. Furthermore, whatever these banks may have said in their

17  advocacy to the SEC about pre-2008 practices does not bear on whether the banks

18  obtained "implied consent" from Toshiba. In any event, Plaintiffs' unpleaded

19  speculation about "implied consent" is a red herring, because passive non-objection

20  by a foreign issuer cannot make an issuer a participant in any ADR transaction that

21  may occur without its involvement.

22       Plaintiffs further assert (again without citation) that because Toshiba falls

23  under Rule 12g3-2, the Court should infer that Toshiba has facilitated the sale of

24  unsponsored ADRs. Opp'n at 1-2, 14. As Toshiba has explained, under Rule

25  12g3-2 Toshiba has no U.S. securities law registration or reporting obligations.

26  Mem. at 8. Plaintiffs acknowledge that a foreign issuer does not have to take any

27  action to fall under Rule 12g3-2, as long as the foreign issuer's securities "are listed

28  on a *regulated foreign exchange* and the issuer publishes English-language

- 12 -

versions" of public disclosures required under foreign securities regulations.  Opp'n at 12-13 (emphasis added).  Plaintiffs thus concede that to fall under Rule 12g3-2, the foreign issuer must be subject to *foreign* — not U.S. —regulation.  Irrespective of Rule 12g3-2, that Toshiba publishes its financial information in English for the benefit of counterparties, creditors, subsidiaries, employees and investors (among others) is hardly surprising.  *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 254 (S.D.N.Y. 2011) (recognizing that English is "the language of international commerce").  English-language publication certainly cannot evidence Toshiba's involvement in Plaintiffs' ADR purchases.

Plaintiffs also urge the Court to save their case because "in Toshiba's view, American investors who purchased its shares as ADSs should not have a remedy for fraud anywhere in the world simply because those securities were 'unsponsored.'"  Opp'n at 15.  But, as Toshiba has observed, the depositary banks — as title owners of Toshiba common stock — may have a claim under Japanese law.  Mem. at 14.  Plaintiffs somehow take this to mean that Toshiba believes that the ADR holders do *not* have any legal remedy, and they assert that the depositary agreements provide that the depositary banks "will not institute or participate in any such action."  Opp'n at 15 (emphasis in original).  Actually, every Form F-6 that Plaintiffs cite (*see id.* at 15 n.16) states (using almost identical language) that the depositary banks "shall be under no obligation" to commence litigation (Mem. Ex. 6 at 47); thus, the depositary banks are free to initiate litigation.

The depositary banks have the same rights as any shareholder.  The contractual agreement between the depositary banks and the ADR holders expressly provides that the depositary banks "shall distribute or otherwise make available to the [ADR] Holder . . . any distributions of cash and securities . . . and any other distribution with respect to the Deposited Securities . . . ."  Mem. Ex. 6 at 44.  Presumably, this would entitle the ADR holders to any recovery the depositary banks may secure through shareholder litigation.  Any right the ADR purchasers

- 13 -

1   may have vis-à-vis the depositary banks does not create any relationship between

2   the ADR purchasers and Toshiba.  Indeed, if both depositary banks and ADR

3   holders had claims against Toshiba, the company would face duplicative damages.

**B.  Plaintiffs Fail To Overcome The Comity Concerns That Compel Dismissal Of Plaintiffs' Japanese Exchange Act Claim**

6        Plaintiffs misapprehend Toshiba's argument regarding the application of

7   foreign law in two critical respects.  Toshiba does not argue that the comity

8   concerns articulated in *Morrison* would be satisfied by a U.S. court's application of

9   foreign securities law.  Opp'n at 26 (quoting Mem. at 11).  Rather, *Morrison*,

10  recognizing that "foreign countries regulate their domestic securities exchanges,"

11  warned against "interference with foreign securities regulation" resulting from

12  differences in securities regulation between countries, including "what disclosures

13  must be made . . . what discovery is available in litigation, what individual actions

14  may be joined in a single suit . . . and many other matters."  561 U.S. at 269-70.

15  The risk of interference is particularly acute where a foreign regulator has

16  commenced its own inquiry or where the matter is already the subject of foreign

17  civil litigation (*see* Wada ¶ 10).  The risk of disparate treatment of overlapping

18  issues, witnesses and evidence also could compromise the integrity and efficiency

19  of foreign civil or criminal proceedings.  *Cf., e.g.*, *Garcia v. City of King City*, No.

