O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK STOYAS; NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND; and AUTOMOTIVE INDUSTRIES PENSION TRUST FUND, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) | Case No. CV 15-04194 DDP (JCx)  **ORDER RE: DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' MOTION TO STRIKE WADA DECLARATION**  [Dkt. Nos. 44, 54] |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TOSHIBA CORPORATION, | ) ) | |
| Defendant. | ) ) | |

Presently before the Court are (1) Defendant Toshiba Corporation's Motion to Dismiss and (2) Plaintiffs' Motion to Strike the Declaration of Ayumi Wada in Support of Defendant Toshiba Corporation's Motion to Dismiss.  (Dkt. Nos. 44, 54.) After hearing oral argument and considering the parties' submissions, the Court adopts the following Order.

///

///

///

# I.    BACKGROUND

## A.    Procedural History

This case is a putative securities class action lawsuit. Plaintiff Mark Stoyas filed this case in June 2015, alleging Defendant and two of its former Chief Executive Officers had violated U.S. securities laws by selling stock with an inflated price caused by Defendants' false profit reports. (See generally Compl., Dkt. No. 1.)  In August 2015, Plaintiff Mark Stoyas did not oppose the Motion of Automotive Industries Pension Trust Fund to be appointed Lead Plaintiff. (See Dkt. Nos. 10-20.)  The Court appointed Automotive Industries Pension Trust Fund as Lead Plaintiff and its counsel as lead counsel for the class in September 2015. (Dkt. No. 22.)

In December 2015, Plaintiffs filed a First Amended Complaint ("FAC") that named a new plaintiff, New England Teamsters & Trucking Industry Pension Fund, and that dismissed the two individual Defendants under Federal Rule of Civil Procedure ("FRCP") 4(a)(1)(A)(i). (FAC, Dkt. No. 34; Notice of Dismissal, Dkt. No. 33.)  Pursuant to a stipulation, the Court set a briefing schedule for Defendant's response to the FAC, which would be a Motion to Dismiss. (Dkt. Nos. 39, 40.)  In February 2016, Defendant filed its Motion to Dismiss under FRCP 12(b)(6), as well as principles of comity and forum non conveniens. (Mot. Dismiss, Dkt. No. 44.)  Defendant also filed a Request for Judicial Notice ("RJN") with twenty-one exhibits. (RJN, Dkt. No. 45.)

Plaintiffs opposed both the RJN and the Motion to Dismiss, as well as filed a Motion to Strike the Declaration of Ayumi Wada in support of Defendant's Motion to Dismiss. (Opp'n to Mot. Dismiss,

1  Dkt. No. 50; Mot. Strike Wada Decl., Dkt. No. 54; Obj. RJN, Dkt.

2  No. 56.)  All three issues are now fully briefed before the Court.

3      **B.  Factual Allegations in the FAC**

4      The FAC alleges Defendant violated the U.S. Securities

5  Exchange Act of 1934 and Japan's Financial Instruments & Exchange

6  Act ("JFIEA").  (FAC ¶ 1.)  The proposed class is defined as: (i)

7  all persons who acquired Toshiba American Depositary Shares or

8  Receipts ("ADSs")[1] between May 8, 2012 and November 12, 2015 (the

9  proposed class period) and (ii) all citizens and residents of the

10  United States who otherwise acquired shares of Toshiba common stock

11  during the Class Period.  (Id. ¶¶ 2, 270.)  Plaintiffs refer to the

12  first group as the "ADS Purchasers" and the second group as the

13  "6502 Purchasers," the latter named after the ticker name of

14  Toshiba on the Tokyo Stock Exchange.  (See id. ¶¶ 25, 270.)

15      According to Plaintiffs, "[t]his case arises from Toshiba's

16  deliberate use of improper accounting over a period of at least six

17  years to inflate its pre-tax profits by more than $2.6 billion

18  . . . and conceal at least $1.3 billion . . . in impairment losses

19  ─────────────────────

20      [1]   The Court notes that Defendant refers to these securities
    as ADRs in its Motion.  However, the FAC refers to the securities
21  as ADSs.  Therefore, the Court will primarily use the term "ADS,"
    but notes the terms are interchangeable references to the same type
22  of security.  According to Plaintiffs,

23      Toshiba's common stock is publicly traded on the Tokyo
        Stock Exchange under the ticker symbol "6502" and on the
24      Over the Counter ("OTC") market operated by OTCMarkets
        Group in the United States under the ticker symbols "TOSBF"
25      and "TOSYY."  One share of TOSBF represents ownership of
        one share of Toshiba common stock sold under the ticker
26      symbol 6502 on the Tokyo exchange.  One share of TOSYY
        represents ownership of six shares of Toshiba common stock.
27      OTCMarkets Group identifies TOSYY as an ADS and TOSBF as
        "Ordinary Shares" on its website.

28  FAC ¶ 25.

1  at its U.S. nuclear business, Westinghouse Electric Co." (Id. ¶

2  3.)  The alleged accounting fraud "was orchestrated by three

3  successive CEOs of Toshiba and dozens of top executives who

4  directed the manipulation of financial results reported by scores

5  of Company subsidiaries and business units." (Id. ¶ 4.)  This

6  fraud "was uncovered by a series of investigations that took place

7  beginning in February 2015" that "revealed numerous instances of

8  deliberate violations of generally accepted accounting principles

9  ("GAAP") carried out at the direction or with the knowledge and

10 approval of Toshiba's most senior executives." (Id. ¶ 5.)

11     Plaintiffs allege that these investigations "resulted in the

12 September 7, 2015 restatement of more than six years of reported

13 financial results that eliminated approximately one-third ($2.6

14 billion) of the profits Toshiba had reported from 2008 to 2014."

15 (Id. ¶ 6.)  Plaintiffs claim that "Toshiba assured investors that

16 there was no need to write down the $2.8 billion . . . in goodwill

17 still carried on Toshiba's books as a result of its 2006

18 acquisition of Westinghouse, falsely claiming that its nuclear

19 business had strengthened since the acquisition, even after the

20 March 2011 meltdown of the Fukushima Daiichi nuclear reactor."

21 (Id.)  But on November 6, 2015, Toshiba did admit that Westinghouse

22 "had written down goodwill in both FY12 and FY13," but that those

23 write-downs were not disclosed in financial statements at the time.

24 (Id.)  Plaintiffs claim a business news report on November 12,

25 2015, "revealed that the secret write-downs had totaled $1.3

26 billion: $926 million in FY12 and $400 million in FY13." (Id.)

