**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARK STOYAS, individually and on behalf of all others similarly situated,<br>*Plaintiff*,<br><br>and<br><br>AUTOMOTIVE INDUSTRIES PENSION TRUST FUND; NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND,<br>*Plaintiffs-Appellants*,<br><br>v.<br><br>TOSHIBA CORPORATION,<br>*Defendant-Appellee.* | No. 16-56058<br><br>D.C. No.<br>2:15-cv-04194-DDP-JC<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, Senior District Judge, Presiding

Argued and Submitted November 9, 2017
Pasadena, California

Filed July 17, 2018

Before: Kim McLane Wardlaw and William A. Fletcher,[*]
Circuit Judges, and Wiley Y. Daniel,[**] District Judge.

Opinion by Judge Wardlaw

## SUMMARY[***]

### Securities Fraud

The panel reversed the district court's dismissal and remanded to allow amendment of the complaint in an action in which purchasers of American Depository Shares or Receipts alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act based on Toshiba Corp.'s fraudulent accounting practices.

ADRs are financial instruments that enable investors in the United States to buy and sell stock in foreign corporations such as Toshiba, whose common stock is publicly traded on the Tokyo Stock Exchange. The district court concluded that under the test set forth in *Morrison v. Nat'l Australia Bank*

---

[*] This case was submitted to a panel that included Judge Stephen R. Reinhardt. Following Judge Reinhardt's death, Judge W. Fletcher was drawn by lot to replace him. Ninth Circuit General Order 3.2.h. Judge W. Fletcher has read the briefs, reviewed the record, and listened to oral argument.

[**] The Honorable Wiley Y. Daniel, United States District Judge for the U.S. District Court for Colorado, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Ltd.*, 561 U.S. 247 (2010), the Exchange Act, which does not apply extraterritorially, did not apply to the purchase of Toshiba ADRs because the over-the-counter market by which the Toshiba ADRs were sold was not a "national exchange," and there was no domestic transaction between the ADR purchasers and Toshiba.

Reversing, the panel declined to resolve the question of whether, under *Morrison*, the Exchange Act applied to "domestic exchanges" or only "national securities exchanges" because the over-the-counter market was not an "exchange" within the meaning of the Exchange Act.   The panel nevertheless concluded that the Exchange Act could apply to the Toshiba ADR transactions, as domestic transactions in securities not registered on an exchange.    The panel concluded that Toshiba ADRs were "securities" under the Exchange Act.   Adopting the Second and Third Circuits' "irrevocable liability" test, looking to where purchasers incurred the liability to take and pay for securities, and where sellers incurred the liability to deliver securities, the panel further concluded that plaintiffs must be allowed to amend their complaint to allege that the purchase of Toshiba ADRs on the over-the-counter market was a domestic purchase, and that the alleged fraud was "in connection with" the purchase.

## COUNSEL

Susan K. Alexander (argued), San Francisco, California, for Plaintiffs-Appellants.

Christopher M. Curran (argued), Washington, D.C., for Defendants-Appellees.

# OPINION

WARDLAW, Circuit Judge:

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court held that the presumption against extraterritorial applicability of congressional legislation renders the U.S. Securities Exchange Act of 1934 ("the Exchange Act") applicable to deceptive conduct only in connection with the purchases or sales of any securities registered on a national securities exchange or domestic transactions in other securities not so registered.  The Court reasoned that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States."  *Id.* at 266. Appellants Automotive Industries Pension Trust Fund ("AIPTF") and New England Teamsters & Trucking Industry Pension Fund (together, the "Funds") are named plaintiffs in a putative class action alleging violations of the Exchange Act and the Financial Instruments and Exchange Act of Japan ("JFIEA") against Toshiba Corporation ("Toshiba") based on its now-admitted fraudulent accounting practices that caused hundreds of millions of dollars in loss to U.S. investors.  The complaint alleges (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 on behalf of American Depository Shares or Receipts ("ADRs") purchasers, (2) violation of Section 20(a) of the Exchange Act on behalf of ADR purchasers, and (3) violation of JFIEA Article 21-2 on behalf of ADR purchasers and purchasers of Toshiba common stock.  The district court dismissed the case with prejudice on the grounds that the over-the-counter market by which ADRs are sold was not a "national exchange" within the meaning of *Morrison*, and that there was not any domestic transaction between ADR purchasers and Toshiba.  Having

dismissed the Exchange Act claims, the district court dismissed the Japanese law claim under principles of comity and forum non conveniens.

Thus, at the heart of this appeal is the question of the nature of ADRs and their transactions, and whether Toshiba ADRs are covered by the Exchange Act through either registry on a national exchange, or through domestic sales and purchases.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In the wake of Toshiba's admission of substantial institutional accounting fraud and accompanying restatements of pre-tax profits,[1] Mark Stoyas filed this securities fraud class action on June 4, 2015, against Toshiba, its current chief executive officer, and its former chief executive officer based on his ownership of thirty-three Toshiba ADRs and a loss of $180.53.  Later, AIPTF became lead plaintiff based on its purchase on March 23, 2015, of 36,000 Toshiba ADRs in the

---

[1] On September 7, 2015, Toshiba restated its pre-tax profits for fiscal years 2008 through 2014, eliminating $2.6 billion in profit, or about a third of its total reported profit during the period.  Toshiba also restated shareholder equity, eliminating $9.9 billion in equity.  The restatements followed a series of internal investigations prompted by a Japanese government order that revealed widespread, deliberately fraudulent accounting practices designed to inflate Toshiba's profit statements over an at least six-year period.  As a result, Toshiba's stock price declined by more than 40 percent, a loss of $7.6 billion in market capitalization, and nine senior executives resigned.

United States on an over-the-counter market run by OTC Markets Group and a loss of $196,913.47.[2]

The Funds filed the first amended complaint ("FAC") on December 17, 2015.  The FAC added New England Teamsters & Trucking Industry Pension Fund as a named plaintiff; unlike AIPTF, it had purchased 343,000 shares of Toshiba common stock on the Tokyo Stock Exchange.

The FAC alleges three class action claims for relief against Toshiba.[3]  The first two claims are brought on behalf of a class of all persons who acquired Toshiba ADRs ("ADR class") between May 8, 2012, and November 12, 2015 ("Class Period").  The first claim alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Class members "acquired" Toshiba ADRs "in reliance upon the truth and accuracy" of Toshiba's fraudulent financial statements, paid artificially inflated prices, and suffered economic loss when the ADRs declined in value after the fraud was revealed and pre-tax profits were restated.

The second claim alleges violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Toshiba, despite having

---

[2] Following the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3)(A)(i), notice of the action was published in Business Wire.  On August 3, 2015, AIPTF filed a motion for appointment as lead plaintiff; in light of AIPTF's larger financial interest, Stoyas did not oppose the motion and the district court granted it.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (rebuttable presumption that the party with the largest financial interest at stake is the most adequate plaintiff).

