

**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARK STOYAS, NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND, and AUTOMOTIVE INDUSTRIES PENSION TRUST FUND, individually and on behalf of all others similarly situated, a Japanese Corporation

Plaintiffs,

v.

TOSHIBA CORPORATION, a Japanese Corporation,

Defendants.

Case No. 2:15-cv-04194 DDP-JC

**AMENDED ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

[Dkt. 108]

Presently before the court is Plaintiffs' Motion for Class Certification. (Dkt. 108.) Having considered the parties' submissions and heard oral argument, the court DENIES the Motion and adopts the following Order.

///

**I. BACKGROUND**

As described in the court's prior Order, (Dkt. 88.), named Plaintiffs Automotive Industries Pension Trust Fund ("AIPTF") and New England Teamsters & Trucking Industry Pension Fund ("NETTPF") are pension funds formed for the benefit of auto industry and trucking workers. (Dkt. 75, Second Amended Complaint ("SAC") ¶¶ 20, 23.) Toshiba Corporation ("Defendant") is a "worldwide enterprise that engages in the research development, manufacture, construction, and sale of a wide variety of electronic and energy products and services," headquartered in Tokyo, Japan. (*Id.* ¶ 25.) On June 4, 2016, Plaintiffs filed a putative securities class action against Defendant, (Dkt. 1), alleging violations of the U.S. Securities Exchange Act of 1934 ("Exchange Act") and the Financial Instruments & Exchange Act of Japan ("JFIEA") in connection with allegations of accounting fraud and misrepresentations.

Plaintiffs allege that on March 23, 2015, AIPTF purchased 36,000 shares of unsponsored Toshiba American Depositary Receipts ("ADRs")[1] "through transactions on the OTC Market[2] in the United States . . . thereby acquiring an ownership interest in

---

[1] As relevant in this action, Plaintiffs' Exchange Act claims concern the purchase of unsponsored ADRs. In contrast to sponsored ADRs, where a foreign company enters into an agreement with a U.S. Depositary bank to sell its shares in U.S. markets, unsponsored ADRs are implemented by a depositary bank without the cooperation of the issuing foreign company. *See* Sec. & Exch. Comm'n, Office of Inv'r Education and Advocacy, "Investor Bulletin: American Depositary Receipts" at 1-2. As such, because unsponsored ADRs are not sanctioned by the issuing company, broker-dealers typically initiate unsponsored ADRs when they wish to establish a domestic trading market for securities not ordinarily sold in the United States.

[2] The "over-the-counter" ("OTC") market refers to the mechanism by which securities are traded via a broker-dealer network as opposed to on a centralized exchange. Whereas sponsored ADRs trade on either a national stock exchange or on the OTC market, unsponsored ADRs only trade on the OTC market. Sec. & Exch. Comm'n, Office of Inv'r Education and Advocacy, "Investor Bulletin: American Depositary Receipts" at 2.

216,000 shares of common stock issued and authorized for sale by Toshiba." (SAC ¶ 20, 56.) Plaintiff further asserts that between April 1, 2015 and October 27, 2015, NETTIPF purchased 343,000 shares of Toshiba's common stock. (*See* Dkt. 34, Ex. B.) According to Plaintiffs, both AIPTF and NETTIPF "utilized the services of professional investment managers to direct the purchase and sale of Toshiba securities on [their] behalf." (Dkt. 109, Mot. at 5.)

In their motion for class certification, Plaintiffs indicate that AIPTF accessed the OTC market through AIPTF's investment manager, ClearBridge Advisors LLC ("ClearBridge"). (*Id.*) On March 20, 2015, Clearbridge placed a buy order for unsponsored ADRs in New York, through its broker, Barclays Capital LE ("Barclays"), also located in New York. (SAC ¶ 22 (a)-(b); *see also* Dkt. 114-8.) Barclays thereafter "purchased [the ADRs] for AITPF on the OTC Market using the OTC Link trading platform." (SAC ¶ 22(c).) On March 26, 2015, AIPTF paid for the ADRs by transferring $922,057.20 to Barclays from its custodian bank in New York. (Dkt. 128-3, Collier Deposition ("Depo.") at 28:19-30:3.)