20  14-cv-01126, 2015 U.S. Dist. LEXIS 46741, *12-14 (N.D. Cal. Apr. 8, 2015)

21  (balancing factors and staying U.S. civil class action to avoid interference with

22  pending U.S. criminal action).

23        Further, Toshiba's position is not, as Plaintiffs suggest, that foreign law can

24  never be applied by U.S. courts.  Opp'n at 27, 30.  Instead, relying on *Morrison* and

25  this Court's decision in *Toyota*, Toshiba argues that *Morrison*'s comity concerns

26  specific to foreign regulation of securities exchanges would be "subverted" by

27  permitting U.S. litigation of Plaintiffs' Japanese-law claim.  *See* Mem. at 17

28  (quoting *In re Toyota*, 2011 WL2675395, at *7 (citing *Morrison*, 561 U.S. at 269)).

- 14 -

1    As this Court recognized in *Toyota*: "Several of the issues that the Supreme

2  Court [in *Morrison*] was concerned with were procedural and *would apply with*

3  *equal force* to supplemental jurisdiction over foreign claims." *In re Toyota*, 2011

4  WL 2675395, at *7 n.11 (emphasis added).  Plaintiffs state that this Court's decision

5  in *Toyota* was "not a rigorous analysis of international comity" (Opp'n at 26-27),

6  but this Court properly relied on *Morrison*'s "clear underlying rationale" that

7  "foreign governments have the right to decide how to regulate their own securities

8  markets" (*In re Toyota*, 2011 WL 2675395, at *7 (citing *Morrison*, 561 U.S. 247)).

9  That the Court in *Toyota* was considering comity in the context of supplemental

10  jurisdiction does not diminish the relevance of the case here (Opp'n at 23), because

11  Plaintiffs themselves assert supplemental jurisdiction over Plaintiffs' Japanese

12  Exchange Act claim.  Am. Compl. ¶ 13.

13    In any event, Plaintiffs' authorities (Opp'n at 27) are inapplicable because

14  they involved claims primarily founded on U.S. law and are otherwise unrelated to

15  foreign securities regulation.  *See GDG Acquisitions*, 749 F.3d at 1030, 1032-33

16  (reversing comity-based dismissal of "garden-variety commercial contract" claims

17  against U.S. seller where "*American law applies*," and defendant had expressly

18  agreed to "the exclusive jurisdiction of any of the federal and state courts in the

19  State of Florida in any action") (emphasis added; citation omitted); *Bigio*, 448 F.3d

20  at 178-79 (reversing comity-based dismissal of U.S. "*common law* claims [which]

21  may also require some modest application of Egyptian law") (emphasis added).  In

22  fact, Plaintiffs do not cite a single case in which a U.S. court adjudicated a foreign

23  securities law claim — including where plaintiffs were U.S. investors.

24    Notwithstanding Plaintiffs' argument (Opp'n at 25 (citing *Mujica*, 771 F.3d

25  at 599)), deference to comity considerations does not require pending litigation in

26  Japan.  *Mujica* establishes that courts may apply adjudicatory comity "to abstain

27  from exercising jurisdiction due to a past *or potential* judicial proceeding

28  elsewhere."  771 F.3d at 600-01 (emphasis added).  Thus, Plaintiffs' election (so

- 15 -

1    far) to sue only here (*see* Opp'n at 24) does not preclude this Court from deferring

2    to Japan's overwhelming interest in regulating its own securities market and

3    adjudicating Japanese securities law claims at home.

4           Further, Plaintiffs do not deny that the primary consideration in a comity

5    analysis is the location of the alleged misconduct.  *See* Mem. at 17 (quoting *Mujica*,

6    771 F.3d at 604-05).  And Plaintiffs concede that the alleged misconduct here took

7    place at Toshiba headquarters in Japan.  *See, e.g.*, Am. Compl. ¶¶ 3-10, 22-24, 28,

8    155-241; Opp'n at 1-2.  Plaintiffs' assertion that the inclusion of Toshiba's

9    worldwide operations in its consolidated financial statements creates a U.S. nexus

10   (Opp'n at 27-28) does not surmount the inescapable fact that the financial

11   statements — and the alleged misstatements in them — were prepared and issued in

12   Japan.  Even with respect to the Westinghouse financials (Opp'n at 28-29),

13   Plaintiffs do not allege any misstatements or omissions by Westinghouse (*see* Am.

14   Compl. ¶¶ 121-144).  Under the "guiding principle" confirmed by *Kiobel v. Royal*

15   *Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013), and its progeny, "the weaker

16   the nexus between the challenged conduct and U.S. territory or U.S. parties, the

17   weaker the justification for adjudicating the matter in U.S. courts and applying U.S.