27     Specifically, Plaintiffs allege that the investigation into

28 the accounting fraud showed that "Toshiba deliberately violated

GAAP by failing to timely record losses on unprofitable construction contracts; channel stuffing manufacturing parts sold at inflated prices; deferring operating expenses until they could be reported without causing an earnings loss; failing to record charges for obsolete inventory or impaired assets; manipulating foreign conversion rates; and engaging in the other fraudulent practices alleged herein." (Id. ¶ 7.)  Plaintiffs claim that Toshiba took these actions to prevent its stock price from dropping to reflect the actual financial situation at Toshiba.  (Id. ¶ 10.) Plaintiffs state that "[b]etween April 3, 2015, when the internal investigation into Toshiba's accounting practices was first announced, and November 13, 2015, following the issuance of Toshiba's restatement and the revelation of the impaired goodwill at Westinghouse, the price of Toshiba securities declined by more than 40%, resulting in a loss of $7.6 billion . . . in market capitalization that caused hundreds of millions of dollars in damages to U.S. investors in Toshiba securities." (Id. (footnote omitted).)

Plaintiffs have filed suit under U.S. federal securities laws, making claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b), 78t(a), and SEC rule 10b-5, codified at 17 C.F.R. § 240.10b-5.  (FAC ¶ 11.) Both of these claims for relief (those under § 10(b) and rule 10b-5 (First Claim for Relief) and those under § 20(a) (Second Claim for Relief)) are made only on behalf of the ADS purchasers.  (Id. at 100-04.)  Plaintiffs also make claims under the JFIEA, over which they argue the Court has diversity and supplemental jurisdiction. (Id. ¶¶ 12-13.)  This third claim for relief is made on behalf of

both ADS purchasers and 6502 purchasers.  (Id. at 105-06.)  These claims all relate to the allegations of Defendant's fraudulent accounting and misrepresentations.  (Id. ¶ 273.)

Lead Plaintiff Automotive Industries Pension Trust Fund is a member of the alleged class because it "acquired Toshiba common stock during the Class Period through the purchase on March 23, 2015 of 36,000 shares of TOSYY ADSs in the United States."  (Id. ¶ 19.)  Plaintiff New England Teamsters & Trucking Industry Pension Fund is a member of the alleged class because it made seven different purchases of Toshiba common stock on the Tokyo Stock Exchange during the class period, totaling over 100,000 shares.  (Id. ¶ 20.)  Plaintiff Mark Stoyas is an individual who "purchased Toshiba securities at artificially inflated prices during the class period."  (Compl., Dkt. No. 1, ¶ 7; FAC ¶ 21 (citing Compl., Dkt. No. 1).)

Defendant Toshiba Corporation is alleged to be "a worldwide enterprise that engages in the research, development, manufacture, construction, and sale of a wide variety of electronic and energy products and services, including semiconductors, disc drives, storage devices, computers, televisions, appliances, nuclear power plants, elevators, lighting systems, and medical equipment."  (Id. ¶ 22.)  Plaintiffs allege the headquarters of Toshiba is in Tokyo, Japan.  (Id.)

## II.  LEGAL STANDARD

### A.  Motion to Dismiss

12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted requires a court to determine the sufficiency of the plaintiff's complaint and whether it contains a

"short and plain statement of the claim showing that the pleader is entitled to relief." <u>See</u> Fed. R. Civ. P. 8(a)(2).  Under Rule 12(b)(6), a court must (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them.  <u>See</u> <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001), <u>amended on denial of reh'g</u>, 275 F.3d 1187 (9th Cir. 2001).

In order to survive a 12(b)(6) motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u> at 678.  Dismissal is proper if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  <u>Mendiondo v. Centinela Hosp. Med. Ctr.</u>, 521 F.3d 1097, 1104 (9th Cir. 2008).

A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 556).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>  The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir. 2003).

1    **B.    Motion to Strike**

2        Rule 12(f) of the Federal Rules of Civil Procedure states that

3    the "court may strike from a pleading . . . any redundant,

4    immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P.

5    12(f).  Immaterial matter is that which has no bearing on the

6    claims for relief or the defenses being pled.  <u>Whittlestone, Inc.</u>

7    <u>v. Handi-Craft Co.</u>, 618 F.3d 970, 974 (9th Cir. 2010).  Impertinent

8    matter consists of statements that do not pertain and are not

9    necessary to the issues in question.  <u>Id.</u>  Under Rule 12(f), the

10   court has the discretion to strike a pleading or portions thereof.

11   <u>MGA Entm't, Inc. v. Mattel, Inc.</u>, No. CV 05-2727 NM (RNBx), 2005 WL

12   5894689, at *4 (C.D. Cal. Aug. 26, 2005).  Generally, motions to

13   strike are "disfavored" and "courts are reluctant to determine

14   disputed or substantial questions of law on a motion to strike."

15   <u>Whittlestone</u>, 618 F.3d at 1165-66; <u>see also</u> <u>Miller v. Fuhu, Inc.</u>,

16   No. 2:14-cv-06119-CAS (ASx), 2014 WL 4748299, at *1, (C.D. Cal.

17   Sept. 22, 2014).  In considering a motion to strike, the court

18   views the pleadings in the light most favorable to the non-moving

19   party.  <u>See</u> <u>In re 2TheMart.com Secs. Litig.</u>, 114 F. Supp. 2d 955,

20   965 (C.D. Cal. 2000)).

21   **C.    Requests for Judicial Notice**

22       "On a motion to dismiss, we may take judicial notice of

23   matters of public record outside the pleadings."  <u>MGIC Indem. Corp.</u>

24   <u>v. Weisman</u>, 803 F.2d 500, 504 (9th Cir. 1986).  A court may take

25   judicial notice of "a fact that is not subject to reasonable

26   dispute because it: (1) is generally known within the trial court's

27   territorial jurisdiction; or (2) can be accurately and readily

28

1  determined from sources whose accuracy cannot reasonably be

2  questioned."  Fed. R. Evid. 201(b)(1), (2).

3  **III. DISCUSSION**

4  Defendant makes two main arguments in its Motion: (1) there

5  are no facts pled — or that could be pled — to support a U.S.

6  Securities Exchange Act cause of action by Plaintiffs, or any other

7  potential class member, because there are no securities sold or

8  listed in the United States by Toshiba Corporation; and (2) the

9  Japanese law claim should be dismissed under principles of comity

10  and *forum non conveniens*.