[3] AIPTF dismissed the claims against the Toshiba chief executive officers before filing the FAC.

the ability to control its directors, officers, and managers, including twenty-four specific individuals, failed to prevent their fraudulent conduct or, alternatively, "actively controlled and directed those actions so as to cause the violations" of securities laws.[4]

The third claim alleges violation of JFIEA Article 21-2. It is brought on behalf of both the ADR class and a class of "all citizens and residents of the United States who otherwise acquired shares of Toshiba common stock during the Class Period." Appellants claim that "Toshiba breached its duty to make a reasonable and diligent investigation of the statements" in its financial reports and "to ensure that the statements contained therein were truthful and accurate." The material false information and omissions artificially inflated the price of Toshiba common stock, and class members were harmed when the value of the stock declined due to the revelation of fraudulent accounting.

The district court dismissed the FAC with prejudice on May 20, 2016. Applying *Morrison*, the district court held that the over-the-counter market was not a "stock exchange" within the meaning of the Exchange Act, and that the FAC failed to allege Toshiba's involvement in the ADR transactions at issue, rendering Section 10(b) inapplicable. Having dismissed the Funds' Exchange Act claims, the district court dismissed the Japanese law claim on the basis of comity and forum non conveniens. Finding any amendment

---

[4] "Controlling person" liability under Section 20(a) requires a primary violation of the Exchange Act, so the Funds' Section 20(a) claim turns on the viability of their Section 10(b) claim. *Morrison*, 561 U.S. at 253 n.2. For clarity, the balance of the opinion discusses only the Section 10(b) claim.

would be futile, the district court dismissed the case with prejudice.  The Funds timely appeal.  Fed. R. App. P. 4(a)(1).

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction over the Exchange Act claims pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a).  The district court had jurisdiction over the JFIEA claim based on diversity jurisdiction, as Toshiba is a foreign corporation, as well as supplemental jurisdiction, because it arises from the same case or controversy as the Exchange Act claims.  28 U.S.C. §§ 1332(a)(2), (d)(2); 28 U.S.C. § 1367.

We have jurisdiction pursuant to 28 U.S.C. § 1291 to review the district court's order and final judgment dismissing the Funds' claims with prejudice.  *See* Fed. R. Civ. P. 54(b).

"We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party."  *Fields v. Twitter, Inc.*, 881 F.3d 739, 743 (9th Cir. 2018) (quotation omitted).  "[R]eview is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice."  *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011).  In other words, we inquire "whether the complaint at issue contains 'sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face.'"  *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Denial of leave to amend is reviewed for abuse of discretion. *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 598 (9th Cir. 2014). "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Harris*, 682 F.3d at 1331 (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam)). "A district court's failure to consider the relevant factors [set forth in *Foman v. Davis*, 371 U.S. 178 (1962)] and articulate why dismissal should be with prejudice instead of without prejudice may constitute an abuse of discretion." *Eminence Capital*, 316 F.3d at 1052.

## III. DISCUSSION

Toshiba's common stock is publically traded on the Tokyo Stock Exchange. The Funds' Exchange Act claims are in connection with Toshiba ADR transactions on the over-the-counter market as opposed to direct purchases of Toshiba common stock. Nevertheless, the Exchange Act applies to Toshiba ADR transactions because Toshiba ADRs are "securities" under the Exchange Act and AIPTF's purchase of Toshiba ADRs on the over-the-counter market is a domestic "purchase or sale of . . . any security not" registered on a national securities exchange. 15 U.S.C. § 78j(b); *see Morrison*, 561 U.S. at 269–70.

### A. Toshiba ADRs are "Securities"

The Exchange Act of 1934 applies to "securities," defined to include "any note, stock, treasury stock, security future, . . . transferable share, investment contract, . . . any instrument commonly known as a 'security'; or any . . . receipt for . . .

any of the foregoing."  15 U.S.C. § 78c(a)(10); *Sec. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946) (describing the definition as encompassing "documents traded for speculation or investment").  This expansive list, along with the Exchange Act's remedial purpose, precludes "a narrow and literal reading of the definition of securities." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009); *see, e.g.*, *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (noting that Congress "painted with a broad brush" the "scope of the market that it wished to regulate" through federal securities laws); *Marine Bank v. Weaver*, 455 U.S. 551, 555–56 (1982) ("[T]he term 'security' was meant to include 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" (quoting H. R. Rep. No. 85 at 11 (1933))); *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality.").

Toshiba ADRs fit comfortably within the Exchange Act's definition of "security," specifically as "stock."  To constitute "stock" under the Exchange Act, an instrument must possess "some of the significant characteristics typically associated" with common stock: "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value."  *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985) (quotation omitted).

ADRs "allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to U.S. capital markets."  Sec. & Exch. Comm'n, Office of Inv'r

Education and Advocacy, "Investor Bulletin: American Depository Receipts" at 1 (August 2012) [hereinafter "ADR Bulletin"]; *see Waggoner v. Barclays PLC*, 875 F.3d 79, 84 n.3 (2d Cir. 2017). Specifically, ADRs are negotiable certificates issued by a United States depositary institution, typically banks, and they represent a beneficial interest in, but not legal title of, a specified number of shares of a non-United States company.[5] *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002). The depositary institution itself maintains custody over the foreign company's shares.[6] *Id.*; ADR Bulletin at 1. There are four depositary institutions for Toshiba ADRs: Bank of New York Mellon, Citibank N.A., Deutsche Bank Trust Company Americas, and Convergex Depositary, Inc.

---

[5] Technically, ADRs are receipts that evidence ownership of an "American Depository Share" or "ADS," which is the actual negotiable certificate. *See* In re Additional Form F-6 Eligibility Requirement, Securities Act Release No. 8287, Exchange Act Release No. 48482 [hereinafter "2003 SEC ADR Release"], 68 Fed. Reg. 54,644, 54,644 n.4 (Sept. 17, 2003). The parties, documents, and other opinions use both terms interchangeably, but for clarity we use only the acronym ADR in this opinion. In any event, if an ADS constitutes "stock" within the meaning of the Exchange Act, then the corresponding ADR is also a "security" within the Exchange Act because 15 U.S.C. § 78c(a)(10) includes receipts for stock.

[6] General background on ADRs can be found in *Pinker*; Bruce L. Hertz, *American Depository Receipts*, 600 P.L.I./Comm. 237 (1992); Adee et al., DR programmes, Bloomenthal and Wolff, 10C International Capital Markets & Securities Regulation § 49:58 (April 2018 Update); Amendola et al., American Depository Receipts, 69 American Jurisprudence 2d, Securities Regulation—Federal § 760 (May 2018 Update); and Adee et al., Depository receipt program, 3F Securities & Federal Corporate Law § 28:15 (2d ed. & March 2018 update).