Plaintiffs now bring a motion to certify a class of securities purchasers under Federal Rule of Civil Procedure 23(b)(3), defined as:

> All persons who purchased securities listed under the ticker symbols TOSYY or TOSBF [between May 8, 2012 and November 12, 2015] using the facilities of the OTC Market ("American Securities Purchasers"); and
> All citizens and residents of the United States who purchased shares of Toshiba 6502 common stock [between May 8, 2012 and November 12, 2015] ("6502 Purchasers").[3]

---

[3] "Excluded from the [c]lass are defendant Toshiba, all subsidiaries, business units, and consolidated entities of Toshiba, and any person who was an officer or director of Toshiba or any of its subsidiaries, business units, or consolidated entities at any time from 2008 to 2019 (collectively, 'Excluded Person(s)'). Also excluded from the [c]lass are the members of the immediate families of any Excluded Person, as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)." (Dkt. 108, Mot. at 1.

(Dkt. 108, Mot. at 1.) AIPTF and NETTPF bring JFIEA claims on behalf of all proposed class members. AIPTF also brings claims under the Exchange Act on behalf of the American Securities Purchasers.

**II. LEGAL STANDARD**

The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met. *See Hanon v. Dataprods. Corp.*, 976 F.2d 508-09 (9th Cir. 1992). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over individual questions . . ., and that class action is superior over individual questions . . . for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). Rule 23(a) sets forth four prerequisites for class certification:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Hanon*, 976 F.2d at 508. These requirements are often referred to as numerosity, commonality, typicality, and adequacy. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982).

In determining the propriety of a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). This Court, therefore, considers the merits of the underlying claim to the extent that the merits overlap with the Rule 23(a) requirements, but will not conduct a "mini-trial" or determine at this stage whether Plaintiffs could actually prevail. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981, 983 n.8 (9th Cir. 2011). Nevertheless, the court must conduct a "rigorous analysis" of the Rule 23 factors. *Id.* at 980. Because the merits of the claims are

"intimately involved" with many class certification questions, the court's rigorous Rule 23 analysis must overlap with merits issues to some extent. *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

**III. DISCUSSION**

**A. The Exchange Act Claims**

Defendant argues that AIPTF has not satisfied the typicality requirement under Rule 23(a). To satisfy the typicality requirement, "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class. Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought. The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (internal citations and quotations omitted).

Defendant argues that Plaintiffs cannot satisfy the typicality requirement with respect to the American Securities Purchasers' Exchange Act claims, because, unlike the members of the proposed class, AIPTF did not acquire "Toshiba securities" in the United States. (*See* Opp. at 4.)[4] As the Supreme Court articulated in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), to state a fraud claim under the Exchange Act, fraudulent statements or omissions must be made in connection with the purchase or sale of (i) "a security listed on an American stock exchange" or (ii) "the purchase or sale of any other

---

[4] The typicality issue only applies to AIPTF, the named plaintiff for the American Securities Purchasers' Exchange Act claims. NITPFF, as well as the 6502 Purchasers, seek relief solely under the JFIEA.

security in the United States." *Id.* at 273. Given that unsponsored ADRs trade on the OTC market, and not on a domestic exchange, the "domestic transaction" inquiry is critical to Plaintiffs' assertion that AIPTF's Exchange Act claims are typical of the American Securities Purchasers' claims. *See Stoyas v. Toshiba Corp.*, 896 F.3d 933, 945 (9th Cir. 2018) ("The over-the-counter market on which Toshiba ADRs trade is simply not an 'exchange' under the Exchange Act."). Defendant argues, however, that AIPTF acquired its Toshiba shares as 6502 common stock in Japan, and thus the relevant purchase was a foreign transaction outside the purview of the Exchange Act. (Opp. at 4; Supp. Opp. at 12.)