18   federal or state law."  *Mujica*, at 605-06 (citing *Kiobel*, 133 S. Ct. at 1664).

19          Plaintiffs rely on *TEPCO* to argue that the U.S. connections here can override

20   the strong preference for litigation in Japan.  Opp'n at 29.  *TEPCO* involved,

21   however, very different allegations and circumstances.  There, plaintiffs were U.S.

22   service-members allegedly injured by TEPCO's negligence while providing

23   humanitarian assistance on behalf of the United States after the nuclear disaster at

24   Fukushima.  *TEPCO*, 2015 WL 10687594, at *1.  The plaintiffs, many California

25   residents too ill to travel to Japan for trial, brought claims under U.S. law.  *Id.* at

26   *18, 20.  Under those particular circumstances, the *TEPCO* court concluded that the

27   United States would be a "more reasonable" forum.  *Id.* at *23.  Here, in contrast,

28   Plaintiffs (i) are primarily institutional investors, (ii) were not acting on behalf of

- 16 -

the United States, (iii) have not alleged any impediment to participating in litigation in Japan, (iv) purchased, in Japan, the stock of a Japanese company listed only on Japanese stock exchanges (or a synthetic security offered by a depositary bank without any involvement of Toshiba), and (v) bring claims under Japanese law.  *See id.*; Mem. at 19-20.  Each of these considerations supports litigation in Japan — not the United States.

Given the foregoing, any U.S. interest does not override Japan's interest. Plaintiffs do not dispute the strength of Japan's interest — including that regulation of Japan's securities markets through the Japanese Exchange Act is a "core prerogative" of Japan.  Mem. at 18 (citing *Mujica*, 771 F.3d at 606).  Instead, Plaintiffs assert that the U.S. interest is stronger.  Opp'n at 28.

But Plaintiffs ignore *Morrison* and other cases which explain with respect to the U.S. Exchange Act that "[n]othing suggests that this *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets."  561 U.S. at 263 (emphasis in original); *Cheng*, 708 F.2d at 1411 ("The presence of American plaintiffs, however, is not in and of itself sufficient to bar a district court from dismissing a case on the ground of *forum non conveniens*.").  And *Ernst & Ernst*, 425 U.S. at 194-95 (Opp'n at 28, 30), says nothing about protecting U.S. investors who purchase securities issued and sold outside the United States and regulated abroad.  *See Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 951 (1st Cir. 1991) (Breyer, J.) (finding no "reason to believe [federal securities] laws seek so strongly to protect Americans who bought their shares *abroad* from misrepresentations (or violations of fiduciary duty) primarily taking place *abroad*" as to bar dismissal of securities claims under *forum non conveniens* where "most of the background facts that might show [the alleged] statements or omissions to be materially false or misleading occurred in Canada") (emphasis in original).

Moreover, an investigation by U.S. authorities — paralleling a primary investigation by the foreign regulator — does not automatically favor private U.S.

- 17 -

1    litigation in the United States.  Opp'n at 29-30.  If anything, a class action suit is

2    "not necessary" given that the U.S. authorities are "fully capable of validating the

3    United States' interest in policing the securities market by bringing suit on [their]

4    own."  *See In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1343

5    (S.D. Fla. 2010) (weighing U.S. interest under *forum non conveniens* analysis).

6          Separately, the ADR purchasers' potential inability to bring suit in Japan

7    would not render Japan an inadequate forum.  If the ADR purchasers cannot bring a

8    claim under the Japanese Exchange Act in Japan (Opp'n at 25, 32), then they

9    cannot bring that same claim in this Court either.  *See Ungaro-Benages v. Dresdner

10   Bank AG*, 379 F.3d 1227, 1240 (11th Cir. 2004) (holding legal obstacles under

11   foreign law would be the same in U.S. court as in alternative foreign forum).  But

12   even if the ADR purchasers cannot bring a claim under the Japanese Exchange Act,

13   their inability to sue would not be "the same as stating that the Plaintiffs have no

14   remedy under [Japanese] law."  *In re Banco Santander*, 732 F. Supp. 2d at 1332