11  First, however, the Court addresses Plaintiffs' Motion to

12  Strike and Objections to Defendant's Request for Judicial Notice.

13  (Dkt. Nos. 54, 56.)  Plaintiffs object to Defendant's Request for

14  Judicial Notice because they argue that Defendant seeks to use

15  these exhibits to support factual arguments, not undisputed

16  adjudicative facts.  (Obj. RJN, Dkt. No. 56, at 3.)  Plaintiffs

17  object specifically to exhibits 1, 2, 3, 4, 9, 10, 13, 14, 15, 16,

18  17, 18, 19, 20.  (Id. at 3-4.)  Plaintiffs do not contest the RJN

19  with respect to exhibits 5-8 and 11.  (Id. at 9.)  The Court GRANTS

20  the RJN with respect to Defendant's exhibits 5-8 and 11 because

21  those exhibits are unopposed.  The Court notes that none of the

22  other exhibits are argued by Plaintiffs to be inaccurate or

23  unauthentic.  (See generally Obj. RJN.)  However, none were

24  considered by the Court in making its decision on the Motion to

25  Dismiss.

26  As to the Motion to Strike, Plaintiffs argue that the Wada

27  Declaration offered in support of Toshiba's Motion to Dismiss

28  should be stricken because Defendant seeks to use the declaration

to establish facts contrary to the FAC, which is inappropriate at the Motion to Dismiss stage. (Mot. Strike, Dkt. No. 54, at 1, 4-5.)  Further, Plaintiffs argue that the declaration lacks foundation and is irrelevant. (Id. at 1, 5-10.)  Defendant responds that the Wada Declaration is properly before the Court as support for Defendant's argument that the Japanese claims should be dismissed under comity and *forum non conveniens* principles. (Opp'n, Dkt. No. 59, at 1, 3-4.)  Further, Defendant claims that the Court can consider the declaration in the FRCP 12(b)(6) motion because the general rule against extrinsic evidence is subject to several exceptions relevant here. (Id. at 2; 5-16.)

Due to the nature of the assertions in the Wada Declaration and the fact that these assertions are contested by Plaintiffs or not in the FAC, the Court does not consider the declaration appropriate to be used in making a determination on the FRCP 12(b)(6) motion.  However, the Court will consider the assertions in the Wada Declaration to the extent the declaration is relevant to the *forum non conveniens* argument. See Van Cauwenberghe v. Biard, 486 U.S. 517, 529 (1988) ("[T]he district court's inquiry does not necessarily require extensive investigation, and may be resolved on affidavits presented by the parties.").

## A. Whether Plaintiffs Can Allege a U.S. Securities Exchange Act Cause of Action

Plaintiffs have made claims under § 10(b) and § 20(a) of the U.S. Securities Exchange Act of 1934 and SEC rule 10b-5. Section 20(a) extends liability for violations of U.S. securities law to "controlling persons" as well as to the underlying person or entity

responsible for the violation.  15 U.S.C. § 78t(a).  Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Defendant argues that Plaintiffs have not properly alleged a U.S. Securities Exchange Act cause of action because Plaintiffs have not (and cannot) allege that they purchased a Toshiba security listed on a U.S. exchange and Plaintiffs have not (and cannot)

allege that Toshiba was involved in any domestic transaction. (See Mot. Dismiss at 9-16.) Defendant relies fundamentally on the U.S. Supreme Court's decision in <u>Morrison v. National Australia Bank Ltd.</u>, 561 U.S. 247 (2010). Defendant claims that <u>Morrison</u> established that the U.S. Securities Exchange Act "does not apply to securities-fraud claims against a foreign issuer that did not list its securities on a U.S. exchange or otherwise trade its securities in the United States." (Mot. Dismiss at 9.) Here, Defendants argue, Toshiba is a foreign issuer and does not list its securities on a U.S. exchange — only in Tokyo and Nagoya, according to Defendant — and Toshiba does not otherwise trade securities, including ADSs, in the United States. (<u>Id.</u>)

According to the Supreme Court in <u>Morrison</u>, the question it was addressing was "whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges." <u>Id.</u> at 250-51. The Australian bank traded its common stock on foreign security exchanges, but not on any exchanges in the United States. <u>Id.</u> at 251. The bank did list ADSs on the New York Stock Exchange. (<u>Id.</u>) The plaintiffs there were Australians who had purchased common stock of the bank on foreign exchanges. <u>Id.</u> at 252. Therefore, the Court was addressing whether the foreign plaintiffs who had purchased securities abroad could raise their claims in the United States.

The Court held that § 10(b) of the Securities Exchange Act did not have an extraterritorial reach. <u>Id.</u> at 265. The plaintiffs there argued that the Court's holding regarding extraterritoriality

did not resolve the case because the deceptive conduct alleged took

place in the United States.  Id. at 266.  However, the Supreme

Court held that "it is in our view only transactions in securities

listed on domestic exchanges, and domestic transactions in other

securities, to which § 10(b) applies."  Id. at 267 (footnote

omitted); see also id. at 269-70 (referring to this as a

"transactional test").  This holding limited § 10(b)'s reach to

securities listed or transacted in the United States, thus avoiding

conflicts with foreign laws and procedures.  Id. at 269.  The Court

noted that "foreign countries regulate their domestic securities

exchanges and securities transactions occurring within their

territorial jurisdiction."  Id.  Further, "the regulation of other

countries often differs from ours as to what constitutes fraud,

what disclosures must be made, what damages are recoverable, what

discovery is available in litigation, what individual actions may

be joined in a single suit, what attorney's fees are recoverable,

and many other matters."  Id.  Therefore, the Court held that the

plaintiffs had not stated a claim because § 10(b) "reache[d] the

use of a manipulative or deceptive device or contrivance only in

connection with the purchase or sale of a security listed on an

American stock exchange, and the purchase or sale of any other

security in the United States."  Id. at 273.

     According to Defendant, the rule in this case means that

Plaintiffs cannot state a claim because Toshiba neither (1) lists

its stocks on a U.S. exchange nor (2) sells any other security in

the United States (or, as Defendant puts it, "transacts in

unsponsored ADRs in the United States (or anywhere else for that

matter)").  (Mot. Dismiss at 11-12.)

### 1.  First Prong: Transaction in Securities Listed on Domestic Exchanges

Defendant claims that OTC markets — where Plaintiffs here bought the TOSYY ADSs — are not national stock exchanges under the first prong of the rule in <u>Morrison</u>. (<u>Id.</u> at 12-13 (citing <u>United States v. Georgiou</u>, 777 F.3d 125, 134-35 (3d Cir. 2015)).)  The Third Circuit in <u>Georgiou</u> noted that the Securities Exchange Act "refers to 'securities exchanges' and 'over-the-counter markets' separately, which suggests that one is not inclusive of the other." <u>Georgiou</u>, 777 F.3d at 134-35.  Thus, to the extent the Supreme Court in <u>Morrison</u> was discussing "national securities exchange[s]" and "American stock exchange[s]," the Third Circuit in <u>Georgiou</u> held that OTC markets were not the exchanges contemplated by the Court for satisfying the first prong.  <u>Id.</u>  According to Defendant, because the only securities alleged in the FAC for this cause of action are ADSs sold on OTC markets, § 10(b) cannot apply here based on the first prong of <u>Morrison</u> because the ADSs were not listed on national stock exchanges.

Plaintiffs disagree with this distinction between national security exchanges and OTC markets.  (Opp'n, Dkt. No. 50, at 6-9.) Plaintiffs claim that <u>Morrison</u> drew a distinction between foreign exchanges and domestic exchanges, not domestic stock exchanges and domestic over-the-counter markets.  (<u>Id.</u> at 6-7 (citing <u>United States v. Isaacson</u>, 752 F.3d 1291, 1299 (11th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 990 (2015); <u>S.E.C. v. Ficeto</u>, 839 F. Supp. 2d 1101, 1107-09 (C.D. Cal. 2011)).)  Further, Plaintiffs point to the definition of an "exchange" in the statute:

> any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes,

maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange.