Toshiba ADRs are registered with the Securities and Exchange Commission through the filing of Form F-6.[7] 17 C.F.R. § 239.36; ADR Bulletin at 2; *see City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655–56 & n.2 (6th Cir. 2005); *Bruns, Nordeman & Co. v. Am. Nat. Bank & Tr. Co.*, 394 F.2d 300, 304 n.4 (2d Cir. 1968) (stating that the Securities and Exchange Commission started requiring registration of ADRs in 1955). Toshiba ADRs are unsponsored, which means that the depositary institutions each filed Form F-6 without Toshiba's "formal participation" and possibly without its acquiescence. American Depository Receipts, Securities Act Release No. 33-6984, Exchange Act Release No. 34-29226, 56 Fed. Reg. 24,420, 24,422 (May 23, 1991) [hereinafter "1991 SEC ADR Release"]; 2003 SEC ADR Release at 54,645. Accordingly, when AIPTF purchased Toshiba ADRs, it was entering into "essentially a

---

[7] Form F-6 "relates only to the contractual terms of deposit under the deposit agreement. . . . [It] contains no information about the non-U.S. company." ADR Bulletin at 2; *see also* 2003 SEC ADR Release at 54,644–45; *Pinker*, 292 F.3d at 367. In Form F-6s for the Toshiba ADRs, the depositary institutions attested that they exercised "reasonable diligence" in forming a "reasonable, good-faith belief" that Toshiba ADRs were exempt from Securities and Exchange Commission registration pursuant to Rule 12g3-2(b), 17 C.F.R. § 240.12g3-2(b). Exemption from Registration under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers, Exchange Act Release No. 58465, 73 Fed. Reg. 52,752, 52,762 (Sept. 5, 2008) [hereinafter "2008 SEC ADR Rulemaking"] (to be codified at 17 C.F.R. pts. 239, 240, 249). Toshiba ADRs are automatically exempt, since (1) a foreign stock exchange is the primary trading market for Toshiba's common stock and (2) Toshiba electronically publishes in English "information that is material to an investment decision" in its securities, including annual reports, financial statements, and press releases. 17 C.F.R. § 240.12g3-2(b)(3)(i).

two-party contract" with the depositary institution.[8]  2003 SEC ADR Release at 54,645.  The contractual terms are specified in the ADR itself, to which ADR holders are "deemed to have agreed . . . by their acceptance and holding of ADRs."  *Batchelder v. Kawamoto*, 147 F.3d 915, 919 (9th Cir. 1998) (quoting 1991 SEC ADR Release).

Toshiba ADRs share many of the five significant characteristics typically associated with common stock.  *See Landreth Timber*, 471 U.S. at 686.  First, depositary institutions transfer the dividends they receive on deposited Toshiba common stock to the corresponding Toshiba ADR owner.[9]  Second, Toshiba ADRs are negotiable: they are traded through U.S. broker-dealers; collectively, the depositary institutions have registered 205 million Toshiba ADRs; Toshiba ADRs are owned "by hundreds of thousands of persons"; and Toshiba ADR holders may split or combine Toshiba ADRs into new instruments as they see fit.  *Pinker*, 292 F.3d at 367 ("ADRs are tradeable in the same manner as

---

[8] In contrast, ADRs are sponsored when a depositary institution and the foreign company jointly file Form F-6 to register the ADRs.  2003 SEC ADR Release at 54,645.  Accordingly, purchasers of sponsored ADRs enter into essentially a three-party contract with the depositary and the foreign company.  *Id.*  Sponsored ADRs are further subdivided into three levels, corresponding to where the ADRs are listed and whether the foreign company is using the ADRs to raise capital.  ADR Bulletin at 2; *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281, at *6 n.5 (N.D. Cal. Jan. 4, 2017); Burch and Foerster, Capital Markets Handbook § 5.19 (6th ed. 2018); Bloomenthal and Wolff, Securities and Federal Corporate Law § 28:15 (2d ed. & March 2018 update).  A sponsored ADR precludes another depositary's issuance of an unsponsored ADR.  *See* 1991 SEC ADR Release at 24,422–23.

[9] Each Toshiba ADR corresponds to six Toshiba common shares.

14    AUTO. INDUS. PENSION TRUST FUND V. TOSHIBA

any other registered American security."); *In re Hawaii Corp.*, 829 F.2d 813, 815 (9th Cir. 1987) (defining negotiability).  Third, nothing in the Toshiba ADRs restricts pledging or hypothecation.  Fourth, each of the four Toshiba ADR depositary institutions is willing to exercise the voting rights associated with the deposited Toshiba common stock as directed by the Toshiba ADR owners.  Fifth, Toshiba ADRs have the same "interest . . . in the management, profit and assets" of Toshiba as investors in Toshiba common stock, *Comm'r of Internal Revenue v. Scatena*, 85 F.2d 729, 732 (9th Cir. 1936), because ADR value is directly linked to the value of Toshiba common stock: Toshiba ADRs decreased in value "in tandem" with the decrease in Toshiba common stock price.[10]

More broadly, the economic reality of Toshiba ADRs is closely akin to stock.  *See Waggoner*, 875 F.3d at 85 n.3 (expert testifying that ADRs are the "rough . . . equivalent" of stock); *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 464 (2d Cir. 2010) (ADRs "share several of the same characteristics as ordinary shares."). They are designed to allow seamless investment in foreign

---

[10] The FAC alleges that Toshiba's actions "affect[ed] the price of Toshiba's ADRs in the same manner and to the same extent" as they affected the price of Toshiba common stock.  We note, however, that one Second Circuit case raised several reasons why that may not be the case. *See Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 469–71 (2d Cir. 2010) ("[T]he price at which an [ADR] is traded is not simply a function of the value of the foreign issuer's underlying security. 'The ADR trading price is also a function of,' *inter alia*, 'foreign currency exchange rates,' the risks of fluctuation in those rates, the administrative costs of establishing, maintaining, and operating the depositary, and 'inefficient market dissemination of news about the issuer of the deposited securities.'" (quoting 1991 SEC ADR Release at 24,424)).