The Ninth Circuit in *Stoyas* previously addressed the domesticity issue in this case on appeal from Defendant's first motion to dismiss. 896 F.3d at 947-50. Applying the "irrevocability test" originally set forth in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012), the court examined whether Plaintiffs alleged sufficient facts to support an inference that AIPTF purchased the unsponsored ADRs in a domestic transaction. *Id.* at 948-49. The test focuses squarely on "*where* [the] purchaser incurred irrevocable liability to take and pay for the securities." 896 F.3d at 948-49 (italics added); *see also id.* ("The point at which the parties become irrevocably bound . . . can be used to determine the locus of a securities purchase or sale."). In the classic contractual sense, "irrevocable liability" attaches once the transaction is fully executed and the parties have committed to perform their obligations under the agreement. *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (citation and quotation marks omitted); *c.f. Gray v. Fedex Corporate Servs., Inc.*, No. CV 14-9131 DMG (JEMx), 2016 WL 5920127, at *17 (C.D. Cal. Feb. 29, 2016). Thus, the question before this Court is whether AIPTF incurred irrevocable liability to take and pay for the ADRs in the United States or in Japan.

Plaintiffs argue that AIPTF incurred irrevocable liability in the United States, and thus acquired the ADRs in a domestic transaction, "when Barclays executed its ADR order." (Supp. Opening Br. at 10.) Specifically, Plaintiffs contend that AIPTF could no

longer cancel the transaction when Clearbridge agreed to the terms of the buy order—namely, the foreign conversion rate, commission equivalent, and price of the ADRs. (*See* Dkt. 114-12, Ex. K at BARC_000088; Reply at 5-6.) According to Plaintiffs' summation of the evidence, on March 20, 2015, ClearBridge's trader placed a market order[5] for 71,000 Toshiba ADRs (36,000 of which were for AIPTF) with ClearBridge's broker, Barclays. (Reply at 6:5-8; *see* Dkt. 114-8, Ex. G.) On March 23, 2015, "Barclays' employees in New York contacted the ClearBridge trader (also in New York), who placed the order to notify her of the price for the ADRs and ask[ed] if she agreed. ClearBridge's trader agreed, at which point there was 'no other information that Barclays would need in order to execute on the trade of the ADRs.'" (Supp. Br. at 11:16-20; *see also* Dkt. 114-12, Ex. K at BARC_000088.) Plaintiffs contend that "final execution" of the ADR trade "occurred on Monday, the 23rd, at which point ClearBridge could no longer cancel the order.'" (Supp. Br. at 12:6-11; *see* Dkt. 128-3 at 72:15-22.) Moreover, Plaintiffs contend that because all communications between Barclays and Clearbridge took place in New York, AIPTF incurred irrevocable liability in the United States. (Supp. Br. at 12:13-18.)

Plaintiffs' approach ascribes little importance to the first step in the ADR conversion process: the purchase of Toshiba common stock. Plaintiffs' argument glosses over the fact that AIPTF's ability to acquire ADRs was contingent upon the purchase of underlying shares of common stock that could be converted into ADRs. The evidence indicates that Barclays traders in New York and Japan executed the purchase of common stock for conversion, on behalf of their client, ClearBridge (i.e., AIPTF). (*See* Dkt. 114-14, Ex. M.) At the time the ClearBridge trader confirmed that she approved of the price, foreign exchange rate, and commission, Barclays traders in New York and Japan had

---

[5] "A market order is an order to buy or sell a stock at the best available price. Generally, this type of order will be executed immediately." Sec. & Exch. Comm'n, Office of Inv'r Education and Advocacy, "Investor Bulletin: Understanding Order Types" (July 12, 2017).

already executed the purchase of common stock "[f]or ADR settlement" on behalf of ClearBridge.[6] (*Id.*; *see also* Dkt. 114-12, Ex. K at BARC_000088.)