15   (finding remedy in Irish courts adequate despite defendant's argument that under

16   Irish law plaintiffs' claims "would fail as a matter of law because they are

17   derivative claims which the Plaintiffs would not have standing to pursue").  The

18   Ninth Circuit in *Mujica* determined that Colombia was an adequate alternative

19   forum despite finding that plaintiffs would be "barred by Colombian law" from

20   recovery against defendants due to their strategic choice of forum.  771 F.3d at 614-

21   15; *see also Ungaro-Benages*, 379 F.3d at 1240 (finding alternative forum adequate

22   despite possible statute-of-limitations bar).

23          Indeed, by virtue of their Japanese-law claim, Plaintiffs necessarily assert

24   that the Japanese Exchange Act provides a remedy for the alleged misconduct.  *See*

25   Opp'n at 23 ("[T]he alleged misrepresentations are actionable under both U.S. and

26   Japanese law.");  Am. Comp. ¶ 306 ("Toshiba is therefore liable under Article 21-2

27   to compensate plaintiffs for damage . . . .").  As in *TEPCO*, "Japan is an adequate

28   alternative forum" because Toshiba is "amendable to service in Japan," "Japanese

                                        - 18 -

1   courts are well-respected and independent of government control and Plaintiffs

2   provide no evidence to the contrary." *See TEPCO*, 2015 WL 10687594, at *17; *id.*

3   at *3 n.1 ("[T]he *Mujica* court held that the focus should be on procedural fairness

4   in the forum and whether *the opponent* has presented specific evidence of

5   significant inadequacy.") (emphasis added) (citing *Mujica*, 771 F.3d at 607-08); *see*

6   *also Lockman Found.*, 930 F.2d at 769 & n.3 (collecting cases finding Japan an

7   adequate forum).

8          **C. Plaintiffs Fail To Overcome Toshiba's Showing That The**

9              **Inconvenience Of U.S. Litigation Compels Dismissal**

10         Plaintiffs cannot justify this Court as the appropriate forum under *forum non*

11  *conveniens* (Opp'n at 31-39):

12         *First*, Plaintiffs' choice of forum deserves little deference because Plaintiffs

13  represent a putative class with potentially divergent interests.  Mem. at 21-22

14  (citing *Lou*, 834 F.2d at 739).  Plaintiffs are incorrect (Opp'n at 32-33) that this

15  interest-balancing rule, which the Ninth Circuit in *Lou* applied to a transfer motion

16  under Section 1404(a), should not apply here.  *See Atl. Marine Constr. Co. v. U.S.*

17  *Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 580 (2013) (holding that "both §

18  1404(a) and the *forum non conveniens* doctrine from which it derives entail the

19  same balancing-of-interests standard" and "relevant factors") (internal quotation

20  marks and citation omitted).  Moreover, long before codification of Section

21  1404(a), the Supreme Court stated that under *forum non conveniens*, the forum

22  preference of class representatives deserves less deference.  *See Koster*, 330 U.S. at

23  525 (holding plaintiff's claim that its home forum is appropriate "is considerably

24  weakened" where plaintiff represents a class — even where plaintiff makes a "real

25  showing of convenience").

26         Here, Plaintiffs' purported preference for this jurisdiction is diluted further

27  because this District is *not* Plaintiffs' "home forum."  *See id.*; Civil Cover Sheet

28  (Dkt. No. 2) (listing Mark Stoyas as resident of "Lake County, IL"); Am. Compl.

- 19 -

¶ 19 (alleging Lead Plaintiff "based in Alameda, California"); *id.* ¶ 20 (alleging named plaintiff New England Teamsters & Trucking Industry Pension Fund "based in Burlington, Massachusetts"); *Gemini Capital Grp., Inc. v. Yap Fishing Corp.*, 150 F.3d 1088, 1091-92 (9th Cir. 1998) (affirming dismissal on *forum non conveniens* where U.S. plaintiffs brought suit outside their home forum: "the district court correctly acted on Ninth Circuit authority in granting Plaintiffs' choice of Hawaii as a forum less deference"). Nor is the putative class limited to residents of this District — or even the United States. *See, e.g.*, Am. Compl. ¶ 270 (defining class of "ADS Purchasers" as "*all persons* who acquired Toshiba ADSs during the Class Period") (emphasis added). Given potentially "hundreds of thousands" of plaintiffs with no specified connection to this District (Am. Compl. ¶ 271), Plaintiffs' choice of forum warrants little deference.