15 U.S.C. § 78c(a)(1) (defining "exchange"). Lastly, Plaintiffs argue that the Third Circuit's holding in Georgiou is not persuasive authority in comparison to the courts' analyses in Ficeto and Isaacson, but note that Georgiou did find that the ADSs involved in that case survived the motion to dismiss under Morrison's second prong. (Opp'n, Dkt. No. 50, at 7-8.)

In reply, Defendant argues that Plaintiffs' argument ignores the plain language of the Court in Morrison, which referred not simply to "exchanges," but to "national securities exchanges." (Reply, Dkt. No. 63, at 3-5.) Defendant claims that any reference in Morrison to "domestic exchanges" is "simply synonymous shorthand for 'national securities exchanges.'" (Id. at 4.) Further, the OTC market involved in this case is not an exchange as defined by the statute, Defendant claims, because it does not satisfy the requirement to register as a national securities exchange or obtain an exemption from the SEC. (Id. at 5-6 (citing 15 U.S.C. § 78(e); SEC Rule 3a1-1(a)).)

The Court notes that the Supreme Court in Morrison focused on the purposes of the Securities Exchange Act in making its determination that § 10(b) was not intended by Congress to be applied extraterritorially. See Morrison, 561 U.S. at 263. The statute's statement of purpose explicitly references over-the-counter markets as well as securities exchanges, stating that both "are effected with a national public interest which makes it

necessary to provide for regulation and control of such

transactions and of practices and matters related thereto."  15

U.S.C. § 78b ("Necessity for regulation").  The statute thus

recognizes a distinction between securities exchanges and OTC

markets.  And looking to the plain language of the statute's

requirements for an "exchange" as cited by Plaintiffs, Plaintiffs

have not pled or argued that the OTC market at issue here satisfies

the requirements to be an "exchange," or that the OTC market

satisfies the SEC's regulatory exemptions from those requirements.

See 15 U.S.C. § 78c(a)(1); SEC Rule 3a1-1(a), codified at 17 C.F.R.

§ 240.3a1-1.  Thus, the OTC market at issue here is likely just

that — an OTC market, not an exchange as meant by Morrison or as

defined and regulated by the statute.

     Plaintiffs' cases are also not entirely persuasive.  The

Eleventh Circuit in Isaacson did not squarely address this question

and its analysis simply found "a U.S. nexus," whether based on the

OTC markets being exchanges or the fact that the purchase of the

securities at issue took place in the United States.  See 752 F.3d

at 1299.  The court in Ficeto noted that the Supreme Court in

Morrison was not addressing OTC markets at all because that was not

relevant to the facts in Morrison.  839 F. Supp. 2d at 1108-09,

1112-14.  But the court in Ficeto did hold that OTC markets were

part of the purpose of the Securities Exchange Act and that case

law demonstrated that the two markets (OTC markets and stock

exchange markets) were meant to be protected under the law,

although ultimately holding that ADRs were foreign transactions.

Id. at 1110-12, 115.  However, a statute protecting and mentioning

both kinds of markets does not mean the markets are the same,

16

particularly when applying <u>Morrison</u>'s two pronged test.  Instead, by creating a distinction between listing stocks on a domestic exchange or otherwise transacting in securities in the United States, <u>Morrison</u> indicates to this Court that domestic securities sales that are not listed on a securities exchange are analyzed under the second prong.

Therefore, the Court holds that the OTC market in this case is not a domestic exchange satisfying the first prong of <u>Morrison</u>.

### 2.   Second Prong: Domestic Transactions in Other Securities

For the second prong, purchases or sales of securities in the United States, Defendant argues that any domestic transaction alleged by Plaintiffs was not done by Toshiba and did not involve Toshiba.  (Mot. Dismiss at 14.)  Instead, the underlying Toshiba common stock was purchased by the depositary bank on a foreign exchange (a foreign transaction), and the depositary bank then sold ADSs based on those common stocks to Plaintiffs in the United States.  (<u>Id.</u>)  Thus, the domestic transaction was between depositary banks and ADS purchasers, not between Defendant and ADS purchasers.  (<u>Id.</u>)

Further, Defendant argues that the ADSs here "are unsponsored and 'set up without the cooperation' of Toshiba" and that "ADR holders have no direct relationship with, and no ownership in, Toshiba."  (<u>Id.</u> at 14 (citing <u>Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings, SE</u>, 763 F.3d 198, 207 n.9 (2d Cir. 2014); <u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 367 (3d Cir. 2002)).) Defendant thus focuses on the distinction between "sponsored" and "unsponsored" ADSs.  As the Third Circuit explained in <u>Pinker</u>,

17

1        An ADR is a receipt that is issued by a depositary
2  bank that represents a specified amount of a foreign
   security that has been deposited with a foreign branch or
3  agent of the depositary, known as the custodian. The holder
   of an ADR is not the title owner of the underlying shares;
4  the title owner of the underlying shares is either the
   depositary, the custodian, or their agent. ADRs are
5  tradeable in the same manner as any other registered
   American security, may be listed on any of the major
6  exchanges in the United States or traded over the counter,
   and are subject to the Securities Act and the Exchange Act.
7  This makes trading a ADR simpler and more secure for
   American investors than trading in the underlying security
   in the foreign market.

8

9        ADRs may be either sponsored or unsponsored. An
   unsponsored ADR is established with little or no
10 involvement of the issuer of the underlying security. A
   sponsored ADR, in contrast, is established with the active
11 participation of the issuer of the underlying security. An
   issuer who sponsors an ADR enters into an agreement with
12 the depositary bank and the ADR owners. The agreement
   establishes the terms of the ADRs and the rights and
13 obligations of the parties, such as the ADR holders' voting
   rights.

14 Pinker, 292 F.3d at 367 (citations omitted). Defendant claims that

15 cases after Morrison have dismissed claims based on unsponsored

16 ADSs because those cases do not involve actions taken by the

17 alleged defendant in a domestic transaction; by contrast, other

18 cases (like Pinker) have been allowed to continue because they were

19 based on sponsored ADSs where the alleged defendant was involved in

20 the transaction.  (Mot. Dismiss at 14-15 (citing Parkcentral, 763

21 F.3d at 198 (involving securities-based swap agreements); Pinker,

22 292 F.3d at 361 (involving sponsored ADRs, but examining personal

23 jurisdiction pre-Morrison); Copeland v. Fortis, 685 F. Supp. 2d

24 498, 506 (S.D.N.Y. 2010) (pre-Morrison case examining personal

25 jurisdiction with collateralized debt obligations and ADRs); In re

26 Société Générale Sec. Litig., No. 08 Civ. 2495 (RMB), 2010 WL

27 3910286, at *6 (S.D.N.Y. Sept. 29, 2010) (post-Morrison case

28 involving ADRs)).)