companies akin to owning shares of U.S. companies—ADRs are denominated in U.S. dollars, cleared through U.S. settlement systems, and are listed alongside U.S. stocks. ADR Bulletin at 1; *Morrison*, 561 U.S. at 251. Prospective investors in Toshiba ADRs have electronic access to English translations of "information that is material to an investment decision" in Toshiba's common stock, including annual reports, financial statements, and press releases. 17 C.F.R. § 240.12g3-2(b)(3)(i). And Toshiba ADR owners can obtain legal ownership of Toshiba common stock in exchange for their ADRs at any time. *Reese v. Malone*, 747 F.3d 557, 563 n.1 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Accordingly, ADRs are consistently referred to and treated as securities by the parties, depositary institutions, the Securities and Exchange Commission, courts, and scholars. *See, e.g.*, *Bank of New York Mellon Corp. v. Comm'r of Internal Revenue*, 801 F.3d 104, 116 (2d Cir. 2015); *Reese*, 747 F.3d at 563 n.1 (analyzing Exchange Act claim based on purchase of ADRs); *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 684–85 (9th Cir. 2011) (same); *City of Monroe*, 399 F.3d at 655–56 (same); *Pinker*, 292 F.3d at 367; *Compaq Computer Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 277 F.3d 778, 779–80 (5th Cir. 2001); *IES Indus., Inc. v. United States*, 253 F.3d 350, 351 (8th Cir. 2001); 17 C.F.R. § 230.405 (defining "depository share" as "a security, evidenced by an American Depositary Receipt"); ADR Bulletin at 1; 2008 SEC ADR Rulemaking at 52,763; 2003 SEC ADR Release at 54,644 n.4 & 54,646 ("For the purposes of Securities Act registration, ADRs and the deposited securities are separate securities, requiring separate registration or exemption from Securities Act registration.");

1991 SEC ADR Release at 24,421 n.5; Nanda et al., American Depository Shares, 2 Litigation of International Disputes in U.S. Courts § 8:38 (April 2018 update); Dickerson et al., Open questions after *Morrison*—American Depository Receipts, Litigating International Torts in U.S. Courts § 7:7 (August 2017 update); Amendola et al., American Depository Receipt, 18 C.J.S. Corporations § 251 (March 2018 update); Lewkow, American depositary shares, Marans et al., 1 Manual of Foreign Investment in the U.S. § 6:26 (3d ed. & December 2013 update); *see also United States v. Martoma*, No. 12 CR 973 PGG, 2013 WL 6632676, at *3 n.1 (S.D.N.Y. Dec. 17, 2013) (collecting post-*Morrison* securities fraud actions that proceeded based on ADRs).[11]

## B.   The Exchange Act

The Exchange Act of 1934 "anchor[s] federal regulation of vital elements of our economy." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006) ("The

---

[11] Toshiba characterizes *Securities and Exchange Commission v. Ficeto*, 839 F. Supp. 2d 1101, 1115 (C.D. Cal. 2011) as concluding that ADRs "fall entirely outside" of the Exchange Act because "they are 'merely placeholders for the ordinary shares traded on foreign exchanges.'"  But in that passage from *Ficeto*, the district court is summarizing the holdings of two cases, one of which is questionable and the other of which is directly contrary.  The first case, *In re Société Générale Sec. Litig.*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010), has been criticized as incorrect and contrary to *Morrison*.  *See Martoma*, 2013 WL 6632676, at *4 & n.3 (noting *In re Société Générale*'s reliance on pre-*Morrison* authority); *Wu v. Stomber*, 883 F. Supp. 2d 233, 253 (D.D.C. 2012), *aff'd*, 750 F.3d 944 (D.C. Cir. 2014).  The second, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016), explicitly refers to ADRs as a separate security.  *Id.* at 521 n.2.

magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."). Exchange Act Section 10(b) makes it "unlawful for any person, directly or indirectly . . . [t]o use or employ . . . any manipulative or deceptive device or contrivance in contravention" of Securities and Exchange Commission rules and regulations "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). As a "'catchall' clause" enabling the Securities and Exchange Commission "to deal with new manipulative (or cunning) devices," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 (1976) (quotation omitted), Section 10(b) is an essential component of the regulatory scheme.

In 1942, the Securities and Exchange Commission promulgated Rule 10b-5 to implement Section 10(b). Sec. & Exch. Comm'n Release Notice, Release No. 3230, 1942 WL 34443 (May 21, 1942). Rule 10b-5 makes it unlawful for

any person, directly or indirectly, . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b); *see Dabit*, 547 U.S. at 78; *Sec. & Exch. Comm'n v. Clark*, 915 F.2d 439, 448, 450 (9th Cir. 1990) (stating that Rule 10b-5 has become "the centerpiece of federal securities regulation"). Notably, Section 10(b) and Rule 10b-5 repeatedly use the qualifier "any," and therefore "are obviously meant to be inclusive." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972); *see also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 312 (1985) (Section 10(b) and Rule 10b-5 have "broad reach.").

Section 10(b) and Rule 10b-5 "may well be the most litigated provisions in the federal securities laws." *Sec. & Exch. Comm'n v. Nat'l Sec., Inc.*, 393 U.S. 453, 465 (1969). However, it was not until 2010 that the Court first addressed whether Section 10(b) and Rule 10b-5 apply extraterritorially. *Morrison*, 561 U.S. at 265.

In *Morrison*, three Australian individuals sought to bring Exchange Act securities fraud claims in the Southern District of New York against National Australia Bank Limited ("Australia Bank"), then the largest bank in Australia. *Id.* at 251–53. One of Australia Bank's subsidiaries, headquartered in Florida, and its executives had allegedly engaged in deceptive conduct and publically made misleading statements, which were repeated in Australia Bank's annual

reports and other public documents.  *Id.* at 251–52.  While
Australia Bank ADRs were listed on the New York Stock
Exchange, the Australians had purchased Australia Bank's
ordinary shares, which were "traded on the Australian Stock
Exchange and other foreign securities exchanges, but not on
any exchange in the United States," and they sought to
represent a class of foreign purchasers of Australia Bank's
ordinary shares.  *Id.* at 251, 253.

Analyzing the text of Section 10(b), the Court found "no
affirmative indication" that it applied extraterritorially.  *Id.* at
265; *see also id.* at 262 ("On its face, § 10(b) contains nothing
to suggest it applies abroad.").  Unless Congress "clearly
expressed" its "affirmative intention" of extraterritorial effect
"we must presume it is primarily concerned with domestic
conditions."  *Id.* at 255 (quotation omitted).  Therefore, the
Court held that Section 10(b) does not apply extraterritorially.
*Id.* at 265.

To define what constitutes the permissible, non-
extraterritorial application of Section 10(b) and Rule 10b-5,
the Court articulated a transactional test rooted in the text of
Section 10(b).  *Id.* at 266–70 & 267 n.9; *see also id.* at
261–62 ("Rule 10b-5 . . . was promulgated under § 10(b), and
does not extend beyond conduct encompassed by § 10(b)'s
prohibition." (quotation omitted)).  Section 10(b) focuses "not
upon the place where . . . deception originated, but upon
purchases and sales of securities in the United States."  *Id.* at
266.  In other words, "Section 10(b) does not punish
deceptive conduct, but only deceptive conduct 'in connection
with the purchase or sale of any security registered on a
national securities exchange or any security not so
registered.'"  *Id.* (quoting Section 10(b), 15 U.S.C. § 78j(b));
*see also id.* at 272 ("Not deception alone, but deception with

20    AUTO. INDUS. PENSION TRUST FUND V. TOSHIBA

respect to certain purchases or sales is necessary for a violation of the statute.").