Once Barclays fully executed the purchase of common stock on the Tokyo Stock Exchange, AIPTF was bound to take and pay for the ADRs, once converted. (*See* Dkt. 128-3, Ex. 2 at 72:15-22; Dkt. 114-14, Ex. M.) As Defendant notes, "if [AIPTF] for any reason had elected to *cancel* the ADR order before Barclays obtained the [ ] common stock in Japan needed to create the ADRs, then AIPTF could *not* have been liable 'to take and pay for' non-existent ADRs." (Supp. Opp. at 10:1-4.) The moment Barclays completed the transaction for Toshiba common stock on the Tokyo Stock Exchange, however, AIPTF became logically and legally bound to perform its contractual obligations. *See Stackhouse v. Toyota Motor Co.*, No. CV 10-0922 DSF (AJWx), 2010 WL 3377409 at * 1 (C.D. Cal. July 16, 2016) ("Because the actual transaction takes place on the foreign exchange, the purchaser or seller has figuratively traveled to that foreign exchange—presumably via a foreign broker—to complete the transaction.").

Plaintiff attempts to refute this logic by arguing that Barclays was not acting on ClearBridge's behalf when it acquired the underlying common stock, but instead as a "riskless principal." (*See* Reply at 8; Supp. Br. at 15.) A broker-dealer acts in a "riskless principal" capacity when he or she purchases securities in the marketplace for purposes of selling them back to another purchaser as a counterparty[7], at the same price. Sec. & Exch. Comm'n, Office of Inv'r Education and Advocacy, "Investor Bulletin: How to Read

---

[6] The deposition testimony of the ClearBridge trader indicates that Barclays was not required to communicate the details of the trade to ClearBridge, thus suggesting that Barclays did not need Clearbridge's permission to execute the purchase of ordinary shares in Japan. (*See* Dkt. 128-3, Ex. 2 at 39:6-9.) The ClearBridge trader testified that Barclays communicated the details of the trade to ClearBridge "as a courtesy[.]" (*Id.* at 39:13-21.)

[7] A "counterparty" is the person or entity on the opposite side of a financial transaction. A counterparty may be the person or entity purchasing or selling the stock.

Confirmation Statements" at 1-2 (Sept. 2012). To Plaintiff, this means that Barclays acquired the 71,000 ADRs (and underlying common stock) for Barclay's own account, as a principal and counterparty, and thereafter sold the ADRs to AIPTF in a separate transaction. (*See* Reply at 8.) Thus, to Plaintiff, because Barclays was not acting as either Clearbridge's or AIPTF's agent at the time it acquired the underlying common stock or ADRs, liability could not have attached until the ADRs were sold in the separate transaction, post-conversion. (*Id.* at 9.) Plaintiffs' argument is unavailing. Contrary to Plaintiffs' position, a common understanding in the financial world is that a "riskless principal" transaction may substantively function as an agency transaction. *See, e.g.*, Joseph I. Goldstein & L. Delane Cox, *Penny Stock Markups and Markdowns*, 85 Nw. U.L. Rev. 676, 684 (1990) ("If the brokerage firm receives the customer's order prior to purchasing the security from a dealer, then the transaction is called a 'riskless principal' transaction because the firm does not incur any risks of ownership, such as price fluctuations or liquidity problems. Thus, even though the firm is acting as a principal in the transaction, its function is analogous to that of an agent.").[8] Indeed, when a broker acts in a "riskless principal" capacity, the broker-dealer enters the marketplace already knowing that when it purchases the security, "it can sell it to [the purchaser] at a certain price." Sec. & Exch. Comm'n, Office of Inv'r Education and Advocacy, "Investor Bulletin: How to Read Confirmation Statements" at 1-2 (Sept. 2012). Therefore, it logically follows that a purchaser may become legally bound to purchase the securities

---

[8] *C.f.* Pamela E F. LeCren, Advisory Opinion, FDIC Law, Regulations, Related Acts, "Subsidiary Requirements for Broker-Dealer Subsidiary Engaged in Riskless Principal Transactions in U.S. Government Securities, Municipal Bonds and Revenue Bons" (Mar. 28, 1988) ("The Securities and Exchange Commission has characterized riskless principal transactions as being in many respects equivalent to transactions effected on an agency basis and further has said such transactions are, in economic substance, agency transactions.").

once the broker fully executes the customer's order, regardless of whether the broker acts as a riskless principal or agent.