*Second*, Plaintiffs cannot deny that most witnesses and evidence are located in Japan. Plaintiffs do not contest that the thirty-three potential witnesses and the evidence identified by Toshiba (and relied on by Plaintiffs in the Amended Complaint) are located in Japan. Mem. at 22-24; Wada ¶¶ 5-9. Still, Plaintiffs argue that the Court cannot consider the inconvenience of U.S. litigation to these witnesses, because Toshiba has not proven the "nature and relevance" of their testimony. Opp'n at 33. But Plaintiffs have necessarily assumed the relevance and materiality of this evidence, because the Amended Complaint itself refers to these witnesses and evidence. Specifically, the Amended Complaint refers to nine former Toshiba executives, by name, 96 times. (Makoto Kubo, for example, former Toshiba CFO, is mentioned thirteen times. Am. Comp. ¶¶ 5, 63-64, 69, 88, 93, 105, 110, 169, 172, 174, 177, 289) The Amended Complaint also identifies by name twenty-four former Toshiba executives who Plaintiffs assert "control[led] or influenc[ed] the business practices or conditions giving rise to the securities violations alleged." Am. Compl. ¶¶ 289-93. Finally, Plaintiffs base the bulk of their allegations on the findings of the Special Investigation Committee and the

- 20 -

1    Independent Investigation Committee. *See, e.g.*, Am. Compl. ¶¶ 38-40, 50, 156.

2    The members of these committees, identified by Toshiba (Wada ¶¶ 6, 8), are

3    uniquely qualified to attest to their findings. The testimony of all of these

4    witnesses, none of whom resides in the United States (Wada ¶¶ 5, 6, 8), is, at least

5    to Plaintiffs, evidently relevant and material to Plaintiffs' claim.

6         Plaintiffs' assertion that "discovery will occur primarily in the United States"

7    (Opp'n at 33), is baseless. Plaintiffs exaggerate when they assert that Toshiba has

8    eliminated the need for discovery in Japan by "admitt[ing]" liability for any

9    accounting fraud, including in Japan. *Id.* And Toshiba's worldwide operations

10   covered in its financial statements are centered in Japan, and operations in the

11   United States are merely one example of Toshiba's many non-Japanese operations.

12   Furthermore, Plaintiffs allege misconduct *only* in Japan, even if some allegations

13   relate to U.S. entities such as Westinghouse. Any communications and documents

14   related to the alleged misconduct — accounting treatment — still would be

15   primarily located in Japan. Indeed, notwithstanding their criticism of Toshiba's

16   purported lack of specificity in identifying willing witnesses (Opp'n at 34-35),

17   Plaintiffs themselves have failed to identify *any* specific U.S. witnesses or evidence

18   (*id.* at 33-34). Nor have Plaintiffs submitted any evidence that litigation in the

19   United States would be more convenient than litigation of Plaintiffs' claim in

20   Japan. In any event, under 28 U.S.C. § 1782, interested parties may obtain

21   discovery in the United States for use in proceedings in Japan.

22        Moreover, Plaintiffs do not dispute that unwilling witnesses in Japan cannot

23   be compelled to testify in the United States. Instead, Plaintiffs contend — without

24   regard to their own Amended Complaint — that it is unclear which witnesses

25   would be unwilling to testify (Opp'n at 34), and the relevance and materiality of

26   any unwilling witnesses has not been shown (*id.* at 35).

27        The Amended Complaint, however, alleges that ten witnesses left Toshiba as

28   a result of misconduct and that five have been sued by the company. Am. Compl.

- 21 -

1   ¶¶ 48, 63-64, 66.  These former Toshiba executives are indisputably beyond the

2   reach of compulsory process.  Under the circumstances, their willingness to provide

3   testimony in U.S. litigation about accounting misconduct in which they were

4   allegedly involved seems unlikely, particularly in the face of pending proceedings

5   against them in Japan.  In particular, the five former Toshiba executives that are the

6   focus of Plaintiffs' Amended Complaint are adverse to Toshiba and potentially to

7   Plaintiffs, and the Court may presume that these individuals will not willingly

8   testify here.  *See Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.*, 918 F.2d

9   1446, 1451 (9th Cir. 1990) (finding defendant could not compel appearance from

10  the Philippines of witnesses who were "not employed by [defendant] nor within

11  [its] control," including some employed by adverse third party).  The likely

12  unavailability of these key witnesses weighs heavily in favor of dismissal under

13  *forum non conveniens*.  *Id.*; *Lueck*, 236 F.3d at 1145 (listing factors); *see also*

14  *Lockman Found.*, 930 F.2d at 770 ("When fraud charges are made, it is desirable

15  that the factfinder have the benefit of demeanor testimony of witnesses.")