Comparing Plaintiffs' unsponsored ADRs to the securities-based swap agreements in Parkcentral, Defendant claims "the ADRs here are 'synthetic' investments, in that the security is 'a separate and distinct financial instrument from the security it references.'" (Mot. Dismiss at 16 (quoting Parkcentral, 763 F.3d at 205-06).) Thus, Defendant argues that as in Parkcentral, there is no basis for a § 10(b) claim here, or a § 20(a) claim that relies on the primary violation of a § 10(b) claim. (Id. (citing Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009)).)

Plaintiffs take issue with Defendant's understanding of Morrison, as well as the focus on sponsored versus unsponsored ADSs. (Opp'n, Dkt. No. 50, at 4-21.) First, Plaintiffs argue that the Court in Morrison was expressly carving out sales and purchases of ADSs in the United States from its holding, as the only U.S. citizen plaintiff in that case, Morrison, had purchased ADSs in the United States, but had been previously dismissed from the case on other grounds. (Id. at 5-6 (citing Morrison, 561 U.S. at 253 n.1, 273).) According to Plaintiffs, the Court in Morrison contemplated that domestic transactions subject to U.S. securities laws included domestic sales and purchases of ADSs, even those not listed on a national security exchange but instead on some kind of domestic exchange or OTC market. (Id. at 6-7.) And Plaintiffs argue that even if the OTC market is not considered a domestic exchange, the ADS purchases here are domestic transactions under the second prong of Morrison because the purchases and sales all took place in the United States where the OTC market is located. (Id. at 9.)

Second, Plaintiffs state that the status of an ADS as sponsored or unsponsored does not matter for determining the

applicability of § 10(b).  Plaintiffs argue that Toshiba's claim about the ADSs here being unsponsored raises factual issues not appropriate for a motion to dismiss regarding Toshiba's involvement in the ADSs' sale.  (Id. at 9-10; 16.)  Additionally, all ADSs, whether sponsored or not, are held by a depositary bank, which ultimately holds the underlying security and sells the ADS.  (Id. at 10.)  Plaintiffs cite cases where ADS sales by a depositary bank were held subject to § 10(b) claims, and Plaintiffs distinguish Defendant's key cases, In re Société Générale Security Litigation and Parkcentral.  (Id. at 10 & n.10; 17-21.)  Further, and contrary to Defendant's argument, Plaintiffs claim that ADS holders have a beneficiary interest in the underlying stock and "the right to obtain the foreign shares on demand as well as other rights providing indicia of ownership, such as the right to receive the dividends payable to and obtain tax credits associated with the underlying shares."  (Id. at 11 (citing 17 C.F.R. § 239.36(a)).)

Lastly, Plaintiffs argue that the unsponsored nature of the ADSs is irrelevant for the purposes of Morrison, particularly as the difference between a sponsored and unsponsored ADS is somewhat artificial.  (Id. at 12-14.)  Plaintiffs cite SEC Rule 12g3-2, codified at 17 C.F.R. § 240.12g3-2, and its allowance of foreign unsponsored ADS sales if "the issuer maintains its listing on a foreign exchange and complies with the requirements to provide American investors with electronic access to English-language translations of the information provided to their foreign-investors."  (Opp'n, Dkt. No. 50, at 13.)  To Plaintiffs, the only difference between the sponsored and unsponsored ADSs, then, is that an unsponsored ADS can be sold without a formal application by

the foreign issuer to establish a ADS program; the disclosure

requirements are otherwise the same.  (Id.)  Toshiba complied with

the disclosure requirements and never objected to the sale of its

securities in the United States.  (Id. at 14.)  Thus, Plaintiffs

argue that finding that Toshiba is subject to the U.S. securities

laws through the ADS sales in the United States would prevent

Toshiba from "evad[ing] liability by refusing to memorialize its

consent to the sale of ADSs," as was mentioned in Morrison and

section 30(b) of the Exchange Act.  (Id. at 14 & n.15.)[2]

     In reply, Defendant argues that Plaintiffs seek to extend the

reach of Morrison's second prong and U.S. securities laws to "a

_____

> [2]     Plaintiffs note that based on the opening Motion, evading
> liability is what Toshiba appears to be seeking to do:
>
>> Toshiba's carefully-worded brief asserts only that the
>> **depositary banks** that sold the ADSs to investors "**may**" have
>> a claim in Japan against Toshiba for the benefit of
>> investors who purchased Toshiba's ADSs, apparently meaning
>> to suggest that the ADS purchasers themselves have no such
>> claim.   Toshiba  ignores,  in  this  regard,  that  the
>> depositary agreements governing the sale of its stock as
>> ADSs specifically provide that the depositary banks will
>> **not** institute or participate in any such action.  Thus, in
>> Toshiba's view, American investors who purchased its shares
>> as ADSs should not have a remedy for fraud anywhere in the
>> world simply because those securities were "unsponsored."
>
> (Opp'n, Dkt. No. 15, at 15 (citation and footnote omitted).)
> However, Defendant states that this cannot be a relevant
> consideration.  (Reply, Dkt. No. 63, at 13.)  To the extent that a
> depositary bank wants to, it can initiate litigation, Defendant
> argues, because the language in the Form F-6 states that depositary
> banks "shall be under no obligation" to sue, not that they cannot
> or may not sue.  (Id.)  Defendant also argues that the agreements
> between the depositary banks and ADS purchasers further demonstrate
> that the relationship is between those two, not between ADS
> purchasers and Toshiba.  (Id. at 13-14.)
>      The Court notes that even if depositary banks have the power
> to sue on behalf of ADS purchasers, there is no indication why or
> how the banks would do so.  But Defendant correctly notes that
> there is no contractual obligation preventing depositary banks from
> making claims for ADS purchasers based on the evidence Plaintiffs
> provided or the allegations in the FAC.

foreign issuer . . . where the issuer . . . is not alleged to have participated in securities transactions in the United States." (Reply, Dkt. No. 63, at 8-9.)  That is, Defendant Toshiba did not sell the ADSs to any Plaintiffs because the ADSs were sold by a depositary bank without any connection to Toshiba; therefore, Toshiba had no connection to any domestic transaction.  (Id. at 8-14.)  "As _Morrison_ states, the U.S. Exchange Act expressly does not apply to 'any person insofar as he transacts a business in securities without the jurisdiction of the United States.'" (Id. at 8 (quoting Morrison, 561 U.S. at 268 (quoting Section 30(b) of the Act, 15 U.S.C. § 78dd(b))).)  Defendant argues that "every one of the cases [Plaintiffs] cite in footnote 10 involved sponsored ADRs (or similar instruments) registered on a national securities exchange."  (Id. at 9-10.)  And Defendant states that it is without precedent to find that an entirely passive security issuer like Toshiba waives objections or impliedly consents to ADS sales of its securities or is subject to the full force of U.S. securities laws simply because it is subject to SEC Rule 12g3-2.  (Id. at 12-13.)