The Court drew a line delineating categories of transactions Congress sought to regulate and parties whom Congress sought to protect: in its view, Section 10(b) applies to "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 267. The transactional test the *Morrison* Court adopted—whether the purchase or sale (1) involves a security listed on a domestic exchange or (2) takes place in the United States—avoided "the interference with foreign securities regulation" that application of the Exchange Act to foreign transactions would produce. *Id.* at 269.

Thus, the Court squarely held that the Exchange Act did not apply where Australia Bank's shares were not listed on a United States exchange and "all aspects of the purchases" took place outside the United States, even though a subsidiary of Australia Bank and its executives "engaged in the deceptive conduct" in the United States. *Id.* at 252–53, 273. Deceptive domestic conduct or the presence of other, non-transactional domestic activity cannot substitute for *Morrison*'s requirement of a security's presence on a domestic exchange or of a security's domestic transaction. As the Court reasoned, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* at 266.

1.  *"Registered on a National Securities Exchange"*

The Court derived its first category of transactions to which Section 10(b) applies from Section 10(b)'s language: "any security registered on a national securities exchange." 15 U.S.C. § 78j(b); *see Morrison*, 561 U.S. at 268 n.10 (stating that the second category arises from the other half of Section 10(b), "any security not so registered"). But when articulating the rule, the *Morrison* Court repeatedly describes the regulated category as "securities listed on *domestic* exchanges."[12] *Morrison*, 561 U.S. at 267 (emphasis added); *see id.* at 268, 270 (same); *id.* at 273 ("security listed on an American stock exchange" and "securities listed on a domestic exchange").

Facially, the terms are distinct: "national security exchange" is a term of art referring to a *subset* of "exchanges" that are registered with the Securities and Exchange Commission and that abide by the requirements set out in 15 U.S.C. § 78f and its regulations. Twenty one exchanges are currently so registered, and two are exempt based on a limited volume of transactions.[13] No over-the-counter market is a "national security exchange," and the Funds do not argue otherwise.

---

[12] Under *Morrison* and in today's common parlance, the terms "registered" and "listed" are essentially equivalent. *See In re Vivendi*, 765 F. Supp. 2d at 528 n.13.

[13] The Securities and Exchange Commission maintains a website listing national securities exchanges. Sec. & Exch. Comm'n, *Fast Answers: National Securities Exchanges*, https://tinyurl.com/ycox23jn (last modified Nov. 1, 2017). As of briefing in this appeal, eighteen national securities exchanges were so registered.

Toshiba urges us to eliminate any discrepancy by reading the term "domestic exchange" as used in *Morrison* as the equivalent of "national securities exchange." But Toshiba incorrectly characterizes *Morrison*'s discussion of "domestic exchange" as mere shorthand for what Toshiba believes the Court must have meant to write—national securities exchange. The Court uses the term "domestic exchange" interchangeably both when defining the first category of transactions to which Section 10(b) applies and throughout the remainder of the opinion. And there is little wonder that the Court did so: the entire focus of the *Morrison* opinion is the "longstanding principle" that Congressional legislation, including Section 10(b), is meant to apply only within the territorial jurisdiction of the United States, and its announcement of the "transactional test" to separate domestic from foreign purchases and sales.[14] *Morrison*, 561 U.S. at 255, 269.

We need not and do not resolve this argument, although from our reading the Funds have the better of it. The over-the-counter market on which Toshiba ADRs trade is simply not an "exchange" under the Exchange Act.

---

[14] Toshiba relies on the Third Circuit's decision in *United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015). But rather than analyzing Section 10(b) or the text of *Morrison*, *Georgiou* cites *Morrison*'s concluding summation paragraph, which used "American stock exchange," and simply treats that term as "national security exchanges." *Id.* at 134 (quoting *Morrison*, 561 U.S. at 273).

The Exchange Act defines "exchange" as

> any organization, association, or group of
> persons, whether incorporated or
> unincorporated, which constitutes, maintains,
> or provides a market place or facilities for
> bringing together purchasers and sellers of
> securities or for otherwise performing with
> respect to securities the functions commonly
> performed by a stock exchange as that term is
> generally understood, and includes the market
> place and the market facilities maintained by
> such exchange.

15 U.S.C. § 78c(a)(1).  The Securities and Exchange
Commission's implementing regulation sets forth two
requirements—the organization, association, or group of
persons must (1) bring "together the orders for securities of
multiple buyers and sellers" and (2) use "established, non-
discretionary methods . . . under which such orders interact
with each other, and the buyers and sellers entering such
orders agree to the terms of the trade."  17 C.F.R. § 240.3b-
16(a)(1)–(2).

24     AUTO. INDUS. PENSION TRUST FUND V. TOSHIBA

Toshiba ADRs trade on OTC Link,[15] an over-the-counter market operated by OTC Markets Group.[16]  Since May 2012, OTC Link has registered with the Securities and Exchange Commission as a "broker-dealer" alternative trading system.[17]

---

[15] Formerly called OTC Pink, OTC Link is a "electronic inter-dealer quotation system that displays quotes from broker-dealers. . . . OTC Link does not require companies whose securities are quotes on its systems to meet any listing requirements."  Sec. & Exch. Comm'n, *Fast Answers: OTC Link LLC*, https://tinyurl.com/yaas8nr9 (last modified May 9, 2013); *see Sec. & Exch. Comm. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1251 (9th Cir. 2013); *Sec. & Exch. Comm. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1081 (9th Cir. 2010).  The Funds allege that OTC Link is a "highly efficient and automated market" and that Toshiba ADRs are owned "by hundreds of thousands of persons."  OTC Link contrasts with two other OTC markets, OTCQX and OTCQB, which both have additional listing and disclosure requirements.  *See* OTC Markets Group, *Reporting Standards*, https://tinyurl.com/y773bmlc (last visited July 9, 2018); OTC Markets Group, *Information for Pink Companies*, https://tinyurl.com/y98g2q3j (last visited July 9, 2018).

[16] The FAC does not specify on which OTC market Toshiba ADRs trade, but we sua sponte take judicial notice of the materials submitted with the Funds' appellate briefing.  *See* Fed. R. Evid. 201.