In this case, the fact that Barclays acted in a "riskless principal" capacity only further supports the proposition that AIPTF incurred liability in Japan. The evidence indicates that Barclays executed the purchase of ordinary stock in Japan on behalf of its client, ClearBridge. (*See* Dkt. 114-14, Ex. M.) Barclays did not assume any risk of loss for purchasing the underlying shares because it already knew that ClearBridge would purchase the converted ADRs at market price. Because ClearBridge was ready and willing to purchase the ADRs, it was bound to complete the ADR trade, beginning with the trade of underlying Toshiba common stock. Thus, the triggering event that caused ClearBridge (and by extension, AIPTF) to incur irrevocable liability occurred in Japan when Barclays acquired the shares of Toshiba common stock on the Tokyo Stock Exchange. [9]

For these reasons, the court concludes that AIPTF purchased the ADRs in a foreign transaction. Because Plaintiffs cannot establish that AIPTF purchased the ADRs

---

[9] As discussed above, the Ninth Circuit in *Stoyas* held that a purchaser of unsponsored ADRs may maintain a cause of action under the Exchange Act so long as the purchaser incurred irrevocable liability in the United States. 896 F.3d at 949. Thereafter, this Court, on remand, found that Plaintiffs had cured the deficiencies in the first amended complaint by pleading facts sufficient to support the inference that AIPTF incurred irrevocable liability in the United States with respect to the ADR transaction. *Stoyas v. Toshiba*, 424 F. Supp. 3d 821, 827 (C.D. Cal. 2020). Moreover, the court observed there were no allegations that AIPTF first purchased the underlying shares of Toshiba common stock in a foreign transaction prior to conversion into ADRs. *Id.* at 826. Although *Stoyas* appears to provide for the possibility that a purchaser might acquire unsponsored ADRs in a domestic transaction, the undisputed evidence here demonstrates that the underlying shares of Toshiba common stock were purchased in Japan, on the Tokyo Stock Exchange, prior to conversion. Notably, moreover, Plaintiffs have not identified a single case where the purchase or sale of <u>unsponsored</u> ADRs constituted or qualified as a domestic transaction.

in a domestic transaction, Plaintiffs also cannot satisfy the typicality requirement. Accordingly, Plaintiffs' Motion for Class Certification as to their Exchange Act claims is DENIED.

**B. The JFIEA Claims**

Defendant further argues that Plaintiffs have failed to satisfy Rule 23(a)'s typicality and adequacy requirements with respect to their JFIEA claims. First, Defendant argues that neither AIPTF nor NETTIPF has statutory standing under Article 21-2 of the JFEIA, thus extinguishing any legal interest they would have to pursue JFIEA claims on behalf of the 6502 Purchasers. (Opp. at 37:15-18.) Defendant posits that only "direct owners" of Toshiba common stock may pursue claims under the JFIEA statute. (*Id.* at 36:15-19.) Defendant contends that institutional investors such as Plaintiffs are not the "direct owners" of shares acquired on the secondary market (the Tokyo Stock Exchange); rather, they are "beneficial owners" who indirectly acquire an ownership interest in Toshiba securities through their agents/trustees or securities custodians. (*See id.* at 36:18-26.) Thus, by Defendant's logic, only agents/trustees or securities custodians who purchase the foreign securities on the institutional investors' behalf may pursue claims under the JFIEA. (*See id.*; Dkt. 114-25; Iida Decl. ¶ 3.)