16  (alterations, quotation marks, and citation omitted).

17        Plaintiffs also do not dispute Toshiba's authorities that evidence-gathering

18  for U.S. litigation by letter rogatory is "time-consuming," "difficult," "costly," and

19  "inefficient."  Mem. at 23-24.  Plaintiffs recognize that even voluntary depositions

20  are burdensome.  Pardieck ¶¶ 63-66 (commenting on special visa requirement for

21  non-Japanese participants, limitation to written questions, requirement of consular

22  supervision, and availability of only three deposition rooms in all of Japan); *see*

23  *also id.* ¶ 65 (stating that litigants "should anticipate scheduling delays") (citation

24  omitted).

25        In sum, the burden of U.S. litigation on even willing witnesses and the

26  current Toshiba employees who reside outside the United States, the cost of

27  bringing witnesses to the United States, and other practical problems, such as

28  interpretation for non-English speakers and translation of Japanese documents, all

- 22 -

1   weigh heavily in favor of litigation in Japan.  *See* Mem. at 22-24; *Lueck*, 236 F.3d

2   at 1145 (citing *Gulf Oil*, 330 U.S. at 508).

3        *Third*, the application of Japanese law favors dismissal.  Even though

4   Plaintiffs dispute Toshiba's assertion of "unresolved issues" under the Japanese

5   Exchange Act (Opp'n at 38-39), they admit that the entirety of the Japanese court

6   system's experience with this law is limited.  *See* Inoue, Ex. B.  There are only

7   three "*de facto* binding" interpretations of the Japanese Exchange Act available

8   from the Japanese Supreme Court (*id.*; Pardieck ¶ 22), and Plaintiffs do not contest

9   that these decisions address "only a limited number of issues" (Ishiguro ¶ 20).

10   Plaintiffs also do not deny that the method for calculating the price of Toshiba's

11   stock "but-for" the alleged misstatements — a key component of any damages

12   claim — "remains unclear."  *Id.*  Thus, questions under the Japanese Exchange Act

13   are best decided by the courts in Japan.

14        *Finally*, any local interest in the United States does not compare with the

15   strength of the local interest in Japan.  The handful of brief articles Plaintiffs submit

16   from U.S.-based, global news outlets (Opp'n at 29 (referring to Exs. 9-16)) hardly

17   reflects "substantial" U.S. attention — let alone any local interest greater than that

18   of Japan (Mem. at 25).  None of these stories refers to *any* specific U.S. impact, or

19   any market other than Japan.  Plaintiffs do not dispute that the *overwhelming*

20   impact of Toshiba's accounting issues has fallen on Japan, where the vast majority

21   of institutional and private shareholders reside, where the vast majority of Toshiba

22   employees work, where Toshiba has been esteemed as a model corporation and a

23   source of national pride, and where Toshiba's fortunes and misfortunes can have a

24   material impact on the national economy.  *See* Mem. at 17-18 (quoting, *inter alia*,

25   statements of Japan's Deputy Prime Minister (Ex. 16)).  Any residual impact on

26   U.S. shareholders would be common to Toshiba shareholders worldwide.

27

28

1

## III.   <u>CONCLUSION</u>

2        For the foregoing reasons, the Court should grant Toshiba's Motion and

3    dismiss the Amended Complaint in its entirety with prejudice.

4

5    Dated:  April 25, 2016                    WHITE & CASE LLP

6                                              By:  */s/ Bryan A. Merryman*
                                                    Bryan A. Merryman

7                                              CHRISTOPHER M. CURRAN
8                                              (*pro hac vice*)
                                               ccurran@whitecase.com

9                                              OWEN PELL
10                                             (*pro hac vice*)
                                               opell@whitecase.com

11                                             JAIME M. CROWE
12                                             (*pro hac vice*)
                                               jcrowe@whitecase.com

13                                             Attorneys for Defendant
14                                             Toshiba Corporation

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 24 -