Further, Defendant argues that the court in Ficeto — one of Plaintiffs' cases — ultimately held that ADR transactions are essentially foreign transactions outside the scope of § 10(b) and the test in Morrison:

> Cases have similarly held that § 10(b) does not reach transactions in a foreign company's shares that are traded only on a foreign exchange but where American Depository Receipts (ADRs) representing those shares are listed and traded on an American exchange. In these cases, courts have held that ADRs are merely placeholders for the ordinary shares traded on foreign exchanges, and thus allowing § 10(b) claims to survive would likewise be contrary to the spirit of Morrison.

<u>Ficeto</u>, 839 F. Supp. 2d at 1115 (citing <u>In re Vivendi Universal,</u>
<u>S.A. Sec. Litig.</u>, 765 F. Supp. 2d 512 (S.D.N.Y. 2011); <u>In re</u>
<u>Société Générale Sec. Litig.</u>, No. 08 Civ. 2495 (RMB), 2010 WL
3910286, at *6 (S.D.N.Y. Sept. 29, 2010)); <u>see also</u> Reply, Dkt. No.
63, at 7-8.

　　　The Court holds that the transactions at issue here do not
fall under the second prong of <u>Morrison</u>.  Facially, the ADS
transactions are securities transactions that occurred
domestically: they were both sold and purchased in the United
States.  However, Plaintiffs have not argued or pled that Defendant
was involved in those transactions in any way — or pointed to how
discovery could assist Plaintiffs in making such a claim.
Plaintiffs state that discovery might show that Toshiba was
involved in some fashion in the otherwise unsponsored ADSs.  But
Plaintiffs must do more than speculate about what discovery might
yield in that regard.

　　　Additionally, Plaintiffs' argument that the defendant does not
have to be involved in the domestic transaction under <u>Morrison</u> is
without support.  The Court acknowledges that privity or some other
kind of direct transactional relationship is not required between a
plaintiff and a defendant in a § 10(b) case; a defendant security
issuer can be liable for fraud even if the issuer did not sell its
securities to the plaintiff.  But while <u>Morrison</u> did not squarely
address the question, nowhere in <u>Morrison</u> did the Court state that
U.S. securities laws could be applied to a foreign company that
only listed its securities on foreign exchanges but whose stocks
are purchased by an American depositary bank on a foreign exchange
and then resold as a different kind of security (an ADR) in the

United States.  In fact, all the policy and reasoning in <u>Morrison</u> point in the other direction.  Plaintiffs' proffered understanding would create essentially limitless reach of § 10(b) claims because even if the foreign defendant attempted to keep its securities from being sold in the United States, the independent actions of depositary banks selling on OTC markets could create liability. This is inconsistent with the spirit and law of <u>Morrison</u>.

Instead, <u>Morrison</u> properly limited the reach of § 10(b) claims based on the plain language of the statute, the presumption against extraterritorial reach of U.S. laws, and comity concerns.  The ADRs that <u>Morrison</u> did not address were listed on the New York Stock Exchange, unlike the unsponsored and unlisted ADRs here.  <u>See</u> <u>Morrison</u>, 561 U.S. 251.  Thus while <u>Morrison</u> did not address the sale of ADRs that are listed on domestic exchanges, even if the Court in <u>Morrison</u> had addressed the sales, the securities at issue in this case are not listed on a domestic exchange.

Most importantly, Plaintiffs have not alleged or provided any evidence (or pointed to where Plaintiffs reasonably expect to find evidence) of any affirmative act by Toshiba related to the purchase and sale of securities in the United States.  Some affirmative act in relation to the purchase or sale of securities is required under the Supreme Court's holding: "Section 10(b) reaches ***the use of a manipulative or deceptive device or contrivance only in connection with*** the purchase or sale of a security listed on an American stock exchange, and ***the purchase or sale of any other security in the United States***." <u>Id.</u> at 273 (emphasis added).  There is no allegation that Toshiba used a manipulative or deceptive device or contrivance in connection with the purchase or sale of any security

24

1   in the United States.   There are allegations that Toshiba committed
2   accounting fraud and misrepresented its profits to investors around
3   the world.   But there is no allegation that those fraudulent
4   actions were connected to Toshiba selling its securities *in the*
5   *United States*.   Plaintiffs have not pled that Toshiba listed its
6   securities in United States or sponsored, solicited, or engaged in
7   any other affirmative act in connection with securities sales in
8   the United States; thus, § 10(b) does not apply to Toshiba.

9        Therefore, Plaintiffs have failed to plead § 10(b), Rule 10b-
10   5, and § 20(a) causes of action in the FAC based on <u>Morrison</u>'s two-
11   prong test because Toshiba neither lists its securities on a
12   domestic exchange nor was involved in the transaction of ADSs in
13   this country.

14        **B.    Whether the Japanese Law Claim Is Properly in this Court**
15        Defendant argues that Plaintiffs' Japanese law claim should be
16   dismissed under principles of comity and *forum non conveniens*.
17   (Mot. Dismiss at 16.)

18        **1.   Comity**
19        Comity was one of the major policy concerns underlying the
20   Supreme Court's holding in <u>Morrison</u> that Congress did not intend
21   for the extraterritorial application of the Security Exchange Act
22   in § 10(b) claims.   <u>Morrison</u>, 561 U.S. at 267-70.   "Comity
23   similarly rests on respect for the legal systems of members of the
24   international legal community — a kind of international federalism
25   — and thus 'serves to protect against unintended clashes between
26   our laws and those of other nations which could result in
27   international discord.'"   <u>Mujica v. AirScan Inc.</u>, 771 F.3d 580, 605
28   (9th Cir. 2014) (quoting <u>E.E.O.C. v. Arabian Am. Oil</u>, 499 U.S. 244,

248 (1991)).  In determining whether comity concerns call for
dismissal, the Ninth Circuit has evaluated three factors as "a
useful starting point for analyzing comity claims": (1) the
strength of the United States' interest; (2) the foreign
government's interest; and (3) the adequacy of the alternative
forum.  Id. at 603.

### (a)  U.S. Interests

"The (nonexclusive) factors we should consider when assessing
U.S. interests include (1) the location of the conduct in question,
(2) the nationality of the parties, (3) the character of the
conduct in question, (4) the foreign policy interests of the United
States, and (5) any public policy interests."  Id. at 604.

Defendant claims that the United States' interests are "weak —
especially compared to Japan's interests."  (Mot. Dismiss at 19.)
Defendant argues that Morrison explicitly warned against inserting
the United States into foreign securities regulation.  (Id. (citing
Morrison, 561 U.S. at 269).)  Further, Defendant claims all the
relevant statements and omissions were made in Japan, thus giving
U.S. interests less weight because the actions at issue in the suit
did not take place here.  (Id.)  Instead, U.S. investors who
purchased common stock can reasonably be expected to pursue their
claims in Japan, where they purchased that stock.  (Id. at 19-20.)
Defendant argues that the court in In re Toyota Motor Corp.
Securities Litigation, No. CV 10-922 DSF (AJWx), 2011 WL 2675395,
at *6-7 (C.D. Cal. July 7, 2011), held that Japanese law claims
against Toyota were dismissed on the basis of comity to Japanese
courts and law.  (Mot. Dismiss at 20-21.)  That was true even
though Toyota sold ADRs in the United States, listed on the New

York Stock Exchange, filed disclosures with the SEC, and solicited investors in the United States. (Id. at 20.) Thus, Defendant claims that, even more so here, comity demands that the Japanese law claim be heard in Japan. (Id.)

Plaintiffs first argue that "this action bears none of the hallmarks of a case that is subject to dismissal under comity" because "this case involves no issue of the extraterritorial application of U.S. law to events taking place in Japan, nor any risk that this case will interfere with the adjudication of any past, present or anticipated civil, criminal, regulatory or investigative proceeding in Japan." (Opp'n, Dkt. No. 50, at 22.) Thus, Plaintiffs argue that this case is unlike Mujica and Toyota. In Toyota, the court was faced with the question of whether to exercise supplemental jurisdiction over a worldwide class of investors, which is not the situation in this case, Plaintiffs point out. (Id. at 23.)

In Mujica, the Ninth Circuit was also faced with a dissimilar case: it "involved federal and California state law claims for wrongful death, torture, war crimes and other acts arising from the bombing of a Colombian village by members of the Colombian air force allegedly acting on behalf of oil companies headquartered in the U.S." (Id. at 24 (citing Mujica, 771 F.3d at 586).) The State Department had provided the court with "two démarches . . . from the Colombian government objecting to the prosecution of the case in this country." (Id. (citing Mujica, 771 F.3d at 584-86).) Thus, Plaintiffs argue that comity is not appropriate here because no such objection or claims are raised in this case as in Mujica. (Id. at 24.) In contrast, Plaintiffs claim that "significant

27

aspects of Toshiba's fraud occurred with respect to business and transactions in this country." (Id. at 28.) And unlike Mujica, a suit in this country has not raised objections from the Japanese government, courts, or other litigants. (Id. at 29.) As Plaintiffs put it, "[e]ven Toshiba's own expert admits that 'the ruling of the U.S. court would have no precedential weight in Japan.'" (Id. at 30 (citing Ishiguro Decl. ¶ 21).)

Lastly, Plaintiffs argue that Defendant has failed to show that "adjudicatory comity or 'comity among courts'" is needed here because the Japanese cases are not brought by the same investors as in this case. (Id. at 25.) Plaintiffs note that Toshiba does not address whether the class members here, such as the ADS purchasers, could even sue in Japan for their claims involving ADSs purchased in the United States. (Id. at 25-26.) Plaintiffs argue that Morrison also did not address the situation where Japanese law would be applied to foreign transactions in a U.S. court, as would be the case here for the 6502 purchaser class. (Id. at 26.) Instead, the interests of the United States are strong here because the class members are U.S. investors and the United States has a strong interest in protecting such investments. (Id. at 28.)

### (b) Foreign Government Interests

"The proper analysis of foreign interests essentially mirrors the consideration of U.S. interests. Foreign states, no less than the United States, have legitimate interests in regulating conduct that occurs within their borders, involves their nationals, impacts their public and foreign policies, and implicates universal norms." Mujica, 771 F.3d at 607. The factors considered are essentially the same: "the territoriality of the questioned activity, its

28

effects, the nationality of the parties, and the interests of the foreign state."  Id.

Defendant argues that "the public misstatements and omissions were made in Japan by a Japanese corporation listed on Japanese stock exchanges," and further that "the Toshiba executives identified in the Amended Complaint and [the internal investigation] Report appear overwhelmingly to be citizens and residents of Japan," all of which shows that Japan has a very strong interest in adjudicating this Japanese law claim.  (Mot. Dismiss at 17 (citing Wada Decl. ¶ 5).)  Further, "[a]pproximately 75 percent of Toshiba stockholders are Japanese citizens, companies, or institutions, while the remainder is dispersed globally."  (Id. at 18 (citing FAC ¶ 243(g)).)  Defendant also cites examples of the Japanese government speaking publicly about the interest in and ramifications of Toshiba's accounting revelations on Japan.  (Id.)  Japanese courts are "handling at least three lawsuits against Toshiba involving a total of 52 investors" and Japanese courts are developing their interpretation of the relevant part of the law, Article 21-2 of the Japanese Exchange Act.  (Id.)

Plaintiffs' response is the same as put forth above, primarily focusing on the fact that this case involves the claims of U.S. citizens and residents based on transactions subject to Japanese law.  (See generally Opp'n, Dkt. No. 50, at 22-31.)  Thus, Plaintiffs acknowledge that Japan has an interest in the case, but they claim that it is weaker compared to the United States's interest, and the interest would be respected by the application of Japanese law in this Court.  (Id.)

1

### (c)   Adequacy of Alternative Forum

2     "[C]ourts consider decisions rendered by the alternative forum
3 and ask (1) whether the judgment was rendered via fraud; (2)
4 whether the judgment was rendered by a competent court utilizing
5 proceedings consistent with civilized jurisprudence; and (3)
6 whether the foreign judgment is prejudicial and repugnant to
7 fundamental principles of what is decent and just." Mujica, 771
8 F.3d at 608 (internal quotation and alteration omitted).
9 "Typically, courts ask whether one side has presented specific
10 evidence that the judgment of the alternative forum was
11 significantly inadequate." Id.

12     Neither party disputes that Japan is a more than adequate
13 forum for these claims based on the above standard.

14

### (d)   The Court's Analysis

15     The Court holds that the comity issues raised in this case
16 weigh in favor of dismissal, as in Toyota, due to the cause of
17 action being based on Japanese securities law for actions of a
18 Japanese company that only lists its securities in Japan (which is
19 also where the fraudulent accounting primarily took place).  As
20 Plaintiffs acknowledge, other cases have been filed in Japan
21 directly relating to this accounting fraud.

22     Plaintiffs' concern that ADS purchasers — who Plaintiffs
23 earlier argued engaged in domestic (U.S.) transactions — will not
24 be able to sue in Japan under Japanese securities laws is perhaps
25 based on the proper application of the Japanese securities laws,
26 not an indication that this Court should keep this cause of action.
27 Further, this Court may also have found that the ADS purchasers
28 would not have a Japanese cause of action; thus, the inclusion of

1  this potential class in the case does not sway the Court's comity

2  analysis.

3      In all, <u>Morrison</u> teaches U.S. courts to consider comity

4  carefully in determining the application of U.S. securities laws.

5  No less should the Court consider comity in deciding whether a

6  Japanese securities law claim is more properly heard here or in

7  Japan, particularly where this Court has already dismissed the U.S.

8  securities law causes of action based on the foreign issuer's

9  noninvolvement and lack of any affirmative act in any domestic

10  transaction.  Thus, the Court holds that principles of comity lead

11  this Court to dismiss the Japanese law cause of action.

12          **2.  *Forum non Conveniens***

13      "[A] plaintiff's choice of forum should rarely be disturbed.

14  However, when an alternative forum has jurisdiction to hear the

15  case, and when trial in the chosen forum would 'establish . . .

16  oppressiveness and vexation to a defendant . . . out of all

17  proportion to plaintiff's convenience,' or when the 'chosen forum

18  [is] in appropriate because of considerations affecting the court's

19  own administrative and legal problems,' the court may, in the

20  exercise of its sound discretion, dismiss the case."  <u>Piper</u>

21  <u>Aircraft Co. v. Reyno</u>, 454 U.S. 235, 241 (1981) (quoting <u>Koster v.</u>

22  <u>Lumbermens Mut. Cas. Co.</u>, 330 U.S. 518, 524 (1947)).  As in the

23  comity analysis, courts consider private interest factors and

24  public interest factors in making this determination:

25      The factors pertaining to the private interests of the
       litigants included the "relative ease of access to sources
26      of proof; availability of compulsory process for attendance
       of unwilling, and the cost of obtaining attendance of
27      willing, witnesses; possibility of view of premises, if
       view would be appropriate to the action; and all other

28

                              31

> practical problems that make trial of a case easy, expeditious and inexpensive."
>
> The public factors bearing on the question included the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Id. at n.6 (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947)) (internal citation omitted) (paragraphing added).

Defendant argues here that under the practical considerations of *forum non conveniens*, this Court should dismiss Plaintiffs' Japanese law claim. (Mot. Dismiss at 21.) Defendant argues that there is an adequate alternative forum in Japan, where Toshiba is "amenable" to suit. (Id. at 22.) Further, the private interest factors weigh in favor of dismissal, Defendant claims. The "overwhelming majority" of evidence is in Japan and relates to accounting issues in Japan. (Id.) The key executives identified in the FAC are no longer employees of Defendant and could not be compelled to appear at trial in the United States under FRCP 45. (Id. at 22-23.)

Additionally, unwilling Japanese witnesses require complicated letters rogatory through Japanese government officials in order to be required to testify, and that requirement is still at the discretion of a Japanese court. (Id. at 23.) Depositions of willing Japanese witnesses would still be costly and complicated; among other things, Japan requires the use of a U.S. consulate or embassy, with a consular officer presiding over the deposition and a special deposition visa for the U.S. participants. (Id. at 23-

32

24.)  These practical discovery problems weigh in favor of dismissal, Defendant claims.  (Id.)

Further, Defendant argues that the public interest factors favor dismissal.  The claim is brought under Japanese law, which under Piper Aircraft Co. weighs toward dismissal.  (Id. at 24.) Defendant claims that Japanese courts are still developing the law around Article 21-2, which means that the Court will have trouble interpreting and applying it.  (Id.)  This also could result in inconsistent judgments and duplicative recovery because Japanese courts are already addressing claims against Toshiba under the same law.  (Id.)

Plaintiffs respond that Defendant has the burden in raising _forum non conveniens_ and that Defendant has failed to meet that burden.  First, Plaintiffs reassert their argument that ADS purchasers will not have an adequate forum in Japan.  (Id. at 32.) Plaintiffs also claim that a plaintiff's choice of forum — even in a class action — is entitled to deference and is presumptively convenient, particularly for domestic plaintiffs choosing their home forum.  (Id.)  Additionally, Plaintiffs argue that there will be a "substantial" amount of discovery in the United States for this case, including for events related to Westinghouse, U.S. auditors at Ernst & Young, and U.S. transactions in Toshiba securities.  (Id. at 33-34.)  Plaintiffs claim that the Japanese evidence could be stipulated to and authenticated, as most of it has been turned over to internal and governmental investigators. (Id. at 34.)  The depositions can also take place in Japan using the method Toshiba identified.  (Id. at 34-35.)  And Toshiba has

33

1   not shown that any witness is unavailable or unwilling to come to
2   the United States for trial, Plaintiffs claim.  (Id.)

3        Additionally, Plaintiffs argue that Toshiba has failed to
4   weigh the inconvenience to the American witnesses and parties if
5   they were required to this litigate this case in Japan.  (Id. at
6   36.)  Further, Toshiba has its American headquarters in this
7   district, Plaintiffs argue, and is subject to personal jurisdiction
8   here and has information relevant to discovery here.  (Id.)
9   Lastly, Plaintiffs argue that applying Japanese law in this case
10  would not be difficult.  According to Plaintiffs, "Japanese law is
11  readily determinable by this Court, the relevant statutes have been
12  translated into English, and relevant case law and treatises are
13  available to this Court."  (Id. at 37.)  Plaintiffs point out that
14  the Court can appoint a special master or expert in Japanese law if
15  needed.  (Id. (citing FRCP 44.1; Fed. R. Evid. 706).)  Plaintiffs
16  also cite several cases where U.S. federal courts applied Japanese
17  law.  (Id. at 38.)  Thus, Plaintiffs argue that the Japanese law is
18  not so uncertain as to be impractical to apply in this Court.  (Id.
19  at 38-39.)

20       As an alternative to the Court's holding on comity, the Court
21  also holds that the doctrine of forum non conveniens makes
22  dismissal proper for the Japanese law cause of action.  Both the
23  private and public factors weigh in favor of dismissal.  There are
24  many practical issues with fully litigating this cause of action in
25  this Court, particularly with taking discovery from and deposing
26  non-Toshiba employees that Plaintiffs have identified as key
27  witnesses and perpetrators of the accounting fraud.  Even taking
28  discovery from and deposing willing witnesses will be a challenge.

Most of the evidence and witnesses identified by both parties as material are in Japan, and Japan has the strongest factual connection to the Japanese law claim.   The Court recognizes its duty to hear cases over which it has jurisdiction, but the Court also finds that Japanese courts are more than competent to hear these claims.

And while the Court is capable of determining and applying Japanese securities law, such a challenge need not be surmounted in this case because other considerations weigh in favor of a more convenient forum being used for both the Court and the witnesses in this case.   Therefore, Plaintiffs' Japanese law cause of action is dismissed with prejudice.

**IV.   CONCLUSION**

For all the reasons discussed above, the Court GRANTS in part and DENIES in part Plaintiffs' Motion to Strike the Wada Declaration, as described above.   The Court GRANTS Defendant's Motion to Dismiss.   The Court finds that leave to amend would be futile; therefore, the case is dismissed with prejudice.


IT IS SO ORDERED.


Dated: May 20, 2016

DEAN D. PREGERSON
United States District Judge

35