[17] The Securities and Exchange Commission maintains a website containing lists of alternative trading systems.  The lists have been posted monthly since August 2014 and were posted approximately every four months between January 2009 and August 2014.  Sec. & Exch. Comm'n, *Alternative Trading System ("ATS") List*, https://tinyurl.com/p3k5l44 (last modified June 30, 2018).  We take judicial notice of the Securities and Exchange Commission's list of registered alternative trading systems.  *See, e.g.*, *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 978 n.2 (9th Cir. 2007) (taking judicial notice of government-published documents).  In addition, OTC Markets Group's website describes OTC Link as an "SEC regulated" and "SEC-registered" alternative trading system.  *See* OTC Markets Group, *Our Company*, https://tinyurl.com/yavh7396 (last visited July 9, 2018); OTC Markets Group, *How To Get Traded*, https://tinyurl.com/yangt6cj (last visited July 9, 2018).

As an alternative trading system, OTC Link is separately regulated by the Securities and Exchange Commission and is specifically exempt from the Exchange Act's definition of "exchange." *See* 15 U.S.C. § 78mm(a)(1);[18] 17 C.F.R. §§ 242.300–303 ("Regulation ATS") (regulations that apply to alternative trading systems); 17 C.F.R. § 240.3a1-1(a)(2) (exempting entities in compliance with Regulation ATS from 15 U.S.C. § 78c(a)(1)'s definition of "exchange"); Regulation of Exchanges and Alternative Trading Systems, 63 Fed. Reg. 70,844 (Dec. 22, 1998). The Securities and Exchange Commission's regulation is a reasonable exercise of the express delegation of authority in 15 U.S.C. § 78mm to the Securities and Exchange Commission, so we give controlling weight to the Securities and Exchange Commission's categorization of OTC Link as not an "exchange" within the meaning of the Exchange Act. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (regulations promulgated pursuant to express Congressional delegations of authority "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute"); *Sharemaster v. Sec. & Exch. Comm'n*, 847 F.3d 1059, 1066 n.5 (9th Cir. 2017) (holding that "Congress vested the Commission with general authority to administer the Exchange Act," thereby meeting the preconditions for *Chevron* deference).

---

[18] 15 U.S.C. § 78mm(a)(1) authorizes the Securities and Exchange Commission to, "notwithstanding any other provision of this chapter, . . . conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this chapter or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors" by "rule, regulation, or order."

The Funds present the Exchange Act's definition of "exchange" but do not respond to Toshiba's argument that OTC Link is an alternative trading system, not an exchange. Instead, they urge us to follow *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), in which the Second Circuit noted that in *Ficeto* the Securities and Exchange Commission "successfully argued that the first prong of *Morrison* is satisfied because the case involves securities traded on the over-the-counter securities market, not securities sold on foreign exchanges." *Id.* at 66 n.3 (citing *Ficeto*, 839 F. Supp. 2d at 1112). As *Absolute Activist* expressly took no position on whether *Morrison*'s first category included over-the-counter markets, the Funds are actually asking us to adopt *Ficeto*. *See id.* at 66 ("The case at hand does not concern the first prong of *Morrison*."). But *Ficeto*'s analysis failed to consider whether over-the-counter market trades fell within *Morrison*'s second category of regulated transactions, and incorrectly assumed that over-the-counter market trades must be regulated, if at all, only if they come within *Morrison*'s first category.

The Funds also urge us to follow the Eleventh Circuit's decision in *United States v. Isaacson*, 752 F.3d 1291 (11th Cir. 2014), which they argue had "no trouble" holding that over-the-counter markets such as OTC Link are "exchanges." But *Isaacson*'s brief discussion of *Morrison* actually had "no trouble" concluding that the criminal conduct at issue satisfied *Morrison*'s requirement of a U.S. nexus. *Isaacson*, 752 F.3d at 1299. *Isaacson* mentioned expert testimony explaining that over-the-counter "exchanges were 'similar to'" the New York Stock Exchange and NASDAQ, but did not state that such evidence *established* that they were domestic exchanges under *Morrison*. Instead, after citing evidence supporting the inference that the securities at issue

were purchased in the United States, *Isaacson* concluded that *Morrison*'s requirements were satisfied. *Isaacson*, 752 F.3d at 1299. As discussed below, we agree with *Isaacson* and the Funds that the Exchange Act regulates over-the-counter markets, but nothing in *Isaacson* convinces us that OTC Link is an "exchange" under the Exchange Act.

2.  *"Or any Security not so Regulated"*

The Court's second category of transactions reached by Section 10(b) is "domestic transactions in other securities," derived from Section 10(b)'s text, "any security not so registered." *Morrison*, 561 U.S. at 268 & n.10 (quoting 15 U.S.C. § 78j(b)); *see also id.* at 273 (defining category as "the purchase or sale of any other security in the United States"). *Morrison* did not describe the contours of this category at length, but did say that it exclusively focuses on "*domestic* purchases and sales." *Id.* at 268; *see id.* at 273 (holding this category inapplicable to the transactions at hand because "all aspects of the purchases complained of . . . occurred outside the United States").

Cases since *Morrison* have articulated an "irrevocable liability" test to determine when a securities transaction is domestic. The test originated in the Second Circuit's decision in *Absolute Activist*, which held that "a securities transaction occurs when the parties incur irrevocable liability." *Absolute Activist*, 677 F.3d at 67. Because irrevocable liability determines the timing of a transaction, it also determines the location: a plaintiff must plausibly allege "that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68. The Second Circuit also found an alternative means of

alleging a domestic transaction: alleging that title to the shares was transferred within the U.S.  *Id.* (citing *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310–11 (11th Cir. 2011) (reversing dismissal under *Morrison* when the complaint alleged domestic transfer of title)).  The Second Circuit detailed factual allegations in a complaint that could sufficiently allege a domestic transaction: "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70.  The irrevocable liability test has been adopted by the Third Circuit.[19]  *See Georgiou*, 777 F.3d at 137.

We recently indicated approval of the irrevocable liability test in *Securities and Exchange Commission v. World Capital Market, Inc.*, 864 F.3d 996 (9th Cir. 2017).  There, we cited *Absolute Activist* and the irrevocable liability rule as support for holding that, where "the undisputed evidence . . . shows that far more than $5 million in investor transactions took place in the United States," the district court properly rejected the argument that application of the Exchange Act was

---

[19] The Second Circuit has repeatedly reaffirmed the irrevocable liability test.  *See, e.g.*, *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 66 (2d Cir. 2018); *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017); *In re Vivendi*, 838 F.3d at 265; *United States v. Mandell*, 752 F.3d 544, 548 (2d Cir. 2014).  The test has also been adopted by numerous district courts in our circuit.  *See, e.g.*, *In re Volkswagen*, 2017 WL 66281, at *4 & n.3; *Sec. & Exch. Comm'n v. Yin Nan Michael Wang*, No. LACV1307553JAKSSX, 2015 WL 12656906, at *10–11 (C.D. Cal. Aug. 18, 2015); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, No. CV09CV02487DMGPLAX, 2013 WL 12203024, at *6 (C.D. Cal. Apr. 4, 2013); *MVP Asset Mgmt. (USA) LLC v. Vestbirk*, No. 2:10-CV-02483-GEB, 2013 WL 1726359, at *3–7 (E.D. Cal. Mar. 22, 2013); *Sec. & Exch. Comm'n v. Geranio*, No. CV 12-04257 DMG, 2013 WL 12146516, at *4 (C.D. Cal. Jan. 29, 2013).

impermissibly extraterritorial. *Id.* at 1008. While we avoided explicitly adopting the test, we deemed *Absolute Activist* "instructive." *Id.* at 1008 n.11 ("We have yet to address what constitutes a domestic transaction under *Morrison*."). Consistent with *World Capital Market* and the irrevocable liability test, in *Securities and Exchange Commission v. Levine*, 462 F. App'x 717 (9th Cir. 2011), we held that the Securities Act governed particular transactions "because the actual sales closed in Nevada when [the individual] received complete stock purchase agreements and payments." *Id.* at 719 (citing *Morrison*); *see Morrison*, 561 U.S. at 268–69 (indicating that the Exchange Act extraterritoriality analysis applies to the Securities Act). And in *Securities and Exchange Commission v. Fujinaga*, 696 F. App'x 203 (9th Cir. 2017), we held that the Exchange Act applied because the "sales of securities were 'made' in the United States." *Id.* at 206 (citing *Morrison*, 561 U.S. at 269–70). We elaborated that "to complete an investment, investors' funds were wired to [a] United States bank account, their paperwork was forwarded to [an] office in Nevada," which "issued the Certificate of Investment." *Id.*

We are persuaded by the Second and Third Circuits' analysis and therefore adopt the irrevocable liability test to determine whether the securities were the subject of a domestic transaction. Looking to where purchasers incurred the liability to take and pay for securities, and where sellers incurred the liability to deliver securities, *Absolute Activist*, 677 F.3d at 68, hews to Section 10(b)'s focus on transactions and *Morrison*'s instruction that purchases and sales constitute transactions, *Morrison*, 561 U.S. at 267–68. Furthermore, factual allegations concerning contract formation, placement of purchase orders, passing of title, and the exchange of

money are directly related to the consummation of a securities transaction. *See Absolute Activist*, 677 F.3d at 70.

As Toshiba acknowledges, the FAC alleges that AIPTF's Toshiba ADRs were purchased in the United States. The FAC also alleges that Bank of New York, one of the depositary institutions, sold Toshiba ADRs in the United States. Missing from the FAC, however, are specific factual allegations regarding where the parties to the transaction incurred irrevocable liability. *Cf. In re Petrobras Sec.*, 862 F.3d at 263, 273 (identifying the relevant facts as including who sold the relevant securities and how those transactions were effectuated, as evidenced by documentation such as confirmation slips). But AIPTF is a United States entity; its executives direct, control, and coordinate its activities in the United States; and its headquarters are in Alameda, California. OTC Markets Group operates OTC Link in the United States. And the four Toshiba ADR depositary institutions' principal executive offices, agents for service, and offices where ADR holders can exchange their ADRs for Toshiba common shares are all in New York. Accordingly, an amended complaint could almost certainly allege sufficient facts to establish that AIPTF purchased its Toshiba ADRs in a domestic transaction.[20] *See Morrison*, 251 U.S. at 273 & 251 n.1 (indicating that at least some aspects of an ADR transaction for an ADR listed on the New York Stock Exchange occur in the United States).

---

[20] The FAC defines the ADR class as "all persons who acquired Toshiba" ADRs, regardless of the location of irrevocable liability. Any class definition in an amended complaint, however, should comport with *Morrison* and the irrevocable liability test.

Rather than challenging whether the transactions were domestic, Toshiba argues that the existence of a domestic transaction is necessary but not sufficient under *Morrison*, relying on the Second Circuit case *Parkcentral Global Hub v. Porsche Automobile Holdings*, 763 F.3d 198 (2d Cir. 2014).  Specifically, Toshiba argues that because the Funds did not allege any connection between Toshiba and the Toshiba ADR transactions, *Morrison* precludes the Funds' Exchange Act claims.  But this turns *Morrison* and Section 10(b) on their heads: because we are to examine the location of the transaction, it does not matter that a foreign entity was not engaged in the transaction.  For the Exchange Act to *apply*, there must be a domestic transaction; that Toshiba may ultimately be found not liable for causing the loss in value to the ADRs does not mean that the Act is inapplicable to the transactions.

*Parkcentral* is distinguishable on many grounds.[21]  First, *Parkcentral* did not involve ADRs but instead involved "securities-based swap agreements."  *Parkcentral*, 763 F.3d at 205.  Unlike ADRs, those entirely private agreements do not constitute investments in the company on whose securities they are based nor do they confer any ownership interest in those reference securities.  *Id.* at 205–07.  Furthermore, the swap agreements' value is wholly unconstrained by the amount of reference security available and is not directly pegged to the value of the reference security.  *Id.* at 205–07 & 206 n.8.  Second, the private swap agreements are not traded on Securities and Exchange

---

[21] *Parkcentral* explicitly cautioned against extending its rule, instructing that its analysis should not be "perfunctorily applied to other cases based on the perceived similarity of a few facts."  *Parkcentral*, 763 F.3d at 217.

Commission-regulated platforms, systems, or exchanges. *Id.* at 207.   Third, the reference securities in the company at issue, Volkswagen, were traded entirely on foreign exchanges, implicating concerns that incompatible U.S. and foreign law would almost certainly regulate the same security. *Id.* at 207, 215–17.  Fourth, there was no allegation that Volkswagen knew about or facilitated the swap agreements. *Id.* at 207, 215.

But the principal reason that we should not follow the *Parkcentral* decision is because it is contrary to Section 10(b) and *Morrison* itself.  It carves-out "predominantly foreign" securities fraud claims from Section 10(b)'s ambit, *id.* at 216, disregarding Section 10(b)'s text: the domestic "purchase or sale of *any* security registered on a national securities exchange or *any* security not so registered," 15 U.S.C. § 78j(b) (emphases added).  The basis for the carve-out was speculation about Congressional intent, *Parkcentral*, 763 F.3d at 215, an inquiry *Morrison* rebukes, *Morrison*, 561 U.S. at 256.  *Parkcentral*'s test for whether a claim is foreign is an open-ended, under-defined multi-factor test, *Parkcentral*, 763 F.3d at 217, akin to the vague and unpredictable tests that *Morrison* criticized and endeavored to replace with a "clear," administrable rule, *Morrison*, 561 U.S. at 257–59, 269–70.  And *Parkcentral*'s analysis relies heavily on the foreign location of the allegedly deceptive conduct, *Parkcentral*, 763 F.3d at 215–16, which *Morrison* held to be irrelevant to the Exchange Act's applicability, given Section 10(b)'s exclusive focus on transactions, *Morrison*, 561 U.S. at 266–68.[22]

---

[22] Notably, no Second Circuit case, nor any other Circuit, has applied *Parkcentral*'s rule.   *See Myun-Uk Choi*, 890 F.3d at 66–67 (citing *Absolute Activist*, not *Parkcentral*, for *Morrison*'s second category); *In re*

*C.  The Sufficiency of the Funds' Exchange Act Allegations*

Toshiba argues forcefully that applying the Exchange Act to these unsponsored ADRs would undermine *Morrison*'s animating comity concerns.  Nevertheless, that is not a basis for declining to follow the Court's clear instructions in *Morrison*.  And it may very well be that the *Morrison* test in some cases will result in the Exchange Act's application to claims of manipulation of share value from afar.

Toshiba's argument, however, is directly relevant to whether the Funds have sufficiently alleged an Exchange Act claim.[23]  *Morrison* delineates the transactions to which the Exchange Act can theoretically apply without being impermissibly extraterritorial, but while applicability is necessary, it is not sufficient to state an Exchange Act claim.

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, *in connection with* the purchase or sale" of a security "any manipulative or deceptive device or contrivance."   15 U.S.C.  § 78j(b) (emphasis added).  Accordingly, there must be "a connection between the misrepresentation or omission and the purchase or sale of a security."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  We have held that for fraud to be "in connection with the purchase or sale of any security," it must "touch" the sale—i.e., it must be done to induce the purchase at issue. *Arrington v. Merrill Lynch, Pierce, Fenner*

----

*Petrobras*, 862 F.3d at 261–62 (same); *In re Vivendi*, 838 F.3d at 265 (same).

[23] Toshiba did not challenge personal jurisdiction before the district court and expressly disclaimed any such argument on appeal.

*& Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981) (citing *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12–13 (1971)); *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999) (The fraud "must have more than some tangential relation to the securities transaction."). Even though "in connection with" "should be construed not technically and restrictively, but flexibly to effectuate [the Exchange Act's] remedial purposes," *Chadbourne*, 134 S. Ct. at 1069 (quotation omitted), the FAC falls short, *Ambassador Hotel*, 189 F.3d at 1026 ("The court should consider whether the plaintiff has shown some causal connection between the fraud and *the securities transaction in question*. Deception related to the value or merit *of the securities in question* has sufficient connection to securities transactions to bring the fraud within the scope of § 10(b)." (emphases added) (citations omitted)); *see generally Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871–72 (9th Cir. 2010).

First and foremost, sufficiently pleading Toshiba's connection to the ADR transactions requires clearly setting forth the transactions. However, the FAC omits basic details about ADRs. It also fails to include factual allegations regarding the over-the-counter market on which Toshiba ADRs are listed, whether Toshiba ADRs are sponsored, the depositary institutions that offer Toshiba ADRs, the Form F-6's they used to register the Toshiba ADRs, the trading volume of Toshiba ADRs, and the Toshiba ADRs' contractual terms (along with relevant variants between depositary institutions). And it lacks detail regarding AIPTF's purchase of the Toshiba ADRs, including how the purchase was made and which particular depositary institution holds the corresponding Toshiba common stock. Instead, the FAC erroneously ignores the distinction between

ADRs and common stock, alleging simply that AIPTF "acquired Toshiba common stock during the Class Period through the purchase on March 23, 2015 of 36,000 shares of [Toshiba ADRs] in the United States," that OTC Link is a "highly efficient and automated market," and that "shares of Toshiba common stock and [ADRs] are owned by hundreds of thousands of persons."

Second, before the district court and on appeal, the Funds argued that "it is likely that Toshiba was indeed involved in the establishment" of the ADRs. In support, the Funds rely on (1) a letter sent by Deutsche Bank (one of the Toshiba ADR depositary institutions) to the Securities and Exchange Commission during ADR rulemaking in 2008 stating that "in practice, depositary banks typically obtain the issuer's consent before establishing an unsponsored ADR facility," 2008 SEC ADR Rulemaking at 52,762 n.113; (2) a Paul, Weiss memorandum about the 2008 rulemaking which states that depositary issuers of unsponsored ADRs "typically request[] a letter of non-objection" from the foreign company; and (3) the fact that Toshiba made it possible for depositary institutions to issue unsponsored Toshiba ADRs by meeting the requirements in 17 C.F.R. § 240.12g3-2(b), including posting its annual report in English on its website and by not establishing a sponsored ADR (which would preclude unsponsored ADRs), *see* 1991 SEC ADR Release at 24,422–23. However, none of these facts is alleged in the FAC.[24]

---

[24] We disagree with the Funds to the extent they argue that Toshiba's exemption under Rule 12g3-2(b), and specifically its maintenance of an English website with English translations of relevant documents and conference calls, without more, is sufficient to connect Toshiba to the Toshiba ADR transactions. The FAC does not allege that Toshiba

36     AUTO. INDUS. PENSION TRUST FUND V. TOSHIBA

Third and finally, the FAC alleges that Bank of New York Mellon is one of Toshiba's largest ten shareholders and that during the Class Period institutional investors in the United States owned "at least 485 million shares of Toshiba common stock, representing more than 11% of the Company's outstanding shares." Absent from the FAC, however, is the Funds' assertion at oral argument that Bank of New York Mellon is unlikely to have acquired over fifty million Toshiba shares without Toshiba's involvement. Oral Arg. at 27:36–28:30 (Nov. 9, 2017), https://tinyurl.com/ydfsrvyw.

## IV.  CONCLUSION

The district court misapplied *Morrison*. And, without significant analysis, it concluded that leave to amend would be futile. It therefore dismissed the Funds' case with prejudice. For the reasons discussed above, we believe the FAC does not sufficiently allege a domestic violation of the Exchange Act, but that allowing leave to amend would not be futile. Therefore, we reverse and remand to allow the Funds to amend their complaint. *See Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1028 (9th Cir. 2014).[25]

### REVERSED; REMANDED.

---

provided English materials to support unsponsored ADRs, and Rule 23g3-2(b) exemption is automatic. 2008 SEC ADR Rulemaking at 52,767. And as Toshiba points out, there are many plausible reasons for a company to provide English materials, precluding the inference that Toshiba's actions were to support unsponsored ADRs.

[25] The district court predicated dismissal of the Funds' JFIEA claim on dismissal of the Exchange Act claims. We decline to address in the first instance whether dismissal of the JFIEA claim remains appropriate notwithstanding the Exchange Act claims' viability.