Defendant also posits that Plaintiffs are not direct owners of Toshiba common stock because they are not listed as registered shareholders within Toshiba's Book-entry Transfer Institution in Japan. (*See* Opp. at 36:26-37:1; Dkts. 114-27, 114-28.) According to Defendant, "[d]irect owners of shares of listed companies [e.g., Defendant] are only those persons who have 'received a record of an increase in shares of the Company in his/her book-entry account registry' held by a 'Book-entry Transfer Institution' in Japan." (*Id.*) In other words, to be treated as the direct owner of shares, the owner must maintain a book-entry account and consent to a recorded increase of shares to effectuate the transfer of shares from the listed company's account to the direct owner's account. (*See* Dkt. 114-25, Iida Decl. ¶ 4.) Per Defendant's logic, only Plaintiffs' agents or securities custodians,

as "direct owners" of the shares, could be named on the account. (*See id.*) ("Even though the book-entry account is under the name of a trustee on behalf of a beneficiary, the trustee owns the shares, and under Japanese Corporate Law the trustee who is named on the book-entry account will be treated as the share owner.").

Plaintiffs do not dispute that they are beneficial owners of Toshiba common stock. Instead, they contend that claimants under JFIEA are those who have "sustain[ed] losses' . . . without reference to whether the shares were nominally held via a broker or other financial institution." (Reply at 38:7-10 (inner quotation marks and citations omitted).) Further, Plaintiffs do not dispute that Toshiba's securities trade via Japan's book-transfer system; instead, they disagree with Defendant's position that beneficial owners must be named on Toshiba's shareholder registry to pursue claims under the JFIEA. (*Id.* at 38:2-39:5.) According to Plaintiffs, other individual investors "are pursuing litigation in Japan against Toshiba" and "have been awarded damages in other JFIEA matters." (*Id.* at 39:1-5.) Thus, it is Plaintiffs' position that the question of whether Plaintiffs are listed as named shareholders of Toshiba common stock in Toshiba's book-entry transfer institution is irrelevant, because investors "continue to exercise their legal rights as investors and shareholders." (*See* Dkt. 128-12, Pardieck Decl. ¶ 46.)

Next, and in addition to its arguments about Plaintiffs' standing, Defendant argues that Plaintiffs' interests conflict with those of the 6502 Purchasers because Plaintiffs have not set forth all methods for calculating damages under the JFIEA. (Opp. at 37:27-38:4.) According to Plaintiffs, *all* proposed class members' damages can be calculated by one of two methodologies: (1) "the difference between the purchase price and either the sale price or, if the shares were not sold, the market value at the time of suit", or (2) "the difference between the average market value of the shares during the month prior to and the month after the date on which the existence of the false information is disclosed, regardless of the purchase price." (Mot. at 26:9-20.) However, Defendant argues that a third measure of damages is necessary to properly ascertain

class members' damages with respect to their JFIEA claims—the investor's entire acquisition price of the securities. Unlike Plaintiffs' two proposed methodologies, which are based on claims that, but for Defendant's misrepresentation, Plaintiffs would not have purchased the securities at an inflated price, this third measure of damages is based on claims that, but for the misrepresentation, a plaintiff would not or could not have purchased the securities at all. (Opp. at 39:3-4.) Thus, according to Defendant, Plaintiffs "have jettisoned potentially valuable rights of putative class members by excluding this third damages methodology from potential class claims," thereby compromising certain putative class members' interests. (*Id.* at 39:18-22.) In response, Plaintiffs argue that this third method of damages "involve[s] rare situations," and that "Japanese Courts routinely reject plaintiffs' attempts to seek damages due to the acquisition of shares itself." Thus, Plaintiffs dispute whether this methodology is pertinent to the JFIEA claims asserted in this case. (Reply at 40:2-9.)

These potentially dispositive questions of law are more appropriate to a motion for summary judgment rather than a class certification motion. Plaintiffs' Motion is therefore denied, without prejudice, with respect to the JFIEA claims.[10]

///

///

///

///

///

///

///

///

---

[10] The court shall issue a separate order setting a briefing schedule on these issues of law.

**IV. CONCLUSION**

For the reasons stated above, the court DENIES Plaintiffs' Motion for Class Certification regarding the Exchange Act claims. The court further DENIES Plaintiffs' Motion for Class Certification regarding the JFIEA claims, without prejudice.

**IT IS SO ORDERED.**

Dated: January 25, 2022

DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE